Avi Burkwitz, Esq., Cal. Bar No. 217225
aburkwitz@pbbllp.com
Ryan A. Graham, Esq., Cal. Bar No. 310186
rgraham@pbbllp.com
**PETERSON • BRADFORD • BURKWITZ**
100 North First Street, Suite 300
Burbank, California 91502
Tel .... 818.562.5800
Fax ...818.562.5810

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

ASHLEY R. VUZ,

       *Plaintiff*,

    v.

DCSS III, INC., a California corporation doing business as GOSSIP GRILL; DWAYNE WYNNE, an individual; COUNTY OF SAN DIEGO, a political subdivision of the State of California; EMILY CHOW, an individual; CITY OF SAN DIEGO, a municipal corporation; MATTHEW ZADJA, an individual; and DOE NOS. 1 THROUGH 45, individuals,

       *Defendants*.

CASE NO. **'20CV246 JLS AGS**
HON. _____

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

PLAINTIFF ASHLEY R. VUZ alleges the following in support of her action for relief under the Civil Rights Act of 1871, codified at 42 U.S.C. § 1983, and related authorities:

## JURISDICTION/VENUE

1.    The Court has original jurisdiction over this action as it presents a federal question under 42 U.S.C. §§ 1983, 1985; the Court has supplemental jurisdiction to adjudicate claims arising under California law. 28 U.S.C. §§ 1331, 1343(a)(3), 1367(a). Venue is proper in this district under 28 U.S.C. § 1391(b) because the events that give rise to this action occurred within this district and all

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1  defendants reside in this district and state.

## PARTIES

### *Plaintiff Ashley Vuz*

2.     PLAINTIFF ASHLEY R. VUZ ("ASHLEY") is a natural person who resides in Los Angeles County. She is referred to by her first name in this complaint to distinguish her from her mother, nonparty Patricia Vuz ("Patti").

3.     ASHLEY is a transgender woman. As of December 29, 2018, the date on which these events began, ASHLEY's progress in her gender transition was substantial. She began transitioning socially in 2015, coming out as transgender to her parents and friends. She adopted the use of female pronouns and began to introduce herself by a female name, "Ashley." ASHLEY began taking hormones and, later, elected to have several surgeries to feminize her appearance. On October 11, 2016, Judge Mark A. Borenstein of the Los Angeles County Superior Court signed a decree ordering that ASHLEY's gender be changed from male to female and that her name be changed to ASHLEY. Afterward, ASHLEY changed her driver license, passport, and social security card identify herself as female. ASHLEY does not self-identify as male for any purposes.

4.     Applying traditional gender norms, any reasonable person who has observed ASHLEY in the last several years would perceive ASHLEY to be female. As of December 29, 2018, ASHLEY's appearance, clothing, mannerisms, and behavior were feminine in nature—and had been for years.

### *Defendants DCSS III, Incorporated, Dwayne Wynne,*
### *Gossip Does (Nos. 1–15), and associated persons/entities*

5.     DEFENDANT DCSS III, INCORPORATED ("DCSS III, INC." or "DCSS III") is a domestic California corporation that has been registered with the California Secretary of State since August 11, 2009. DCSS III, INC. is engaged in the business of operating restaurants and bars in San Diego that serve the LGBTQ community. GOSSIP GRILL is the fictitious business name of a bar and restaurant

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

**COMPLAINT FOR DAMAGES**

operated by DCSS III, INC., located at 1220 University Ave, San Diego, CA 92103. GOSSIP GRILL actively promotes itself as a space for members of the LGBTQ community, especially women.

6.    DEFENDANT DWAYNE WYNNE ("WYNNE") is a natural person who, as of December 29 and 30, 2018, worked at GOSSIP GRILL. On information and belief, ASHLEY alleges that WYNNE was employed by DCSS III, INC. as of December 2018.

7.    DEFENDANT DOE NO. 1 ("DOE NO. 1" and, collectively with DEFENDANT DOE NOs. 1 through 15, inclusive, "GOSSIP DOES") is a natural person who, as of December 29 and 30, 2018, worked at GOSSIP GRILL. On information and belief, ASHLEY alleges that DOE NO. 1 was employed by DCSS III, INC. as of December 2018. Her name is, at the time of filing, unknown to ASHLEY. She is pictured below.



///
///
///
///

**COMPLAINT FOR DAMAGES**

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8.    DEFENDANT DOE NO. 2 ("DOE NO. 2" and, collectively with DEFENDANT DOE NOs. 1 through 15, inclusive, "GOSSIP DOES") is a natural person who, as of December 29 and 30, 2018, worked at GOSSIP GRILL. On information and belief, ASHLEY alleges that DOE NO. 2 was employed by DCSS III, INC. as of December 2018. His name is, at the time of filing, unknown to ASHLEY. He is pictured below.



9.    DEFENDANT DOE NO. 3 ("DOE NO. 3" and, collectively with DEFENDANT DOE NOs. 1 through 15, inclusive, "GOSSIP DOES") is a natural person who, as of December 29 and 30, 2018, worked at GOSSIP GRILL. On information and belief, ASHLEY alleges that DOE NO. 3 was employed by DCSS III, INC. as of December 2018. His name is, at the time of filing, unknown to ASHLEY. He is pictured below.



10.     DEFENDANT DOE NOs. 4 through 15 ("GOSSIP DOES," collectively with DEFENDANT DOE NOs. 1 through 13, inclusive) are natural persons who, as of December 29 and 30, 2018, worked at GOSSIP GRILL. On information and belief, ASHLEY alleges that all GOSSIP DOES were, as of December 2018, employees of DCSS III, INC. Their names are, at the time of filing, unknown to ASHLEY.

### Defendants City of San Diego, Matthew Zadja,
### City Does (Nos. 16–30), and associated persons/entities

11.     DEFENDANT CITY OF SAN DIEGO ("CITY") is a municipal corporation organized under the laws of California. The SAN DIEGO POLICE DEPARTMENT (SDPD) is an administrative sub-unit of the CITY responsible for the CITY's law enforcement functions, including patrol operations within the CITY's territorial jurisdiction. GOSSIP GRILL is located within the territorial patrol jurisdiction of the SDPD.

12.     DEFENDANT MATTHEW ZADJA ("ZADJA") is a natural person who, as of December 29 and 30, 2018, was employed by CITY as an SDPD police officer.

13.     DEFENDANT DOE NOs. 16 through 30 ("CITY DOES," collectively) are natural persons who, as of December 29 and 30, 2018, were employed by CITY as sworn SDPD peace officers and non-sworn SDPD staff. Their names are, at the time of filing, unknown to ASHLEY.

### Defendants County of San Diego, Emily Chow,
### Doe Nos. 31–45, and associated persons/entities

14.     DEFENDANT COUNTY OF SAN DIEGO ("COUNTY") is a political subdivision of the State of California. The SAN DIEGO COUNTY SHERIFF'S DEPARTMENT ("SHERIFF'S DEPARTMENT") is an administrative sub-unit of the COUNTY responsible for the COUNTY's law enforcement functions.

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

15. The COUNTY operates seven adult detention facilities: San Diego Central Jail (SDCJ); Las Colinas Detention and Reentry Facility (LCDRF); George F. Bailey Detention Facility; Facility 8; South Bay Detention Facility; East Mesa Reentry Facility; and Vista Detention Facility (VDF).

16. DEFENDANT EMILY CHOW is a natural person who, as of December 30, 2018, was employed by COUNTY as a nurse at SDCJ.

17. DEFENDANT DOE NO. 31 ("DOE NO. 31" or, collectively with DEFENDANT DOE NOs. 31 through 45, inclusive, "COUNTY DOES") is a natural person who, as of December 30, 2018, was employed by COUNTY at SDCJ as a Detention Processing Technician. DOE NO. 31 was responsible for processing inmates, such as ASHLEY, during the booking and intake process. At the time of filing, this individual's name remains unknown to ASHLEY.

18. DEFENDANT DOE NO. 32 and DEFENDANT DOE NO. 33 ("DOE NOs. 32 and 33" or, collectively with DEFENDANT DOE NOs. 31 through 45, inclusive, "COUNTY DOES") are natural persons who, as of December 30, 2018, were employed by COUNTY at the SDCJ and were responsible for relocating ASHLEY between cells during her detention. At the time of filing, these individuals' names remain unknown to ASHLEY.

19. DEFENDANT DOE NO. 34  ("DOE NO. 34" or, collectively with DEFENDANT DOE NOs. 31 through 45, inclusive, "COUNTY DOES") is a natural person who, as of December 30, 2018, was employed by COUNTY at SDCJ. DOE NO. 34 was responsible for processing detainees, such as ASHLEY, before being released out of SDCJ. At the time of filing, this individual's name remains unknown to ASHLEY.

20. DEFENDANT DOE NOs. 35 through 45 (when referred to collectively with DEFENDANT DOE NOs. 31 through 34, inclusive, "COUNTY DOES") are natural persons who, as of December 30, 2018, were employed by COUNTY at SDCJ. Their names are, at the time of filing, unknown to ASHLEY.

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1

## PROCEDURAL REQUIREMENTS

2       21.    Consistent with the California Government Claims Act's requirement

3   that California state claims be presented to a public entity within six months,

4   ASHLEY presented claims to COUNTY on June 27, 2019.

5       22.    The COUNTY denied ASHLEY's claim on August 8, 2019.

