1  Avi Burkwitz, Esq., Cal. Bar No. 217225
   aburkwitz@pbbllp.com
2  Ryan A. Graham, Esq., Cal. Bar No. 310186
   rgraham@pbbllp.com
3  **PETERSON • BRADFORD • BURKWITZ**
   100 North First Street, Suite 300
4  Burbank, California 91502
   Tel ....818.562.5800
5  Fax ...818.562.5810

6  *Attorneys for Plaintiff*

7

8                **UNITED STATES DISTRICT COURT**

9                **SOUTHERN DISTRICT OF CALIFORNIA**

10 ASHLEY R. VUZ,                          | Case No. 3:20-CV-00246-GPC-AGS
                                            | Hon. Gonzalo P. Curiel (Dist. Judge)
11          *Plaintiff*,                    | Hon. Andrew G. Schopler (Mag. Judge)

12     v.                                   | **SECOND AMENDED COMPLAINT FOR
                                            | DAMAGES**
13 DCSS III, INC., a California corporation
   doing business as GOSSIP GRILL;         | Compl. Filed: February 7, 2020
14 DWAYNE WYNNE, an individual; MARIA       | FAC Filed: April 17, 2020
   MARTINEZ ROCHA, an individual
15 formerly identified as Doe No. 1;
   ARNELL CASTEEL, an individual formerly
16 identified as Doe No. 2; JERMAINE
   CASTANEDA, an individual formerly
17 identified as Doe No. 3; COUNTY OF SAN
   DIEGO, a political subdivision of the
18 State of California; EMILY CHOW, an
   individual; CITY OF SAN DIEGO, a
19 municipal corporation; MATTHEW ZADJA,
   an individual; and DOE NOS. 4 THROUGH
20 45, individuals,

21          *Defendants*.

22

23     PLAINTIFF ASHLEY R. VUZ alleges the following in support of her

24 action for relief under the Civil Rights Act of 1871, codified at 42 U.S.C. § 1983,

25 and related authorities:

26                    **JURISDICTION/VENUE**

27     1.     The Court has original jurisdiction over this action as it presents a

28 federal question under 42 U.S.C. §§ 1983, 1985; the Court has supplemental

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1   jurisdiction to adjudicate claims arising under California law. 28 U.S.C. §§ 1331,

2   1343(a)(3), 1367(a). Venue is proper in this district under 28 U.S.C. § 1391(b)

3   because the events that give rise to this action occurred within this district and all

4   defendants reside in this district and state.

## PARTIES

### Plaintiff Ashley Vuz

7       2.      PLAINTIFF ASHLEY R. VUZ ("ASHLEY") is a natural person who

8   resides in Los Angeles County. She is referred to by her first name in this

9   complaint to distinguish her from her mother, nonparty Patricia Vuz ("Patti").

10      3.      ASHLEY is a transgender woman. As of December 29, 2018, the date

11  on which these events began, ASHLEY's progress in her gender transition was

12  substantial. She began transitioning socially in 2015, coming out as transgender to

13  her parents and friends. She adopted the use of female pronouns and began to

14  introduce herself by a female name, "Ashley." ASHLEY began taking hormones

15  and, later, elected to have several surgeries to feminize her appearance. On October

16  11, 2016, Judge Mark A. Borenstein of the Los Angeles County Superior Court

17  signed a decree ordering that ASHLEY's gender be changed from male to female

18  and that her name be changed to ASHLEY. Afterward, ASHLEY changed her

19  driver license, passport, and social security card to identify herself as female.

20      4.      ASHLEY does not self-identify as male for any purpose.

21      5.      Applying traditional gender norms, any reasonable person who has

22  observed ASHLEY in the last several years would perceive ASHLEY to be female.

23  As of December 29, 2018, ASHLEY's appearance, clothing, mannerisms, and

24  behavior were feminine in nature—and had been for years.

### Defendants DCSS III, Incorporated, Dwayne Wynne,
### Maria Martinez Rocha, Arnell Casteel, Jermaine Castaneda,
### Gossip Does (Nos. 4–15), and associated persons/entities

28      6.      DEFENDANT DCSS III, INCORPORATED ("DCSS III, INC." or

1   "DCSS III") is a domestic California corporation that has been registered with the

2   California Secretary of State since August 11, 2009. DCSS III, INC. is engaged in

3   the business of operating restaurants and bars in San Diego that serve the LGBTQ

4   community. GOSSIP GRILL is the fictitious business name of a bar and restaurant

5   operated by DCSS III, INC., located at 1220 University Ave, San Diego, CA

6   92103. GOSSIP GRILL actively promotes itself as a space for members of the

7   LGBTQ community, especially women.

8         7.    DEFENDANT DWAYNE WYNNE ("WYNNE") is a natural person

9   who, as of December 29 and 30, 2018, worked at GOSSIP GRILL and was

10  employed by DCSS III, INC.

11        8.    DEFENDANT MARIA MARTINEZ ROCHA ("ROCHA"), formerly

12  referred to as DOE NO. 1, is a natural person who, as of December 29 and 30,

13  2018, worked at GOSSIP GRILL and was employed by DCSS III, INC.

14        9.    DEFENDANT ARNELL CASTEEL ("CASTEEL"), formerly

15  referred to as DOE NO. 2, is a natural person who, as of December 29 and 30,

16  2018, worked at GOSSIP GRILL and was employed by DCSS III, INC.

17        10.   DEFENDANT JERMAINE CASTENADA ("CASTENADA"),

18  formerly identified as DOE NO. 3, is a natural person who, as of December 29 and

19  30, 2018, worked at GOSSIP GRILL and was employed by DCSS III, INC.

20        11.   DEFENDANT DOE NOs. 4 through 15 ("GOSSIP DOES,"

21  collectively) are natural persons who, as of December 29 and 30, 2018, worked at

22  GOSSIP GRILL. On information and belief, ASHLEY alleges that all GOSSIP

23  DOES were, as of December 2018, employees of DCSS III, INC. Their names are,

24  at the time of filing, unknown to ASHLEY.

25      **Defendants City of San Diego, Matthew Zajda,**

26      **City Does (Nos. 16–30), and associated persons/entities**

27        12.   DEFENDANT CITY OF SAN DIEGO ("CITY") is a municipal

28  corporation organized under the laws of California. The SAN DIEGO POLICE

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

DEPARTMENT (SDPD) is an administrative sub-unit of the CITY responsible for the CITY's law enforcement functions, including patrol operations within the CITY's territorial jurisdiction. GOSSIP GRILL is located within the territorial patrol jurisdiction of the SDPD.

13.     DEFENDANT MATTHEW ZAJDA ("ZAJDA") is a natural person who, as of December 29 and 30, 2018, was employed by CITY as an SDPD police officer. All of ZAJDA's actions described in this complaint were taken in his capacity as an SDPD officer.

14.     DEFENDANT DOE NOs. 16 through 30 ("CITY DOES," collectively) are natural persons who, as of December 29 and 30, 2018, were employed by CITY as sworn SDPD peace officers and non-sworn SDPD staff. Their names are, at the time of filing, unknown to ASHLEY. All of CITY DOES' actions described in this complaint were taken in their capacities as SDPD employees.

**Defendants County of San Diego, Emily Chow,**
**Doe Nos. 31–45, and associated persons/entities**

15.     DEFENDANT COUNTY OF SAN DIEGO ("COUNTY") is a political subdivision of the State of California. The SAN DIEGO COUNTY SHERIFF'S DEPARTMENT ("SHERIFF'S DEPARTMENT") is an administrative sub-unit of the COUNTY responsible for the COUNTY's law enforcement functions.

16.     DEFENDANT EMILY CHOW is a natural person who, as of December 30, 2018, was employed by COUNTY as a nurse at the San Diego Central Jail (SDCJ). All of CHOW's actions described in this complaint were taken in her capacity as a COUNTY employee.

17.     DEFENDANT DOE NO. 31 ("DOE NO. 31" or, collectively with DEFENDANT DOE NOs. 31 through 45, inclusive, "COUNTY DOES") is a natural person who, as of December 30, 2018, was employed by COUNTY at

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

SDCJ as a Detention Processing Technician within the Inmate Processing Division. DOE NO. 31 was responsible for processing inmates, such as ASHLEY, during the booking and intake process. At the time of filing, this individual's name remains unknown to ASHLEY. All of DOE NO. 31's actions described in this complaint were taken in his capacity as a COUNTY employee.

18.    DEFENDANT DOE NO. 32 and DEFENDANT DOE NO. 33 ("DOE NOs. 32 and 33" or, collectively with DEFENDANT DOE NOs. 31 through 45, inclusive, "COUNTY DOES") are natural persons who, as of December 30, 2018, were employed by COUNTY at SDCJ and were responsible for classifying arrestees' risk level, making housing assignments, and adjusting housing assignments (including relocating ASHLEY between cells during her detention). At the time of filing, these individuals' names remain unknown to ASHLEY. All of DOE NO. 32's and DOE NO. 33's actions described in this complaint were taken in their capacities as COUNTY employees.

19.    DEFENDANT DOE NO. 34  ("DOE NO. 34" or, collectively with DEFENDANT DOE NOs. 31 through 45, inclusive, "COUNTY DOES") is a natural person who, as of December 30, 2018, was employed by COUNTY at SDCJ. DOE NO. 34 was responsible for processing detainees, such as ASHLEY, before being released out of SDCJ. At the time of filing, this individual's name remains unknown to ASHLEY. All of DOE NO. 34's actions described in this complaint were taken in her capacity as a COUNTY employee.

20.    DEFENDANT DOE NOs. 35 through 45 (when referred to collectively with DEFENDANT DOE NOs. 31 through 34, inclusive, "COUNTY DOES") are natural persons who, as of December 30, 2018, were employed by COUNTY at SDCJ. Their names are, at the time of filing, unknown to ASHLEY.

## PROCEDURAL REQUIREMENTS

21.    Consistent with the California Government Claims Act's requirement that California state claims be presented to a public entity within six months,

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

ASHLEY presented claims to COUNTY on June 27, 2019.

22.    The COUNTY denied ASHLEY's claim on August 8, 2019.

## GENDER-RELATED ALLEGATIONS

23.    Gender identity, gender expression, sex, and the characteristics that are related to these concepts are explained briefly in order to contextualize the CITY and COUNTY policies later alleged.

