1  ROBERT A. ORTIZ, Senior Deputy (SBN 246849)
   ALEXA KATZ, Senior Deputy (SBN 317968)
2  Office of County Counsel, County of San Diego
   1600 Pacific Highway, Room 355
3  San Diego, California 92101-2469
   Telephone: (619) 531-5279; Fax: (619) 531-6005
4  E-mail: robert.ortiz@sdcounty.ca.gov

5  Attorneys for Defendants County of San Diego and Emily Chow

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11  ASHLEY R. VUZ,                        )  No. 20cv0246-GPC-AGS
                                          )
12         Plaintiff,                     )  **MEMORANDUM OF POINTS AND**
                                          )  **AUTHORITIES IN SUPPORT OF**
13     v.                                 )  **MOTION FOR SUMMARY**
                                          )  **JUDGMENT,  OR IN THE**
14  DCSS III, Inc., a California corporation )  **ALTERNATIVE, PARTIAL**
    doing business as GOSSIP GRILL;       )  **SUMMARY JUDGMENT**
15  DWAYNE WYNNE, an individual;          )
    COUNTY OF SAN DIEGO, a political      )  Date: January 21, 2022
16  subdivision on the State of California, )  Time: 1:30 p.m.
    EMILY CHOW, an individual; CITY OF    )  Courtroom: 2D
17  SAN DIEGO, a municipal corporation;   )  Judge: Hon. Gonzalo P. Curiel
    MATTHEW ZADJA, an individual; and     )
18  DOES NOS. 1 THROUGH 45,               )
    individuals,                          )
19                                        )
           Defendants.                    )
20  _____)

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................iii

 I.  INTRODUCTION ................................................................................... 2

II.  FACTS .................................................................................................... 2

A.  Plaintiff's Visit to an LGBTQ-Friendly Bar Ends in Arrest After She Steals Money from the Bar and Punches a Security Guard who Tried to Stop Her.............................. 2

B.  Plaintiff is Arrested for Robbery by the San Diego Police Department and Transported to San Diego Central Jail ......................................................................... 3

C.  Plaintiff is Screened by Jail Intake Nurse Emily Chow to Determine Whether She was Medically and Mentally "Fit for Jail"........................................................................ 3

D.  Pursuant to Policy, Plaintiff is Interviewed by Classification to Obtain Her Housing Preferences in the Event She Did Not Post Bond ............................................................ 5

E.  Plaintiff was Provided a Private Holding Cell to Ensure Her Safety and She was Never "Housed" in the Jail's Housing Modules because She posted Bond within Ten Hours........................................................................................................................ 6

F.  County Policies Mandate that Transgender Inmates be Afforded the Same Opportunities as other Inmates and that they be Housed in a Way that Honors their Gender Identity while Ensuring the Safety of All Inmates........................................... 7

G.  The County Maintains Robust Policies and Practices to Ensure Clean and Safe Jail Facilities ........................................................................................................................ 8

III.  LEGAL STANDARD............................................................................. 8

IV.  ANALYSIS.............................................................................................. 9

A.  Plaintiff's Municipal Liability Claims Based on Equal Protection and Conditions of Confinement are Barred as a Matter of Law because (1) There is No Underlying Constitutional Violation, (2) There is No Policy that Directed a Constitutional Violation, and (3) There is No Pattern of Similar Constitutional Violations................................................................................................................... 9

   1.  Applicable Fourteenth Amendment Equal Protection Law ............................... 10

   2.  Applicable Fourteenth Amendment Substantive Due Process, Conditions-of-Confinement Law ............................................................................ 11

   3.  There is No Municipal Liability Based on Equal Protection or Conditions of Confinement because there is No Evidence that any Deputy or Nurse Violated Plaintiff's Constitutional Rights ............................................................. 12

       a.  There is no evidence of an underlying Equal Protection violation.............. 12

       b.  There is no evidence of an underlying Fourteenth Amendment Substantive Due Process (conditions of confinement) violation ................. 14

c. There is no evidence that any express County policy ("*Monell* Model") directed any alleged constitutional violation..................................................18

d. There is no evidence that the County had a pervasive custom or practice ("*Canton* model") that directed similar constitutional violations of the type complained of by Plaintiff.....................................................21

B. Nurse Chow is Shielded from Liability for Not Unilaterally Providing Plaintiff Immediate Access to Transition Related Medication During the Intake Medical Screening.....................................................................................................23

1. Nurse Chow Did Not Violate any Constitutional Guarantee by Not Improperly Supplying Plaintiff with Transition-Related Medication During the Medical Intake Screening.....................................................................24

2. No Clearly Established Law Holds that Jail Intake Nurses Must Unilaterally Provide Inmates with Transition-Related Medications During the Intake Screening Process.................................................................................24

V. CONCLUSION ...........................................................................................25

No. 20cv0246-GPC-AGS

# Table of Authorities

**Cases**                                                 **Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................. 9

*Barren v. Harrington*,
  152 F.3d 1193 (9th Cir. 1998) ................................................. 10

*Bd. of the County Comm'rs of Bryan County v. Brown*,
  520 U.S. 397 (1997) ................................................ 9, 10, 11, 21, 22

*Bell v. Wolfish*,
  441 U.S. 520 (1979) ................................................................ 11

*Benavidez v. Cnty. of San Diego*,
  993 F.3d 1134 (9th Cir. 2021) ................................................. 22

*Bridges v. Dart*,
  950 F.3d 476 (7th Cir. 2020) ................................................... 23

*Brown v. Phillips*,
  2018 WL 10798975 (D. Neb. Feb. 8, 2018) ............................ 11

*Canton v. Harris*,
  489 U.S. 378 (1989) ................................................................ 10

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .................................................................. 9

*Chappell v. Mandeville*,
  706 F.3d 1052 (9th Cir. 2013) ................................................. 16

*Clairmont Mental Health v. Sound Mental Health*,
  632 F.3d 1091 (9th Cir. 2011) ................................................. 24

*Dinote v. Danberg*,
  601 F. App'x 127 (3d Cir. 2015) ............................................. 20

*Fairbank v. Wunderman Cato Johnson*,
  212 F.3d 528 (9th Cir. 2000) .................................................... 9

*Forrester v. City of San Diego*,
  25 F.3d 804 (9th Cir. 1994) ..................................................... 12

*Garcia v. Garcia*,
  2018 WL 11257395 (E.D. Cal. May 31, 2018) .................... 15-16

*Gordon v. Cty. of Orange*,
   888 F.3d 1118 (9th Cir. 2018) ....................................................... 11

*Graves v. Arpaio*,
   2008 WL 4699770 (D. Ariz. Oct. 22, 2008) .................................. 16

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982) ....................................................................... 23

*Harrison v. Kernan*,
   971 F.3d 1069 (9th Cir. 2020) ................................................... 10-11

*Hunter v. Bryant*,
   502 U.S. 224 (1991) ....................................................................... 23

*Johannes v. Cnty. of Los Angeles*,
   2011 WL 6149253 (C.D. Cal. 2011) .............................................. 16

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019) ....................................................... 10

*Leer v. Murphy*,
   844 F.2d 628 (9th Cir. 1988). ....................................................... 12