6   ## COMMON ALLEGATIONS

7   ### *Introductory Concepts Related to Gender*

8       23.    Gender identity, gender expression, sex, and the characteristics that

9   are related to these concepts are explained briefly in order to contextualize the

10   CITY and COUNTY policies later alleged. *Primary sex characteristics* refer to a

11   person's genitalia/reproductive organs; *secondary sex characteristics* are those

12   characteristics that develop as the body matures, such as breast development and

13   facial hair.

14       24.    *Sex* describes the classification as either male or female customarily

15   applied to newborns based on visual observations of primary sex characteristics

16   (*i.e.*, genitalia).[1] *Gender identity* is a person's inward sense of self as male, female,

17   both, or neither. A person's gender identity cannot be changed. *Gender expression*

18   is a person's outward expression of gender. These concepts are critically distinct

19   from sex insofar as gender identity and expression are not controlled by primary

20   sex characteristics (or, for that matter, secondary sex characteristics).

21       25.    A *cisgender* individual is a person whose sex and gender identity are

22   congruent. A *transgender* individual is a person whose sex and gender identity are

23   not congruent. *Gender dysmorphia* is a medical diagnosis related to conflicts

24   between a person's experienced gender and a person's assigned sex.

25       26.    Because the socialization of children has historically been controlled

26   by sex, rather than a person's inward gender identity, many transgender individuals

27   grow up experiencing complications associated with gender dysphoria and spend

28

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

---

[1] Sex is also referred to, alternatively, as "*biological sex*," "*natal sex*," or a person's "*sex assigned at birth*."

1  significant periods of their lives being treated in a manner that is inconsistent with

2  their identity, which causes pain and trauma.

3      27.    Many transgender individuals undergo a *gender transition*—the

4  process by which a person begins to live according to their gender identity. Many

5  transgender individuals do not transition, however, and the nature of any gender

6  transition is a personal decision. Gender transitions often include a social

7  component in which transgender individuals disclose their gender identity to

8  friends and family and change their pronouns. Transitions can also include a

9  medical component in which the individual undergoes surgical and non-surgical

10 procedures to conform body to identity, and a legal transition, in which a person's

11 gender is changed as a matter of law.

12     28.    Not all transgender individuals transition socially, medically, and

13 legally, and the decision to forgo any (or all) of these components does not reflect

14 on the sincerity or legitimacy of the individual's gender identity. Some transgender

15 individuals forgo medical transitions because of surgical risks or health issues;

16 other individuals may delay surgery because of costs; and in some cases, a

17 transgender individual may simply forgo surgical procedures due to preference.

18 For those individuals whose transitions include surgery, deciding which particular

19 surgeries to undergo is a matter of personal choice.

20     29.    Surgically revising a primary sex characteristic (also known as

21 "*gender reassignment surgery*") is generally a more invasive and expensive

22 surgery than revising secondary sex characteristics. According to a 2015 survey by

23 the National Center for Transgender Equality, 49% of respondents desired

24 hormone therapy. It also reported that, among individuals who were assigned a sex

25 of male at birth, only 10% had undergone a vaginoplasty and/or labiaplasty—by

26 contrast, 41% have undergone hair removal or electrolysis.

27     30.    Nevertheless, some people outside the transgender community are

28 fixated on genitalia—such as the CITY, which effectively refuses to acknowledge

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

**COMPLAINT FOR DAMAGES**

1 | any transgender person's identity unless they undergo gender reassignment

2 | surgery.

3 | ***General Allegations of City Policy***

4 |     31.    SDPD policies are set forth in the *San Diego Police Department*

5 | *Policy Manual*. SDPD policies are CITY policies for purpose of municipal

6 | liability. Pursuant to the *SDPD Policy Manual*, members of the SDPD are required

7 | to abide by information contained in various types of directives, including *Training*

8 | *Bulletins*. One such bulletin is Training Bulletin 14-05, dated October 28, 2014,

9 | which is titled "Police Interaction with Transgender Individuals." Section III.C. of

10 | Training Bulletin 14-05 is titled "Arresting and booking procedures involving

11 | transgender individuals." It provides the following:

12 |         a.  That "[a]n individual's lower anatomy or surgical status

13 |            determines which jail facility the individual is booked into; no

14 |            other changes or surgeries apply."

15 |         b.  That, "[f]or purposes of booking, it is necessary to inquire

16 |            about details of an individual's anatomy or surgical status to

17 |            determine the appropriate jail facility."

18 |         c.  That, if COUNTY deputies at a detention facility determine that

19 |            the information provided to a CITY police officer about an

20 |            incoming inmate's gender is incorrect, that the CITY police

21 |            officer "will transport the individual to the appropriate facility."

22 |         d.  That, once a transgender individual is booked into a COUNTY

23 |            jail facility, the CITY police officer must alert the COUNTY

24 |            intake deputy that the individual is transgender or transitioning

25 |     32.    Training Bulletin 14-05 acknowledges that transgender individuals.

26 | "are taking a number of medications as part of their transition" and that "[m]issing

27 | dosage or coming off those medications can be life threatening to the individual."

28 | It expressly requires that SDPD officers must "make every reasonable attempt to

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

recover medications for the individual and take those medications to the jail facility with their personal property." If, however, the officer cannot retrieve medications, "a list of current medications should be gathered and given to the nurse at the jail facility."

33.     The consequences of Training Bulletin 14-05 are unmistakable. By tethering the booking process to a person's "lower anatomy," Training Bulletin 14-05 subordinates individuals' gender to their genitals. By stating that "no other changes or surgeries apply," the policy discounts the transitions of ASHLEY and any other like-minded transgender individual arrested by SDPD as *insufficient*. This policy establishes a test for womanhood that, by design, the overwhelming majority of transgender women will fail. Insisting that a transgender woman undergo gender reassignment surgery in order to be treated as a woman ensures that an entire population of transgender individuals who are uninterested in or unable to undergo such a surgery will have the most fundamental aspect of their personhood erased. A misgendering of this magnitude is made even more traumatic by the setting in which the policy is applied (*i.e.*, when the state leverages its coercive powers of arrest and detention).

### *General Allegations of County Policy*

34.     Within the SHERIFF'S DEPARTMENT, the *Detention Services Bureau* (DSB) is responsible for operating the SHERIFF'S DEPARTMENT's detention facilities. The policies of the SHERIFF'S DEPARTMENT are memorialized in the *Policy and Procedure Manual* (SHERIFF MPP). DSB policies, specifically, are further memorialized in the *Detention Services Bureau—Manual of Policies and Procedures* (DSB-MPP), all of which are the policies of the COUNTY for purposes of municipal liability.

35.     Under DSB-MPP section R.11, the Jail Population Management Unit (JPMU) screens inmates for the purpose of assigning inmates to an appropriate facility. Under the guidelines set forth in DSB-MPP section R.11, only LCDRF

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

and VDF can accommodate females. SDCJ is a male-only facility, and is the primary point of intake for male arrestees/prisoners in San Diego County, while LCRDF is the primary point of intake for females.

36.    SDCJ's policies for admitting and booking inmates are memorialized in Section Q of the DSB-MPP. Pursuant to Section Q.7 (titled "Inmate Processing," dated June 18, 2018), all arrestees must complete the intake process. Subsection (I) of Q.7 provides the following:

> "II. INTAKE SCREENING
>
> The arresting officer (AO) will complete a Booking Intake/Personal Property Inventory (J-15) form and provide it to the Detention Processing Technician (DPT). The DPT will verify the arrest is acceptable based on the established departmental booking acceptance criteria and will create a record in the Jail Information Management System (JIMS).
>
> […]
>
> A. Prior to acceptance into the facility, all incoming inmates shall be evaluated to assess medical or mental health problems. All inmates shall be screened per DSB P&P section M.9. Licensed medical staff shall document the responses in the JIMS triage screen.
>
> B. Once the inmate is determined to be 'fit for jail,' the pre-book process will be completed by the assigned DPT. The accuracy and completeness of the J-15 form will be verified in the AO/transporting officer's presence before the arrest information is entered in the JIMS.
>
> […]
>
> H. After the booking process is complete, the inmate will be taken to the designated holding area to await the classification process. The Jail Population Management Unit (JPMU) will determine the appropriate housing assignments for each inmate."

37.    DSB-MPP section R.13 (dated November 13, 2018) concerns transgender individuals within the COUNTY's detention facilities. Its purpose is to "ensure decisions regarding the searching, housing, programming, and in-custody services such as clothing, commissary, and toiletries are applied in a manner consistent with an inmate's declared gender identity." It further provides that JPMU staff will be consulted to determine individualized housing assignments for all transgender persons in custody to determine the "most suitable housing

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

11

assignment." JPMU staff are to provide transgender individuals with a *Voluntary Gender Identity Statement of Preference Form (J-350)* to document housing preferences and individuals who do not specify a housing preference "will receive housing assignment consistent with their biological sex."

38.    The SHERIFF'S DEPARTMENT's policies concerning medical and healthcare services are memorialized in Section M of the DSB-MPP. Section M.9 states the following: "All inmates to be housed at a detention facility shall be medically screened. This process will be conducted by a R[egistered] N[urse] after the inmate has completed intake processing. The RN will complete a comprehensive assessment of the medical and psychiatric needs of the inmate and record the responses in JIMS." Under the DSB-MPP, the nurse is responsible for clearing inmates as "fit for jail." Arrestees who are *not* fit for jail, as determined by a nurse, are not booked into the facility.