24.    *Primary sex characteristics* refer to a person's genitalia/reproductive organs; *secondary sex characteristics* are those characteristics that develop as the body matures, such as breast development and growing facial hair.

25.    *Sex* describes the classification as either male or female customarily applied to newborns based on visual observations of primary sex characteristics (*i.e.*, genitalia).[1]

26.    *Gender identity* is a person's inward sense of self as male, female, both, or neither. A person's gender identity cannot be changed. *Gender expression* is a person's outward expression of gender. These two concepts are critically distinct from sex insofar as gender identity and expression are not controlled by primary sex characteristics.

27.    A *cisgender* individual is a person whose sex and gender identity are congruent. A *transgender* individual is a person whose sex and gender identity are not congruent. *Gender dysmorphia* is a medical diagnosis related to conflicts between a person's gender identity and a person's assigned sex.

28.    Because the socialization of children has historically been controlled by sex, rather than a person's inward gender identity, many transgender individuals grow up experiencing complications associated with gender dysphoria and spend significant periods of their lives being treated in a manner that is inconsistent with their identity, which causes pain and trauma.

29.    Many transgender individuals undergo a *gender transition*—the

---

[1] Sex is also referred to, alternatively, as "*biological sex*," "*natal sex*," or a person's "*sex assigned at birth*."

SECOND AMENDED COMPLAINT FOR DAMAGES

process by which a person begins to live according to their gender identity. Many transgender individuals do not transition, however, and the nature of any gender transition is a personal decision. Gender transitions often include a social component in which transgender individuals disclose their gender identity to friends and family and change their pronouns. Transitions can also include a medical component in which the individual undergoes surgical and non-surgical procedures to conform body to identity, and a legal transition, in which a person's gender is changed as a matter of law.

30.     Not all transgender individuals transition socially, medically, and legally, and the decision to forgo any (or all) of these components does not reflect on the sincerity or legitimacy of the individual's gender identity. Some transgender individuals forgo medical transitions because of surgical risks or health issues; other individuals may delay surgery because of costs; and, in some cases, a transgender individual may simply forgo surgical procedures due to preference. For those individuals whose transitions include surgery, deciding which particular surgeries to undergo is a matter of personal choice.

31.     Surgically revising a primary sex characteristic (also known as "*gender reassignment surgery*") is generally a more invasive and expensive surgery than revising secondary sex characteristics. According to a 2015 survey by the National Center for Transgender Equality, 49% of respondents desired hormone therapy. It also reported that, among individuals who were assigned a sex of male at birth, only 10% had undergone a vaginoplasty and/or labiaplasty—by contrast, 41% have undergone hair removal or electrolysis.

32.     Nevertheless, some people outside the transgender community are fixated on genitalia—such as the CITY, which effectively refuses to acknowledge any transgender person's identity unless they undergo gender reassignment surgery.

///

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

**SECOND AMENDED COMPLAINT FOR DAMAGES**

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

# COUNTY JAIL FACILITIES

33.     The COUNTY operates seven adult detention facilities: San Diego Central Jail (SDCJ); Las Colinas Detention and Reentry Facility (LCDRF); George F. Bailey Detention Facility; Facility 8; South Bay Detention Facility; East Mesa Reentry Facility; and Vista Detention Facility (VDF).

34.     SDCJ is the central point of intake for male arrestees. LCDRF is the central point of intake for female arrestees.

35.     Pursuant to California law, the San Diego County Grand Jury ("Grand Jury") makes regular inquiries into the condition and management of the COUNTY's jails.

36.     According to the Grand Jury, SDCJ inmates do not have access to fresh air or sunshine and the suicide rate at SDCJ is significantly higher than in other counties, even counties larger than San Diego County, such as Los Angeles County. It has described SDCJ as "mostly enclosed and somewhat dreary" and has noted that, during its visits to SDCJ, "[t]he odor of urine was very strong surrounding the safety cells."

37.     By contrast, the Grand Jury has found LCDRF to have "the feel of a college campus," spotless grounds, and well-manicured landscaping. LCDRF's open courtyards and unrestricted walkways "create a feeling of normalcy and optimism lacking at the men's facilities."

38.     In 2018, the Grand Jury found SDCJ was overcrowded (114% of capacity) and recommended that the SHERIFF'S DEPARTMENT develop a plan to alleviate the overcrowding. During the same period, LCDRF was not overcrowded (71% of capacity). Since 2015, the occupancy at SDCJ has ranged from 95% to 114%; while the occupancy at LCDRF has ranged from 69% to 71%.

39.     LCDRF's intake facility operates under a policy of "Open Booking," which the Grand Jury has described as a "new philosophy of effective and open communications between deputies and inmates." The intake facility at LCDRF

1  permits detainees to "have expanded use of a reception area, a telephone,
2  restrooms, vending machines and a television." By contrast, the Grand Jury has
3  noted that, at SDCJ, "[a] lot of activity takes place in the booking area, which is
4  small for the intended purpose."

5      40.    LCRDF also features "Direct Supervision," which the Grand Jury has
6  described as a supervisory approach that "allows on duty deputies to interact more
7  with the inmates for problem solving and conflict resolution."

## MUNICIPAL POLICY ALLEGATIONS

### City Booking Policy

10     41.    SDPD policies are set forth in the *San Diego Police Department*
11 *Policy Manual* ("SDPD Policy Manual").

12     42.    SDPD policies are CITY policies for the purpose of municipal
13 liability.

14     43.    The SDPD Policy Manual requires SDPD members to abide by
15 information contained in Training Bulletins.

16     44.    Training Bulletin 14-05 ("TB 14-05"), dated October 28, 2014, is
17 titled "Police Interaction with Transgender Individuals." Section III.C. of TB 14-05
18 is titled "Arresting and booking procedures involving transgender individuals."

19     45.    Section III.C of TB 14-05 provides the following:

20         a. That "[a]n individual's lower anatomy or surgical status
21            determines which jail facility the individual is booked into; no
22            other changes or surgeries apply."

23         b. That, "[f]or purposes of booking, it is necessary to inquire
24            about details of an individual's anatomy or surgical status to
25            determine the appropriate jail facility."

26         c. That, if COUNTY deputies at a detention facility determine that
27            the information provided to a CITY police officer about an
28            incoming inmate's gender is incorrect, that the CITY police

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

9

officer "will transport the individual to the appropriate facility."

    d.   That, once a transgender individual is booked into a COUNTY jail facility, the CITY police officer must alert the COUNTY intake deputy that the individual is transgender or transitioning.

46.    The consequences of TB 14-05 are unmistakable. By tethering the booking process to a person's "lower anatomy," TB 14-05 subordinates individuals' gender to their genitals. By stating that "no other changes or surgeries apply," the policy discounts the transitions of ASHLEY and any other like-minded transgender individual arrested by SDPD as *insufficiently female*, rendering the legal status of her gender meaningless. This policy establishes a test for womanhood that, by design, the overwhelming majority of transgender women will fail. Insisting that a transgender woman undergo gender reassignment surgery in order to be treated as a woman ensures that an entire population of transgender individuals who are uninterested in or unable to undergo such a surgery will have the most fundamental aspect of their personhood erased: their gender identity. A misgendering of this magnitude is made even more traumatic by the setting in which the policy is applied (*i.e.*, when the state leverages its coercive powers of arrest and detention).

**County Intake and Booking Policies**

47.    The policies of the SHERIFF'S DEPARTMENT are memorialized in the *Policy and Procedure Manual* (SDSD-MPP).

48.    Within the SHERIFF'S DEPARTMENT, the *Detention Services Bureau* (DSB) is responsible for operating the SHERIFF'S DEPARTMENT's detention facilities.

49.    DSB policies, specifically, are memorialized in the *Detention Services Bureau—Manual of Policies and Procedures* (DSB-MPP)

50.    For purposes of municipal liability, the policies set forth in the SDSD-MPP and DSB-MPP are policies of the COUNTY.

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

51.     When arrested individuals arrive at a COUNTY jail facility, they go through the intake process before being housed in the inmate population. Intake is comprised of several steps, including the booking process, medical screening, and the classification interview—controlled by DSB-MPP § Q (booking), § M (medical), and § R (classification).

52.     DSB-MPP § Q provides that acceptance into a SHERIFF'S DEPARTMENT detention facility requires the following: (1) that the arresting officer must complete a Form J-15 (Booking Intake/Personal Property Inventory); (2) that, for a warrantless field arrest, a completed probable cause declaration (PCD) must be presented prior to acceptance; and (3) that the arrestee must be medically screened by a nurse pursuant to DSB-MPP § M.9 and found to be "fit for jail."

53.     Section M.9 provides that arrestees to be housed in a COUNTY detention facility must be medically screened by a registered nurse, who must conduct a "comprehensive assessment of the medical and psychiatric needs of the inmate and record the responses in JIMS."[2] It is the nurse who is responsible for medically clearing detainees as "fit for jail," and nobody else. Arrestees who are *not* fit for jail, as determined by a nurse, are not booked into the facility.

54.     Once the booking processing is complete, the arrestee is taken to a holding area to await the classification process, in which the Jail Population Management Unit (JPMU) determines appropriate housing assignments.

**County Classification Policies**

55.     Under the guidelines set forth in DSB-MPP § R.11, only LCDRF and VDF can accommodate females. SDCJ is a male-only facility, and is the primary point of intake for male arrestees/prisoners in San Diego County, while LCRDF is the primary point of intake for females.

56.     Under DSB-MPP § R.11, the Jail Population Management Unit

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

---

[2] JIMS is the *Jail Information Management System*.

**SECOND AMENDED COMPLAINT FOR DAMAGES**

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1   (JPMU) screens inmates for the purpose of assigning inmates to an appropriate

2   facility.

3       57.     DSB-MPP § R.13 (dated November 13, 2018) concerns transgender

4   individuals within the COUNTY's detention facilities. Its purpose is to "ensure

5   decisions regarding the searching, housing, programming, and in-custody services

6   such as clothing, commissary, and toiletries are applied in a manner consistent with

7   an inmate's declared gender identity." It further provides that JPMU staff will be

8   consulted to determine individualized housing assignments for all transgender

9   persons in custody to determine the "most suitable housing assignment." JPMU

10  staff are to provide transgender individuals with a *Voluntary Gender Identity*

11  *Statement of Preference Form (J-350)* to document housing preferences and

12  individuals who do not specify a housing preference "will receive housing

13  assignment consistent with their biological sex."