*Long v. City & Cty. of Honolulu*,
   511 F.3d 901 (9th Cir. 2007) ......................................................... 12

*Los Angeles v. Heller*,
   475 U.S. 796 (1986) ....................................................................... 12

*Malley v. Briggs*,
   475 U.S. 335 (1986) ....................................................................... 23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ......................................................................... 9

*Mitchell v. Kallas*,
   895 F.3d 492 (7th Cir. 2018) .................................................... 17, 24

*Monell v. Department of Social Services*,
   436 U.S. 658 (1978) .................................................................... 9, 18

*Nelson v. Pima Cmty. Coll.*,
   83 F.3d 1075 (9th Cir. 1996) ..................................................... 13-14

*Oltarzewski v. Ruggiero*,
   830 F.2d 136 (9th Cir. 1987) ......................................................... 13

iv

*Overton v. Bazzetta*,
   539 U.S. 126 (2003) ................................................................ 11

*Oviatt v. Pearce*,
   954 F.2d 1470 (9th Cir. 1992) ................................................. 19

*Pearson v. Callahan*,
   555 U.S. 223 (2009) ................................................................ 23

*Phillips v. Cty. of Riverside*,
   2020 WL 4260963 (C.D. Cal. July 24, 2020) ............................ 15

*Plumhoff v. Rickard*,
   572 U.S. 765 (2014) ................................................................ 25

*Raiser v. San Diego Cty., No. 19-cv-0751-GPC-KSC*,
   2019 U.S. Dist. LEXIS 185460 (S.D. Cal. Oct. 25, 2019) ......... 23

*S.B. v. Cty. of San Diego*,
   864 F.3d 1010 (9th Cir. 2017) ................................................. 25

*Saucier v. Katz*,
   533 U.S. 194 (2001) ................................................................ 24

*Shakur v. Schriro*,
   514 F.3d 878 (9th Cir. 2008) ................................................... 10

*Thornton v. City of St. Helens*,
   425 F.3d 1158 (9th Cir. 2005) ................................................. 10

*Trevino v. Gates*,
   99 F.3d 911 (9th Cir. 1996) ............................................... 10, 22

*United States v. Phillips*,
   367 F.3d 846 (9th Cir. 2004) ................................................... 12

*United States v. Virginia*,
   518 U.S. 515 (1996) ................................................................ 20

*Vazquez v. Cty. of Kern*,
   949 F.3d 1153 (9th Cir. 2020) ................................................. 12

*Villegas v. Gilroy Garlic Festival Ass'n*,
   541 F.3d 950 (9th Cir. 2008) ................................................... 12

*Walker v. Ahern*,
   2018 WL 2267745 (N.D. Cal. May 17, 2018) ...................... 15, 16

v

*Witherow v. Paff,*
    52 F.3d 264 (9th Cir. 1995) (per curiam) ...................................................................... 9

### **RULES/STATUES**

### **Federal Rules of Civil Procedure**

Rule 56 .................................................................................................................. 8, 9

### **Penal Code**

Section 212.5 ............................................................................................................ 3

### **Title 24 Unites States Code**

Section 30301 ......................................................................................................... 21

### **Title 42 Unites States Code**

Section 1983 ........................................................................... 9, 10, 13, 19, 23, 24

## I.   INTRODUCTION

After multiple motion-to-dismiss rulings, Plaintiff Ashley Vuz's ("Plaintiff") claims against the County of San Diego ("County") and Emily Chow ("Nurse Chow," collectively, "County Defendants") have been greatly narrowed.  The only remaining claims are municipal liability claims against the County under the Fourteenth Amendment Equal Protection clause premised on Plaintiff's booking and housing and a Fourteenth Amendment Substantive Due Process claim based on the conditions of Plaintiff's confinement at the San Diego Central Jail ("SDCJ").  The sole remaining claim against Nurse Chow is a Fourteenth Amendment Substantive Due Process claim based on Nurse Chow not unilaterally providing transition-related prescription medications to Plaintiff during the initial jail intake screening process.

The County is entitled to judgment as a matter of law because (1) Plaintiff did not suffer any constitutional violation, and (2) there is no evidence of any constitutionally inadequate County policy or practice. Similarly, Nurse Chow is entitled to judgment as a matter of law because her actions as the intake screening nurse with respect to Plaintiff's medications were constitutionally permissible.  She is also entitled to qualified immunity because there was no robust precedent that provided Nurse Chow notice that her actions were clearly unconstitutional.

## II.   FACTS

A.   <u>Plaintiff's Visit to an LGBTQ-Friendly Bar Ends in Arrest After She Steals Money from the Bar and Punches a Security Guard who Tried to Stop Her</u>.

Plaintiff is a transgender women who began transitioning from male to female in 2015.  She has not had gender confirming surgery on her genitalia.  (Undisputed Material Fact ("UMF") 1.)  On December 29, 2018, Plaintiff was in San Diego visiting her mother and two friends.  After dinner, Plaintiff and her companions visited local bars for drinks. The group left their first bar and visited an LGBTQ-friendly bar in Hillcrest called Gossip Grill.[1]  They paid a cover charge to enter Gossip Grill.  (UMF 2.)  After about twenty

---

[1] https://www.sandiego.org/plan/lgbtq/gay-friendly-bars-and-clubs.aspx

minutes, Plaintiff got into an argument with a female security guard.  The security guard asked Plaintiff to leave the bar because she appeared to be intoxicated.  This upset Plaintiff who believed the LGBTQ-friendly bar was discriminating against her because of her gender identity.  (UMF 3.)  She went to the Gossip Grill employee collecting the cover charge and demanded a return of her cover charge.  During this exchange, Plaintiff reached inside the cash box and grabbed a handful of cash. (UMF 4.)

This prompted further involvement from Gossip Grill security who approached Plaintiff and demanded she return the stolen money.  Plaintiff refused.  As the security guards were escorting Plaintiff out, she turned around and punched one in the face, prompting security to restrain her.  A Gossip Grill security guard called 911.  (UMF 5.)

B. <u>Plaintiff is Arrested for Robbery by the San Diego Police Department and Transported to San Diego Central Jail.</u>

After leaving Gossip Grill, security guards followed Plaintiff down the street and demanded that she return the stolen money.  (UMF 6.)  As this was happening, SDPD officers responded to the call.  The officers found Plaintiff hiding at a nearby bar and detained her.  The officers conducted an investigation, including gathering statements from witnesses and a curbside line up.  (UMF 7.)

After finding probable cause to arrest Plaintiff for violating Penal Code section 212.5 (Felony Second Degree Robbery), she was transported to SDPD headquarters by Officer Matthew Zadja.  (UMF 8.)  While transporting Plaintiff, Officer Zadja learned that Plaintiff had not yet had gender confirming surgery.  As directed by SDPD Training Bulletin 14-05, Officer Zadja transported Plaintiff to SDCJ.  (UMF 9, 10.)

C. <u>Plaintiff is Screened by Jail Intake Nurse Emily Chow to Determine Whether She was Medically and Mentally "Fit for Jail."</u>

Plaintiff arrived at San Diego Central Jail ("SDCJ") at approximately 3:10 a.m. She went through the initial booking procedures outlined in Detention Services Bureau ("DSB") Policies Q.1 and Q.7, including meeting with a jail intake nurse Emily Chow. (UMF 11.)  Nurse Chow's role in the intake process was to ensure that every individual

1  who entered the facility was medically stable, otherwise known as being "fit for jail."