### *The Night(mare) Begins: Gossip Grill*

39.    In December 2018, ASHLEY went to San Diego to visit her mother, Patti, for the winter holidays. On December 29, 2018, ASHLEY went to dinner with her mother and friends. Afterward, a group of four (ASHLEY, Patti, and two friends) went to GOSSIP GRILL.

40.    On December 29, 2018, GOSSIP GRILL was charging a cover of $5.00 per person for entry, which was being collected by a hostess stationed at a small table at the entrance. ASHLEY paid the cover charge for herself, her mother, and her two friends, totaling $20.00. ASHLEY paid in cash (*i.e.*, paper currency). After paying, the group entered the establishment—at approximately 11:30 p.m.

41.    Minutes later, ASHLEY went to use the restroom. She initially waited in a line for the women's restroom, as is her routine practice. But ASHLEY ultimately chose a restroom designated as gender-neutral (for which there was no line).

///

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

42.    A member of the GOSSIP GRILL staff, DOE NO. 1, followed ASHLEY into the gender-neutral restroom. DOE NO. 1 began shouting at ASHLEY, accusing her of being drunk and vomiting in the restroom.

43.    While ASHLEY was at GOSSIP GRILL, she did not vomit, did not consume any alcohol, and did not appear intoxicated.

44.    ASHLEY denied the accusations, and made clear that she—as a transgender individual—had every right to be in the gender-neutral restroom. DOE NO. 1 grabbed ASHLEY's arm and yelled at ASHLEY to leave the restroom. ASHLEY felt scared and threatened. She exited the gender-neutral restroom to re-join her mother and friends.

45.    Around this time, the SDPD received a call for service from GOSSIP DOES to 1220 University Avenue in San Diego (*i.e.*, the address of GOSSIP GRILL) reporting a robbery.

46.    After the incident in the restroom, DOE NO. 1 followed ASHLEY back to her friends and Patti, continuing to verbally harass ASHLEY. DOE NO. 1 repeated that ASHLEY was "cut off" from drinking alcohol and falsely accused ASHLEY of vomiting three times.

47.    ASHLEY was humiliated in front of her mother, her friends, and numerous strangers. ASHLEY felt intimidated, unsafe, and unwelcome, prompting the group to leave the bar—at approximately midnight.

48.    While the group was exiting, ASHLEY asked the hostess for a refund of the $20.00 paid in cover charges because the group was at GOSSIP GRILL for such a brief period and did not derive any use, enjoyment, or other benefit from paying such charges. During this exchange, GOSSIP DOES began to collect around the hostess table, watching and listening. DOE NO. 1 and WYNNE went out to the sidewalk to conspire how to deal with ASHLEY.

49.    The hostess agreed to refund ASHLEY the cover charges. As the hostess was reaching toward her cash box for ASHLEY's refund, GOSSIP DOES

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1   rushed toward ASHLEY and began physically attacking her. During the attack,

2   ASHLEY was held in a headlock by one of either WYNNE or GOSSIP DOES.

3   Although she tried to defend herself, ASHLEY was struck multiple times and

4   suffered a laceration to her arm. At no point was ASHLEY the aggressor in this

5   altercation.

6       50.   After this abuse, ASHLEY, Patti, and their friends began walking

7   away from GOSSIP GRILL and for a few brief moments, GOSSIP DOES relented.

8       51.   The group paused momentarily at the corner of University Avenue

9   and Vermont Street ("the streetcorner") to collect themselves. ASHLEY and her

10  mother intended to return home.

11      52.   DOE NO. 1, DOE NO. 2, and DOE NO. 3, however, had been

12  following the group down University Avenue. As they approached the streetcorner,

13  DOE NO. 1, DOE NO. 2, and DOE NO. 3 began to harass ASHLEY again. They

14  falsely accused ASHLEY of being drunk, yet again.

15      53.   At no point during the exchange on the streetcorner did DOE NO. 1,

16  DOE NO. 2, DOE NO. 3, or any other of the GOSSIP DOES accuse ASHLEY of

17  robbery, burglary, theft, larceny, conversion, or any other property crime—nor did

18  they refer to these crimes by using lay terms. At no point was ASHLEY accused of

19  "stealing," "knocking over," or "taking," for example.

20      54.   Next, DOE NO. 2 suddenly made an aggressive physical advance

21  toward ASHLEY, as if he were going to strike ASHLEY. DOE NO. 2 was not

22  provoked by ASHLEY, and he gave no warning before making this hostile gesture.

23  ASHLEY, who had only escaped the sidewalk brawl minutes earlier, felt terrorized

24  and ran for safety. DOE NO. 2 initially began chasing ASHLEY, but gave up and

25  returned to the streetcorner. DOE NO. 2, enraged, attempted to punch ASHLEY's

26  friends, requiring he be physically restrained.

27      55.   Scared for her life, ASHLEY ran around the Hillcrest neighborhood

28  attempting to find safety. Without ASHLEY to torment, DOE NO. 1, DOE NO. 2,

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1    and DOE NO. 3 returned to GOSSIP GRILL.

2        56.    Throughout the exchange on the streetcorner, ASHLEY's friends

3    requested that DOE NO. 1, DOE NO. 2, and DOE NO. 3 call police to straighten

4    out the situation. They did not know, however, that GOSSIP DOES had already

5    called the police to fabricate a robbery.

6                         ***Arrest by SDPD***

7        57.    Sometime around midnight on December 30, 2018, ZADJA and CITY

8    DOES—in no fewer than *three* marked SDPD patrol vehicles—intercepted

9    ASHLEY approximately one block away from GOSSIP GRILL.

10       58.    ZADJA immediately placed ASHLEY under arrest—handcuffing her

11    and detaining her in the back seat of his patrol vehicle. He did not have a warrant

12    or any other court order authorizing the arrest. At all times, ASHLEY remained

13    pleasant and was compliant with ZADJA's instructions.

14       59.    ZADJA stated, on scene, that he was arresting ASHLEY for felony

15    robbery, which is consistent with SDPD records that refer to California Penal Code

16    sections 211 and 212.5(c) as the basis for the call and ultimate arrest.

17       60.    ZADJA had no probable cause to believe that ASHLEY committed

18    robbery or any other crime at the time of arrest. ZADJA was not present at

19    GOSSIP GRILL during the period that ASHLEY was there (either were any

20    uniformed CITY DOES).

21       61.    The minimal investigation conducted by ZADJA and CITY DOES

22    on-scene did not establish probable cause. ZADJA and CITY DOES refused to

23    independently investigate the charges made by GOSSIP DOES, and stated that

24    they were arresting ASHLEY pursuant to a citizen arrest (even though ZADJA's

25    arrest report states there was no citizen arrest).

26       62.    After ZADJA arrived on the scene, ZADJA met with GOSSIP DOES

27    to investigate the circumstances prompting the call for service. GOSSIP DOES

28    collected at one end of an SDPD patrol car with ZADJA and CITY DOES.

GOSSIP DOES appeared gleeful at ASHLEY's situation.

63.    ZADJA's on-scene investigation did not include any affirmative attempts to obtain information from ASHLEY, her mother, or her friends for the purpose of investigating the circumstances of the evening or for the purpose of corroborating any information received from GOSSIP DOES.

64.    During the arrest, ASHLEY's friends and Patti approached ZADJA and CITY DOES in an attempt to provide information about the situation; ZADJA was not receptive.

65.    At one point, ZADJA asked ASHLEY to stand up, turn her body, and look toward a person in the distance. Based on this information, ASHLEY believes, and thereon alleges, that ZADJA was presenting ASHLEY to one of GOSSIP DOES for the purpose of assessing a positive identification that ASHLEY was the person reported to law enforcement in the original call for service.

66.    During the course of the arrest, ZADJA and CITY DOES learned that ASHLEY is transgender. However, in the SDPD arrest report, ZADJA recorded ASHLEY's sex as female.

### Transportation to SDCJ

67.    After arresting ASHLEY, ZAJDA drove her to SDCJ, a men's jail, located at 1173 Front Street, San Diego, California 92101. During this car ride, ZADJA learned that ASHLEY had not undergone gender reassignment surgery.

68.    Upon learning that she was being transported to a men's jail, ASHLEY was mortified and feared for her life.

69.    ZADJA informed ASHLEY that he was transporting her to a men's jail because of her genitalia, and that this was required per policy.

70.    ASHLEY takes prescription medication as part of her gender transition. At no point during her ordeal were her medications provided to her by ZADJA, any COUNTY employee, or any CITY employee.

///

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

***Booking at SDCJ***

71.     At some point in the early morning hours of December 30, 2018, ASHLEY was booked into SDCJ for second degree felony robbery with a bail amount set at $50,000.

72.     Following DSB-MPP section Q.7, ZAJDA completed a form J-15 and provided it to DOE NO. 31, the DPT who was responsible for intake at SDCJ. The form states ASHLEY's sex as "male"—even though ZADJA documented ASHLEY's sex as "female" in SDPD records. DOE NO. 31, following COUNTY policy, verified that ASHLEY's arrest was acceptable based on the established departmental booking acceptance criteria. During the booking process, DOE NO. 31 also verified the accuracy and completeness of ZADJA's form J-15.