## FACTUAL ALLEGATIONS

### The Night(mare) Begins: Gossip Grill

16      58.     In December 2018, ASHLEY went to San Diego to visit her mother,

17  Patti, for the winter holidays. On December 29, 2018, ASHLEY went to dinner

18  with her mother and friends. Afterward, a group of four (ASHLEY, Patti, and two

19  friends) went to GOSSIP GRILL.

20      59.     On December 29, 2018, GOSSIP GRILL was charging a cover of

21  $5.00 per person for entry, which was being collected by a hostess stationed at a

22  small table at the entrance.

23      60.     ASHLEY paid the cover charge for herself, her mother, and her two

24  friends, totaling $20.00.

25      61.     ASHLEY paid in cash (*i.e.*, paper currency).

26      62.     After paying, the group entered the establishment—at approximately

27  11:30 p.m.

28      63.      Minutes after entering, ASHLEY went to use the restroom. She

initially waited in a line for the women's restroom, as is her routine practice. But ASHLEY ultimately chose a restroom designated as gender-neutral (for which there was no line).

64.    ROCHA followed ASHLEY into the gender-neutral restroom.

65.    ROCHA began shouting at ASHLEY, accusing her of being drunk and vomiting in the restroom.

66.    While ASHLEY was at GOSSIP GRILL, she did not vomit, did not consume any alcohol, and did not appear intoxicated.

67.    ASHLEY denied ROCHA's accusations, and made clear that she—as a transgender individual—had every right to be in the gender-neutral restroom.

68.    ROCHA grabbed ASHLEY's arm and yelled at ASHLEY to leave the restroom.

69.    ASHLEY felt scared and threatened by ROCHA's aggression.

70.    ASHLEY exited the gender-neutral restroom to re-join her mother and friends.

71.    Around this time, the SDPD received a call for service from a member of the GOSSIP GRILL staff to 1220 University Avenue in San Diego (*i.e.*, the address of GOSSIP GRILL) reporting a robbery.

72.    After the incident in the restroom, ROCHA followed ASHLEY back to her friends and Patti, continuing to verbally harass ASHLEY. ROCHA repeated that ASHLEY was "cut off" from drinking alcohol and falsely accused ASHLEY of vomiting three times.

73.    ASHLEY was humiliated in front of her mother, her friends, and numerous strangers. ASHLEY felt intimidated, unsafe, and unwelcome, prompting the group to leave the bar—at approximately midnight.

### Sidewalk Melee: Gossip Grill Staff Attack Ashley

74.    While the group was exiting, ASHLEY asked the hostess for a refund of the $20.00 paid by ASHLEY in cover charges because the group was at

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

GOSSIP GRILL for such a brief period and did not derive any use, enjoyment, or other benefit from paying such charges.

75.    During ASHLEY's exchange with the hostess, ROCHA, CASTEEL, CASTENADA, WYNNE, and GOSSIP DOES began to collect around the hostess table, watching and listening. ROCHA and WYNNE went out to the sidewalk to conspire how to deal with ASHLEY.

76.    The hostess agreed to refund ASHLEY the cover charges.

77.    As the hostess was reaching toward her cash box for ASHLEY's refund, ROCHA, CASTEEL, CASTENADA, and GOSSIP DOES rushed toward ASHLEY and began physically attacking her onto the sidewalk.

78.    During the attack, ASHLEY was held in a headlock by ROCHA, CASTEEL, CASTENADA, WYNNE, or GOSSIP DOES. Although she tried to defend herself, ASHLEY was struck multiple times and suffered a laceration to her arm.

79.    At no point was ASHLEY the aggressor in this altercation.

80.    ASHLEY had to be removed from the headlock by one of her friends.

81.    After this abuse, ASHLEY, Patti, and their friends began walking away from GOSSIP GRILL and for a few brief moments, the Gossip Grill staff relented.

**Streetcorner Assault**

82.    The group paused momentarily at the corner of University Avenue and Vermont Street ("the streetcorner") to collect themselves. ASHLEY and her mother intended to return home.

83.    ROCHA, CASTEEL, and CASTENADA, however, had been following the group down University Avenue. As they approached the streetcorner, ROCHA, CASTEEL, and CASTENADA continued to harass ASHLEY again. They falsely accused ASHLEY of being drunk, yet again.

84.    At no point during the exchange on the streetcorner did ROCHA,

CASTEEL, CASTENADA, WYNNE, or any other of the GOSSIP DOES accuse ASHLEY of robbery, burglary, theft, larceny, conversion, or any other property crime—nor did they refer to these crimes by using lay terms. At no point was ASHLEY accused of "stealing," "knocking over," or "taking," for example.

85.     Next, CASTEEL suddenly made an aggressive physical advance toward ASHLEY, as if he were going to strike ASHLEY. CASTEEL was not provoked by ASHLEY, and he gave no warning before making this hostile gesture. ASHLEY, who had only escaped the sidewalk brawl minutes earlier, felt terrorized and ran for safety.

86.     CASTEEL initially began chasing ASHLEY, but gave up and returned to the streetcorner. CASTEEL, enraged, attempted to punch ASHLEY's friends, requiring he be physically restrained.

87.     Scared for her life, ASHLEY ran around the Hillcrest neighborhood attempting to find safety. Without ASHLEY to torment, ROCHA, CASTEEL, and CASTENADA returned to GOSSIP GRILL.

88.     Throughout the exchange on the streetcorner, ASHLEY's friends requested that ROCHA, CASTEEL, and CASTENADA call police to straighten out the situation. They did not know, however, that the GOSSIP GRILL staff had already called the police to fabricate a robbery.

**Arrest by SDPD**

89.     Sometime around midnight on December 30, 2018, ZAJDA and CITY DOES—in no fewer than *three* marked SDPD patrol vehicles—intercepted ASHLEY approximately one block away from GOSSIP GRILL.

90.     ZAJDA immediately placed ASHLEY under arrest—handcuffing her and detaining her in the back seat of his patrol vehicle.

91.     ZAJDA did not have a warrant or any other court order authorizing ASHLEY's arrest.

92.     At all times, ASHLEY remained pleasant and was compliant with

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

**SECOND AMENDED COMPLAINT FOR DAMAGES**

ZAJDA's instructions.

93.     ZAJDA stated, on scene, that he was arresting ASHLEY for felony robbery, which is consistent with SDPD records that refer to California Penal Code sections 211 and 212.5(c) as the basis for the call and ultimate arrest.

94.     ZAJDA had no probable cause to believe that ASHLEY committed robbery or any other crime at the time of arrest. ZAJDA was not present at GOSSIP GRILL during the period that ASHLEY was there (either were any uniformed CITY DOES).

95.     The minimal investigation conducted by ZAJDA and CITY DOES on-scene did not establish probable cause. ZAJDA and CITY DOES refused to independently investigate the allegations made by the GOSSIP GRILL staff, and stated that they were arresting ASHLEY pursuant to a citizen arrest (even though ZAJDA's arrest report states there was no citizen arrest).

96.     After ZAJDA arrived on the scene, ZAJDA met with ROCHA, CASTEEL, CASTENADA, WYNNE, and GOSSIP DOES to investigate the circumstances prompting the call for service. The GOSSIP GRILL staff collected at one end of an SDPD patrol car with ZAJDA and CITY DOES and appeared gleeful at ASHLEY's situation.

97.     ZAJDA's on-scene investigation did not include any affirmative attempts to obtain information from ASHLEY, her mother, or her friends for the purpose of investigating the circumstances of the evening or for the purpose of corroborating any information received from the GOSSIP GRILL staff.

98.     During the arrest, ASHLEY's friends and Patti approached ZAJDA and CITY DOES in an attempt to provide information about the situation; ZAJDA was not receptive.

99.     At one point, ZAJDA asked ASHLEY to stand up, turn her body, and look toward a person in the distance. Based on this information, ASHLEY believes, and thereon alleges, that ZAJDA was presenting ASHLEY to one of the

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

**SECOND AMENDED COMPLAINT FOR DAMAGES**

1   GOSSIP GRILL staff for the purpose of obtaining a positive identification that

2   ASHLEY was the person reported to law enforcement in the original call for

3   service.

4       100.   During the course of the arrest, ZAJDA and CITY DOES learned that

5   ASHLEY is transgender. However, in the SDPD arrest report, ZAJDA recorded

6   ASHLEY's sex as female.

7   **Transportation to SDCJ**

8       101.   After arresting ASHLEY, ZAJDA drove her to SDCJ, a men's jail,

9   located at 1173 Front Street, San Diego, California 92101. During this car ride,

10   ZAJDA learned that ASHLEY had not undergone gender reassignment surgery

11   from ASHLEY herself, who stated to ZAJDA that she maintained traditionally-

12   male genitalia in the course of their conversation.

13       102.   Upon learning that she was being transported to a men's jail,

14   ASHLEY was mortified and feared for her life.

15       103.   ZAJDA informed ASHLEY that he was transporting her to a men's

16   jail because of her genitalia, and that this was required per policy.

17       104.   ASHLEY takes prescription medication as part of her gender

18   transition. At no point during her ordeal were her medications provided to her by

19   ZAJDA, any COUNTY employee, or any CITY employee.

20   **Booking at SDCJ**

21       105.   At some point in the early morning hours of December 30, 2018,

22   ASHLEY was booked into SDCJ for second degree felony robbery with a bail

23   amount set at $50,000.

24       106.   Following DSB-MPP section Q.7, ZAJDA completed a Form J-15

25   and provided it to DOE NO. 31, the SDCJ employee responsible for intake.

26       107.   ZAJDA's Form J-15 states ASHLEY's sex as "male"—even though

27   ZAJDA documented ASHLEY's sex as "female" in the SDPD arrest report.

28       108.   DOE NO. 31, following COUNTY policy, verified that ASHLEY's

PETERSON • BRADFORD • BURKWITZ<br>100 North First Street, Suite 300<br>Burbank, CA 91502-1845<br>818.562.5800

17

**SECOND AMENDED COMPLAINT FOR DAMAGES**

1   arrest was acceptable based on the established departmental booking acceptance

2   criteria. During the booking process, DOE NO. 31 also verified the accuracy and

3   completeness of ZAJDA's Form J-15.

4       109.   At no point was ASHLEY provided with a Form J-350.