2  Pursuant to DSB Policy M.9, the nurse assesses the arrestee's vital signs, observes any

3  signs of illness or injury, and asks a series of questions regarding the arrestee's physical

4  and psychological health. (UMF 12.) If an arrestee is not stable enough to enter the

5  facility because they are having a medical or psychological emergency, they are rejected

6  and the arresting officer is instructed to take them to a hospital. If the intake nurse

7  determines that the arrestee needs further medical evaluation, they are directed to a

8  secondary screening for further evaluation. (UMF 13.)

9       As part of the medical intake, every arrestee, regardless of appearance, is asked if

10  they identify as transgender, either male to female or female to male. If the arrestee

11  responds affirmatively, they are also asked whether they are in the process of gender

12  reassignment therapy. (UMF 14.) If an arrestee identifies as transgender, the nurse calls

13  a Jail Population Management Unit ("JPMU") classification deputy who assesses that

14  individual's housing needs. (UMF 15.) This process is identical for all County intake

15  facilities, including: San Diego Central Jail and Los Colinas Detention. (UMF 16.)

16      The intake nurse also asks every arrestee if they are taking any prescription

17  medications and has the arrestee execute information releases so the Medical Services

18  Division can begin the process of confirming that individual's medical and prescription

19  records. (UMF 17.) The intake nurse is prohibited from dispensing any medication,

20  regardless if the medication is prescription or over-the-counter. They are solely charged

21  with gathering information, screening the arrestee's health, and having the arrestee sign

22  releases. A nurse in Nurse Chow's position is not allowed to prescribe or dispense

23  medications unless acting under the order of a doctor. (UMF 18.)

24      While meeting with Nurse Chow, Plaintiff confirmed that she identified as

25  transgender and was in the process of gender reassignment therapy. She also told Nurse

26  Chow that she was taking "several" medications and she received her medications from

27  Walgreens pharmacy. Plaintiff did not have these medications with her when she was

28  booked into custody. Nurse Chow had Plaintiff sign the releases allowing medical staff

1   to obtain those medications should Plaintiff have remained in County custody.  (UMF

2   19.)  After evaluating Plaintiff's general health, Nurse Chow determined Plaintiff was

3   stable enough to enter the facility.  (UMF 20.)

4       To obtain prescription medications for an inmate, the inmate's prescription records

5   need to be obtained from their pharmacy.  Once the records are obtained, a doctor who

6   works at the jail then verifies those records to ensure the medications are still active and

7   necessary for the inmate.  Depending on the medication and the inmate's medical history,

8   a physician may need to meet with the inmate for further evaluation or will send out the

9   prescription to be filled.  The doctor may also contact a specialist or the arrestee's

10  primary care doctor to obtain further information.  While San Diego Central Jail stocks

11  some medications, it is not a pharmacy, so many medications needs to be obtained by an

12  outside pharmacy.  (UMF 21.)  This process takes more than ten hours to complete, but is

13  necessary to ensure that inmates are being provided the correct medications.  (UMF 22.)

14      D.   Pursuant to Policy, Plaintiff is Interviewed by Classification to Obtain
15           Her Housing Preferences in the Event She Did Not Post Bond.

16      As a result of Plaintiff identifying as transgender during the medical intake

17  screening, Classification Deputy Michael Frushon conducted a classification interview

18  with Plaintiff.  (UMF 23.)  A classification deputy meets with every arrestee who may be

19  housed in the facility.  The purpose of the classification interview is to provide inmates

20  appropriate housing assignments so they are not at risk of harm and they do not place

21  others at risk of harm.  All arrestees answer the same series of questions to help deputies

22  assess appropriate housing.  (UMF 24.)

23      When an individual identifies as transgender, the classification deputy also obtains

24  an inmate's preference regarding housing in a primarily male or female facility.  This

25  question is asked regardless of surgical status.  The individual will also complete a

26  Gender Identity Statement of Preference Form, also known as a J-350 form.  The form

27  asks if the individual prefers to be housed with males, females, or has no preference.

28  Gender identity is not necessarily determinative of housing preferences, which is part of

1   the importance of the J-350.  (UMF 25.)  If the inmate expresses fear for their safety and

2   may be at risk of harm if housed with other inmates, the classification deputy may also

3   fill out a segregated housing order, also known as a J-72 form.  (UMF 26.)

4       During the intake and classification process, Plaintiff expressed fear of being

5   beaten and harassed by other inmates because she was transgender.  She also told Deputy

6   Frushon that she planned to post bail.  (UMF 27.)  Deputy Frushon observed that Plaintiff

7   identified as female and exhibited female characteristics.  Plaintiff completed the J-350

8   form where she indicated that she wanted to be housed with women. Because Plaintiff

9   expressed fear for her safety, Deputy Frushon noted that Plaintiff should be placed in

10  protective custody and further noted that she should be housed in a female facility.

11  (UMF 28.)  Plaintiff was never housed in administrative segregation nor was it ever

12  recommended that she should be housed in administrative segregation.  (UMF 29.)

13      E.  <u>Plaintiff was Provided a Private Holding Cell to Ensure Her Safety and She</u>
14          <u>Was Never "Housed" in the Jail's Housing Modules Because She Posted</u>
15          <u>Bond within Ten Hours</u>.

16      After completing the intake process, Plaintiff was placed alone in private holding

17  cells on the first and second floor for the duration of her time at SDCJ.  And she was

18  never housed in the jail's housing modules, which are located on floors three through

19  eight in the jail.  (UMF 30.)

20      Plaintiff was first placed in a holding cell on the first floor at approximately 4:15

21  a.m.  She tried to use the phone in that cell, but could not get it to function. She brought

22  this to the attention of a deputy and told him she was trying to post bail and needed to use

23  the phone.  Shortly thereafter, she was transferred to the cell next door, where she was

24  able to use the phone to arrange bail and call her mother. Plaintiff cannot identify these

25  deputies. (UMF 31.)

26      During the conversation with her mother, she mentioned that a female jail deputy

27  and the police officer who were arrested her were both "nice."  (UMF 32.)  She also told

28  her mother that the cell she was in was dirty with toilet paper everywhere.  She did not

mention that there was feces in the cell.  There was also no mention of the cell being covered with feces during Plaintiff's deposition. She never told any deputy that the cell she was in was unclean.  Plaintiff was in that cell for approximately five hours and then moved to a cell on the second floor.  (UMF 33.)

During the intake process, a female deputy removed Plaintiff's shoes, which were high-heeled black boots that had been damaged during the altercation at Gossip Grill. Although Plaintiff had her shoes with her, Plaintiff remained barefoot when she was placed in the first and second holding cells.  Plaintiff believed she could not put her shoes back on.  No other deputy prevented her from putting her shoes back on.  When Plaintiff was moved to the second floor she was provided replacement shoes.  (UMF 34.)