73.     At no point was ASHLEY provided with a Form J-350.

74.     Following DSB-MPP section M.9, ASHLEY was subjected to a medical screening by CHOW during the SDCJ booking process. During the screening, ASHLEY informed CHOW that she (ASHLEY) is transgender. In the psychiatric portion of CHOW's intake report, she documented that ASHLEY identifies as a male-to-female transgender individual. In the report, CHOW confirmed that—in her view—ASHLEY was fit for jail. The biographical portion of CHOW's report states "Sex: M."

75.     Critically, maintaining ASHLEY's gender identity requires that she take certain medications. ASHLEY disclosed this fact to CHOW. Despite this, neither CHOW nor any other member of the SDCJ staff provided ASHLEY with her medicine.

76.     At some point during the booking process, ASHLEY was instructed by COUNTY DOES to remove her footwear (shoes) for safety concerns. But her shoes were not confiscated. ASHLEY was allowed to keep her shoes nearby, but was prohibited from wearing them. She was not given any replacement footwear. Consequently, she remained barefoot during her detention at SDCJ.

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1   77.    During the booking process, COUNTY DOES seized $64.00 in cash

2   from ASHLEY. To date, she has not received this money back.

3                    ***Housing Assignment at SDCJ***

4   78.    ASHLEY was not housed with the general population at SDCJ. She

5   was housed by herself in administrative segregation. This isolation caused her

6   angst and anxiety.

7   79.    Initially, ASHLEY was isolated in a cell that did not have an

8   operational telephone. Without access to a telephone, ASHLEY was prevented

9   from contacting her mother or her friends. Patti actually came to SDCJ to learn

10  information about her daughter's arrest. Patti was told by COUNTY DOES that

11  she must be mistaken, given that SDCJ was a men's facility. Only after insisting

12  that ASHLEY was indeed at SDCJ was Patti provided with information about the

13  whereabouts of her daughter. Without a telephone, ASHLEY also had no way of

14  leaving SDCJ. With bail set at $50,000, she needed to contact a bail bondsman in

15  order to be released. While contact information for local bail bondsmen was

16  available at SDCJ, ASHLEY could not contact any of them unless she could dial

17  out of the facility.

18  80.    ASHLEY communicated her desire to use a telephone to COUNTY

19  DOES. In response, two members of the SDCJ staff, DOE NOs. 32 and 33,

20  transferred ASHLEY to a second cell that was covered with *human feces* (still wet)

21  and was infested with flies. The feces were on the walls, seating, and floor of the

22  cell. ASHLEY suffered severe emotional distress from being exposed to feces.

23  81.    Worse, while the second cell had a toilet, there was no clean, un-used

24  toilet paper—although pieces of *used* toilet paper were stuck to the moist feces like

25  papier mâché. The second cell did not include a bed, mattress, sleeping bag, or

26  anything else appropriate for sleeping. It was bad enough that ASHLEY was

27  falsely accused of robbery, taken to a men's jail, and denied her medication—but

28  now she was being placed in a feces-laden jail cell. While ASHLEY's second cell

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1  did indeed have a functioning telephone—which did eventually enable her to

2  secure bail—the use of such telephone was conditioned on ASHLEY suffering

3  exposure to human feces.

4       82.     The volume of human feces restricted ASHLEY's mobility within her

5  cell. Feces covered the walls, seating, and floor of the second cell. ASHLEY

6  remained barefoot on the instruction of COUNTY DOES. Due to the color and

7  texture of the feces, ASHLEY could not easily determine which surfaces within the

8  cell were feces-free. In order to avoid direct exposure to the feces, ASHLEY

9  avoided all unnecessary physical movement.

10       83.     For the occasions ASHLEY could not avoid moving around her cell,

11  she devised a plan. ASHLEY was able to identify which surfaces remained wet

12  with human feces and which were starting to dry by watching the flies that had

13  infested her cell—which would land in the cell's dry patches. Using these insects

14  to navigate around the feces, ASHLEY was only able to move around her cell with

15  considerable effort.

16       84.     At some point, ASHLEY had to use the restroom. She had a single

17  option: the toilet in her cell. But there was no un-used toilet paper.

18       85.     In order to use the restroom, ASHLEY was reduced to harvesting

19  what few visibly unsoiled scraps of toilet paper could be torn away from the

20  streamers of filthy toilet paper hanging around the cell.

21       86.     ASHLEY was able to use the telephone in the second cell to reach a

22  bail bondsman and arrange bail. The costs associated with securing bail were

23  exorbitant, due to the false allegation made against ASHLEY that she committed

24  felony robbery.

25       87.     COUNTY DOES witnessed the conditions under which ASHLEY

26  was being detained. None of them intervened. Instead, they snickered at ASHLEY

27  and her situation.

28       88.     Later in the day (December 30, 2018), ASHLEY was released. Before

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1   that, however, she was escorted from her cell to a waiting area within the jail for

2   final processing. There, a member of the SDCJ staff—DOE NO. 34—was

3   responsible for processing inmates checking out of SDCJ. DOE NO. 34 was aware

4   that ASHLEY was being released and knew ASHLEY had paid bail. Knowing this,

5   she went for an extended lunch (1 to 2 hours). When she returned, she laughed at

6   ASHLEY and finally processed her release. ASHLEY is informed and believes

7   that exit processing at SDCJ would require DOE NO. 34 to consult JIMS, which

8   would indicate that ASHLEY is transgender; on such basis, ASHLEY alleges that

9   DOE NO. 34 left her waiting for several hours—extending her detention for

10  several hours—because of ASHLEY's transgender status.

11  *Aftermath: Gossip Grill fabricates evidence to support prosecution*

12       89.    Beginning on December 30, 2018, WYNNE and GOSSIP DOES

13  created several video clips—at least ten—from GOSSIP GRILL's security camera

14  system. These cameras record various locations around the establishment,

15  including the location at the entrance where ASHLEY was attacked.

16       90.    GOSSIP GRILL's security system includes a playback feature, in

17  which the recorded security footage can be viewed on a monitor.

18       91.    WYNNE and GOSSIP DOES did not create these clips directly from

19  the system's native files. They used the video recording feature on a mobile

20  telephone to record the security system's monitor playing back portions of the

21  footage. In other words, they made a video of a video.

22       92.    While creating these video clips, WYNNE and GOSSIP DOES

23  removed excerpts from the native files on at least two occasions. In one video clip,

24  the footage's timestamp jumps from 11:48:10 p.m. to 11:48:20 p.m.—skipping 10

25  seconds. In a second clip, the timestamp jumps from 23:48:59 to 23:49:17—

26  skipping 18 seconds. The metadata for the second clip indicates it was created at

27  2:44 a.m. on December 30, 2018 using an Android device.

28       93.    By using a mobile device to record the video clips, rather than

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1    creating clips from the raw, native footage, WYNNE and GOSSIP DOES were

2    able to reduce the quality of video clips. This reduction in video quality makes it

3    difficult to notice that WYNNE and GOSSIP DOES edited the footage.

4         94.    The edits made by WYNNE and GOSSIP DOES give the false

5    impression that ASHLEY was the aggressor in the attack at GOSSIP GRILL.

6         95.    The video clips were provided to the relevant prosecuting authorities

7    for purposes of being used against ASHLEY in a criminal court proceeding.

8         96.    ASHLEY was never charged or convicted with any crime in

9    connection with these events. The San Diego County District Attorney's office

10   declined to prosecute ASHLEY for felony robbery. The CITY's Office of the City

11   Attorney considered whether to prosecute ASHLEY for a misdemeanor, but also

12   declined to prosecute ASHLEY.

13                              **DAMAGES**

14        97.    As a result of the conduct of DCSS III, INC., GOSSIP DOES,

15   WYNNE, COUNTY, CHOW, COUNTY DOES, CITY, ZADJA, and CITY

16   DOES, ASHLEY has suffered physical injuries and emotional distress. ASHLEY

17   was intimidated, harassed, embarrassed, and beaten by GOSSIP DOES. She was

18   repeatedly misgendered during her detention at SDCJ. ASHLEY was forced to pay

19   an exorbitant bond to secure bail because of the false allegations against her. She

20   was not given back the $64.00 seized as part of her arrest. After ASHLEY left

21   SDCJ, she began to feel physically sick. ASHLEY was diagnosed with influenza

22   by a physician. On the orders of the physician, ASHLEY was unable to travel for a

23   week. (As a separate injury, ASHLEY's freedom to travel was also restricted due

24   to ASHLEY's bail arrangement.) ASHLEY was forced to take medication for her

25   influenza. Due to the conditions under which she was detained and the Hepatitis

26   outbreak in San Diego, ASHLEY had to receive a Hepatitis A vaccine. ASHLEY

27   has also suffered emotional injuries. Since the events of December 29 and 30,

28   2018, ASHLEY has experienced sadness, apathy, anxious feelings, and recurrent

1  nightmares. For almost a year, ASHLEY was emotionally unable to travel to San

2  Diego to visit her mother. ASHLEY grows fearful whenever she sees law

3  enforcement, concerned she will be arrested, taken to a men's jail, isolated in

4  administrative segregation, and thrown back into a feces cell—which are all highly

5  probable, even today, given the policies of the CITY and COUNTY. ASHLEY

6  gets nervous when selecting a restroom. ASHLEY suffers from mental distress

7  because of the way she was treated at GOSSIP GRILL, during her arrest, and

8  during her detention—and has been diagnosed with Post Traumatic Stress Disorder

9  (PTSD).