5       110.   Following DSB-MPP section M.9, ASHLEY was subjected to a

6   medical screening by CHOW during the SDCJ booking process.

7       111.   During the screening, ASHLEY informed CHOW that she (ASHLEY)

8   is transgender.

9       112.   In CHOW's report, she documented that ASHLEY identifies as a

10  male-to-female transgender individual and found ASHLEY fit for jail at SDCJ.

11  The biographical portion of CHOW's report states "Sex: M."

12      113.   Critically, maintaining ASHLEY's gender identity requires that she

13  take certain medications. ASHLEY disclosed this fact to CHOW. Despite this,

14  neither CHOW nor any other member of the SDCJ staff provided ASHLEY with

15  her medicine.

16      114.   At some point during the booking process, ASHLEY was instructed

17  by COUNTY DOES to remove her footwear (shoes) out of safety concerns.

18      115.   However, ASHLEY's shoes were not confiscated. ASHLEY was

19  allowed to hold her shoes, but was prohibited from wearing them.

20      116.   ASHLEY was not provided with any replacement footwear.

21      117.   Consequently, Ashley remained barefoot while detained at SDCJ.

22      118.   During the booking process, COUNTY DOES seized $64.00 in cash

23  from ASHLEY, which has never been returned.

24                  **Classification and Housing at SDCJ**

25      119.   ASHLEY was not housed with the general population at SDCJ. She

26  was housed by herself in administrative segregation ("ad-seg") based on the

27  custody level assigned by DOE NOs. 32 and 33.

28      120.   ASHLEY's isolation in ad-seg caused her to suffer angst and anxiety.

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

121.   Initially, ASHLEY was isolated in an ad-seg cell that did not have an operational telephone.

122.   Without access to a telephone, ASHLEY was prevented from contacting her mother or her friends.

123.   During this time, Patti actually came to SDCJ to learn information about her daughter's arrest, but was told by COUNTY DOES that she must be mistaken, given that SDCJ was a men's facility. Only after insisting that ASHLEY was indeed at SDCJ was Patti provided with information about the whereabouts of her daughter.

124.   Without a telephone, ASHLEY also had no way of leaving SDCJ. With bail set at $50,000, she needed to contact a bail bondsman in order to be released. While contact information for local bail bondsmen was available at SDCJ, ASHLEY could not contact any of them unless she could dial out of the facility.

125.   ASHLEY communicated her desire to use a telephone to COUNTY DOES. In response, DOE NOs. 32 and 33 transferred ASHLEY to a second ad-seg cell that was covered with *human feces* (still wet) and was infested with flies. The feces were on the walls, seating, and floor of the cell. ASHLEY suffered severe emotional distress from being exposed to feces.

126.   Worse, while the second ad-seg cell had a toilet, there was no clean, un-used toilet paper—although pieces of *used* toilet paper were stuck to the moist feces like papier mâché.

127.   The second ad-seg cell did not include a bed, mattress, sleeping bag, or anything else appropriate for sleeping. It was bad enough that ASHLEY was falsely accused of robbery, taken to a men's jail, and denied her medication—but now she was being placed in a feces-laden jail cell, with no shoes or bedding.

128.   While ASHLEY's second cell did indeed have a functioning telephone—which did eventually enable her to secure bail—the use of such

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

telephone was conditioned on ASHLEY suffering exposure to human feces.

129. The volume of human feces restricted ASHLEY's mobility within her cell. Feces covered the walls, seating, and floor of the second ad-seg cell. ASHLEY remained barefoot on the instruction of COUNTY DOES. Due to the color and texture of the feces, ASHLEY could not easily determine which surfaces within the cell were feces-free. In order to avoid direct exposure to the feces, ASHLEY avoided all unnecessary physical movement.

130. For the occasions ASHLEY could not avoid moving around her cell, she devised a plan. ASHLEY was able to identify which surfaces remained wet with human feces and which were starting to dry by watching the flies that had infested her cell—which would land on the cell's dry patches. Using these insects to navigate around the feces, ASHLEY was only able to move around her cell with considerable effort.

131. At some point, ASHLEY had to use the restroom. She had a single option: the toilet in her cell. But there was no un-used toilet paper.

132. In order to use the restroom, ASHLEY was reduced to harvesting what few visibly unsoiled scraps of toilet paper could be torn away from the streamers of filthy toilet paper hanging around the cell.

133. ASHLEY was able to use the telephone in the second ad-seg cell to reach a bail bondsman and arrange bail. The costs associated with securing bail were exorbitant, due to the false allegation made against ASHLEY that she committed felony robbery.

134. COUNTY DOES witnessed the conditions under which ASHLEY was being detained. None of them intervened. Instead, they snickered at ASHLEY and her situation.

135. Later in the day (December 30, 2018), ASHLEY was released. Before that, however, she was escorted from her cell to a waiting area within the jail for final processing. There, a member of the SDCJ staff—DOE NO. 34—was

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

SECOND AMENDED COMPLAINT FOR DAMAGES

responsible for processing inmates checking out of SDCJ. DOE NO. 34 was aware that ASHLEY was being released and knew ASHLEY had paid bail. Knowing this, she went for an extended lunch (1 to 2 hours). When she returned, she laughed at ASHLEY and finally processed her release. ASHLEY is informed and believes that exit processing at SDCJ would require DOE NO. 34 to consult JIMS, which would indicate that ASHLEY is transgender; on such basis, ASHLEY alleges that DOE NO. 34 left her waiting for several hours—extending her detention for several hours—because of ASHLEY's transgender status.

**Aftermath: Gossip Grill fabricates evidence to support prosecution**

136.    Beginning on December 30, 2018, WYNNE and GOSSIP DOES created several video clips—at least ten—from GOSSIP GRILL's security camera system. These cameras record various locations around the establishment, including the location at the entrance where ASHLEY was attacked.

137.    GOSSIP GRILL's security system includes a playback feature, in which the recorded security footage can be viewed on a monitor.

138.    WYNNE and GOSSIP DOES did not create these clips directly from the system's native files. They used the video recording feature on a mobile telephone to record the security system's monitor playing back portions of the footage. In other words, they made a video of a video.

139.    While creating these video clips, WYNNE and GOSSIP DOES removed excerpts from the native files on at least two occasions. In one video clip, the footage's timestamp jumps from 11:48:10 p.m. to 11:48:20 p.m.—skipping 10 seconds. In a second clip, the timestamp jumps from 23:48:59 to 23:49:17— skipping 18 seconds. The metadata for the second clip indicates it was created at 2:44 a.m. on December 30, 2018 using an Android device.

140.    By using a mobile device to record the video clips, rather than creating clips from the raw, native footage, WYNNE and GOSSIP DOES were able to reduce the quality of video clips. This reduction in video quality makes it

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1    difficult to notice that WYNNE and GOSSIP DOES edited the footage.

2         141.   The edits made by WYNNE and GOSSIP DOES give the false

3    impression that ASHLEY was the aggressor in the attack at GOSSIP GRILL.

4         142.   The video clips were provided to the relevant prosecuting authorities

5    for purposes of being used against ASHLEY in a criminal court proceeding.

6         143.   ASHLEY was never charged or convicted with any crime in

7    connection with these events. The San Diego County District Attorney's office

8    declined to prosecute ASHLEY for felony robbery. The CITY's Office of the City

9    Attorney considered whether to prosecute ASHLEY for a misdemeanor, but also

10   declined to prosecute ASHLEY.

11                                    **DAMAGES**

12        144.   As a result of the conduct of DCSS III, INC., ROCHA, CASTEEL,

13   CASTENADA, GOSSIP DOES, WYNNE, COUNTY, CHOW, COUNTY DOES,

14   CITY, ZAJDA, and CITY DOES, ASHLEY has suffered physical injuries and

15   emotional distress. ASHLEY was intimidated, harassed, embarrassed, and beaten

16   by GOSSIP DOES. She was repeatedly misgendered during her detention at SDCJ.

17   ASHLEY was forced to pay an exorbitant bond to secure bail because of the false

18   allegations against her. She was not given back the $64.00 seized as part of her

19   arrest. After ASHLEY left SDCJ, she began to feel physically sick. ASHLEY was

20   diagnosed with influenza by a physician. On the orders of the physician, ASHLEY

21   was unable to travel for a week. (As a separate injury, ASHLEY's freedom to

22   travel was also restricted due to ASHLEY's bail arrangement.) ASHLEY was

23   forced to take medication for her influenza. Due to the conditions under which she

24   was detained and the Hepatitis outbreak in San Diego, ASHLEY had to receive a

25   Hepatitis A vaccine. ASHLEY has also suffered emotional injuries. Since the

26   events of December 29 and 30, 2018, ASHLEY has experienced sadness, apathy,

27   anxious feelings, and recurrent nightmares. For almost a year, ASHLEY was

28   emotionally unable to travel to San Diego to visit her mother. ASHLEY grows

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

fearful whenever she sees law enforcement, concerned she will be arrested, taken to a men's jail, isolated in administrative segregation, and thrown back into a feces cell—which are all highly probable, even today, given the policies of the CITY and COUNTY. ASHLEY gets nervous when selecting a restroom. ASHLEY suffers from mental distress because of the way she was treated at GOSSIP GRILL, during her arrest, and during her detention—and has been diagnosed with Post Traumatic Stress Disorder (PTSD).

145.    These events have also aggravated the gender dysphoria associated with ASHLEY's transgender identity. The impact of these events on ASHLEY, as a transgender individual, is especially severe—and so is the psychological damage. At birth, ASHLEY was assigned the sex of male and treated as a male for much of her life, even though she identifies as female. Over the years, as part of ASHLEY's gender transition, ASHLEY has made numerous affirmative steps to ensure she would be treated as a female—legally and socially. Treating ASHLEY as male has the effect of undoing much of the progress she has made in her gender transition, aggravating ASHLEY's gender dysmorphia.

146.    As a result of these events, ASHLEY has paid medical expenses and other costs. The $64.00 in paper currency seized from ASHLEY during the booking process has never been returned. ASHLEY's shoes were damaged during her stay at SDCJ, requiring repairs by a cobbler. She was forced to pay a bail bondsman and retain a criminal defense attorney.

147.    ASHLEY seeks an award of exemplary (punitive) damages pursuant to California Civil Code section 3294, and any state or federal laws authorizing the award of punitive damages, to make an example of and punish DCSS III, INC., WYNNE, ZAJDA, CITY DOES, CHOW, and COUNTY DOES in the hope of deterring future conduct of a similar nature.