Plaintiff posted bail and left SDCJ at approximately 1:20 p.m. the same day she was booked.  (UMF 35.)  Plaintiff was at SDCJ for less than ten hours, which is within the 6 to 12 hour window it can take for detainees to post bail and be processed in and out of the facility.  (UMF 36.)  Plaintiff was not provided her unspecified medications while at SDCJ because her records could not be processed and verified prior to her release. (UMF 37.)  Because Plaintiff takes her transition-related medications in the morning, she was only delayed in taking her medications by a few hours.  Over the next week and a half Plaintiff received a Hepatitis A shot and contracted the flu.  (UMF 38, 39.)

F.    County Policies Mandate that Transgender Inmates be Afforded the Same Opportunities as other Inmates and that they be Housed in a Way that Honors their Gender Identity while Ensuring the Safety of All Inmates.

Pursuant to Policy R. 1, all inmates that are booked into the facility participate in the classification process.  The classification process generally consists of individualized interviews with every individual who enters any jail facility to ensure that they are housed in an appropriate area based on various factors such as prior criminal history. This interview takes into account the classification deputy's evaluation of that inmate's safety as well as the safety of the individuals that inmate will be housed with.  (UMF 40.) Policy R.13 directs that transgender identifying inmates are to be provided the same

1  housing and programming opportunities as cisgender inmates regardless of the facility

2  where they are housed.  (UMF 41.)

3      R.13 expands the criteria in Policy R.1 to take into account gender identity and the

4  specific vulnerabilities of transgender individuals in determining housing assignments.

5  The policy emphasizes case-by-case individualized evaluations of the preferences of

6  gender non-conforming inmates and instructs deputies to primarily consider that

7  individual's housing preferences in determining whether they should be housed in a

8  primarily male or primarily female facility.  (UMF 42.)  The policy also provides

9  instructions on the use of the J-350 form to document each individual's housing

10 preferences (male, female, or no preference). This form can be amended at any time by

11 an inmate.  Moreover, gender identity does not necessarily inform preferences regarding

12 searches and housing.  Many arrestees in County custody who are transitioning from

13 male to female prefer to be housed in a male facility or have no preference.  (UMF 43.)

14 The language in Policy R.13 is based on the language in the Federal Prison Rape

15 Elimination Act ("PREA"), which provides guidance to law enforcement agencies on

16 how to safely house vulnerable populations while balancing gender expression.  (UMF

17 44.)  The Board of State and Community Corrections has also noted no deficiencies in the

18 Sheriff's Department's classification policies.  (UMF 45.)

19      G.   The County Maintains Robust Policies and Practices to Ensure Clean and
20           Safe Jail Facilities.

21      Inspections of SDCJ between 2016 and 2018 pursuant to Title 15 note that the

22 facility maintains clean and hygienic facilities and the facility is "clean and well

23 maintained."  (UMF 46.)  Title 15 inspections also noted no deficiencies in County

24 policies concerning medical intake screening, management of communicable diseases,

25 and pharmaceutical management.  (UMF 47.)

26 **III.   LEGAL STANDARD**

27      Summary judgment is appropriate under Federal Rules of Civil Procedure, rule

28 56(c) where the moving party demonstrates the absence of a genuine issue of material

1   fact and entitlement to judgment as a matter of law.  See Fed.R.Civ.P. 56(c); *Celotex*

2   *Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

3          A moving party's initial burden in a motion for summary judgment is slight.  Rule

4   56 does not require a moving party to negate the opponent's claim or show an absence of

5   issues of material fact to be awarded summary judgment.  *Celotex*, 477 U.S. at 323, 327.

6   The moving party must merely allege an absence of evidence to support the opposing

7   party's case, and identify supporting portions of the record.  *Id.*; *see also Fairbank v.*

8   *Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

9          Once the moving party meets its initial responsibility, the burden shifts to the non-

10  moving party to produce evidence to show that a genuine issue of material fact remains to

11  be determined.  *Celotex*, 477 U.S. at 322-324.  Mere allegation and speculation are not

12  sufficient to create a factual dispute for purposes of summary judgment.  *Witherow v.*

13  *Paff*, 52 F.3d 264, 266 (9th Cir. 1995) (per curiam); *see also Matsushita Elec. Indus. Co.*

14  *v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (the non-moving party "'must do

15  more than simply show that there is some metaphysical doubt as to the material facts'").

16  Only disputes over facts that might affect the outcome of the case properly may preclude

17  entry of summary judgment.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

18  **IV.    ANALYSIS**

19          A.    Plaintiff's Municipal Liability Claims Based on Equal Protection and

20                 Conditions of Confinement are Barred as a Matter of Law because (1) There
                   is No Underlying Constitutional Violation, (2) There is No Policy that

21                 Directed a Constitutional Violation, and (3) There is No Pattern of Similar

22                 Constitutional Violations.

23         Under section 1983, a municipality cannot be held responsible for the acts of its

24  employees under a respondeat superior theory of liability.  *See Bd. of the County*

25  *Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997); *Monell v. Department of*

26  *Social Services*, 436 U.S. 658, 691 (1978).  A municipality can be sued directly under

27  section 1983 *only* where the alleged unconstitutional conduct is the result of an official,

28  formal policy (*Monell* model) *or* as a result of a pervasive practice (*Canton* model), and

                                                    9

1   the policy or practice was the "moving force" behind the violation.  *Canton v. Harris,*

2   489 U.S. 378, 389-91 (1989); *Brown*, 520 U.S. at 404; *Trevino v. Gates*, 99 F.3d 911, 918

3   (9th Cir. 1996).  The Supreme Court has emphasized that "[w]here a plaintiff claims that

4   the municipality . . . has caused an employee to [violate plaintiff's constitutional rights],

5   rigorous standards of culpability and causation must be applied to ensure that the

6   municipality is not held liable solely for the actions of its employee." *Brown*, 520 U.S. at

7   405.  The need to heed the warning in *Brown* is even more imperative in cases like this,

8   where Plaintiff failed to even identify the alleged deputies who Plaintiff claims violated

9   her constitutional rights.[2]

10          **1.     Applicable Fourteenth Amendment Equal Protection Law.**

11          "The Equal Protection Clause requires the State to treat all similarly situated

12   people equally." *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008) (citation omitted).

13   "To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of

14   the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent

15   or purpose to discriminate against the plaintiff based upon membership in a protected

16   class." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).  A claim under the

17   Equal Protection Clause fails where the wrong is not alleged to be directed towards an

18   individual as a member of a class or group singled out for discriminatory intent.  *See*

19   *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005) ("An equal protection

20   claim will not lie by 'conflating all persons not injured into a preferred class receiving

21   better treatment' than the plaintiff.").

22          Intermediate scrutiny applies to equal protection cases alleging discrimination

23   based on gender identity.  *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019); *see*

24   *also Harrison v. Kernan*, 971 F.3d 1069, 1076 (9th Cir. 2020).  Thus, regulations

25   premised on gender are constitutional when such regulation "serve[ ] important

26   governmental objectives and [] the discriminatory means employed are substantially

27   related to the achievement of those objectives." *Harrison*, 971 F.3d at 1076 (quoting

28   _____

[2] Plaintiff failed to name or serve County Does 31 through 34 and the time for
Plaintiff to amend her pleadings and conduct fact discovery have passed.