10      98.    These events have also aggravated the gender dysphoria associated

11  with ASHLEY's transgender identity. The impact of these events on ASHLEY, as

12  a transgender individual, is especially severe—and so is the psychological damage.

13  At birth, ASHLEY was assigned the sex of male and treated as a male for much of

14  her life, even though she identifies as female. Over the years, as part of ASHLEY's

15  gender transition, ASHLEY has made numerous affirmative steps to ensure she

16  would be treated as a female—legally and socially. Treating ASHLEY as male has

17  the effect of undoing much of the progress she has made in her gender transition,

18  aggravating ASHLEY's gender dysmorphia.

19      99.    As a result of these events, ASHLEY has paid medical expenses and

20  other costs. The $64.00 in paper currency seized from ASHLEY during the

21  booking process has never been returned. ASHLEY's shoes were damaged during

22  her stay at SDCJ, requiring repairs by a cobbler. She was forced to pay a bail

23  bondsman and retain a criminal defense attorney.

24      100.   ASHLEY seeks an award of exemplary (punitive) damages pursuant

25  to California Civil Code section 3294, and any state or federal laws authorizing the

26  award of punitive damages, to make an example of and punish DCSS III, INC.,

27  WYNNE, ZADJA, CITY DOES, CHOW, and COUNTY DOES in the hope of

28  deterring future conduct of a similar nature.

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

# FIRST CLAIM FOR RELIEF—42 U.S.C. § 1983
## (4TH AMENDMENT, SEIZURE)

### Count 1: Public Defendants
### (against Defendants ZADJA, CITY DOES)

101.   The Fourth Amendment prohibits searches and arrests without probable cause and is actionable under 42 U.S.C. § 1983. ZADJA violated ASHLEY's Fourth Amendment right to be free from unreasonable seizures by arresting ASHLEY without probable cause to believe that she committed any offense.

102.   ASHLEY incorporates ¶¶ 1–96, by reference, as if fully set forth herein.

103.   At some point in the early morning hours of December 30, 2018, ZAJDA arrested ASHLEY for alleged felony robbery, without a warrant, in his capacity as an SDPD officer.

104.   Specifically incorporating ¶¶ 57–66, ZADJA and CITY DOES lacked probable cause to arrest ASHLEY for felony robbery or any other offense. A prudent law enforcement officer would not believe that ASHLEY committed felony robbery or any other crime based on the facts and circumstances known to ZADJA. ASHLEY further alleges that her wounds, which were visible, would cause a reasonable officer to conduct a more comprehensive investigation than ZADJA's and CITY DOES' investigation. At the time of arrest, ASHLEY was bleeding.

105.   Specifically incorporating ¶ 96, both the District Attorney and the City Attorney declined to prosecute ASHLEY.

106.   As a direct and proximate consequence of ZADJA's conduct, ASHLEY was injured physically and emotionally

107.   ASHLEY incorporates herein the damages allegations of ¶¶ 97–99, as they relate to this claim. ASHLEY incorporates herein the punitive damages

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

allegations of ¶ 100, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

### *Count 2: Private Defendants*

### *(against Defendants WYNNE, GOSSIP DOES)*

108.   ASHLEY incorporates ¶¶ 1–96, by reference, as if fully set forth herein.

109.   WYNNE and GOSSIP DOES, as private individuals, are liable for their conduct in exercising control over the decision-making in ZADJA's and CITY DOES' investigation and arrest of ASHLEY.

110.   On December 29 and 30, 2018, WYNNE and GOSSIP DOES exercised control over the SDPD investigation. These private individuals called the SDPD to GOSSIP GRILL for purposes of having ASHLEY arrested and prosecuted for felony robbery. In support of that purpose, they made false accusations that ASHLEY had robbed GOSSIP GRILL. On-scene, ZADJA stated that he was arresting ASHLEY pursuant to a citizen arrest as the behest of GOSSIP DOES.

111.   As a direct and proximate consequence of the actions of WYNNE and GOSSIP GOES, ASHLEY was injured physically and emotionally.

112.   ASHLEY incorporates herein the damages allegations of ¶¶ 97–99, as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 100, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

### SECOND CLAIM FOR RELIEF—42 U.S.C. § 1983

### (14TH AMENDMENT, EQUAL PROTECTION)

113.   The Equal Protection Clause guarantees equality of treatment of those persons who are similarly situated and is actionable under 42 U.S.C. § 1983.

114.   ASHLEY's gender is female. While ASHLEY does not self-identify as male, she was classified as male during her arrest and booking.

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

*Count 1: City Booking Procedures*
*(against Defendants ZADJA, CITY)*

115.   ASHLEY incorporates ¶¶ 1–96, 113, and 114, by reference, as if fully set forth herein.

116.   ZADJA, while acting under color of law, deprived ASHLEY of her civil rights under the Equal Protection Clause when he discriminated against ASHLEY on the basis of her sex, gender, and transgender status by, among other things, transporting ASHLEY to SDCJ for booking based solely on her primary sex characteristics.

117.   The CITY is liable, under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978), because the affirmative policies enshrined in Training Bulletin 14-05 were the moving force behind ZADJA's conduct and the resulting injuries to ASHLEY.

118.   The actions of ZADJA and CITY treated ASHLEY differently than other female, cisgender arrestees similarly situated on the basis of her status as a transgender individual. The actions of ZADJA and CITY also treated ASHLEY differently than similarly-situated individuals on the basis of gender (female) and sex (perceived to be male).

119.   ZADJA transported ASHLEY to SDCJ for booking based on ASHLEY's status as a transgender individual. Pursuant to Training Bulletin 14-05, cisgender females are transported to LRCDF.

120.   ZADJA's conduct was motivated by his stated adherence to CITY policy, which was the moving force behind ZADJA's conduct.

121.   ZADJA's and CITY's conduct does not satisfy the requisite level of scrutiny.

122.   As a result of ZADJA's conduct in transporting ASHLEY to SDCJ and the events that resulted, ASHLEY was injured physically and emotionally.

123.   ASHLEY incorporates herein the damages allegations of ¶¶ 97–99, as

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

**COMPLAINT FOR DAMAGES**

they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 100, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

### *Count 2: County Booking Procedures*
### *(against Defendants DOE NO. 31, CHOW)*

124.   ASHLEY incorporates ¶¶ 1–96, 113, and 114, by reference, as if fully set forth herein.

125.   DOE NO. 31, while acting under color of law, deprived ASHLEY of her civil rights under the Equal Protection Clause when DOE NO. 1 discriminated against ASHLEY on the bases of her sex, gender, and transgender status by, among other things, accepting ASHLEY (a woman) for booking into SDCJ (a men's jail). DOE NO. 31's actions set in motion a series of acts by CHOW and DOE NOs. 32, 33, and 34, as well as COUNTY DOES, which DOE NO. 31 knew or reasonably should have known would cause others to inflict further injuries.

126.   By accepting ASHLEY for booking into SDCJ, DOE NO. 31 treated ASHLEY differently than other cisgender, female arrestees similarly situated.

127.   CHOW, while acting under color of law, deprived ASHLEY of her civil rights under the Equal Protection Clause when CHOW discriminated against ASHLEY on the bases of her sex, gender, and transgender status by, among other things, finding that ASHLEY (a woman) was fit for jail at SDCJ (a men's jail). CHOW's actions set in motion a series of acts by DOE NOs. 32, 33, and 34, as well as COUNTY DOES, which CHOW knew or reasonably should have known would cause others to inflict further injuries.

128.   By finding that ASHLEY was fit for jail at SDCJ, CHOW treated ASHLEY differently than other cisgender, female arrestees similarly situated.

129.   CHOW's and DOE NO. 31's conduct does not satisfy the requisite level of scrutiny.

130.   As a result of CHOW's contributions to the process of accepting

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

ASHLEY into SDCJ, ASHLEY was injured physically and emotionally.

131. ASHLEY incorporates herein the damages allegations of ¶¶ 97–99, as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 100, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

***Count 3: Housing Assignment***

***(against Defendants COUNTY DOES, COUNTY)***

132. ASHLEY incorporates ¶¶ 1–96, 113, and 114, by reference, as if fully set forth herein.

133. COUNTY DOES, inclusive of DOE NOs. 32, 33 and 34, while acting under color of law, deprived ASHLEY of her civil rights under the Equal Protection Clause when they discriminated against ASHLEY on the bases of her sex, gender, and transgender status by, among other things, the following actions and omissions:

a. Taking ASHLEY to a holding area to be classified after the booking process was complete and proceeding to classify ASHLEY in such a manner that she was placed in administrative segregation solely on the basis of being transgender, pursuant to DSB-MPP section Q.7;
b. Placing ASHLEY in a cell without a working telephone;
c. Re-locating ASHLEY to a cell covered in human excrement;
d. Laughing at ASHLEY during the release process and going to lunch, prolonging ASHLEY's detention; and
e. Failing to provide ASHLEY with a J-350.