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

**SECOND AMENDED COMPLAINT FOR DAMAGES**

## FIRST CLAIM FOR RELIEF—42 U.S.C. § 1983
## (1ST AMENDMENT, RETALIATION/EXPRESSION)

148.   The Free Speech Clause of the First Amendment, actionable under 42 U.S.C. § 1983, prohibits the government from "abridging the freedom of speech."

149.   Through her conduct, ASHLEY expresses her gender in a manner that is traditionally female, which is incongruent with her sex assigned at birth.

150.   Expressive conduct is protected as free speech under the First Amendment, which also prohibits retaliation motivated by protected activities. As to ASHLEY, specifically, she asserts that her gender expression is protected by the First Amendment. ASHLEY chooses to wear women's apparel and styles herself (*e.g.*, cosmetics, hairstyle) in a manner that is feminine. She has undergone cosmetic surgeries to feminize her appearance. Her mannerisms are those traditionally associated with women. As part of her gender transition, ASHLEY has deliberatively adopted these features of her gender identity with the intention of conveying a feminine gender identity, to the exclusion of any masculine gender identity that might otherwise be forced upon her. And ASHLEY alleges that her gender expression would be interpreted by the reasonable observer as feminine in nature.

151.   ASHLEY also asserts, as First Amendment protected speech, her statement to ZAJDA in the patrol car that she maintains male genitalia. Specifically, in the patrol car immediately after her arrest, ASHLEY stated to ZAJDA in the course of their conversation that she had not undergone surgery to revise her genitalia.

### Count 1: Unconstitutional Burden on Protected Expression
### *(against Defendant CITY, ZAJDA)*

152.   ASHLEY incorporates ¶¶ 1–143 and 148–14950, by reference, as if fully set forth herein.

153.   ZAJDA transported ASHLEY to SDCJ, a men's jail, for no other

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1   purposes than her decision to express her gender identity in a manner that is

2   traditionally feminine and her statement to ZAJDA regarding her genitalia.

3       154.   ZAJDA's act of transporting ASHLEY to SDCJ based on her gender

4   expression was motivated by his stated adherence to CITY policy.

5       155.   CITY policy, TB-05, burdens ASHLEY's First Amendment right to

6   express her gender by conditioning her ability to be booked, processed, and housed

7   in female-gendered detention facilities and undergoing highly invasive, expensive,

8   gender reassignment surgery. CITY policy also burdens ASHLEY's First

9   Amendment right to convey confidential information in the course of her arrest.

10      156.   Specifically incorporating ¶¶ 33-46, ASHLEY was subjected to

11  discriminatory treatment based on her gender by being detained at SDCJ, rather

12  than LCDRF.

13      157.   ZAJDA's conduct and TB-05 constitute viewpoint-based regulations,

14  as they do not burden gender expression of all persons. ZAJDA's conduct and TB-

15  05 burden, specifically, the expression of a transgender identity. Consequently,

16  TB-05 is subject to strict scrutiny.

17      158.   TB-05 is not narrowly-tailored to any compelling state interest.

18      159.   In the alternative, ASHLEY alleges that TB-05 does not satisfy

19  intermediate scrutiny.

20      160.   As a result of ZAJDA's and CITY's conduct, ASHLEY has suffered

21  physical and emotional injuries.

22      161.   ASHLEY incorporates herein the damages allegations of ¶¶ 144–147,

23  as they relate to this claim. ASHLEY incorporates herein the punitive damages

24  allegations of ¶ 147, as punitive damages relate to the malicious and reckless

25  conduct alleged in this claim.

26              **Count 2: Retaliation for Protected Expression**

27          *(against Defendants COUNTY, CHOW, COUNTY DOES,*

28                  *CITY, ZAJDA, CITY DOES)*

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

162.   ASHLEY incorporates ¶¶ 1–143 and 148–14950, by reference, as if fully set forth herein.

163.   As retaliation for ASHLEY's gender expression, she was forced to endure the following acts:

    a.   ZAJDA's act of transporting ASHLEY to a men's jail;

    b.   Being accepted for booking into SDCJ, an event that resulted from the combined efforts of DOE NO. 31 and CHOW;

    c.   Being placed in administrative segregation for no legitimate purpose by DOE NOs. 32 and 33;

    d.   Being housed in cells that either lacked a functioning telephone or were covered in human feces by DOE NOs. 32 and 33;

    e.   DOE NO. 34 laughing at ASHLEY during the release process and going to lunch for an extended period, prolonging ASHLEY's detention;

    f.   Specifically incorporating ¶¶ 33-46, ASHLEY was subjected to discriminatory treatment based on her gender by being detained at SDCJ, rather than LCDRF.

164.   As a result of the conduct identified in ¶ 163, ASHLEY was injured physically and emotionally.

165.   For purposes of municipal liability against CITY, ASHLEY alleges that TB 14-05 was the moving force behind ZAJDA's conduct.

166.   For purposes of municipal liability against COUNTY, ASHLEY alleges that the failure to provide sufficient guidance on detaining transgender individuals in §§ R, Q, and M of the DSB-MPP was the moving force behind the conduct alleged in ¶ 163.

167.   As a result of the conduct identified in ¶ 163, ASHLEY was injured physically and emotionally.

168.   ASHLEY incorporates herein the damages allegations of ¶¶ 144–147,

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 147, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

## Count 3: Telephone Access

### *(against Defendants ZAJDA, DOE NO. 31, DOE NO. 32, DOE NO. 33)*

169.   ASHLEY incorporates ¶¶ 1–143 and 148–14950, by reference, as if fully set forth herein.

170.   The First Amendment protects the right to communicate with persons outside prison walls, and use of a telephone provides a means of exercising this right.

171.   ZAJDA did not permit ASHLEY to make any telephone calls during the period in which ASHLEY was in his custody.

172.    DOE NO. 31 failed to permit ASHLEY to make any telephone calls upon booking.

173.   DOE NO. 32 and DOE NO. 33 failed to provide ASHLEY access to a telephone until she was relocated to the feces cell. DOE NOs. 32 and 33 further burdened ASHLEY's exercise of her First Amendment right to communicate with persons outside the jail by conditioning her access to a functioning telephone on ASHLEY enduring a jail cell that was covered in human feces, infested with insects, and lacked toilet paper.

174.   As a result of the lack of access to a telephone, ASHLEY suffered emotional distress and prolonged detention.

175.   ASHLEY incorporates herein the damages allegations of ¶¶ 144–147, as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 147, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

SECOND AMENDED COMPLAINT FOR DAMAGES

# SECOND CLAIM FOR RELIEF—42 U.S.C. § 1983
## (4TH AMENDMENT, SEIZURE)

176. The Fourth Amendment prohibits searches and arrests without probable cause and is actionable under 42 U.S.C. § 1983. ZAJDA violated ASHLEY's Fourth Amendment right to be free from unreasonable seizures by arresting ASHLEY without probable cause to believe that she committed any offense.

### Count 1: Arrest by SDPD
### *(against Defendants ZAJDA, CITY DOES)*

177. ASHLEY incorporates ¶¶ 1–143 and 176, by reference, as if fully set forth herein.

178. At some point in the early morning hours of December 30, 2018, ZAJDA arrested ASHLEY for alleged felony robbery, without a warrant, in his capacity as an SDPD officer.

179. Specifically incorporating ¶¶ 89–100, ZAJDA and CITY DOES lacked probable cause to arrest ASHLEY for felony robbery or any other offense. A prudent law enforcement officer would not believe that ASHLEY committed felony robbery or any other crime based on the facts and circumstances known to ZAJDA. ASHLEY further alleges that her wounds, which were visible, would cause a reasonable officer to conduct a more comprehensive investigation than ZAJDA's and CITY DOES' investigation. At the time of arrest, ASHLEY was bleeding.

180. Specifically incorporating ¶ 143, both the District Attorney and the City Attorney declined to prosecute ASHLEY.

181. As a direct and proximate consequence of ZAJDA's conduct, ASHLEY was injured physically and emotionally

182. ASHLEY incorporates herein the damages allegations of ¶¶ 144–147, as they relate to this claim. ASHLEY incorporates herein the punitive damages

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

allegations of ¶ 147, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

### Count 2: Detention at SDCJ
### *(Against Defendant DOE NO. 31)*

183. ASHLEY incorporates ¶¶ 1–143 and 176, by reference, as if fully set forth herein.

184. ASHLEY's detention at SDCJ constitutes a seizure for Fourth Amendment purpose.

185. ASHLEY was detained at SDCJ without probable cause. Specifically incorporating ¶¶ 17 and 152, ASHLEY alleges that COUNTY policies required DOE NO. 31 to verify that probable cause to arrest was present by reviewing and collecting a probable cause declaration from ZADJA.

186. ASHLEY is informed that her attorneys requested, by way of a California Public Records Act request directed to the CITY, a copy of the probable cause declaration associated with her arrest. ASHLEY is further informed that the CITY responded that no such document was in its possession. ASHLEY, informed of such facts, believes that DOE NO. 31 made no attempt to verify that her arrest was based on probable cause and that he accepted her into SDCJ for booking without any indication that ASHLEY's detention was supported by probable cause.

187. As a result of the unlawful detention, ASHLEY was injured physically and emotionally.

188. ASHLEY incorporates herein the damages allegations of ¶¶ 144–147, as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 147, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

### Count 3: Private Defendants
### *(against Defendants WYNNE, ROCHA, CASTEEL, CASTENADA, and GOSSIP DOES)*

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

189.   ASHLEY incorporates ¶¶ 1–143 and 176, by reference, as if fully set forth herein.

190.   WYNNE and GOSSIP DOES, as private individuals, are liable for their conduct in exercising control over the decision-making in ZAJDA's and CITY DOES' investigation and arrest of ASHLEY.

191.   On December 29 and 30, 2018, WYNNE, ROCHA, CASTEEL, CASTENADA, and GOSSIP DOES exercised control over the SDPD investigation. These private individuals called the SDPD to GOSSIP GRILL for purposes of having ASHLEY arrested and prosecuted for felony robbery. In support of that purpose, they made false accusations that ASHLEY had robbed GOSSIP GRILL. On-scene, ZAJDA stated that he was arresting ASHLEY pursuant to a citizen arrest as the behest of the GOSSIP GRILL staff.