*United States v. Virginia*, 518 U.S. 515, 533 (1996)).  The "'purpose of requiring' intermediate scrutiny for gender-based distinctions is to ensure that they are rooted in 'reasoned analysis' by policymakers, rather than discriminatory animus…." *Id.* at 1078.

In *Harrison,* the Ninth Circuit confirmed that intermediate scrutiny applies to gender classifications in jails, but, in doing so, repeatedly cautioned that deference should be granted to the decisions of prison officials:

> "[W]e are acutely aware of the uniquely difficult circumstances faced by prison officials as they work to maintain safe conditions in the facilities they are charged with overseeing. The deference owed to judgments made by prison officials must always be factored carefully into the analysis of inmates' constitutional challenges to prison regulations, and our decision today should not be taken to hold otherwise… it is a predominant factor in evaluating the strength of the state interest the Department seeks to advance with its challenged regulation.

*Id.* at 1076; *see also Brown v. Phillips*, 2018 WL 10798975, at *15 (D. Neb. Feb. 8, 2018) ("No matter what level of scrutiny applies, the Defendants' treatment of [plaintiff] must be balanced against penological or institutional interests like safety and protection from violence.); *see also Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (explaining that courts "must accord substantial deference to the professional judgment of prison administrators. . . .").

### 2.    Applicable Fourteenth Amendment Substantive Due Process, Conditions-of-Confinement Law.

Conditions-of-confinement claims brought by pre-trial detainees are evaluated under an "objective deliberate indifference standard." *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).  In evaluating the constitutionality of conditions or restrictions of pretrial detention . . . the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).  "Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense…" *Id.* at 537-538.  "For a particular governmental action to constitute punishment, (1) that action must cause the detainee to suffer some harm or

'disability,' and (2) the purpose of the governmental action must be to punish the detainee." *Vazquez v. Cty. of Kern*, 949 F.3d 1153, 1163 (9th Cir. 2020)(internal citations omitted). "'[T]o constitute punishment, the harm or disability caused by the government's action must either significantly exceed, or be independent of, the inherent discomforts of confinement.' . . . Once harm is established, the court considers 'whether this harm is imposed 'for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.'" *Id*. (internal citations omitted).

### 3. There is No Municipal Liability Based on Equal Protection or Conditions of Confinement because there is No Evidence that any Deputy or Nurse Violated Plaintiff's Constitutional Rights.

To bring a claim against a municipality, there must be some evidence of an underlying constitutional violation. *See Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 957(9th Cir. 2008); *Long v. City & Cty. of Honolulu*, 511 F.3d 901, 907 (9th Cir. 2007) ("If no constitutional violation occurred, the municipality cannot be held liable"). Thus, a prerequisite to any municipal civil rights claim is proof that an employee violated plaintiff's constitutional rights. *Forrester v. City of San Diego*, 25 F.3d 804, 808 (9th Cir. 1994); *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

### a. There is no evidence of an underlying Equal Protection violation.

Even evaluating Plaintiff's allegations under the more lenient 12(b)(6) standard, this Court recognized such incidences could not form the basis for an equal protection claim. *See* ECF No. 65 at pp. 27-28 (The "aforementioned allegations are insufficient to make a finding that the County intentionally discriminated against [Plaintiff] on the basis of her transgender status.") Thus, it has already been determined that these allegations do not support an equal protection claim. *See United States v. Phillips*, 367 F.3d 846, 856 (9th Cir. 2004) ("Issues that a district court determines during pretrial motions become law of the case.")

///

To the extent the matter remains at issue, there is no evidence that—because of her transgender status—Plaintiff was discriminated against (e.g., intentionally placed in a cell without a working phone, placed in a feces-covered cell, being laughed at, and having her detention unnecessarily prolonged).  It is undisputed that Plaintiff was put in the allegedly unclean cell so she could use the phone.  And, the ten hours she spent in custody was not "prolonged" as it can take between 6 to 12 hours to post bond depending on various factors, many outside the control of jail staff.  Similarly, there is no evidence that she was housed in administrative segregation, was not provided a J-350 form, or that she was laughed at as a result of being transgender.  Plaintiff's assertions about administrative segregation and not receiving a J-350 form are contradicted by undisputed evidence.  In fact, she was never even assigned to a housing module.  Administrative segregation cells are located only on the housing floors (floors three through eight), which Plaintiff never visited.  Lastly, even if Plaintiff was allegedly "laughed at," it does not rise to the level of a constitutional violation.  *See Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987) (explaining that "verbal harassment . . . is not sufficient to state a constitutional deprivation under [Section 1983].")

To the extent Plaintiff incorrectly conflates being in a private holding cell with administrative segregation, her equal protection rights were not violated.  Her placement in a private holding cell was in accordance with her own preferences because she expressed fear of being beaten and harassed by other inmates.  She further indicated that she wished to be housed with women on the J-350 form.  Based on Plaintiff's female gender identity and fear for her safety, the classification deputy agreed it would not be appropriate to place Plaintiff in a cell with male inmates.  Thus, Plaintiff's temporary placement in a cell by herself did not violate her equal protection rights because it was in accordance with her own preferences.

Any contention that Plaintiff would not have experienced these alleged conditions if she had been transferred to Los Colinas, a facility the houses female inmates, is too speculative to support an equal protection claim.  *See Nelson v. Pima Cmty. Coll.,* 83

13

1    F.3d 1075, 1081-82 (9th Cir. 1996) ("mere allegation and speculation do not create a

2    factual dispute for purposes of summary judgment.")  Even if Plaintiff had been

3    transported to Los Colinas, there is no evidence that Los Colinas' "open booking policy"

4    would have prevented her from being placed in an unclean cell, allowed her access to a

5    working phone, or prevented her from being "laughed at."  There is also no evidence that

6    the booking system at Los Colinas is the result of gender distinctions as opposed to the

7    design of the facility.  To the contrary, the evidence supports that the procedures in

8    Policy R.13 for the booking and intake of transgender-identifying individuals apply

9    equally to every facility to ensure that gender identity is being honored while taking into

10   account individual safety and security.

11                       b.   There is no evidence of an underlying Fourteenth Amendment
12                            Substantive Due Process (conditions of confinement) violation.

13            Summary judgment should be granted on Plaintiff's conditions-of-confinement

14   claim premised on alleged housing in administrative segregation, placement in a cell

15   without a telephone, placement in a feces-covered cell, removal of Plaintiff's shoes,

16   failure to provide clean toilet paper, failure to provide bedding, and failure to provide

17   transition-related medications during intake medical screenings.  These allegations are

18   unsupported by the facts on the record and fail to state a claim as matter of law.

19        To establish a constitutional violation, "[t]he inquiry into causation must be

20   individualized and focus on the duties and responsibilities of each individual defendant

21   whose acts or omissions are alleged to have caused a constitutional deprivation."  *Leer v.*

22   *Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). At the outset, Plaintiff is unable to proffer

23   evidence to support specific factual allegations regarding any of the deputies that

24   allegedly implemented or enforced the unlawful conditions of confinement and their

25   duties and responsibilities.  This precludes any argument that each acted with reckless

26   disregard.  Because there are no specific facts implicating how any individual deputy

27   violated Plaintiff's constitutional rights based on her conditions of confinement, summary

28   judgment is warranted.