134. By engaging in the conduct identified in ¶ 133, COUNTY DOES treated ASHLEY differently than other female arrestees similarly situated.

135. For purposes of municipal liability against COUNTY, ASHLEY alleges that Sections R, Q, and M of the DSB-MPP were the moving force behind

the conduct alleged in ¶ 133. In failing to provide ASHLEY with a J-350, COUNTY DOES were deliberately indifferent to the obvious risks of housing a transgender woman at SDCJ. Under DSB-MPP section R.13, the failure to specify a housing assignment on a J-350—which obviously cannot be accomplished if one is not actually provided with such a form—will automatically result in a housing assignment based on sex.

136.   As a result of the conduct identified in ¶ 133, ASHLEY was injured physically and emotionally.

137.   ASHLEY incorporates herein the damages allegations of ¶¶ 97–99, as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 100, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

## THIRD CLAIM FOR RELIEF—42 U.S.C. § 1983
## (14TH AMENDMENT, SUBSTANTIVE DUE PROCESS)
### (against Defendants COUNTY, CHOW, COUNTY DOES, CITY, ZADJA, CITY DOES)

138.   The substantive protections of the Fourteenth Amendment's Due Process Clause guarantee that detained individuals, who have not yet been convicted, will not be kept in conditions that amount to punishment. ASHLEY is entitled to the protections of the Fourteenth Amendment, rather than the Eighth Amendment, because she has never been prosecuted, let alone convicted, for any of the events described in this complaint and was not serving a sentence when she was detained at SDCJ.

139.   ASHLEY incorporates ¶¶ 1–96, by reference, as if fully set forth herein.

140.   ASHLEY challenges the following affirmative acts and omissions of COUNTY and COUNTY DOES as constituting punishment in violation of the substantive protections of the Due Process Clause:

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

a. Affirmatively placing ASHLEY in administrative segregation without any legitimate security need, and based only on her status as a transgender individual;

b. Affirmatively placing ASHLEY in a housing unit without a functioning telephone;

c. Affirmatively placing ASHLEY in a housing unit with human feces;

d. Affirmatively instructing ASHLEY to remove her shoes and refusing to provide replacement footwear;

e. Failing to provide ASHLEY with clean toilet paper (the non-provision of toilet paper amounts to a non-provision of a toilet);

f. Failing to provide ASHLEY with a bed, mattress, or similar sleeping mechanism; and

g. Failing to provide ASHLEY with transition-related medication required to maintain her gender identity.

141. DOE NO. 31 and CHOW, by accepting ASHLEY for booking and finding her fit for jail, set in motion the acts and omissions alleged in ¶ 140.

142. ZADJA's affirmative act of transporting ASHLEY to SDCJ for booking set in motion the acts and omissions alleged in ¶ 140.

143. For purposes of municipal liability against COUNTY, ASHLEY alleges that Sections R, Q, and M of the DSB-MPP were the moving force behind the conduct alleged in ¶¶ 140 and 141.

144. For purposes of municipal liability against CITY, ASHLEY alleges that Training Bulletin 14-05 was the moving force behind the conduct alleged in ¶¶ 140 and 142.

145. As it concerns the omissions described in ¶ 140, COUNTY and COUNTY DOES were deliberately indifferent to the known, obvious risks associated with such omissions.

a. Refusing to provide footwear to a detainee housed in a feces cell has obvious consequences on that detainee's physical and mental wellbeing. During this period, the San Diego region was suffering from a catastrophic Hepatitis A outbreak that killed no fewer than 20 people and infected more than 500 others. Even if this threat were not a then-current event, the discomfort associated with excrement is near-universal.

b. Refusing to provide clean, dry bedding to a pretrial detainee in such filthy conditions carries obvious risks to such a detainee's physical and mental health.

c. The risks associated with failing to provide transition-related medication to a transgender individual are also obvious, given the trauma associated with gender dysphoria.

146.   None of the acts or omissions described in ¶ 140 are rationally related to any governmental purpose—let alone a legitimate, nonpunitive one. The goal of correctional facilities, as it concerns *pretrial* detainees, is to ensure that an arrestee actually appears at trial. None of the acts or omission described in ¶ 140 serve such purpose. Moreover, none of acts or omissions challenged by ASHLEY are necessary for managing SDCJ effectively.

147.   The acts and omissions described in ¶ 140 placed ASHLEY at substantial risk of suffering serious harm.

148.   As a result of the conduct identified in ¶ 140, ASHLEY was injured physically and emotionally.

149.   ASHLEY incorporates herein the damages allegations of ¶¶ 97–99, as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 100, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

///

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

**COMPLAINT FOR DAMAGES**

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

**FOURTH CLAIM FOR RELIEF—42 U.S.C. § 1983**
**(1ST AMENDMENT, RETALIATION/EXPRESSION)**
*(against Defendants COUNTY, CHOW, COUNTY DOES,*
*CITY, ZADJA, CITY DOES)*

150.   The Free Speech Clause of the First Amendment, actionable under 42 U.S.C. § 1983, prohibits the government from "abridging the freedom of speech." Expressive conduct is protected as free speech under the First Amendment, which also prohibits retaliation motivated by protected activities.

151.   ASHLEY incorporates ¶¶ 1–96, by reference, as if fully set forth herein.

152.   ASHLEY expresses her gender in a manner that is traditionally female, which is incongruent with her sex assigned at birth. As retaliation for ASHLEY's gender expression, she was forced to endure the following acts and omissions:

   a.  ZADJA's act of transporting ASHLEY to a men's jail;
   b.  Being accepted for booking into SDCJ, an event that resulted from the combined efforts of DOE NO. 1 and CHOW;
   c.  Being placed in administrative segregation for no legitimate purpose;
   d.  Being housed in cells that either lacked a functioning telephone or were covered in human feces;
   e.  Laughing at ASHLEY during the release process and going to lunch for an extended period, prolonging ASHLEY's detention.

153.   As a result of the conduct identified in ¶ 152, ASHLEY was injured physically and emotionally.

154.   For purposes of municipal liability against CITY, ASHLEY alleges that Training Bulletin 14-05 was the moving force behind ZADJA's conduct.

155.   For purposes of municipal liability against COUNTY, ASHLEY

1    alleges that Sections R, Q, and M of the DSB-MPP were the moving force behind

2    the conduct alleged in ¶¶ 152.b, 152.c, 152.d, and 152.e.

3        156.   ASHLEY incorporates herein the damages allegations of ¶¶ 97–99, as

4    they relate to this claim. ASHLEY incorporates herein the punitive damages

5    allegations of ¶ 100, as punitive damages relate to the malicious and reckless

6    conduct alleged in this claim.

7                 **FIFTH CLAIM FOR RELIEF—42 U.S.C. § 1985(3)**

8                                      **(CONSPIRACY)**

9              ***(against Defendants WYNNE, GOSSIP DOES, ZADJA, CITY DOES)***

10       157.   42 U.S.C. § 1985(3) prohibits private conspiracy for the purpose of

11   depriving any person or class of persons of the equal protection of the laws, or of

12   equal privileges and immunities under the laws.

13       158.   ASHLEY incorporates ¶¶ 1–96, by reference, as if fully set forth

14   herein.

15       159.   On December 29 and 30, 2018, WYNNE and GOSSIP DOES

16   conspired with ZADJA and CITY DOES to violate ASHLEY's Fourth

17   Amendment rights to be free from unreasonable seizure.

18       160.   Specifically incorporating ¶¶ 48 and 57–66, ASHLEY alleges that

19   WYNNE, GOSSIP DOES, ZADJA, and CITY DOES came to a meeting of the

20   minds in which they shared the common objective of having ASHLEY arrested.

21       161.   WYNNE, GOSSIP DOES, ZADJA, and CITY DOES were motivated

22   by ASHLEY's sex, gender, and transgender status.

23       162.   As a result of the conspiracy, ASHLEY was injured physically and

24   emotionally.

25       163.   ASHLEY incorporates herein the damages allegations of ¶¶ 97–99, as

26   they relate to this claim. ASHLEY incorporates herein the punitive damages

27   allegations of ¶ 100, as punitive damages relate to the malicious and reckless

28   conduct alleged in this claim.

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

**COMPLAINT FOR DAMAGES**

1
2

## SIXTH CLAIM FOR RELIEF—CAL. GOV. CODE § 815.6

### *(against Defendant COUNTY)*

3     164.   California Government Code section 815.6 provides that "[w]here a

4 public entity is under a mandatory duty imposed by an enactment that is designed

5 to protect against the risk of a particular kind of injury, the public entity is liable

6 for an injury of that kind proximately caused by its failure to discharge the duty

7 unless the public entity establishes that it exercised reasonable diligence to

8 discharge the duty." Enactments include constitutional provisions, statutes, charter

9 provisions, ordinances, and regulations. Cal. Gov. Code § 810.6.

10     165.   ASHLEY incorporates ¶¶ 1–96, by reference, as if fully set forth

11 herein.

12     166.   The California Board of Corrections has established minimum

13 standards for local detention facilities, which are set forth in Title 15, Division 1,

14 Chapter 1, Subchapter 4, sections 1000 through 1282, in the California Code of

15 Regulations ("Title 15"). These regulatory sections create enactments that impose

16 mandatory duties on the entities who run local detention facilities.