192.   As a direct and proximate consequence of the actions of WYNNE and GOSSIP GOES, ASHLEY was injured physically and emotionally.

193.   ASHLEY incorporates herein the damages allegations of ¶¶ 144–147, as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 147, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

## THIRD CLAIM FOR RELIEF—42 U.S.C. § 1983
## (14TH AMENDMENT, EQUAL PROTECTION)

194.   The Equal Protection Clause guarantees equality of treatment of those persons who are similarly situated and is actionable under 42 U.S.C. § 1983.

195.   ASHLEY is a transgender individual whose gender expression is feminine in nature. However, she has not undergone gender reassignment surgery.

196.   Classifications based on ASHLEY's transgender status are subject to intermediate scrutiny. Classifications based on ASHLEY's surgical status are also subject to intermediate scrutiny. In the alternative, ASHLEY alleges that her surgical status classification is subject to rational basis review.

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

## Count 1: TB-05 (Direct Path/*Monell*)

### (against Defendant CITY)

197.   ASHLEY incorporates ¶¶ 1–143 and 194–196, by reference, as if fully set forth herein.

198.   TB-05 classifies individuals based on their transgender status. It forces transgender individuals to disclose the nature of their genitalia, while it does not require cisgender individuals to disclose the nature of their genitalia.

199.   TB-05's classification of persons by their status as transgender individuals is not substantially related to any important governmental interest.

200.   TB-05 classifies transgender individuals based on their surgical status. Among transgender individuals, TB-05 creates a distinction between those who have undergone gender reassignment surgery and those who have not—permitting only the former to be transported to detention facilities that are consistent with their gender identity.

201.   TB-05's classification of transgender persons by their surgical status is neither substantially related to any important governmental interest nor rationally related to any legitimate governmental interest.

202.   As a direct result of TB-05, ASHLEY was denied equal protection under the law in violation of the Fourteenth Amendment, rendering the CITY directly liable for ASHLEY's constitutional injuries. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1144 (9th Cir. 2012).

203.   As a result of the unconstitutional policy, TB-05, ASHLEY was injured physically and emotionally.

204.   ASHLEY incorporates herein the damages allegations of ¶¶ 144–147, as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 147, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

## Count 2: Transportation to SDCJ
### *(against Defendants ZAJDA, CITY)*

205.   ASHLEY incorporates ¶¶ 1–143 and 194–196, by reference, as if fully set forth herein.

206.   ZAJDA, while acting under color of state law, transported ASHLEY to SDCJ for booking based on ASHLEY's status as a transgender individual who had not undergone gender reassignment surgery. Pursuant to TB 14-05, cisgender females and transgender females who have undergone gender reassignment surgery are transported to LCDRF.

207.   ZAJDA's act of transporting ASHLEY to SDCJ was motivated by his stated adherence to CITY policy.

208.   Specifically incorporating ¶¶ 33-46, ASHLEY was subjected to discriminatory treatment based on her gender by being detained at SDCJ, rather than LCDRF.

209.   The actions of ZAJDA and CITY treated ASHLEY differently than other arrestees similarly situated on the basis of her transgender status and her surgical status.

210.   The CITY is liable because the affirmative policies enshrined in TB 14-05 were the moving force behind ZAJDA's conduct and the resulting injuries to ASHLEY.

211.   Detaining ASHLEY in a men's facility based on her transgender status is not substantially related to any important government interest.

212.   Detaining ASHLEY in a men's jail on the basis of surgical status is neither substantially related to an important government nor rationally related to a legitimate government interest.

213.   As a result of ZAJDA's conduct in transporting ASHLEY to SDCJ and the events that resulted, ASHLEY was injured physically and emotionally.

214.   ASHLEY incorporates herein the damages allegations of ¶¶ 144–147,

as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 147, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

## Count 3: Booking at SDCJ

### *(against Defendants DOE NO. 31)*

215.   ASHLEY incorporates ¶¶ 1–143 and 194–196, by reference, as if fully set forth herein.

216.   ASHLEY was detained at SDCJ, a men's facility, on the basis of her transgender status and surgical status.

217.   The decision to detain an arrested individual at SDCJ requires that the arrestee be accepted for booking by a member of the SDCJ's Inmate Processing Division (*i.e.*, DOE NO. 31) and found "fit for jail" by a nurse (*i.e.*, CHOW).

218.   ASHLEY's detention at SDCJ was the result of the combined actions of DOE NO. 31 (who accepted ASHLEY for intake into SDCJ) and CHOW (who medically cleared ASHLEY as "fit for jail").

219.   By accepting ASHLEY for booking into SDCJ, DOE NO. 31 treated ASHLEY differently than other cisgender, female arrestees who would not have been accepted for intake at a men's jail. In so doing, DOE NO. 31 also treated ASHLEY differently than other transgender females who have undergone gender reassignment surgery.

220.   Specifically incorporating ¶¶ 33-46, ASHLEY was additionally subjected to discriminatory treatment based on her gender by being detained at SDCJ, rather than LCD

221.   Detaining a female arrestee in a men's facility based on her transgender status is not substantially related to any important government interest.

222.   Detaining a transgender female arrestee in a men's jail on the basis of surgical status is neither substantially related to an important government nor rationally related to a legitimate government interest.

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

223.   As a result of her detention at SDCJ, rather than a women's jail, ASHLEY was injured physically and emotionally.

224.   ASHLEY incorporates herein the damages allegations of ¶¶ 144–147, as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 147, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

## Count 4: Classification and Housing

### *(against Defendants DOE NO. 32, DOE NO. 33, DOE NO. 34, COUNTY)*

225.   ASHLEY incorporates ¶¶ 1–143 and 194–196, by reference, as if fully set forth herein.

226.   COUNTY DOES, inclusive of DOE NOs. 32, 33 and 34, while acting under color of law, deprived ASHLEY of her civil rights under the Equal Protection Clause when they discriminated against ASHLEY on the bases of her sex, gender, and transgender status by, among other things, the following actions and omissions:

a.   Taking ASHLEY to a holding area to be classified after the booking process was complete and proceeding to classify ASHLEY in such a manner that she was placed in administrative segregation solely on the basis of being transgender, pursuant to DSB-MPP section Q.7;

b.   Placing ASHLEY in a cell without a working telephone;

c.   Re-locating ASHLEY to a cell covered in human excrement;

d.   Laughing at ASHLEY during the release process and going to lunch, prolonging ASHLEY's detention; and

e.   Failing to provide ASHLEY with a J-350.

227.   By engaging in the conduct identified in ¶ 226, COUNTY DOES treated ASHLEY differently than other female arrestees similarly situated.

228.   For purposes of municipal liability against COUNTY, ASHLEY

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

SECOND AMENDED COMPLAINT FOR DAMAGES

alleges that Section R of the DSB-MPP was the moving force behind the conduct alleged in ¶ 226. In failing to provide ASHLEY with a J-350, COUNTY DOES were deliberately indifferent to the obvious risks of housing a transgender woman at SDCJ. Under DSB-MPP section R.13, the failure to specify a housing assignment on a J-350—which obviously cannot be accomplished if one is not actually provided with such a form—will automatically result in a housing assignment based on sex.

229.   As a result of the conduct identified in ¶ 226, ASHLEY was injured physically and emotionally.

230.   ASHLEY incorporates herein the damages allegations of ¶¶ 144–147, as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 147, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

## FOURTH CLAIM FOR RELIEF—42 U.S.C. § 1983
## (14TH AMENDMENT, PROCEDURAL DUE PROCESS)

### (against Defendants ZAJDA, DOE NO. 31, DOE NO. 32, and DOE NO. 33)

231.   California Penal Code § 851.5 requires that a person who is arrested has the right to make at least three completed telephone calls immediately upon booking, but no later than three hours after being arrested.

232.   California Penal Code § 851.5 gives rise to a liberty interest that is protected by the procedural dimension of the Due Process Clause.

233.   ZAJDA, DOE NO. 31, DOE NO. 32, and DOE NO. 33 violated California Penal Code § 851.5 by failing to provide ASHLEY with the opportunity to make three completed telephone calls within the time period contemplated by California Penal Code § 851.5.

234.   By violating California Penal Code § 851.5, ZAJDA, DOE NO. 31, DOE NO. 32, and DOE NO. 33 violated ASHLEY's procedural due process rights.

235.   As a result of the lack of access to a telephone, ASHLEY suffered

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1  emotional distress and prolonged detention.

2  236.   ASHLEY incorporates herein the damages allegations of ¶¶ 144–147,

3  as they relate to this claim. ASHLEY incorporates herein the punitive damages

4  allegations of ¶ 147, as punitive damages relate to the malicious and reckless

5  conduct alleged in this claim.

## FIFTH CLAIM FOR RELIEF—42 U.S.C. § 1983
## (14TH AMENDMENT, SUBSTANTIVE DUE PROCESS)
### Count 1: Conditions of Confinement
### (against Defendants COUNTY, CHOW, COUNTY DOES, ZAJDA)

10  237.   The substantive protections of the Fourteenth Amendment's Due

11  Process Clause guarantee that detained individuals, who have not yet been

12  convicted, will not be kept in conditions that amount to punishment. ASHLEY is

13  entitled to the protections of the Fourteenth Amendment, rather than the Eighth

14  Amendment, because she has never been prosecuted, let alone convicted, for any

15  of the events described in this complaint and was not serving a sentence when she

16  was detained at SDCJ.

17  238.   ASHLEY incorporates ¶¶ 1–143, by reference, as if fully set forth

18  herein.

19  239.   ASHLEY challenges the following affirmative acts and omissions of

20  COUNTY and COUNTY DOES as constituting punishment in violation of the

21  substantive protections of the Due Process Clause:

22            a.   Affirmatively placing ASHLEY in administrative segregation

23                 without any legitimate security need, and based only on her

24                 status as a transgender individual;

25            b.   Affirmatively placing ASHLEY in a housing unit without a

26                 functioning telephone;

27            c.   Affirmatively placing ASHLEY in a housing unit with human

28                 feces;

d.  Affirmatively instructing ASHLEY to remove her shoes and refusing to provide replacement footwear;

e.  Failing to provide ASHLEY with clean toilet paper (the non-provision of toilet paper amounts to a non-provision of a toilet);

f.  Failing to provide ASHLEY with a bed, mattress, or similar sleeping mechanism; and

g.  Failing to provide ASHLEY with transition-related medication required to maintain her gender identity.