1    Administrative Segregation/Phone Access: Plaintiff's allegations that she was

2    housed in administrative segregation and did not have access to a phone are without

3    factual support.  To the extent Plaintiff is alleging punishment based on placement in a

4    private holding cell, there was legitimate penological reasons to not house Plaintiff with

5    other inmates, including that she told deputies she was in fear for her safety.  Moreover, it

6    is undisputed that Plaintiff was given access to a phone as she was placed in two cells

7    with phones.  When the first phone would not operate, Plaintiff was moved into a second

8    cell where the phone was operational.  There is no evidence that any deputy intentionally

9    put Plaintiff in a cell where there was not a functioning phone.

10    Holding Cell Conditions: There is no evidence supporting that feces covered the

11    second cell where Plaintiff was moved, at her request, so she could use a phone.  While in

12    the cell, Plaintiff told her mother on the phone that someone went crazy with the toilet

13    paper and she "didn't even know" what else was everywhere.  In her deposition, when

14    asked to describe the cell, she stated that it was "a mess" and "wet" with toilet paper

15    streamers on the floor and flies that would land on the wet areas.  Plaintiff says nothing

16    about fecal matter being strewn throughout the cell during her deposition or

17    contemporaneously to her mother.

18    Regardless, Plaintiff was in this cell for approximately five hours. While the cell

19    may have been dirty or even "filthy," temporary placement in a messy cell for five hours

20    is not violation of any constitutional guarantees.  *See Walker v. Ahern*, 2018 WL

21    2267745, at *8 (N.D. Cal. May 17, 2018) (no Fourteenth Amendment violation when

22    inmate was temporarily exposed to "feces infested and plugged up toilet" for two days);

23    *Phillips v. Cty. of Riverside*, 2020 WL 4260963, at *13 (C.D. Cal. July 24, 2020) (no

24    Fourteenth Amendment violation alleged when Plaintiff placed in cell with "fecal

25    particles, fresh feces, urine, and vomit" for two days because such placement was

26    temporary.)  Furthermore, the fact that Plaintiff did not have access to toilet paper during

27    the few hours she was in the cell also does not state a constitutional violation.  *Garcia v.*

28    *Garcia*, 2018 WL 11257395, at *5 (E.D. Cal. May 31, 2018) (no Fourteenth amendment

violation when detainee did not have access to a toilet or food for 8.5 hours).  While the cell may have been unclean, Plaintiff's placement in an unclean cell was temporary and therefore does not rise to the level of a constitutional violation.

Moreover, there is no evidence that Plaintiff was placed into this cell for any punitive reasons or without a legitimate government purpose.  And there is no evidence the alleged conditions placed Plaintiff's health or safety at a high degree of risk.  She was placed in the cell after the phone in the first cell would not operate and she expressed a need to contact a bail bondsman.  Thus, Plaintiff was not placed into the "messy" cell for punitive reasons, but to allow access to a phone.  *Johannes v. Cnty. of Los Angeles*, 2011 WL 6149253, at *26 (C.D. Cal. 2011) (cockroach infestation did not constitute a constitutional violation where the condition was not intended to punish or excessive in relation to a non-punitive purpose and gross negligence did not constitute deliberate indifference).

Bedding Items: Plaintiff also failed to state a constitutional violation resulting from any failure to provide her with bedding. She was booked into SDCJ at approximately 3:30 a.m.  While in custody, she went through the booking process, posted bail, and was released at approximately 1:15 p.m. the same day she was booked into jail.  Plaintiff even remained in her street clothes.  It is undisputed that she was never housed inside the facility, kept overnight, or in the jail for more than twelve hours. Accordingly, there was no requirement that she be provided bedding.  *See* Cal. Code Regs. Tit. 15, § 1270; *see also Chappell v. Mandeville*, 706 F.3d 1052, 1060 (9th Cir. 2013)(to state an Eighth Amendment claim based on failure to provide bedding, plaintiff must be deprived of bedding for more than a few days); *see also Walker,* 2018 WL 2267745, at *8 (use of dirty bedding on a "temporary basis" does not amount to punishment or violate constitutional guarantees); *Graves v. Arpaio*, 2008 WL 4699770, at *10 (D. Ariz. Oct. 22, 2008) ("Depriving a pretrial detainee of a bed or mattress for two nights in jail without legitimate governmental purpose violates the Fourteenth Amendment.").

///

1    There are also no facts that any specific individual made an intentional decision to
2    deprive Plaintiff bedding or did so as a form of punishment.  Instead, not being provided
3    bedding was incidental to her release from the facility.  She was not at risk of suffering
4    serious harm because she was not provided bedding nor has she alleged that she suffered
5    injury as a result of not being provided a pillow or mattress.

6    <u>Shoe Removal</u>: In regards to Plaintiff allegations regarding the removal of her
7    shoes. Plaintiff was provided replacement footwear and there is no evidence that any
8    deputy, other than a female deputy during intake, prevented her from putting on her
9    shoes, which she states were damaged, back on.  Once again, Plaintiff remained in the
10   facility for less than ten hours and had possession of her shoes.  Any period of time with
11   replacement footwear was not prolonged.

12   <u>Prescription Medication</u>: Similarly, summary judgment should be granted in favor
13   of Nurse Chow because her duties and responsibility did not include providing Plaintiff
14   with medication. The sole remaining allegation against Nurse Chow is her alleged failure
15   to provide Plaintiff with transition-related medications.  Nurse Chow, however, was only
16   responsible for medically screening Plaintiff and making sure she was stable enough to
17   enter the facility. As a registered nurse, Nurse Chow is prohibited from both prescribing
18   and providing prescription medications to a patient without direct orders from a
19   physician.  It was also not within her duties to provide medications whether prescription
20   or over-the-counter to detainees during the intake screening process.  *See Mitchell v.*
21   *Kallas*, 895 F.3d 492, 499 (7th Cir. 2018) (district court properly granted summary
22   judgment on behalf of a prison psychologist because she had no authority to order
23   hormone therapy).  It was Nurse Chow's duty to present detainees with information
24   releases so pharmacy records could be obtained.  And, it is undisputed that Plaintiff did
25   sign these releases.  That was the extent of her duties as an intake screening nurse.

26   During the ten hours Plaintiff was in custody, she was not provided medications
27   because they could not be procured before she was released from the facility.  When
28   prescription records are sent to the jail is dependent on the provider; and, once the records

1   are sent, they need to be reviewed and verified by a physician who then needs to send out

2   the prescription to be filled by a pharmacy.  The process of verifying prescription

3   information for inmates is crucial because it can be hazardous to provide an arrestee

4   incorrect medications.  It is also not uncommon for detainees to lie about their

5   prescriptions.  Accordingly, the fact that Plaintiff's transition related-medications could

6   not be procured in ten hours is the result of legitimate penological processes and was in

7   no way a punishment.  Because there are no facts supporting that Nurse Chow effectuated

8   a constitutional violation, any claims against her fail as a matter of law.

9                    c.    There is no evidence that any express County policy ("*Monell*
10                         model") directed any alleged constitutional violation.

11          Under a *Monell*-modeled claim, a municipality's formal policy instructs the

12   entity's employee to take the unconstitutional action, and thus directly inflicts the injury.