17     167.   Section 1270 of Title 15 requires "[t]he standard issue of clean

18 suitable bedding and linens, for each inmate entering a living area who is expected

19 to remain overnight." 15 CCR § 1270. Such bedding includes a mattress, mattress

20 cover or sheet, a towel, and a blanket—and "[a]ny mattress issued to an inmate in

21 any facility shall be enclosed in an easily cleaned, non-absorbent ticking." 15 CCR

22 §§ 1270, 1272. Section 1263 requires that "[t]here shall be a quantity of clothing,

23 bedding, and lined available for actual and replacement needs of the inmate

24 population."

25     168.   Sections 1263, 1270, and 1272 create mandatory duties under which

26 officials at SDCJ had no discretion to deny bedding to ASHLEY.

27     169.   The COUNTY breached its duties under sections 1263, 1270, and

28 1272. While ASHLEY was detained at SDCJ, she was not provided with any

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1  bedding. She was not given any mattress, sheets, towels, blankets, or even a

2  sleeping bag.

3      170.   Sections 1263, 1270, and 1272 were designed to protect against the

4  kind of injuries suffered by ASHLEY.

5      171.   As a result of the conduct identified in ¶ 169, ASHLEY was injured

6  physically and emotionally.

7      172.   ASHLEY incorporates herein the damages allegations of ¶¶ 97–99, as

8  they relate to this claim. ASHLEY incorporates herein the punitive damages

9  allegations of ¶ 100, as punitive damages relate to the malicious and reckless

10  conduct alleged in this claim.

## SEVENTH CLAIM FOR RELIEF—UNRUH ACT

### *(against Defendants DCSS III, INC., WYNNE, GOSSIP DOES)*

13      173.   The Unruh Act guarantees that individuals are entitled to full and

14  equal accommodations, advantages, facilities, privileges, and services in all

15  business establishments no matter their sex. Cal. Civ. Code § 51(b). Sex includes

16  sex, gender, gender identity, gender expression, gender-related appearance, and

17  gender-related behavior—and perceptions about related characteristics. Cal. Civ.

18  Code § 51(e)(5)-(6).

19      174.   ASHLEY was denied full and equal access to accommodations,

20  advantages, facilities, privileges, or services at GOSSIP GRILL on the basis of her

21  sex, as that concept is defined by the Unruh Act.

22      175.   ASHLEY incorporates ¶¶ 1–96, by reference, as if fully set forth

23  herein.

24      176.   GOSSIP GRILL, a bar and restaurant owned by DCSS III, INC., is a

25  "business establishment" for purposes of the Unruh Act.

26      177.   DCSS III, INC., WYNNE, and GOSSIP DOES committed the

27  following discriminatory acts at some point between 11:30 p.m. on December 29,

28  2018 and 12:30 a.m. on December 30, 2018, which denied ASHLEY full and equal

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1    accommodations, advantages, facilities, privileges, or services:

2           a.  In the scope of her employment for DCSS III, INC., DOE NO.

3               1 verbally harassed ASHLEY in the gender-neutral GOSSIP

4               GRILL restroom, physically grabbed ASHLEY's arm, and

5               followed ASHLEY around the GOSSIP GRILL facility

6               verbally harassing her;

7           b.  GOSSIP DOES, while in the scope of their employment for

8               DCSS III, INC., physically attacked ASHLEY as she was

9               attempting to leave GOSSIP GRILL;

10          c.  WYNNE and GOSSIP DOES, while in the scope of their

11              employment with DCSS III, INC. called law enforcement to

12              falsely report that ASHLEY committed robbery;

13          d.  DOE NO. 2, in the scope of his employment for DCSS III,

14              INC., made physically aggressive body motions in the street

15              outside GOSSIP GRILL, placing ASHLEY in fear and causing

16              her to flee; DOE NO. 2 then attempted to pursue ASHLEY,

17              chasing her through the streets of San Diego.

18      178.   At the time of the events described in ¶ 177, DCSS III, INC.,

19  WYNNE, and GOSSIP DOES were aware of ASHLEY's transgender status.

20      179.   The actions described in ¶ 177 were arbitrary and substantially

21  motivated by ASHLEY's transgender status.

22      180.   The actions of DCSS III, INC., WYNNE, and GOSSIP DOES caused

23  ASHLEY to suffer harm, including both physical injuries and emotional injuries.

24      181.   ASHLEY incorporates herein the damages allegations of ¶¶ 97–99, as

25  they relate to this claim. ASHLEY incorporates herein the punitive damages

26  allegations of ¶ 100, as punitive damages relate to the malicious and reckless

27  conduct alleged in this claim.

28  ///

## EIGHTH CLAIM FOR RELIEF—BANE ACT

### *(against Defendants DCSS III, INC., GOSSIP DOES, WYNNE, CHOW, COUNTY DOES)*

182.   The Bane Act, codified at California Government Code section 52.1, prohibits any person from interfering by threats, intimidation, or coercion with the exercise or enjoyment by any individual of rights secured by the Constitution or laws of the United States.

183.   ASHLEY incorporates ¶¶ 1–96, by reference, as if fully set forth herein.

184.   DCSS III, INC. WYNNE, and GOSSIP DOES violated the Bane Act by subjecting ASHLEY to threats and intimidation, thereby interfering with her rights under the Unruh Act. As a result of this conduct, ASHLEY was injured physically and emotionally.

185.   CHOW and COUNTY DOES violated engaged in coercion and intimidation while interfering with ASHLEY's Fourteenth Amendment rights. As a result of this conduct, ASHLEY was injured physically and emotionally.

186.   ASHLEY incorporates herein the damages allegations of ¶¶ 97–99, as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 100, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

## NINTH CLAIM FOR RELIEF—NEGLIGENCE

### *Count 1: Negligent Hiring, Retention, Supervision*
### *(against Defendant DCSS III, INC.)*

187.   ASHLEY incorporates ¶¶ 1–96, by reference, as if fully set forth herein.

188.   DCSS III, INC. owed a duty of care to ASHLEY to use reasonable care while she was a customer at GOSSIP GRILL.

189.   DCSS III, INC. breached its duty of care to ASHLEY by hiring,

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

retaining, and supervising GOSSIP DOES in such a manner as to encourage them to use unprovoked violence and make false accusations to law enforcements to harass ASHLEY.

190.   As to the use of unprovoked violence to harass patrons, the staff at GOSSIP GRILL have a documented history of using physical violence against patrons where there is no legitimate security need justifying such violence.

191.   As to the use of law enforcement to harass patrons, ASHLEY is informed that a member of the GOSSIP GRILL staff previously made statements in May 2017 that, when the members of the staff dislike a patron, they know precisely what actions to take in order to put that patron in a compromising position and be forced to "pay a lot of money," or words to such effect. Aware of this information, ASHLEY believes, and alleges, that there is a well-established custom at GOSSIP GRILL of making calls for service to law enforcement that report either false or exaggerated stories with the specific purpose of forcing patrons to defend themselves in court.

192.   The information alleged in ¶¶ 190 and 191 is either known or well-known to DCSS III, INC. According to publicly-filed documents with the California Secretary of State, the president of DCSS III, INC. is one Monique Girton. ASHLEY is informed that Ms. Girton is regularly present at GOSSIP GRILL—she is not an absent manager. GOSSIP GRILL's reputation for violence is also public knowledge, given the number of reviews online that describe prior incidents of violence by GOSSIP GRILL staff. Aware of such information, ASHLEY believes and alleges that Ms. Girton (at the very minimum) would know of the reputation of GOSSIP GRILL staff.

193.   Despite this knowledge, DCSS III, INC. has persevered in hiring, retaining, and supervising a staff that routinely uses unprovoked violence and law enforcement to harass patrons (such as ASHLEY) for whom the staff have no legitimate reason to harass or expel—breaching the duty of care owed to

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

**COMPLAINT FOR DAMAGES**

1   ASHLEY.

2      194.   As a result of that breach, ASHLEY was injured physically and

3   emotionally.

4      195.   ASHLEY incorporates herein the damages allegations of ¶¶ 97–99, as

5   they relate to this claim. ASHLEY incorporates herein the punitive damages

6   allegations of ¶ 100, as punitive damages relate to the malicious and reckless

7   conduct alleged in this claim.

8      ***Count 2: Negligence Per Se***

9      ***(against Defendants DCSS III, INC., WYNNE, GOSSIP DOES)***

10      196.   ASHLEY incorporates ¶¶ 1–96, by reference, as if fully set forth

11   herein.

12      197.   California Penal Code section 134 provides the following: "Every

13   person guilty of preparing any false or ante-dated book, paper, record, instrument

14   in writing, or other matter or thing, with intent to produce it, or allow it to be

15   produced for any fraudulent or deceitful purpose, as genuine or true, upon any trial,

16   proceeding, or inquiry whatever, authorized by law, is guilty of felony."

17      198.   Beginning on December 30, 2018, WYNNE and GOSSIP DOES

18   created several video clips of the incidents at GOSSIP GRILL. In doing so, they

19   removed excerpts from at least two clips. By doing so, the edited video gives a

20   false impression that ASHLEY was the aggressor in the physical altercation

21   between her and GOSSIP DOES. WYNNE and GOSSIP DOES then submitted

22   these clips to the relevant prosecuting authorities in the hope that ASHLEY would

23   be prosecuted for felony robbery.