240.   DOE NO. 31 and CHOW, by accepting ASHLEY for booking and finding her fit for jail, set in motion the acts and omissions alleged in ¶ 239.

241.   ZAJDA's affirmative act of transporting ASHLEY to SDCJ for booking set in motion the acts and omissions alleged in ¶¶ 239 and 240. As to foreseeability, ASHLEY is informed and believes that ZAJDA was assigned to work in the patrol area that encompasses the Hillcrest neighborhood of San Diego during the relevant period, and is familiar with arresting and transporting members of the LGBT community to San Diego's jails. ASHLEY further believes that, as a member of the SDPD, ZAJDA has previously arrested females and is familiar with LCDRF. ASHLEY is further informed and believes that that conditions of San Diego's jails, including SDCJ, are the subject of public record, and alleges on such bases that ZAJDA would have known about the overcrowding and other issues the resulted in the conditions in which ASHLEY was housed.

242.   For purposes of municipal liability against COUNTY, ASHLEY alleges that the failure to provide sufficient guidance on detaining transgender individuals in §§ R, Q, and M of the DSB-MPP was the moving force behind the conduct alleged in ¶¶ 239 and 240.

243.   As it concerns the omissions described in ¶ 239, COUNTY and COUNTY DOES were deliberately indifferent to the known, obvious risks associated with such omissions.

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

a. Refusing to provide footwear to a detainee housed in a feces cell has obvious consequences on that detainee's physical and mental wellbeing. During this period, the San Diego region was suffering from a catastrophic Hepatitis A outbreak that killed no fewer than 20 people and infected more than 500 others. Even if this threat were not a then-current event, the discomfort associated with excrement is near-universal.

b. Refusing to provide clean, dry bedding to a pretrial detainee in such filthy conditions carries obvious risks to such a detainee's physical and mental health.

c. The risks associated with failing to provide transition-related medication to a transgender individual are also obvious, given the trauma associated with gender dysphoria.

244.   None of the acts or omissions described in ¶ 239 are rationally related to any governmental purpose—let alone a legitimate, nonpunitive one. The goal of correctional facilities, as it concerns *pretrial* detainees, is to ensure that an arrestee actually appears at trial. None of the acts or omission described in ¶ 239 serve such purpose. Moreover, none of acts or omissions challenged by ASHLEY are necessary for managing SDCJ effectively.

245.   The acts and omissions described in ¶ 239 placed ASHLEY at substantial risk of suffering serious harm.

246.   As a result of the conduct identified in ¶ 239, ASHLEY was injured physically and emotionally.

247.   ASHLEY incorporates herein the damages allegations of ¶¶ 144–147, as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 147, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

SECOND AMENDED COMPLAINT FOR DAMAGES

**Count 2: Incommunicado Detention**

*(against Defendants ZAJDA, DOE NO. 31, DOE NO. 32, and DOE NO. 32)*

248.   The substantive protections of the Fourteenth Amendment's Due Process Clause guarantee that detained individuals will not be held incommunicado.

249.   ZAJDA, DOE NO. 31, DOE NO. 32, and DOE NO. 32, by failing to provide ASHLEY with telephone access, violated ASHLEY's protected liberty interest in communicating with the outside world.

250.   There were no logistical or security reasons that justified holding ASHLEY incommunicado.

251.   As a result of the conduct identified in ¶ 249, ASHLEY was injured emotionally and suffered a prolonged detention.

252.   ASHLEY incorporates herein the damages allegations of ¶¶ 144–147, as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 147, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

## SIXTH CLAIM FOR RELIEF—UNRUH ACT

*(against Defendants DCSS III, INC., ROCHA, CASTEEL, CASTENADA, WYNNE, and GOSSIP DOES)*

253.   The Unruh Act guarantees that individuals are entitled to full and equal accommodations, advantages, facilities, privileges, and services in all business establishments no matter their sex. Cal. Civ. Code § 51(b). Sex includes sex, gender, gender identity, gender expression, gender-related appearance, and gender-related behavior—and perceptions about related characteristics. Cal. Civ. Code § 51(e)(5)-(6).

254.   ASHLEY was denied full and equal access to accommodations, advantages, facilities, privileges, or services at GOSSIP GRILL on the basis of her sex, as that concept is defined by the Unruh Act.

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

255.   ASHLEY incorporates ¶¶ 1–143, by reference, as if fully set forth herein.

256.   GOSSIP GRILL, a bar and restaurant owned by DCSS III, INC., is a "business establishment" for purposes of the Unruh Act.

257.   DCSS III, INC., WYNNE, and GOSSIP DOES committed the following discriminatory acts at some point between 11:30 p.m. on December 29, 2018 and 12:30 a.m. on December 30, 2018, which denied ASHLEY full and equal accommodations, advantages, facilities, privileges, or services:

a. In the scope of her employment for DCSS III, INC., ROCHA verbally harassed ASHLEY in the gender-neutral GOSSIP GRILL restroom, physically grabbed ASHLEY's arm, and followed ASHLEY around the GOSSIP GRILL facility verbally harassing her;

b. ROCHA, CASTEEL, CASTENADA, WYNNE, and GOSSIP DOES, while in the scope of their employment for DCSS III, INC., physically attacked ASHLEY as she was attempting to leave GOSSIP GRILL;

c. ROCHA, CASTEEL, CASTENADA, WYNNE, and GOSSIP DOES, while in the scope of their employment with DCSS III, INC. called law enforcement to falsely report that ASHLEY committed robbery;

d. CASTEEL, in the scope of his employment for DCSS III, INC., made physically aggressive body motions in the street outside GOSSIP GRILL, placing ASHLEY in fear and causing her to flee; CASTEEL then attempted to pursue ASHLEY, chasing her through the streets of San Diego.

258.   At the time of the events described in ¶ 257, DCSS III, INC., ROCHA, CASTEEL, CASTENADA, WYNNE, and GOSSIP DOES were aware

1  of ASHLEY's transgender status.

2      259.   The actions described in ¶ 257 were arbitrary and substantially

3  motivated by ASHLEY's transgender status.

4      260.   The actions of DCSS III, INC., ROCHA, CASTEEL, CASTENADA,

5  WYNNE, and GOSSIP DOES caused ASHLEY to suffer harm, including both

6  physical injuries and emotional injuries.

7      261.   ASHLEY incorporates herein the damages allegations of ¶¶ 144–147,

8  as they relate to this claim. ASHLEY incorporates herein the punitive damages

9  allegations of ¶ 147, as punitive damages relate to the malicious and reckless

10  conduct alleged in this claim.

11  ## SEVENTH CLAIM FOR RELIEF—BANE ACT

12  ### (against Defendants DCSS III, INC., ROCHA, CASTEEL, CASTENADA,

13  ### WYNNE, GOSSIP DOES, COUNTY DOES)

14      262.   The Bane Act, codified at California Government Code section

15  52.1, prohibits any person from interfering by threats, intimidation, or coercion

16  with the exercise or enjoyment by any individual of rights secured by the

17  Constitution or laws of the United States.

18      263.   ASHLEY incorporates ¶¶ 1–143, by reference, as if fully set forth

19  herein.

20      264.   DCSS III, INC., ROCHA, CASTEEL, CASTENADA, WYNNE, and

21  GOSSIP DOES violated the Bane Act by subjecting ASHLEY to threats and

22  intimidation, thereby interfering with her rights under the Unruh Act. As a result of

23  this conduct, ASHLEY was injured physically and emotionally.

24      265.   DCSS III, INC., ROCHA, CASTEEL, CASTENADA, WYNNE, and

25  GOSSIP DOES violated the Bane Act by subjecting ASHLEY to threats and

26  intimidation in the course of their assault of ASHLEY, battery of ASHLEY, and

27  subjecting ASHLEY to intentional infliction of emotional distress.

28      266.   ASHLEY incorporates herein the damages allegations of ¶¶ 144–147,

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 147, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

## EIGHTH CLAIM FOR RELIEF—NEGLIGENCE

### Count 1: Negligent Hiring, Retention, Supervision

### *(against Defendant DCSS III, INC.)*

267.   ASHLEY incorporates ¶¶ 1–143, by reference, as if fully set forth herein.

268.   DCSS III, INC. owed a duty of care to ASHLEY to use reasonable care while she was a customer at GOSSIP GRILL.

269.   DCSS III, INC. breached its duty of care to ASHLEY by hiring, retaining, and supervising its employees—ROCHA, CASTEEL, CASTENADA, WYNNE, and GOSSIP DOES—in such a manner as to encourage them to use unprovoked violence and make false accusations to law enforcements to harass ASHLEY.

270.   As to the use of unprovoked violence to harass patrons, the staff at GOSSIP GRILL have a documented history of using physical violence against patrons where there is no legitimate security need justifying such violence.

271.   As to the use of law enforcement to harass patrons, ASHLEY is informed that a member of the GOSSIP GRILL staff previously made statements in May 2017 that, when the members of the staff dislike a patron, they know precisely what actions to take in order to put that patron in a compromising position and be forced to "pay a lot of money," or words to such effect. Aware of this information, ASHLEY believes, and alleges, that there is a well-established custom at GOSSIP GRILL of making calls for service to law enforcement that report either false or exaggerated stories with the specific purpose of forcing patrons to defend themselves in court.

272.   The information alleged in ¶¶ 271 and 272 is either known or well-

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1  known to DCSS III, INC. According to publicly-filed documents with the

2  California Secretary of State, the president of DCSS III, INC. is one Monique

3  Girton. ASHLEY is informed that Ms. Girton is regularly present at GOSSIP

4  GRILL—she is not an absent manager. GOSSIP GRILL's reputation for violence

5  is also public knowledge, given the number of reviews online that describe prior

6  incidents of violence by GOSSIP GRILL staff. Aware of such information,

7  ASHLEY believes and alleges that Ms. Girton (at the very minimum) would know

8  of the reputation of GOSSIP GRILL staff.

9       273.   Despite this knowledge, DCSS III, INC. has persevered in hiring,

10  retaining, and supervising a staff that routinely uses unprovoked violence and law

11  enforcement to harass patrons (such as ASHLEY) for whom the staff have no

12  legitimate reason to harass or expel—breaching the duty of care owed to

13  ASHLEY.

14       274.   As a result of that breach, ASHLEY was injured physically and

15  emotionally.