13   *Monell*, 436 U.S. at 690.

14          Plaintiff contends that various County policies were the moving force behind

15   constitutional violations consisting of alleged placement in administrative segregation,

16   placement in a cell without a working phone and covered in feces, being laughed at, not

17   receiving bedding, not being able to put on her shoes, not receiving transition-related

18   medication, and having her detention prolonged.  All of these allegedly unconstitutional

19   actions, and the policies that necessitated them, are allegedly linked to her being

20   transgender.  ECF No. 68 at ¶¶ 228, 242.  There is no evidence supporting direct

21   municipal liability stemming from County policies.  And any disparate treatment as a

22   result of Plaintiff's gender identity is supported by legitimate penological purposes.

23          Plaintiff alleges, without evidentiary support, that Detention Policy sections R

24   ("Classification"), Q ("Admission, Booking, Property Control, and Release"), and M

25   ("Medical and Healthcare Services") were the moving force behind her alleged

26   constitutional violations.  Plaintiff's *Monell*-modeled claim fails to allege what specific

27   language in these policies directed the alleged constitutional violations.  Policy sections

28   R, Q, and M could not direct a constitutional violation because they are general policies

regarding medical intake, screening, and housing of inmates.  They have no bearing on a transgender inmate's ability to use a phone, to receive bedding in a temporary holding cell, the cleanliness of holding cells, to take off or put on shoes, or the processes for obtaining prescription medications.  *See Oviatt v. Pearce*, 954 F.2d 1470, 1477-78 (9th Cir. 1992) ("The existence of a policy, without more, is insufficient to trigger local government liability under section 1983.")

Plaintiff cannot identify any specific policy provisions that required or expressly permitted any of the objectionable conduct that she was allegedly forced to endure.  This fundamental omission only reaffirms the fact that none of the acts and conditions-of-confinement that she complains of were required or even permitted by policy sections R, Q, and M—or other any County policy.  Indeed, the allegedly unconstitutional acts and conditions of confinement are *contrary* to Policy R. 13, which expressly reinforces the rights of transgender inmates.

The challenged policies do not instruct or condone constitutional violations premised on differential treatment of transgender detainees.  The policies do not intentionally discriminate against transgender inmates because all arrestees in all County facilities go through the intake, booking, and classification processes pursuant to policy.  Yet, because transgender individuals identify in ways that are outside traditional notions of gender identity and are at particular risk for sexual victimization, further classification procedures are necessary. These procedures do not proscribe disparate treatment, but instead provide guidance to ensure gender expression and safety are taken into account, while also ensuring that transgender individuals are being given the same housing and programming opportunities as cisgender inmates.  Policy R.13 strikes this balance by mandating that placement of transgender-identifying individuals is conducted on a case-by-case basis and instructing that no housing opportunities or privileges can be withheld on the basis of gender identity.

Policy sections R, Q, and M, and their implementation in Plaintiff's situation, served a legitimate penological purpose.  Plaintiff's medical assessment during intake and

her temporary placement in a private holding cell while she posted bond served the legitimate penological interest of maintaining her safety and security during the intake and release process.  Moreover, the directives in Policy R.13 apply equally regardless of the primary gender of the facility.  Temporary placement in a private holding cell, as was done with Plaintiff, allows classification deputies time to evaluate the best housing assignment for inmates in the event they do not post bond and need to be housed.  *See Chapter Three: Classification and Housing of Transgender Inmates in American Prisons*, 127 Harv.L.Rev. 1746, 1763 (2014) (explaining "placement in segregation pending the collection of more information and the finalization of housing arrangements seems to be a sensible compromise in the interest of overall safety: when all a correctional institution knows about a particular inmate is his or her transgender status, it is hard to assess what type of placement would be best.")  Even national transgender advocacy organizations have recognized the importance of balancing gender identity with safety.  *Id.* at 1757. Moreover, while honoring the gender identity and ensuring the safety of the transgender individual is paramount, deputies also have a duty to ensure the safety of other inmates in considering housing assignments for transgender individuals.  This serves an important governmental objective of ensuring the safety of all inmates in County custody.  *United States v. Virginia*, 518 U.S. 515, 533 (1996) (even differential treatment is permissible if it bears a sufficient nexus to a qualifying governmental interest).

Moreover, the challenged policies did not direct the arresting officer to book Plaintiff in any proscribed facility and there is no claim against the County regarding Plaintiff's acceptance into SDCJ.  *See* ECF No. 68 at ¶¶ 215-224.  Regardless, there is no constitutional right for an arrestee to be booked in one facility over another facility.  *See e.g. Dinote v. Danberg*, 601 F. App'x 127 (3d Cir. 2015)(dismissal of claim regarding women being booked into male prison facility for up to 48 hours until transfer to a women's facility).  Similarly, there is also no constitutional right to be separated from members of the opposite sex.  Jail employees of both sexes work in both male and female facilities. Also, many transgender-identifying women request to be housed in a male

facility.  Accordingly, Plaintiff's Fourteenth Amendment rights were not violated as a result of briefly being held in a primarily "male" facility.

Furthermore, no challenged policy directs any disparate treatment regarding a transgender inmate's surgical status.  As long as an individual identifies as transgender during the medical intake interview, the procedures in Policy R. 13 are prompted regardless of where the individual is in their transition.  Regardless of what facility an individual is housed, Policy R. 13 specifically prohibits the denial of access to programs, services, or types of housing based on gender identity.  Furthermore, classification deputies retain discretion to coordinate with inmates to change their preference or if deputies feel that specific housing is no longer a suitable option for safety reasons.

There is also no evidence that the challenged policies were adhered to with deliberate indifference.  Policy R. 13 was created in accordance with federal directives set forth in the Prison Rape Elimination Act (34 U.S.C. § 30301, *et. seq.*).  It would therefore not have been obvious to County officials that complying with federal mandates would result in constitutional violations.  The Board of State and Community Corrections also confirmed that the County's classification policies and procedures are in compliance with state mandates.  Plaintiff constitutional rights were not violated nor did jail officials' adherence to policy sections R, Q, and M cause any constitutional violation.  Therefore, summary judgment should be granted on behalf of the County.

> d.   There is no evidence that the County had a pervasive custom or practice ("*Canton* model") that directed similar constitutional violations of the type complained of by Plaintiff.

In *Canton*-type cases, a plaintiff must prove a pattern of similar constitutional violations (*i.e.*, multiple instances of harm) from which it can be plausibly shown that the challenged practice or custom was the moving force of the constitutional violation, and municipal decision makers were on notice.  *Brown*, 520 U.S. at 407-08.  Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be

///

1  founded upon practices of sufficient duration, frequency and consistency that the conduct

2  has become a traditional method of carrying out policy.  *Trevino,* 99 F.3d at 918.

3     The Second Amended Complaint ("SAC") does not expressly allege *Canton*-model

4  liability based on an alleged unconstitutional custom or practice.  ECF No. 68 at ¶¶ 228,

5  242-243.  To the extent the SAC includes such a claim, Plaintiff must establish that the

6  County had a longstanding custom so persistent and widespread that it constituted a

7  permanent and well-settled policy, the practice amounted to deliberate indifference to

8  Plaintiff's constitutional rights, and the practice was the moving force behind the

9  constitutional violation.  *See Brown*, 520 U.S. at 402-04.