24      199.   WYNNE and GOSSIP DOES falsified the video recordings in

25   violation of California Penal Code section 134.

26      200.   ASHLEY is one of the persons for whose protections California Penal

27   Code section 134 was adopted.

28      201.   As a consequence of the falsified evidence, ASHLEY was forced to

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1   endure the mental anxiety of a potential criminal prosecution, to pay bail fees, and

2   to pay for the costs of a criminal defense attorney.

3       202.   ASHLEY incorporates herein the damages allegations of ¶¶ 97–99, as

4   they relate to this claim. ASHLEY incorporates herein the punitive damages

5   allegations of ¶ 100, as punitive damages relate to the malicious and reckless

6   conduct alleged in this claim.

## TENTH CLAIM FOR RELIEF—ASSAULT

### Count 1: Restroom Touching

### (against Defendants DCSS III, INC., DOE NO. 1)

10      203.   ASHLEY incorporates ¶¶ 1–96, by reference, as if fully set forth

11  herein.

12      204.   Specifically incorporating ¶¶ 41–46, DOE NO. 1 intentionally

13  touched ASHLEY, without ASHLEY's consent, in a harmful and offensive

14  manner in the GOSSIP GRILL restroom while in the course and scope of her

15  employment with DCSS III, INC. As a result of DOE NO. 1's conduct, ASHLEY

16  reasonably believed she was about to be touched in a harmful or offensive manner.

17      205.   As a result of DOE NO. 1's conduct, ASHLEY has suffered physical

18  injuries, emotional injuries, and medical costs. DOE NO. 1's conduct was a

19  substantial factor in causing those injuries.

20      206.   ASHLEY incorporates herein the damages allegations of ¶¶ 97–99, as

21  they relate to this claim. ASHLEY incorporates herein the punitive damages

22  allegations of ¶ 100, as punitive damages relate to the malicious and reckless

23  conduct alleged in this claim.

### Count 2: Sidewalk Melee

### (against Defendants DCSS III, INC., WYNNE, GOSSIP DOES)

26      207.   ASHLEY incorporates ¶¶ 1–96, by reference, as if fully set forth

27  herein.

28      208.   Specifically incorporating ¶ 49, GOSSIP DOES and WYNNE

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

**COMPLAINT FOR DAMAGES**

1  intentionally touched ASHLEY in a harmful and offensive manner, without

2  ASHLEY's consent, while in the course and scope of their employment with

3  DCSS III, INC. As a result of these acts, ASHLEY reasonably believed she was

4  about to be touched in a harmful or offensive manner. As a further result of these

5  acts, ASHLEY has suffered physical injuries, emotional injuries, and medical

6  costs. These acts were a substantial factor in causing those injuries.

7      209.   ASHLEY incorporates herein the damages allegations of ¶¶ 97–99, as

8  they relate to this claim. ASHLEY incorporates herein the punitive damages

9  allegations of ¶ 100, as punitive damages relate to the malicious and reckless

10  conduct alleged in this claim.

11                        ***Count 3: Foot Pursuit***

12          ***(against Defendants DCSS III, INC., DOE NO. 2)***

13      210.   ASHLEY incorporates ¶¶ 1–96, by reference, as if fully set forth

14  herein.

15      211.   Specifically incorporating ¶ 54, DOE NO. 2 intentionally touched

16  ASHLEY in a harmful and offensive manner, without ASHLEY's consent, while

17  in the course and scope of their employment with DCSS III, INC. As a result of

18  DOE NO. 2's conduct, ASHLEY reasonably believed she was about to be touched

19  in a harmful or offensive manner.

20      212.   As a result of DOE NO. 2's conduct, ASHLEY has suffered physical

21  injuries, emotional injuries, and medical costs. DOE NO. 2's conduct was a

22  substantial factor in causing those injuries.

23      213.   ASHLEY incorporates herein the damages allegations of ¶¶ 97–99, as

24  they relate to this claim. ASHLEY incorporates herein the punitive damages

25  allegations of ¶ 100, as punitive damages relate to the malicious and reckless

26  conduct alleged in this claim.

27  ///

28  ///

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

## ELEVENTH CLAIM FOR RELIEF—BATTERY

### *Count 1: Restroom Touching*
### *(against Defendants DCSS III, INC., DOE NO. 1)*

214.   ASHLEY incorporates ¶¶ 1–96, by reference, as if fully set forth herein.

215.   Specifically incorporating ¶¶ 41–46, DOE NO. 1 intentionally made physical contact with ASHLEY, without ASHLEY's consent, while in the course and scope of her employment with DCSS III, INC. A reasonable person in ASHLEY's situation would have been offended by DOE NO. 1's touching.

216.   As a result of DOE NO. 1's conduct, ASHLEY has suffered physical injuries, emotional injuries, and medical costs. DOE NO. 1's conduct was a substantial factor in causing those injuries.

217.   ASHLEY incorporates herein the damages allegations of ¶¶ 97–99, as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 100, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

### *Count 2: Sidewalk Melee*
### *(against Defendants DCSS III, INC., WYNNE, GOSSIP DOES)*

218.   ASHLEY incorporates ¶¶ 1–96, by reference, as if fully set forth herein.

219.   Specifically incorporating ¶ 49, GOSSIP DOES and WYNNE intentionally made contact ASHLEY, without ASHLEY's consent, while in the course and scope of their employment with DCSS III, INC. A reasonable person in ASHLEY's situation would have been offended this touching.

220.    As a result of these acts, ASHLEY has suffered physical injuries, emotional injuries, and medical costs. These acts were a substantial factor in causing those injuries.

221.   ASHLEY incorporates herein the damages allegations of ¶¶ 97–99, as

1 | they relate to this claim. ASHLEY incorporates herein the punitive damages
2 | allegations of ¶ 100, as punitive damages relate to the malicious and reckless
3 | conduct alleged in this claim.

<div align="center">

**TWELFTH CLAIM FOR RELIEF—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

***(against Defendants DCSS III, INC., WYNNE, GOSSIP DOES)***

</div>

222.    ASHLEY incorporates ¶¶ 1–96, by reference, as if fully set forth herein.

223.    Between 11:30 p.m. on December 29, 2018 and 12:30 a.m. on December 30, 2018, GOSSIP DOES engaged in numerous acts of outrageous conduct, including the following:

    a.  DOE NO. 1 verbally harassing ASHLEY in the gender-neutral GOSSIP GRILL restroom, physically grabbing ASHLEY's arm, and following ASHLEY around the GOSSIP GRILL facility, continuing the verbal harassment;

    b.  GOSSIP DOES and WYNNE physically attacking ASHLEY as she was trying to leave GOSSIP GRILL;

    c.  DOE NOs. 1, 2, and 3 following ASHLEY down University Avenue;

    d.  DOE NO. 2 making physically aggressive body motions, placing ASHLEY in fear and causing her to flee, and chasing ASHLEY through the streets of San Diego; and

    e.  Calling law enforcement to falsely accuse ASHLEY of robbery; and

    f.  Editing the video clips from the GOSSIP GRILL security system to support the criminal prosecution of ASHLEY.

224.    In doing the acts identified in ¶ 223, GOSSIP DOES and WYNNE intended to cause ASHLEY to experience emotional distress and acted with a

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1 | reckless disregard of the probability those actions would cause emotional distress

2 | for ASHLEY. As a result of these actions, ASHLEY experienced severe emotional

3 | suffering. GOSSIP DOES and WYNNE, while committing these acts, were acting

4 | within the scope of their employment for DCSS III, INC.

5 |     225.   ASHLEY incorporates herein the damages allegations of ¶¶ 97–99, as

6 | they relate to this claim. ASHLEY incorporates herein the punitive damages

7 | allegations of ¶ 100, as punitive damages relate to the malicious and reckless

8 | conduct alleged in this claim.

9 | <div align="center">**<u>DEMAND FOR JURY TRIAL</u>**</div>

10 |     226.   ASHLEY demands a trial by jury.

11 | <div align="center">**<u>PRAYER</u>**</div>

12 |     227.   WHEREFORE, ASHLEY prays that the Court enter judgment against

13 | Defendants DCSS III, INC., DWAYNE WYNNE, the COUNTY OF SAN

14 | DIEGO, EMILY CHOW, the CITY OF SAN DIEGO, MATTHEW ZADJA, and

15 | DOE NOs. 1 through 45, inclusive, as follows:

16 |     a.   Economic damages in an amount to be determined at trial;

17 |     b.   Non-economic damages in an amount to be determined at trial;

18 |     c.   Punitive damages (as to all defendants except the COUNTY

19 |     and CITY);

20 |     d.   Attorney fees, costs and expenses as authorized law, according

21 |     to proof;

22 |     e.   Interest;

23 |     f.   Injunctive relief; and

24 |     g.   Any other and further relief that the Court considers proper.

25 | DATED: February 7, 2020       PETERSON • BRADFORD • BURKWITZ

26 |        *Ryan A. Graham, Esq.*

27 |        Avi Butkwitz, Esq.
Ryan A. Graham, Esq.

28 |        *Attorneys for Plaintiff*

<div align="center">43</div>

<div align="center">**COMPLAINT FOR DAMAGES**</div>