16       275.   ASHLEY incorporates herein the damages allegations of ¶¶ 144–147,

17  as they relate to this claim. ASHLEY incorporates herein the punitive damages

18  allegations of ¶ 147, as punitive damages relate to the malicious and reckless

19  conduct alleged in this claim.

20  **Count 2: Negligence Per Se**

21  ***(against Defendants DCSS III, INC., WYNNE, GOSSIP DOES)***

22       276.   ASHLEY incorporates ¶¶ 1–143, by reference, as if fully set forth

23  herein.

24       277.   California Penal Code section 134 provides the following: "Every

25  person guilty of preparing any false or ante-dated book, paper, record, instrument

26  in writing, or other matter or thing, with intent to produce it, or allow it to be

27  produced for any fraudulent or deceitful purpose, as genuine or true, upon any trial,

28  proceeding, or inquiry whatever, authorized by law, is guilty of felony."

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

278.   Beginning on December 30, 2018, WYNNE and GOSSIP DOES created several video clips of the incidents at GOSSIP GRILL. In doing so, they removed excerpts from at least two clips. By doing so, the edited video gives a false impression that ASHLEY was the aggressor in the physical altercation at the GOSSIP GRILL hostess stand. WYNNE and GOSSIP DOES then submitted these clips to the relevant prosecuting authorities in the hope that ASHLEY would be prosecuted for felony robbery.

279.   WYNNE and GOSSIP DOES falsified the video recordings in violation of California Penal Code section 134.

280.   ASHLEY is one of the persons for whose protections California Penal Code section 134 was adopted.

281.   As a consequence of the falsified evidence, ASHLEY was forced to endure the mental anxiety of a potential criminal prosecution, to pay bail fees, and to pay for the costs of a criminal defense attorney.

282.   ASHLEY incorporates herein the damages allegations of ¶¶ 144–147, as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 147, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

### NINTH CLAIM FOR RELIEF—ASSAULT

#### Count 1: Restroom Touching

#### *(against Defendants DCSS III, INC., ROCHA)*

283.   ASHLEY incorporates ¶¶ 1–143, by reference, as if fully set forth herein.

284.   Specifically incorporating ¶¶ 63–73, ROCHA intentionally touched ASHLEY, without ASHLEY's consent, in a harmful and offensive manner in the GOSSIP GRILL restroom while in the course and scope of her employment with DCSS III, INC. As a result of ROCHA's conduct, ASHLEY reasonably believed she was about to be touched in a harmful or offensive manner.

285. As a result of ROCHA's conduct, ASHLEY has suffered physical injuries, emotional injuries, and medical costs. ROCHA's conduct was a substantial factor in causing those injuries.

286. ASHLEY incorporates herein the damages allegations of ¶¶ 144–147, as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 147, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

## Count 2: Sidewalk Melee
### *(against Defendants DCSS III, INC., ROCHA, CASTEEL, CASTENADA, WYNNE, GOSSIP DOES)*

287. ASHLEY incorporates ¶¶ 1–143, by reference, as if fully set forth herein.

288. Specifically incorporating ¶¶ 74–81, ROCHA, CASTEEL, CASTENADA, WYNNE, and GOSSIP DOES intentionally touched ASHLEY in a harmful and offensive manner, without ASHLEY's consent, while in the course and scope of their employment with DCSS III, INC. As a result of these acts, ASHLEY reasonably believed she was about to be touched in a harmful or offensive manner. As a further result of these acts, ASHLEY has suffered physical injuries, emotional injuries, and medical costs. These acts were a substantial factor in causing those injuries.

289. ASHLEY incorporates herein the damages allegations of ¶¶ 144–147, as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 147, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

## Count 3: Streetcorner Assault
### *(against Defendants DCSS III, INC., CASTEEL)*

290. ASHLEY incorporates ¶¶ 1–143, by reference, as if fully set forth herein.

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

**SECOND AMENDED COMPLAINT FOR DAMAGES**

1    291.    Specifically incorporating ¶¶ 82–88, CASTEEL made aggressive

2    motions toward ASHLEY, without ASHLEY's consent, while in the course and

3    scope of his employment with DCSS III, INC. As a result of CASTEEL's conduct,

4    ASHLEY reasonably believed she was about to be touched in a harmful or

5    offensive manner.

6    292.    As a result of CASTEEL's conduct, ASHLEY has suffered physical

7    injuries, emotional injuries, and medical costs. CASTEEL's conduct was a

8    substantial factor in causing those injuries.

9    293.    ASHLEY incorporates herein the damages allegations of ¶¶ 144–147,

10   as they relate to this claim. ASHLEY incorporates herein the punitive damages

11   allegations of ¶ 147, as punitive damages relate to the malicious and reckless

12   conduct alleged in this claim.

### TENTH CLAIM FOR RELIEF—BATTERY

#### Count 1: Restroom Touching

#### *(against Defendants DCSS III, INC., ROCHA)*

16   294.    ASHLEY incorporates ¶¶ 1–143, by reference, as if fully set forth

17   herein.

18   295.    Specifically incorporating ¶¶ 63–73, ROCHA intentionally made

19   physical contact with ASHLEY, without ASHLEY's consent, while in the course

20   and scope of her employment with DCSS III, INC. A reasonable person in

21   ASHLEY's situation would have been offended by ROCHA's touching.

22   296.    As a result of ROCHA's conduct, ASHLEY has suffered physical

23   injuries, emotional injuries, and medical costs. ROCHA's conduct was a

24   substantial factor in causing those injuries.

25   297.    ASHLEY incorporates herein the damages allegations of ¶¶ 144–147,

26   as they relate to this claim. ASHLEY incorporates herein the punitive damages

27   allegations of ¶ 147, as punitive damages relate to the malicious and reckless

28   conduct alleged in this claim.

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

**Count 2: Sidewalk Melee**

***(against Defendants DCSS III, INC., ROCHA, CASTEEL, CASTENADA, WYNNE, GOSSIP DOES)***

298.   ASHLEY incorporates ¶¶ 1–143, by reference, as if fully set forth herein.

299.   Specifically incorporating ¶¶ 74–8176, ROCHA, CASTEEL, CASTENADA, WYNNE, and GOSSIP DOES intentionally made contact ASHLEY, without ASHLEY's consent, while in the course and scope of their employment with DCSS III, INC. A reasonable person in ASHLEY's situation would have been offended this touching.

300.   As a result of these acts, ASHLEY has suffered physical injuries, emotional injuries, and medical costs. These acts were a substantial factor in causing those injuries.

301.   ASHLEY incorporates herein the damages allegations of ¶¶ 144–147, as they relate to this claim. ASHLEY incorporates herein the punitive damages allegations of ¶ 147, as punitive damages relate to the malicious and reckless conduct alleged in this claim.

# THIRTEENTH CLAIM FOR RELIEF—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

***(against Defendants DCSS III, INC., ROCHA, CASTEEl, CASTENADA, WYNNE, and GOSSIP DOES)***

302.   ASHLEY incorporates ¶¶ 1–143, by reference, as if fully set forth herein.

303.   Between 11:30 p.m. on December 29, 2018 and 12:30 a.m. on December 30, 2018, ROCHA, CASTEEL, CASTENADA, WYNNE, and GOSSIP DOES engaged in numerous acts of outrageous conduct, including the following:

    a.   ROCHA verbally harassing ASHLEY in the gender-neutral GOSSIP GRILL restroom, physically grabbing ASHLEY's

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

1  arm, and following ASHLEY around the GOSSIP GRILL

2  facility, continuing the verbal harassment;

3     b.  ROCHA, CASTEEL, CASTENADA, WYNNE, and GOSSIP

4       DOES physically attacking ASHLEY as she was trying to leave

5       GOSSIP GRILL;

6     c.  ROCHA, CASTEEL, and CASTENADA following ASHLEY

7       down University Avenue;

8     d.  CASTEEL making physically aggressive body motions, placing

9       ASHLEY in fear and causing her to flee, and chasing ASHLEY

10       through the streets of San Diego;

11     e.  Calling law enforcement to falsely accuse ASHLEY of robbery;

12     f.  Editing the video clips from the GOSSIP GRILL security

13       system to support the criminal prosecution of ASHLEY.

14     304.  In doing the acts identified in ¶ 304, ROCHA, CASTEEL,

15  CASTENADA, WYNNE, and GOSSIP DOES intended to cause ASHLEY to

16  experience emotional distress and acted with a reckless disregard of the probability

17  those actions would cause emotional distress for ASHLEY. As a result of these

18  actions, ASHLEY experienced severe emotional suffering. ROCHA, CASTEEL,

19  CASTENADA, WYNNE, and GOSSIP DOES, while committing these acts, were

20  acting within the scope of their employment for DCSS III, INC.

21     305.  ASHLEY incorporates herein the damages allegations of ¶¶ 144–147,

22  as they relate to this claim. ASHLEY incorporates herein the punitive damages

23  allegations of ¶ 147, as punitive damages relate to the malicious and reckless

24  conduct alleged in this claim.

25  # DEMAND FOR JURY TRIAL

26     306.  ASHLEY demands a trial by jury.

27  # PRAYER

28     307.  WHEREFORE, ASHLEY prays that the Court enter judgment against

48

Defendants DCSS III, INC., DWAYNE WYNNE, the COUNTY OF SAN

DIEGO, EMILY CHOW, the CITY OF SAN DIEGO, MATTHEW ZAJDA, and

DOE NOs. 1 through 45, inclusive, as follows:

      a. Economic damages in an amount to be determined at trial;

      b. Non-economic damages in an amount to be determined at trial;

      c. Punitive damages (as to all defendants except the COUNTY
        and CITY);

      d. Nominal damages in an amount to be determined at trial;

      e. Attorney fees, costs and expenses as authorized law, according
        to proof;

      f. Interest;

      g. Injunctive relief; and

      h. Any other and further relief that the Court considers proper.

DATED: August 31, 2020         PETERSON • BRADFORD • BURKWITZ

*Ryan A. Graham, Esq.*
Avi Butkwitz, Esq.
Ryan A. Graham, Esq.
*Attorneys for Plaintiff*

PETERSON • BRADFORD • BURKWITZ
100 North First Street, Suite 300
Burbank, CA 91502-1845
818.562.5800

SECOND AMENDED COMPLAINT FOR DAMAGES