10    The SAC is devoid of allegations regarding an unlawful County custom or practice

11  that was the moving force behind the alleged violation of Plaintiff's constitutional rights.

12  Instead, Plaintiff relies solely on her single experience in jail—in a county with over

13  three million residents and tens of thousands of annual jail bookings.  Her experience is

14  insufficient to plead a *Canton*-model municipal liability claim.  Other than the incident at

15  issue in this case, Plaintiff does not allege any specific facts, nor present any evidence, to

16  demonstrate a persistent and widespread custom or practice of violating transgender

17  inmates' rights in the manner alleged in the SAC.  Specifically, there is no evidence that

18  the County had a practice of placing transgender arrestees in dirty cells, failing to provide

19  them telephone access, medication, bedding, or preventing them from putting on their

20  shoes.  Title 15 reports noted no violations in regards to the County's health and safety

21  standards.  Similarly, the Board of State and Community Corrections remarked that SDCJ

22  appeared "clean and well maintained."

23    The *Canton*-model claim in this case is similar to the one rejected in *Benavidez*, a

24  recent Ninth Circuit case from this district.  *Benavidez v. Cnty. of San Diego*, 993 F.3d

25  1134, 1154-55 (9th Cir. 2021).  In that case, the plaintiffs advanced various municipal

26  liability theories, including that County employees followed a custom of acting with

27  deliberate indifference to the rights of the plaintiffs.  *Benavidez*, 993 F.3d at 1154. The

28  Ninth Circuit affirmed the dismissal *at the pleading stage* of the plaintiffs' claims,

1  holding that the allegations regarding the unconstitutional custom did not support

2  *Canton*-model liability because they rely on a single incident.  *See id*. ("[O]ne instance of

3  County employees violating the constitutional rights of parents and children is

4  insufficient to demonstrate a custom supporting [municipal] liability.")

5         Here, too, Plaintiff's *Canton*-model claims rest entirely on her own experience.

6  This is legally insufficient.  *See Raiser v. San Diego Cty.*, No. 19-cv-0751-GPC-KSC,

7  2019 U.S. Dist. LEXIS 185460, at *17 (S.D. Cal. Oct. 25, 2019) (finding that two

8  instances in the five years preceding the events forming the basis of plaintiff's § 1983

9  claims did not amount to a widespread custom); *see also Bridges v. Dart*, 950 F.3d 476,

10  480-81 (7th Cir. 2020) (three or five instances over a seven-year period where inmates'

11  rights were violated did not demonstrate a widespread practice in a county with five

12  million residents and thousands of detainees).  As this Court found in *Raiser,* cursory

13  singular allegations, even at the pleading stage, cannot sustain a claim of widespread

14  custom or practice.  To find otherwise, would make municipalities, particularly large

15  municipalities, vicariously liable for every employee's improper conduct, a principle

16  starkly rejected by the Supreme Court.  Therefore, the County is entitled to summary

17  judgment.

18         B.     Nurse Chow is Shielded from Liability for Not Unilaterally Providing
19                Plaintiff Immediate Access to Transition Related Medication During the
20                Intake Medical Screening.

21         When facing a claim for violation of civil rights, a defendant may move for a

22  finding of qualified immunity, which shields the officer from liability.  *Hunter v. Bryant*,

23  502 U.S. 224, 227 (1991).  Qualified immunity protects defendants from claims based on

24  their conduct in situations requiring the exercise of discretion.  *Harlow v. Fitzgerald,* 457

25  U.S. 800, 818 (1982).  The doctrine protects "all but the plainly incompetent or those

26  who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

27         A qualified immunity determination presents two inquiries either or both of which

28  a court may answer as it deems appropriate under the specific circumstances of the case.

*Pearson v. Callahan*, 555 U.S. 223, 236-238 (2009). One inquiry is whether taken in the light most favorable to the plaintiff, the facts show the conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The second inquiry is whether the constitutional right was clearly established at the time.  *Id.* at 201-202.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.*

### 1.   Nurse Chow Did Not Violate any Constitutional Guarantee by Not Improperly Supplying Plaintiff with Transition-Related Medication During the Medical Intake Screening.

As discussed, *supra,* Nurse Chow was only charged with evaluating Plaintiff's overall health to ensure she was healthy enough to enter SDCJ.  Nurse Chow cannot legally prescribe or dispense prescription medications without authorization from a physician.  Her medical assessment deeming Plaintiff "fit for booking" under SDCJ criteria and her decision to request a medical release from Plaintiff to begin the process of identifying any active prescriptions were lawful, non-discriminatory and did not violate Plaintiff's constitutional rights.  *See Mitchell v. Kallas*, 895 F.3d 492, 499 (7th Cir. 2018) (summary judgment for medical provider affirmed where she was not sufficiently involved in the failure to prescribe treatment, had no authority to order treatment, and could not have sped up or influenced treatment decision).  Accordingly, Nurse Chow did not violate Plaintiff's rights by not unilaterally providing her with medication.

### 2.   No Clearly Established Law Holds that Jail Intake Nurses Must Unilaterally Provide Inmates with Transition-Related Medications During the Intake Screening Process.

The plaintiff in a Section 1983 action has the burden to demonstrate infringement of a clearly established right; if plaintiff fails to do so, the defendant prevails. *Clairmont Mental Health v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011) ("The plaintiff bears the burden to show that the contours of the right were clearly

1 established.").  In order for law to be clearly established, "existing precedent must have
2 placed the statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd,* 563
3 U.S. 731, 741 (2011).  Thus, it is incumbent on the plaintiff to identify "a robust
4 'consensus of cases of persuasive authority.'" *Id.* at 742.

5      The Supreme Court has repeatedly emphasized that district courts are "not to
6 define clearly established law at a high level of generality since doing so avoids the
7 crucial question whether the official acted reasonably in the particular circumstances that
8 he or she faced."  *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014); s*ee S.B. v. Cty. of San*
9 *Diego,* 864 F.3d 1010, 1015 (9th Cir. 2017) (stating "[w]e hear the Supreme Court loud
10 and clear" when discussing the specificity required in assessing qualified immunity).

11      Thus, general case law holding that an arrestee is entitled to adequate medical care
12 is far too generalized to guide the qualified-immunity analysis.  Outside of general
13 statements about inmate medical care, Plaintiff cannot point to robust and controlling
14 precedent that specifically placed Nurse Chow on notice that she had a constitutional
15 obligation, as an intake screening nurse, to immediately provide a transgender inmate
16 with transition-related medications during the intake process, even though it fell outside
17 of the scope of her duties, the inmate had yet to see a physician or have her prescription
18 verified, and even though the transgender inmate posts bond and was released within ten
19 hours.  Without any case support, let alone "robust" precedent, Nurse Chow is entitled to
20 qualified immunity.

21 **V.    CONCLUSION**

22      Based on the foregoing, the County Defendants respectfully request that summary
23 judgment, or in the alternative, partial summary judgment, be entered in their favor**.**

24 DATED:  September 23, 2021       Office of County Counsel

26                                 By: s/ALEXA KATZ, Senior Deputy
Attorneys for Defendants County of San Diego
and Emily Chow