ROBERT A. ORTIZ, Senior Deputy (SBN 246849)
ALEXA KATZ, Senior Deputy (SBN 317968)
Office of County Counsel, County of San Diego
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-5279; Fax: (619) 531-6005
E-mail: robert.ortiz@sdcounty.ca.gov

Attorneys for Defendants County of San Diego and Emily Chow

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ASHLEY R. VUZ,<br><br>Plaintiff,<br><br>v.<br><br>DCSS III, Inc., a California corporation doing business as GOSSIP GRILL; DWAYNE WYNNE, an individual; COUNTY OF SAN DIEGO, a political subdivision on the State of California, EMILY CHOW, an individual; CITY OF SAN DIEGO, a municipal corporation; MATTHEW ZADJA, an individual; and DOES NOS. 1 THROUGH 45, individuals,<br><br>Defendants. | No. 20cv0246-GPC-AGS<br><br>**NOTICE OF LODGMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date: January 21, 2022<br>Time: 1:30 p.m.<br>Courtroom: 2D<br>Judge: Hon. Gonzalo P. Curiel |

Defendants County of San Diego and Emily Chow hereby lodge the following exhibits in support of their motion for summary judgment, or in the alternative, partial summary judgment:

**Exhibit A**-Deposition of Plaintiff Ashley R. Vuz, November 10, 2020.

**Exhibit B**- Gossip Grill Surveillance Video of Plaintiff, her Mother, and her Friends Entering Gossip Grill.

**Exhibit C**-Deposition of Dwayne Wynn, August 13, 2021.

**Exhibit D**-Gossip Grill Surveillance Video of Plaintiff grabbing money from the Till.

**Exhibit E**-Gossip Grill Surveillance Videos of Altercation with Security Guards.

**Exhibit F**- Cell Phone Video of Plaintiff Running Across Street.

**Exhibit G**- San Diego Police Department Arrest and Investigation Reports.

**Exhibit H**- Probable Cause Declaration and Judge Response Report.

**Exhibit I**- Deposition of San Diego Police Office Matthew Zadja, August 25, 2021.

**Exhibit J**- San Diego Central Jail CCTV Video Stills.

**Exhibit K**- Deposition of Nurse Emily Chow, August 24, 2021.

**Exhibit L**- San Diego Sheriff's Department Detention Services Bureau Policies Q.1 and Q.7.

**Exhibit M**- San Diego Sheriff's Department Detention Services Bureau Policies M.9.

**Exhibit N**-Ashley R. Vuz Medical Intake Questionnaire.

**Exhibit O**- Releases signed by Ashley R. Vuz during the Medical Intake Screening.

**Exhibit P**- Voluntary Gender Identity Statement of Preference form J-350 Form signed by Ashley R. Vuz.

**Exhibit Q**- Voluntary Gender Identity Statement of Preference Forms (J-350) signed by other detainees.

**Exhibit R**-Incident Report written by Corporal Frushon.

**Exhibit S**-Segregated Housing Order J-72.

**Exhibit T**- Transcripts of phone calls between Ashley and her Mother, Patricia Vuz while at San Diego Central Jail.

**Exhibit U**- San Diego Sheriff's Department Detention Services Bureau Polices R.1 and R.13.

**Exhibit V**- Title 15 Inspection Reports from 2016-2017, 2017- 2018, and 2018-2019.

**Exhibit W**- Board of State and Community Corrections Biennial Reports from 2016-2018 and 2018-2020.

DATED: September 23, 2021

Office of County Counsel

By: s/ALEXA KATZ, Senior Deputy
Attorneys for Defendants County of San Diego and Emily Chow

# Exhibit A

Videotaped Deposition of

**Ashley R. Vuz**

November 10, 2020

Vuz

vs.

DCSS III, Inc.

@ptus
COURT REPORTING
www.aptusCR.com / 866.999.8310

EXHIBIT A1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

Ashley R. Vuz,

Plaintiff,

vs.

DCSS III, Inc., a California Corporation doing business as Gossip Grill; Dwayne Wynne, an individual; County of San Diego, a political subdivision of the State of California; Emily Chow, an individual; City of San Diego, a municipal corporation; Matthew Zadja, an individual; Does Nos. 4 through 45, individuals; Maria Martinez Rocha, an individual formerly identified as Doe No. 1; Arnell Casteel, an individual formerly identified as Doe No. 2. Jermaine Casteneda, an individual formerly identified as Doe No. 3

Defendants.

CASE NO. 20-CV-00246-GPC-AGS

VIDEOTAPED DEPOSITION OF

ASHLEY R. VUZ

Tuesday, November 10, 2020

REPORTED BY:

LAUREN BIGGINS, CSR NO. 14185

JOB NO. 10074163

DEPOSITION OF ASHLEY R. VUZ, TAKEN ON BEHALF OF THE DEFENDANTS, AT 8:15 AM, NOVEMBER 10, 2020, AT 1000 WILSHIRE BLVD., SUITE 1900, LOS ANGELES, CA 90017, BEFORE LAUREN BIGGINS, CSR NO. 14185.

APPEARANCES OF COUNSEL

FOR PLAINTIFF:

LAW OFFICES OF RYAN A. GRAHAM
BY: RYAN A. GRAHAM, ESQ.
1049 HAVENHURST DR.
SUITE 510
WEST HOLLYWOOD, CA 90046
323-792-6377
RYAN@RYAN.LAW

FOR DEFENDANTS:

*APPEARANCE VIA ZOOM*
OFFICE OF THE COUNTY COUNSEL
BY: ALEXA KATZ, ESQ.
1600 PACIFIC HIGHWAY
ROOM 355
SAN DIEGO, CA 92101
619-531-5836
ALEXA.KATZ@SDCOUNTY.CA.GOV

*APPEARANCE VIA ZOOM*
SAN DIEGO CITY ATTORNEY'S OFFICE
BY: JACKIE MCQUARRIE, ESQ.
1200 3RD AVE.
SUITE 1620
SAN DIEGO, CA 92101
619-236-6220
JMCQUARRIE@SANDIEGO.GOV

APPEARANCES, CONTINUED:

FOR DEFENDANTS:

*APPEARANCE VIA ZOOM*
HOSP GILBERT BERGSTEN
BY: WARREN GILBERT, ESQ.
301 N. LAKE AVE.
SUITE 410
PASADENA, CA 91101
626-792-2400
WLGILBERT@HOSPLAW.COM

ALSO PRESENT:

TRAVIS SIMMONS - LEGAL VIDEOGRAPHER

VICTORIA GREZKA - SAN DIEGO COUNTY PARALEGAL
*APPEARANCE VIA ZOOM*

MATT HALVRESON - CITY ATTORNEY LEGAL INTERN
*APPEARANCE VIA ZOOM*

**Q And where were you born?**

A Excuse me?

**Q Where were you born?**

A I was born in Carollton, Texas.

**Q What is your full legal name?**

A My full -- are you asking about when I was born or currently?

**Q No. So what's your current legal name?**

A My current legal name is Ashley Ryan Vuz.

**Q Have you ever gone by any other names?**

A Yes, ma'am.

**Q What are those names?**

A I previously went by Austin Ryan Vuz.

**Q Did you go by any other names?**

A No, ma'am.

**Q Would you consider yourself to be transgender?**

A Yes, ma'am. I am transgender.

**Q And you were born with male genitalia?**

A Yes, ma'am. I was born with male genitalia.

**Q What age did you know you -- what age did you begin identifying as female?**

A Are you asking when did I understand what transgender was, or when I felt that I was trans?

**Q Yes. So when did you feel you were transgender?**

A No, ma'am. I do not know the exact year.

**Q What about friends? When did you start, I guess, telling friends that you were going to start using female pronouns and felt that you were transgender?**

A Yes. I started telling friends that -- to start using female pronouns and that I was transgender about five years ago.

**Q So 2015?**

A Yes. Around that time.

**Q And is there a point where you kind of came out as transgender?**

A Yes, ma'am.

**Q When was that?**

A Are you asking about how I came out, or the time?

**Q Yeah. So did you -- when did you start communicating to people and, I guess, openly dressing and referring to yourself with female pronouns?**

A I believe it must have been between like 2015-2016, around March and April of either of those years, whichever year it was.

**Q Are you married?**

A No, ma'am.

**Q Do you have any significant others?**

A Yes.

A Yes, ma'am.

Q **Do you ever skip dosages of these hormones?**

A No, ma'am. I do not skip dosages.

Q **So you're very strict with taking them?**

A Yes, ma'am.

Q **How often do you take them?**

A I take my prescriptions as prescribed.

Q **I understand that, but how -- do you take them once a day? Twice a day? Does it depend?**

A Yes. I usually take them in the morning.

Q **All the medications that you take in the morning?**

A All of the transition related medications, I take in the morning.

Q **Are there side effects if you forget to take them?**

MR. GRAHAM: Objection. Foundation.

BY MS. KATZ:

Q **Sorry, are there any side effects if you forget to take the hormones?**

A I would have to consult with a medical professional about that.

Q **Have you experienced any side effects as a result of, I guess, missing any dosages?**

MR. GRAHAM: Objection. Misstates prior

EXHIBIT A7

testimony.

THE WITNESS: Yeah. I'm not sure if I can answer that question, as I just told you that I take them as prescribed.

BY MS. KATZ:

Q How were the surgeries and procedure -- I guess, let's go with surgeries.

How were the surgeries -- the surgeries that you received as part of your transition paid for?

A I paid for them with credit card and checks.

Q Okay. Did insurance pay for the surgeries?

A Yes. Some of it.

Q Okay. How much money did insurance pay for the surgeries? So you said that you had facial reconstruction and breast augmentation?

A Yes, ma'am.

Q Yeah. So how -- so how much did insurance pay towards those surgeries?

A I would have to give you an estimate. Is that okay?

Q Yes.

A I would say around $12,000, I believe.

Q And did you pay the balance?

A What do you mean by pay the balance?

Q Was the surgeries totally covered by insurance?

**Q Do you recall if they were a male or female?**

A I would like to say they're a male, but I do not recall.

**Q So you do not remember anything about the person that took your picture?**

A No, ma'am.

**Q Did you have any other conversation with the individual that took your picture?**

A No. I do not believe so.

**Q So after the individual took your picture, what happened?**

A So after the individual took my picture, I walked with Officer Zedja to another area of processing.

**Q Okay. And what happened there?**

A They handcuffed me to a wall and removed the other handcuffs that were on me.

**Q Okay. And what happened after that?**

A Well, I was sitting on a chair, and then I spoke with a nurse at that time.

**Q Okay. And what did the nurse look like?**

A The nurse was a female. I believe -- are you asking for like specific details, or...

**Q Just describe what the nurse looked like.**

A Yes. She was a woman. She didn't appear large. She appeared average size. Yeah.

**Q Did she -- what color was her hair?**

A I do not recall that at this time.

**Q Okay. Do you know what the nurse's name is?**

A Yes. I believe it was Emily.

**Q Did the nurse ask you questions?**

A Yes.

**Q Okay. What questions did the nurse ask you?**

A I believe she was -- she asked what medications I was on.

**Q Okay. What did you say?**

A I gave her the list of my medications.

**Q Okay. Did she ask you any other questions?**

A I'm -- not that I can recall at this time.

**Q So you can't recall if the nurse asked you any other questions?**

A I can't recall any specific questions. No.

**Q Did the nurse treat you respectfully?**

A Yes.

**Q Did the individual that took your picture treat you respectfully?**

A Yes. There was nothing out of disrespect that they said to me. No.

**Q Okay. Did either of them misgender you?**

A Well, I believe everyone in this facility misgendered me. Yeah.

EXHIBIT A10

because they could be used as a weapon.

Q **What type of shoes were these?**

A They were high heels.

Q **How high was the heel?**

A I would have to give an estimate. I would say about two inches.

Q **So you took off your shoes, and then you went through the body scanner and were searched?**

A Yes, ma'am.

Q **And were the shoes ever returned to you?**

A Yes. I was instructed to hold onto them.

Q **Did anyone tell you you could not put the shoes back on?**

A Yes.

Q **Who told you that you could not put the shoes back on?**

A The woman who did the patdown and had me take the shoes off.

Q **Were you ever given any replacement shoes?**

A No. I was not. Well, no, actually I was, but not until I had paid bail, and they were escorting me to check out.

Q **Were the shoes that you were wearing broken?**

A The shoes I was wearing were damaged. Yes.

Q **How were you shoes damaged?**

A The shoes were damaged because they were dragging me when they were attacking me.

**Q So when you say they were dragging you when they were attacking you, what are you referring to?**

A They -- well, I was hold -- I was put in a choke hold at one point at Gossip, and then again at another point when I was being taken to the police. It wasn't -- it was before the police officer was there. Some people were dragging me.

**Q Okay. And this all occurred earlier in the evening while you were at Gossip Grill?**

A It occurred at Gossip Grill and then down the street from Gossip Grill. Yes.

**Q So the shoes were damaged at Gossip Grill or around Gossip Grill?**

A Yes. That night. They were damaged that night.

**Q How were they damaged?**

A The plastic pieces at the bottom were damaged and sticking out, and the fabric was fraying and like spraying out.

**Q On what part of the shoe?**

A On the heal portion of the shoe.

**Q Do you know the brand of the shoes?**

A I do not know the brand of the shoes.

**facility?**

A That's correct.

**Q Okay. And you had a conversation with that person about you being transgender?**

A Yes.

**Q Okay. And what was the -- what was discussed during that conversation?**

A I basically told him that I was afraid of going into the men's prison, because I am transgender.

**Q And was this officer a male or female?**

A This officer was a male.

**Q Right. And what did that individual look like?**

A I do not recall the exact response, but basically he just took me to the cell and then he asked me -- I don't know if it was him or someone else asked me if I would be posting bail.

**Q Okay. I asked, what did the officer or deputy look like?**

A He was a man larger than me. Bigger frame than me. I don't recall specific details of what this man looked like.

**Q Was he -- was he thin?**

A No. I believe he was larger than me.

**Q So he was heavy set?**

A I'm not sure if I would use that word, but he

that was presented to me.

**Q Did you review those forms?**

A Are you asking if I, like, read everything, or...

**Q If you what?**

A If I, like, read everything, or what do you mean by review?

**Q Yeah. Yeah.**

MR. GRAHAM: I'm going to object as vague as to time.

BY MS. KATZ:

**Q While at the San Diego Central Jail, did you review the forms before you signed them?**

A I reviewed forms as much as I could for the -- it being very late in the morning.

**Q Did any of those forms have anything to do with your housing?**

A I would have to see the forms again.

**Q Okay. Did you request a copy of any of those forms?**

MR. GRAHAM: Objection. Vague as to time.

THE WITNESS: They -- no. I did not request a copy of forms.

BY MS. KATZ:

**Q At any point, did any deputy tell you that you**

were being housed in administrative segregation?

A What do you mean by that?

Q At any point, did any deputy tell you that you were going to be housed in administrative segregation?

A And so what is -- can you define administrative segregation?

Q Well, I'm just asking, did you hear that term in any conversation you had with any county employee while in the San Diego Central Jail?

A I do not recall hearing that word specifically, no, but it may have been said. I don't know.

Q You don't recall anyone telling you that you were going to be housed in administrative segregation?

A I don't know. I would have to -- I don't know what words people, like, used with me like that, that night.

Q So you entered the jail and Officer Zedja left, right?

A Yes.

Q And you had a conversation with the deputy that escorted you to a cell about the fact that you are transgender?

A Yes.

Q Okay. What did you tell -- specifically, what did you tell that deputy?

A Specifically, well, I told him that I was in great fear for me -- the fact that I was transgender, and that I feared being beaten and harassed by inmates. I feared for my safety.

**Q Did you say those exact words to him?**

A I can't say the exact words I said, but that was the conversation.

**Q And what did he say?**

A In response to that?

**Q Yes.**

A I don't know exact words and stuff.

**Q So you told him that you were scared?**

A Yeah.

**Q And that you were worried you were going to be, you said harassed?**

A Yeah.

**Q But you don't remember what he said to you when you said that to him?**

A I believe he said that he was going to put me in a cell by myself.

**Q Okay. And what happened next?**

A And then we walked over to a cell and he put me inside the cell, and yeah.

**Q Okay. And what did you do while you were in the cell?**

A When I was in the cell, I had to use the bathroom at one point, and I tried to use the phone to post bail.

**Q Okay. And what happened then?**

A When I tried using the phone to post bail, there were a lot of technical issues, and after some time of trying to use the phone, I came to the conclusion, the phone wasn't in working order.

**Q Okay. And what did that phone look like?**

A The phone looked like an old school type phone, like attached by like a wire to something that maybe looked like a pay phone of some sort.

**Q And then, so the phone wasn't working?**

A Yeah. That's correct. It wasn't calling out.

**Q Okay. So what did you do?**

A So I informed at one point -- well, I think there was some sort of button you could push inside the cell. I think I pushed that at some point, and then I eventually was able to get attention of someone working there, and told them that the phone wasn't working and I asked if I could be moved to a cell with a working phone so that I could post bail.

**Q Okay. And then what happened after that?**

MR. GRAHAM: Objection. Overbroad. Vague.

THE WITNESS: So are you asking like what --

I'm sorry. Can you resay the question?

BY MS. KATZ:

Q I'm just going through the sequence. So you told somebody that -- you pressed the button and you told somebody the phone wasn't working?

A Uh-huh. Yeah.

Q Okay. And somebody responded?

A Oh, yeah. They --

Q Or did someone respond to that?

A Yeah.

Q When you pressed the button?

A Yeah. I believe I was told that they would have to wait for another cell to open up before they could move me.

Q Okay. And did they eventually move you?

A Yes.

Q Okay. How long after you alerted them that the phone wasn't working did they move you?

A I don't think I had access to time while I was at the facility.

Q Okay. But can you -- was it like five minutes? Ten minutes? Do you have any --

MR. GRAHAM: Objection. Asked and answered.

THE WITNESS: It -- I don't know the specifics of how much time.

Q Is the same individual that put you in that cell the same individual that you alerted that the phone wasn't working, or were they two different people?

A I do not recall which individuals I spoke to at several times throughout the facility. There was a number of individuals I spoke to at that facility, and -- but I can say that the individuals that put me into the -- that transferred me from one cell to another, I believe it was two guards that did that transfer.

Q Oh, so there's -- okay.

So the question I asked you is, was the person that you alerted about the phone the same person that transferred you to the second cell?

A I'm not sure.

Q Okay. What did the person that you told about the phone not working look like?

A I don't know exact descriptions of what people look like, but yeah.

Q Was -- were they short? Tall?

A I don't recall the heights of people that I spoke to.

Q Were -- what was the hair color?

A I do not recall the hair color.

Q Okay. Do you know what they were wearing?

A I do not recall what people were wearing.

**Q Do you recall that -- if they were male or female?**

A I believe most of the guards, yes, were male.

**Q Okay. And then you don't know if that was the same individual that moved you to the second cell?**

A I do not. No.

**Q Okay. Do you know what that individual looked like?**

A No.

**Q So you don't know if it was the same person or a different person, you don't know if it was one or two -- what either of them, or if it was one of them, what they looked like?**

MR. GRAHAM: May I please have that question read back?

(Record read as follows:

THE COURT REPORTER: "So you don't know if it was the same person or a different person, you don't know if it was one or two -- what either of them, or if it was one of them, what they looked like?")

MR. GRAHAM: Objection. Vague and compound.

THE WITNESS: I'm sorry. I'm not sure what the question was. It seemed like there was several

**Q Do you recall hair color?**

A I do not recall hair color.

**Q Or eye color?**

A I do not recall eye color.

**Q Do you recall any identifying features of these individuals?**

A No, ma'am.

**Q Okay. And you said that one of these individuals said something about the condition of the cell?**

A Yes.

**Q What did they say?**

A They said the cell has a working phone, but it's kind of messy, though, and laughed. They both laughed.

**Q They both laughed?**

A That's correct.

**Q And then what happened?**

A And then they put me inside the cell.

**Q Okay. What happened after that?**

A After that, I was able to use the phone in that cell to call out and post bail.

**Q Okay. Did you call anyone else while you were in the cell?**

A Yes.

Q Who did you call?
A I believe I called my mom.
Q Okay. Anyone else?
A Not that I can recall at this time.
Q Do you remember your conversation with your mom?
A Yes.
Q What did you discuss with your mom?
A I believe I discussed just bail and posting bail.
Q How long were you in that cell for?
A I was in that cell for several hours.
Q When you say several hours, like two hours? Three hours?
A I believe longer. Yeah. I was in there for a long time.
Q You said that you arranged bail while you were in that cell?
A Yes.
Q So you -- what was your conversation with the bail bondsman?
A My conversation with the bail bondsman was about posting bail and just kind of how it worked and just about the amount.
Q What did that cell look like?

A The cell -- are you asking about the state of the cell, or was it physically looked like?

**Q Both.**

A Okay. Well -- so the cell was rectangular-ish and had a door on one side with a window on it, and to the left of the door, there was a small bench and then a wall. And then, on the like -- I think it was like a half wall, and then on the other side of the half wall, were like the toilet facilities, and the state of the cell was a mess. It was wet everywhere. There were streamers hanging down from the door of toilet paper. There was no toilet paper available to use that wasn't used -- that wasn't either wet on the floor or used as streamers to decorate the cell by the previous individual, and there were flies landing throughout the cell in wet areas.

**Q Did you tell anyone about the condition of the cell?**

A I don't believe I needed to tell anyone, because everyone knew the condition of the cell when they put me into it, and it was obvious.

**Q When you say everyone knew, what do you mean by that?**

A So the guards that put me in there, the two guards, they knew that it was a mess.

Q And then you were put back in?

A That's correct.

Q And you don't know if it was the same or different deputy that put you back in to the second cell?

MR. GRAHAM: Objection. Ambiguous.

THE WITNESS: Well, I believe when they -- the individual that took me out of the cell was the same individual or individuals that put me back into it, but --

MS. KATZ: The --

THE WITNESS: Sorry. Go ahead.

BY MS. KATZ:

Q Go ahead. I interrupted you.

A But yes, I don't know if it was the original ones that put me in the dirty cell in the first place.

Q Did that individual or individuals say anything to you while they took you out of the cell?

A I can't recall if they said anything to me when they took me out of the cell.

Q Did they have any conversation with you while you were outside of the cell?

A I do not recall if they had conversation with me outside the cell.

Q Did you have your shoes with you at this point?

A Yes. I had the shoes with me, I believe, but I

wasn't allowed to wear them.

Q Did any deputy tell you that you weren't allowed to put your shoes back on?

A Yes.

Q Which deputy told you that?

A It was the deputy that instructed me to take them off.

Q So when you were booked -- when you were searched earlier --

A Uh-huh.

Q -- did any of the deputies that transported you between the cells ever tell you that you cannot put your shoes back on?

A Well, she told me I wasn't allowed to put them back on for the entirety that I was there.

Q Okay. But you never --

A So --

Q None of the deputies that transported you said that you could not put your shoes back on?

A I don't recall if any deputies that transported me inside the facility had a conversation with me about putting the shoes back on, but I would assume that -- because I would have put them on right away if I could, so...

Q So it was the deputy that searched -- and that

**searched you and took you to the scanner that told you that you were not able to put the shoes back on?**

A Yeah. That's correct.

Q **And that was a female deputy?**

A That's correct.

MR. GRAHAM: Counsel, if you're near a stopping point, I just wanted to throw the idea of a lunch out there at some point.

MS. KATZ: I mean, do you want to take lunch now?

MR. GRAHAM: No. Just if you're going to take it at 12:00, I just wanted to put that in there if you have a big long stretch coming up that you didn't want to break up.

MS. KATZ: Can we go off the record? I'm sorry.

MR. GRAHAM: Yeah.

THE VIDEOGRAPHER: Off the record at 11:37.

(A lunch recess was taken.)

THE VIDEOGRAPHER: We are back on the record at 12:33. This is the beginning of Disc 3.

BY MS. KATZ:

Q **Okay. Can you hear me okay?**

A Yes.

Q **Okay. Just want to make sure.**

Q Were the only -- oh, sorry. Go ahead.
A Oh, sorry. And had large windows.
Q And were you the only person in that cell?
A Yes.
Q Were you the only person in each of the cells that you were in?
A Yes.
Q Did anything happen while you were in that cell?
A Yes.
Q What happened?
A They -- someone came by and gave me lunch, and people who were imprisoned came by and were trying to talk to me, and they got in trouble for it.
Q When you say people who were imprisoned, are you talking about other inmates? How do you know they were imprisoned?
A Yes. They were inmates, because they were being instructed by the guards, and yeah.
Q So tell me what happened? They just walked by your window?
A Yeah. They walked by the window and they were just like asking me questions and trying to talk to me.
Q What questions did they ask you?
A I don't know the specific questions, but it was

A No. I don't remember the exact date I came back to San Diego.

**Q Do you remember how long it was after the incident before you came back down to San Diego?**

A No. I do not remember how long it was.

**Q Was it more than a year?**

A No. It was not more than a year.

**Q It was less than a year?**

A Yes.

**Q Do you remember why you came down to San Diego?**

A To see my mom.

**Q So you had plans to go out to dinner with your mom that night?**

MR. GRAHAM: Objection. Vague as to time.

BY MS. KATZ:

**Q On December 29th?**

A Yes.

**Q Did you end up going out to dinner?**

A Yes.

**Q Okay. Who did you go out to dinner with?**

A I went out to dinner with my mom, Jerome, Rodrigo, and I believe two or three girls.

**Q Okay. And where did you go out to dinner?**

A I do not recall the -- where we went to dinner.

**Q Prior to my -- prior to going out to dinner,**

**Q Do you remember what you were wearing?**

A Yes.

**Q What were you wearing?**

A I was wearing high-heeled shoed, a dress, and a shawl.

**Q What colors or color was the dress?**

A The dress was black and white.

**Q And what color was the shawl?**

A It was purple.

**Q Did you take any pictures while you were at dinner?**

A Yes.

**Q What did you do after you were done eating dinner?**

A When we were done eating dinner, we walked somewhere nearby.

**Q When you say somewhere, what do you mean?**

A We walked to a different -- a different location nearby.

**Q Was this location a bar?**

A Yes.

**Q Did you have anything to drink at that location?**

A Yes.

**Q Okay. What did you have to drink at that**

**location?**

A I do not recall.

**Q Did the drink that you had at that location have alcohol in it?**

A Yes.

**Q Okay. Did you have any other drinks at that location?**

A No.

**Q How long were you at that location for?**

A I was at that location -- I have to give an estimate -- about 30 or 40 minutes.

**Q Do you remember what time you got there?**

A No.

**Q Okay. What time did you leave?**

A I am not sure.

**Q Where did you go after that, you went to that bar?**

A After we left that bar, we got in an Uber.

**Q Okay. Where did you go in the Uber?**

A And then from the Uber, that took us to Gossip Grill.

**Q Okay. What time did you arrive at Gossip Grill?**

A I'm not sure the exact time at the moment.

**Q How did you decide to go to Gossip Grill?**

BY MS. KATZ:

Q And were those the same people that you went to Gossip Grill with?

A Oh, I'm sorry. I thought we were talking about Gossip Grill just now.

Q No. So I was talking about the -- you said you went for dinner, and then you went to a bar after dinner?

A Yeah.

Q Who did you go to that bar with?

A I went with Jerome, Rod, and my mother. I'm not sure if the other girls were still there or not with us.

Q Okay. And then who did you go to Gossip Grill with?

A I went to Gossip Grill with my mom, Rodrigo, and Jerome.

Q And had you been to Gossip Grill before?

A Yes.

Q How many times had you been to Gossip Grill before, prior to the incident?

A Yes. I can estimate around five or six times.

Q Was that -- were those five or six times over two years? Three years? One year? A month?

A I -- I would say it was over -- yeah. Over several years when I would go down there, I would go

**years prior to the incident?**

A Are you asking about my first time that I had ever gone there?

**Q Yes.**

A I would have to say within -- within two to four years was my first time ever going.

**Q So you had gone to Gossip Grill five to six times in two to four years?**

A That's correct.

**Q Prior to the incident, had you ever had any issues at Gossip Grill?**

A No. I had not had issues.

**Q What did you do when you first arrived at Gossip Grill?**

A That night?

**Q Uh-huh. Yes.**

A Well, when we first arrived there, we waited at the front to get in.

**Q I apologize for the beeping.**

**So you waited in line to get in?**

A That's correct. We waited at the front.

**Q And how long were you in line for?**

A I don't recall if there was a line or not.

**Q Okay. You said you waited at the front to get in?**

A Yeah. We had to -- we had to pay to get in, so we waited at the hostess stand before we could be let in.

**Q Did you pay to get in?**

A Yes.

**Q Okay. What did you do when you first went in to Gossip Grill?**

A When I first went in to Gossip Grill, I walked over to the water -- the water cooler and filled up a cup of water.

**Q Where was the water cooler located in the restaurant?**

A So walking into the bar, facing into the bar, it was located on the left of the pathway.

**Q Okay. So it was on -- was the water cooler inside or outside?**

A The -- it was -- it was on the outside area of the bar. Yeah.

**Q So after getting a cup of water, what did you do then?**

A I'm sorry. I just want to clarify the last question. So outside, you mean, like -- do you mean, like, exterior, like where trees are in the bar? Or do you mean outside the perimeter of the bar?

**Q I'm talking about inside the bar.**

A Yeah. Because there's an outside portion of

the restroom.

Q **Okay. And what happened when you went to go use the restroom?**

A When I went to use the restroom, there was a line and there was two girls standing there, and I asked if they were in line for the restroom.

Q **What did they say?**

A They said yes, they were in line for the restroom.

Q **And then what did you do then?**

A And then I stood in line for a moment, but then looked at the -- I looked towards the other restroom and I saw that there was a gender neutral sign on it.

Q **So there are two restrooms in the bar?**

A That I know of. There was two restrooms where I was standing at that time. Yes.

Q **And what restroom were you initially in line for?**

A I was in line for what appeared to be the women's bathroom.

Q **Okay. And then when you saw that there wasn't a line, you went to the other bathroom?**

A That's correct. The one that was marked gender neutral.

Q **Did you go -- so did you end up using that**

restroom?

A Yes.

Q Did anything happen inside that restroom?

A Yes.

Q Okay. What happened inside the restroom?

A Well, I went to use the restroom, and then as I was using the restroom, I heard a shout coming from outside the restroom.

Q When you say outside the restroom, is it -- were people by the sink area, or was it outside the door of the restroom?

A Outside the door of the restroom.

Q Okay. So you heard a shout outside the door of the restroom?

A Yeah.

Q Is the restroom like a one-person restroom, or are there multiple stalls and sinks?

A There's one stall and a sink area and two urinals.

Q So what happened after you heard the shout outside?

A I tried to finish using the bathroom quick and kind of cut myself off.

Q Was it just like a yell, or was someone saying something?

A They were saying something.
Q Okay. What was being said?
A They said, "She's vomiting, she's vomiting."
Q And was it a female voice or a male voice?
A I believe it was a female voice.
Q Was -- and I'm sorry if I asked you this before.
So it was a multiperson bathroom?
A Yes.
Q But the person that shouted was outside, outside the door of the bathroom?
A That's correct.
Q So how did they know you were in one of the stalls? Were other people in the bathroom?
A I -- sorry. That's like two questions.
Q I'm sorry. Let me rephrase that.
A Yeah.
Q So when you went in to use the bathroom --
A Yes.
Q -- right? Were there other people inside the bathroom?
A No one was inside the bathroom.
Q Okay. So you go into a stall?
A That's correct.
Q And while you were in the stall, outside the

A Well I don't know if it was directed towards me.

**Q Okay. But someone was shouting outside the restroom that you were vomiting?**

A Someone was shouting the words, "She's vomiting, she's vomiting."

**Q But you don't think that was directed at you?**

MR. GRAHAM: Objection. Misstates prior testimony.

THE WITNESS: I wasn't sure who it was directed by, but I believed it could have been directed toward me.

BY MS. KATZ:

**Q But you weren't sure?**

A That's correct.

**Q So what happened after that, the shouting?**

A Yes. So I tried to cut myself off and just quickly, like, wash my hands, and to try to get out of there.

**Q Why did you try to hurry and get out of there?**

A Because I didn't want to get in trouble. I didn't want a situation to happen.

**Q Why would a situation happen?**

A A situation -- bathroom situations often happen with transgender people.

**Q So did anything else occur inside the restroom**

as you were trying to leave?

A Yes.

Q What happened?

A A bouncer rushed into the restroom and grabbed me.

Q Was the bouncer the same person that had shouted outside the door?

A I didn't have eyes on the person who shouted outside the door.

Q Do you think the person outside the door and the bouncer were two different people?

A Yes.

Q So the bouncer comes in to the bathroom, and what happens?

A The bouncer came in to the restroom and grabbed me and said that I needed to leave.

Q When you say grabbed you, how did the bouncer grab you?

A She firmly grabbed me physically on my arm in a harsh manner.

Q So she grabbed your upper arm?

A That's correct.

Q Did she say anything to you before she grabbed your arm?

A She spoke in tandem as she grabbed my arm.

**Q What did she say as she grabbed your arm?**

A She said, "You need to leave."

**Q Was she talking about the restroom, you need to leave the restroom?**

A I believe she was talking about the bar in general.

**Q What did the bouncer look like?**

A The bouncer was heavyset. She had darker hair, short hair, female.

**Q What was she wearing?**

A I believe she was in a black shirt, but I don't recall the other items of clothing.

**Q Sorry. I missed what you said. What she was wearing?**

A I said I believe she was wearing a shirt that was black, but I don't recall the other items of clothing.

**Q What happened after she grabbed you?**

A When she grabbed me, I asked her to remove her hands off of me and said that I informed her that it's illegal to remove a transgender person for the manner in which they use the restroom in the State of California.

**Q Okay. And what happened after that?**

A After that, she accused me of vomiting, to which I replied I wasn't vomiting, and that I told her I

was using the restroom standing up, which is why my feet were facing the toilet.

Q And did that conversation occur while you were still in the bathroom?

A Yes.

Q Did -- at some point, did you leave the bathroom?

A Yes.

Q Okay. What happened when you left the bathroom?

A When I left the bathroom, I went back to the area in which my mom and friends were.

Q Okay. What happened when you got back to that area?

A When we got back to that area, she had followed me to that area and she started yelling at them saying that I was vomiting and saying that I needed to drink water.

Q Did you say anything to her?

A Yes.

Q What did you say?

A I said that she might have the wrong person. I asked why she thought I was throwing up, and then I asked -- I asked her if she could go double check with the people who said someone was throwing up to see if it

A I'd have to estimate. I would say between, like, 30 seconds to, like, 2 minutes.

**Q And how did that conversation end?**

A The conversation ended with me stating that I was going to leave and that I was going to ask for a refund.

**Q And what did you do then?**

A And so then I walked over to the hostess stand, told them what had just occurred, and asked for a refund.

**Q And what did the hostess say?**

A The hostess said okay, but she needed to talk to her manager first.

**Q Okay. Did she end up talking to her manager?**

A No.

**Q So what happened?**

MR. GRAHAM: Objection. Overbroad and vague.

THE WITNESS: So what happened when she went to -- when she said she was going to ask for the manager, we were interrupted by the security guards getting involved again.

BY MS. KATZ:

**Q The two that you were speaking with at the table?**

A Yes, plus another one was now involved.

**Q Oh, so now, a third security guard got**

A Yes.

**Q But you didn't order a drink?**

A That's correct.

**Q So the security guards were yelling at the hostess?**

A That's correct.

**Q Okay. So there's just this, I guess, alteration by the hostess stand?**

MR. GRAHAM: Objection. Is that a question?

MS. KATZ: What was that?

MR. GRAHAM: Is there a question pending? Was that a question or is that a statement?

BY MS. KATZ:

**Q Yeah. I just -- how long was this, I guess, conversation at the hostess stand?**

A I believe it was -- I can give an estimate of 20 seconds to a minute.

**Q Did anything else occur during this conversation?**

A Yes.

**Q What else happened?**

A Well, the hostess had grabbed the money out of the till and she said she was going to ask for the manager, so she was holding the money in her hand and the security guards got involved and started yelling more.

Q What were -- so the security guards were just yelling?

A Yeah. They were informing her that I was drinking and that I was throwing up, and then the other security guard, the man near the front, he yelled at me to get out right now.

Q And what did you do?

A I grabbed the money that I was owed and followed his directions.

Q So you grabbed the money from the hostess?

A No. I grabbed it -- the $20 out of the till, because I didn't want to grab it out of her hand.

Q And then you left?

A Yes.

Q Okay. Was there any further interactions with the security guards as you were leaving?

A Yes.

Q Okay. What happened as you were leaving?

A They attacked me.

Q How did they attack you?

A They assaulted me. They were grabbing me, holding me, hitting me. I was bleeding.

Q Where were you bleeding?

A On my arm.

Q Where on your arm?

A On my forearm.

**Q Do you know what caused that injury?**

A I do not.

**Q When did you notice you were bleeding?**

A Once we had gotten to the curb, I noticed I was bleeding.

**Q So if you were just leaving, do you know why they followed you on the way out?**

A I do not. No. You would have to ask them why they followed me.

**Q Did you still have the money in your hand at that point?**

A I'm not sure if it was in my hand or in my purse at that point.

**Q So at some point you had taken the money and put it in your purse?**

A I'm not sure if it was in my hand or if it was in my purse at that point. Yeah.

**Q So where were your mom and your friends at this point?**

A My mom and my friends were in the area next to the hostess stand when all that occurred.

**Q And how -- when you say all that occurred, what do you mean?**

A When I asked the hostess for a refund, when the

EXHIBIT A44

security officers got involved, and when they started grabbing me.

Q As you were leaving, did you become physical with any of the security guards?

A Yes.

Q How did you become physical with the securities guards?

A I slapped the male in the face.

Q And was that while you were at the hostess stand?

A No.

Q When was that?

A It was as I was exiting the premises.

Q Is that the only, I guess, physical -- strike that question.

Other than slapping the male security guard in the face, did you do -- did you have any other physical alterations with any of the other security guards?

A Are you asking if I hit them or if they hit me?

Q I'm asking if you hit them. Other than slapping the male security guard in the face, did you -- was there any other -- did you hit them again, or --

A No, ma'am.

Q So you only slapped that one male security guard in the face?

**Q Did you have any sort of conversation with them?**

MR. GRAHAM: Objection. Vague as to them.

THE WITNESS: Yeah. They were just saying that I couldn't leave and they were trying to say that they didn't come grab me in the restroom and that -- yeah. That was pretty much it.

BY MS. KATZ:

**Q What did you say to them?**

A What did I say to them?

**Q Uh-huh.**

A I said that they had, like, assaulted me in the bathroom, and they were saying that I couldn't leave and that's what the conversation was.

**Q Why were they saying you couldn't leave?**

A I don't know why they were saying I couldn't leave.

**Q Was your two friends and your mom with you?**

A Yeah.

**Q How did you react to this conversation?**

A I was extremely scared for my safety.

**Q So what did you do?**

A I ran away.

**Q And where did you run to?**

A I ran across the street, and they pursued me,

and then I ran across the street again and then I ran past some of the bars before ducking into another bar to hide from them.

**Q What bar did you go into?**

A I do not know for certain the name of the bar I went into.

**Q How long were you in that bar?**

A I believe I was in that bar for about one to five minutes.

**Q And did something happen in that bar?**

A Yes.

**Q What happened?**

A I went to order a car, because I was trying to get away from them, and they -- I saw them, like, outside the bar talking to the bar security, and so I walked to the back of the bar to exit the bar.

**Q And what happened as you were walking towards the back of the bar?**

A They said no one was allowed to leave the bar.

**Q Did you say anything in response to that?**

A No, I didn't. I didn't say anything.

**Q Okay. And what happened after that?**

MR. GRAHAM: Objection. Vague as to that.

THE WITNESS: Well, what happened after me trying to leave out of the back exit?

A I do not know the color of his eyes.

**Q What was Officer Zedja wearing?**

A I do not know exactly what he was wearing. I assume it was a police officer uniform.

**Q How long were you at the police station for?**

A I don't know how long I was there for. I'd have to give an estimate.

**Q Okay. What would that be?**

A I would say for an hour or two.

**Q And then did you have any further conversations with Officer Zedja while you were at the police station?**

A Yes.

**Q What else did you discuss?**

A He asked me if I had a penis.

**Q Did he -- he asked you that at the police station?**

A Yes. And he also asked which way I was transitioning.

**Q And that was at the police station as well?**

A Yes.

**Q What did you say in response?**

A Well, I said that I was transitioning from male to female, or that I have transitioned from male to female and I said that, yes, I do have a penis.

**Q Did you have any other conversations with him**

BY MS. KATZ:

**Q Ms. Vuz, can you describe -- in your own words, can you describe all injuries or complaints you are claiming as a result of the incident?**

A So you're asking me just to describe my injuries? What do you mean by complaints?

**Q What effects you're claiming it's had on you.**

A Certainly. Are you talking about the incident as a whole, or the part only relating to the county?

**Q Let's start with the incident as a whole.**

A Okay. Well, one was physically, I was assaulted and I was bleeding. I had bruising that was apparent. I had to get a Hepatitis A shot. I had to -- I ended up testing positive for the flu. I had post traumatic stress disorder and depression. I have anxiety that occurs every time I have to use a public restroom. I have monetary damages as well.

I had to have my shawl fixed. I had to have my shoes fixed. I had to pay for a lawyer, a criminal defense lawyer. I had to pay the ten percent bail fee. Let's see, I had to also pay co-pays for doctors and medications that resulted from my Hepatitis A visit and contracting the flu. Yeah. That's what the damages I recall at the moment.

**Q So out of the list you just gave me, what**

A I believe my ID was loose inside my purse.

**Q And was your money also loose inside your purse?**

A Yes. I believe so.

**Q Do you know how much money you had with you that night?**

MR. GRAHAM: Objection. Vague as to time.

THE WITNESS: Are you asking when I went out, did I know how much money I was going out with?

MS. MCQUARRIE: Yeah.

THE WITNESS: I did not know how much money was in my purse when I was going out.

BY MS. MCQUARRIE:

**Q Did you have any of your hormone medications with you?**

A No, ma'am.

**Q Can you give an estimate of how long you waited in the back the patrol car before Officer Zedja drove you away from the scene and to the police headquarters?**

A Yes. I can give you a rough estimate. I believe it was around 30 or 40 minutes.

**Q And did you -- were you able to see what all of the officers were doing during that time while you were in the car?**

A I was not able to see what all of the officers

while you were still in the patrol car?

A No. It happened as we were exiting the patrol car, walking up to the men's facility.

Q Did you ever tell any of the officers that you are transgender?

A Yes, ma'am.

Q You told Officer Zedja?

A That's correct.

Q Was that during the conversation that you had with him when he asked you if you had male genitalia?

A Yeah. That was prior to him asking.

Q Okay. You mentioned that you had some discussions with Officer Zedja during both car rides.

Did he answer the questions that you asked him?

A Yes. He did.

Q Now, once you were at the jail, I know there were kind of multiple steps prior to you actually being booked into the jail.

Can you give an estimate of how long that process took? So how long Officer Zedja was with you while you were at the jail?

A Yes. So once we arrived at the men's jail facility, we -- Officer Zedja was with me I would estimate about an hour or so.

Q And at any time prior to getting to the jail,

did you ask Officer Zedja to use the telephone?

A I do not believe I asked Officer Zedja if I could use his telephone. Yeah. I do not recall if I asked him that.

Q You -- but you did ask while you were in custody at the jail to use the telephone?

A Yes. That's correct.

Q And then you were given access to that phone in that second cell that you were placed in; is that right?

A Well, they put me in the first cell, and told me to use the telephone to post bail, but it didn't work, and so that's when they moved me to the other cell to give me access.

Q Okay. When you were released from the jail, you took an Uber to your mom's house; is that right?

A That's correct.

Q And then you said that you met with your criminal attorney on January 1st, so you were still in San Diego at that time; is that right?

A Yes, ma'am.

Q What do you hope to get from suing the City of San Diego?

A Well, that's a big question. But the first thing that comes to mind is that I do not want this to happen to transgender people, not just in San Diego, but

what I had stated earlier. He had -- when he saw the expression on my face, he went to explain that it was their policy, they don't go by what's on your license, they go by what's between your legs. And so I think I believe I told him that you don't have to have that bottom surgery down there, is what they call it, in order to be recognized as a female in the State of California.

Q Okay. And did I understand you right earlier that you do not have plans to have gender reassignment surgery; is that right?

A Not at the moment. No.

Q Okay. When we were talking about the -- when you were in the bathroom at Gossip Grill and you were saying that you kind of didn't want to have any trouble relating to that, you made a comment about how that often occurs with trans people, they have issues with bathrooms.

So I'm just wondering, have you personally had any prior restroom incidents?

A I personally have not had a prior restroom incidences.

Q Since this incident, have you had any issues at the restroom relating to being transgender?

A Aside from, you know, experiencing discomfort when I have to use -- you know, go to a public restroom

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ X ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: November 27, 2020

Lauren B. Biggins, CSR No. 14185

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Vuz vs. DCSS III, Inc.

Date of Deposition: 11/10/2020

Job No.: 10074163

I, ASHLEY R. VUZ, hereby certify under penalty of perjury under the laws of the State of ________________ that the foregoing is true and correct.

Executed this ______ day of __________________, 2020, at ____________________.

_________________________________

ASHLEY R. VUZ

NOTARIZATION (If Required)

State of ________________

County of _______________

Subscribed and sworn to (or affirmed) before me on this _____ day of ____________, 20__, by________________________, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: ______________________________ (Seal)

# Exhibit B



Ashley R. Vuz
v.
DCSS III, Inc., et al.
USDC No.
3:20-cv-00246-GPC-AGS
Defendants Emily Chow and County of San Diego
Notice of Lodgment of Exhibits
Exhibits B, D, E1,E2, F

EXHIBIT B1

# Exhibit C

Videotaped Deposition of

**Dwayne Wynne**

August 13, 2021

Vuz

vs.

DCSS III, Inc.

www.aptusCR.com | 866.999.8310

EXHIBIT C1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

Ashley R. Vuz,

Plaintiff,

vs.

No. 20-cv-00246-GPC-AGS

DCSS III, Inc., a California corporation doing business as Gossip Grill; et al.,

Defendants.

_______________________________

VIDEOTAPED DEPOSITION OF DWAYNE WYNNE

San Diego, California

August 13, 2021

Reported by:
Margaret A. Smith
RPR, CRR, CSR No. 9733

Job No.: 10085895

EXHIBIT C2

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

Ashley R. Vuz,

Plaintiff,

vs. No. 20-cv-00246-GPC-AGS

DCSS III, Inc., a California corporation doing business as Gossip Grill; et al.,

Defendants.

---

Video deposition of Dwayne Wynne taken on behalf of Defendants County of San Diego and Emily Chow, at 1200 Third Avenue, Suite 1100, San Diego, California, beginning at 1:39 p.m., and ending at 5:47 p.m., on Friday, August 13, 2021, before Margaret A. Smith, RPR, CRR, Certified Shorthand Reporter No. 9733.

APPEARANCES

For Plaintiff:

LAW OFFICES
BY: RYAN GRAHAM, ESQUIRE
1049 Hevenhurst Drive, Suite 510
West Hollywood, California 90046
323.792.6377
ryan@ryan.law

For Defendants County of San Diego and Emily Chow:

OFFICE OF COUNTY COUNSEL, SAN DIEGO COUNTY
BY: ALEXA KATZ, ESQUIRE
1600 Pacific Highway, Room 355
San Diego, California 92101
619.531.5836
alexa.katz@sdcounty.ca.gov

For Defendants City of San Diego and Matthew Zadja:

HURRELL CANTRALL, LLP
BY: FARYAR BARZIN, ESQUIRE
300 S. Grand Avenue, Suite 1300
Los Angeles, California 90071
213.426.2000
fbarzin@hurrellcantrall.com

Dwayne Wynne

Vuz vs. DCSS III, Inc.

APPEARANCES continued:

For Defendant DCSS III, Inc.:

HOSP, GILBERT & BERGSTEN
BY: WARREN L. GILBERT, ESQUIRE
301 N. Lake Avenue, Suite 410
Pasadena, California 91101
626.792.2400
wlgilbert@hosplaw.com

Also present:

Ashley R. Vuz (telephonically)
Stacy Plotkin-Wolff

Page 4

www.aptusCR.com

EXHIBIT C5

down the pace, please, so that there is not an interruption of the question.

MS. KATZ: Okay. Sounds good.

BY MS. KATZ:

Q So just wait until I finish answering (sic) my question. I know in some normal conversations, you can anticipate. But that makes it really difficult for the court reporter. And I'll slow down as well.

Does Gossip Grill have policies or protocols regarding patrons who are intoxicated?

A Yes.

Q And is that a -- is that a policy, like a written policy?

A It's -- Mo's Universe has their own -- we're seven restaurants. So it's the same policy throughout.

Q And is that policy specifically geared towards customers of Gossip Grill who are intoxicated?

A Yes.

Q And what does that policy say?

A We have a zero puke policy. If anybody throws up, they're -- no matter the situation, they are asked to leave. And then if we observe somebody that is overly intoxicated by swaying or slurring their speech, they are also asked to leave.

Q And did you receive training on this zero puke

**allegations that were against Gossip Grill in this case?**

A Yes.

**Q What is your understanding of those allegations?**

A My understanding of it is she thinks that she was escorted out for being transgender.

**Q And is that true?**

A No.

**Q What about any allegations against you personally? Are you aware of any allegations against you?**

A No.

**Q So going to the date of the incident -- so the evening of 12/29 of 2018, when did you first become aware of that there was an issue with a customer?**

A I had relieved the door girl so she could go to the restroom. So I was covering the door. I noticed -- or one of my guards, Mech, Maria, had radioed that she had one coming out. And then she came up to me and explained the situation that she had heard somebody throwing up in the restroom and that she was asking her to leave. And then that's when I noticed her yelling at my door girl, Kelsey. And then that's when I intervened.

**Q And -- and you now know this customer to be the**

**Q And when she came out of the restaurant, what happened?**

A She stopped at the -- where we take her cover and was screaming that she was going to sue us. And then that's when I saw her reach into our till and take an undisclosed amount of money. And I stepped up and I asked her, I said we need the money back. And she just kept screaming that she was transgender, we were kicking her out because of that, that she was going to sue us. She said that she was going to sue us at least four or five times. And then when I tried to get the money out of her hand is when she got right in my face, started screaming profanities at me, spit in my face, threw a glass of water. And then that's when one of our guard trainings is to put their arms out like that (gesturing) so then they can't physically assault you.

And I was trying to get her outside of the building. And then as soon as I put my hand down is when she assaulted me.

**Q And so I'm going to -- we're going to break that down a little bit.**

A Okay.

**Q Who -- when she came out, you said she was screaming.**

**Who was she screaming at?**

EXHIBIT C8

A Kelsey Engler.

Q **Okay. And did she -- other than saying that she was going to sue Gossip Grill, was she saying anything else?**

A She said I'm a transgender female that got kicked out of a restroom for being transgender and just kept screaming that over and over again.

Q **And what was Kelsey's reaction?**

A Kelsey was just kind of shocked. She just kind of sat there and didn't know what to do.

Q **And when I say "Kelsey," Kelsey is the employee that's sitting at the -- at the front of Gossip Grill taking cover charges?**

A Correct.

Q **And how long was she -- was she screaming at Kelsey for?**

A Like 15, 20 seconds. And then that's when she reached into the till and took money, and I immediately went right up onto that to try to get the money back.

Q **And so while she was -- was screaming at Kelsey, you were watching this happen?**

A Correct.

Q **Were there any other security guards nearby when this was going on?**

A Maria was right next to the door.

A Correct.

Q Was -- would you describe her tone of voice as very angry?

A Yes.

Q Was she making any movements with her arms or what was her demeanor?

A Just very agitated, arms kind of flailing around while she was talking.

Q Did she appear intoxicated?

A Not -- not to me.

Q And so you're standing at the front, watching this happen. And you see Ashley reach into the -- the till and grab money?

A Correct.

Q Did you see how much she grabbed?

A I did not.

Q Was it more than one bill? One bill?

A It -- she just had a handful of bills.

Q At any point did you see Kelsey hand her any money?

A No.

Q In any circumstance, would someone who was collecting cover charges hand -- give money back to someone who is being escorted out?

A No.

**Q And when you saw Plaintiff reach in and take the money, did you understand that to be a robbery?**

A Yes.

**Q From -- did you under -- and on what basis did you understand that to be a robbery?**

A Because we don't -- number one, we don't give refunds back to people that are being escorted out. And we also don't allow guests to reach into our till.

MR. GILBERT: I'm just going to interpose a belated objection. Calls for -- calls for a legal conclusion as to whether that constitutes robbery or not.

BY MS. KATZ:

**Q So after Plaintiff reached in and took the handful of money, you approached her.**

**Did any other guards approach her?**

A No.

**Q So you approached her, and what -- what do you say?**

A I asked for the money back. And she continued to scream in my face that she was being kicked out for being transgender. I explained that was not the reason why she was being kicked out, and she didn't want to listen to anything else. And I demanded to get the money back and I tried to take it out of her hand. And

then that's when things escalated even more.

**Q When you say "things escalated even more," what do you mean?**

A She got even more agitated, spit in my face, threw whatever was in her glass in my face. And then when I got her outside of Gossip's gates is when she turned around and swung and punched me in the left jaw.

**Q Did she turn around and swing at you one time, or two times?**

A Once.

**Q And the sequence of events was she spit on you first?**

A Correct.

**Q And then she threw water on you?**

A Correct.

**Q And then she turned around and hit you?**

A Yes.

**Q And was it a closed-fist punch?**

A Yes.

**Q And you said you had escorted her out of the Gossip Grill gates.**

**When you say "escorted out," did you utilize your guard training that you learned at the -- your -- the guard course?**

A Yes.

**Q And what did you utilize from that training?**

A Put your hand all the way out with your hand out like this so then you can stop them so they don't attack you.

**Q And at that point, did you believe she was going to attack you?**

A No.

**Q Were you surprised when she turned around and swung at you?**

A Extremely.

**Q Did she seem resistant to leaving?**

A Yes.

**Q Why?**

A She was very adamant that she was being kicked out because she was transgender. And she just -- at that point, there was no reasoning with her. She didn't want to listen to anything else.

**Q After she punched you in the face, what happened after that?**

A That's when guards went and restrained her. At that point, I thought I was bleeding, so I went in towards the kitchen. And then I was radio'd and asked if we wanted to detain her because we had called the police for assault. And I said yes.

**Q Did you call the police?**

A My guard, Dre Jennings, did.

Q And the guards that you -- who were the guards that restrained her after she punched you?

A I believe it was DreShana Jennings. C.J. was out there. And Arnell and Jermaine.

Q So there were a lot of security guards out there?

A Yes. When somebody assaults us, we have to take steps for that.

Q What about when somebody takes money from the till?

A I was trying to get that back. And then that's when -- everything else came after that.

Q Did you ever get the money back?

A No.

Q Do you know what happened to the money?

A No.

Q And you said you went inside to check on your -- did you say you went inside to check on your face? Is that --

A Correct.

Q Did you have any injuries?

A It was immediately swelling up.

Q Did you take any pictures?

A Yes.

A Yes.

**Q When did you tell Dre Jennings to call the police?**

A Right after I was punched.

**Q And then how -- how did -- after you were punched, you said that Ashley -- or Plaintiff was restrained. Correct?**

A Okay.

**Q And how did the -- the restraining end?**

A I finally told them just to let her go because her mom and whoever else she was with was just screaming bloody murder at all of us.

So I wanted them -- because I noticed that they were out onto -- they had gone off the sidewalk into the street. And I wanted everybody back up on the sidewalk. So I said to let her go. And then she just kind of stood off to the side and continued to scream. But at that point, we still -- we had already called the police. So she needed to be restrained -- stay on property.

**Q Oh. So by the time you -- I'm sorry. Repeat that last part one more time.**

**So you had already called the police?**

A She had called the police while -- while they're being restrained, she called the police and said

that somebody had stolen money out of our till and that one of the guards had gotten assaulted. And then because we called the police, we do need to restrain that person and wait until the police show up.

**Q And how did she know to call the police?**

A Because I told her to call the copies.

**Q Did you tell her via radio?**

A No. She was up front at that point.

**Q And so she saw Plaintiff take the money from the till?**

A I don't know if she saw her take the money from the till, but she saw her punch me.

**Q I see.**

**And then you instructed her to go call the police?**

A Correct.

**Q And you were attempting to restrain her and wait for the police to come?**

A Yes.

**Q And is it standard protocol at Gossip Grill to call the police if -- if someone is taking money from the till?**

A Yes.

**Q So you said that her mom was screaming bloody murder --**

A Yes.

Q Have you ever been assaulted by a customer before?

A Yes.

Q So this wasn't your first time --

A No.

Q -- being hit?

And then in this picture, it looks like it's a screen shot of your photo reel. Is that correct?

A Correct.

Q And it has Saturday, December 29th, 2018. It has three photos -- three smaller photos. It looks like Photo B and C and then a picture of your incident report.

Is that all correct?

A Correct.

Q And then it says Sunday, December 30th of 2018.

Would that be -- that's another picture of your face and I guess what it looked like the next -- what the injury looked like the next day?

A Correct.

Q And all of these -- the injuries on these photos, they were caused by Plaintiff swinging at you on the night of the incident?

A Correct.

took another photo of your neck.

Is that -- is that -- would that be a photo of your neck?

A Correct.

Q Okay. And does that photo just show that the -- that there's still redness and like a little mark from Plaintiff's ring on -- on Thursday, January 3rd, 2019?

A Correct.

Q So the incident from Plaintiff lasted that long?

A Correct.

MS. KATZ: I will label that as Exhibit F.

(Exhibit F was marked for identification.)

BY MS. KATZ:

Q And you recognize that that was your neck in all the photos?

A Correct.

MS. KATZ: So we'll go ahead and label this as Exhibit G.

THE REPORTER: Which exhibit now is G?

MS. KATZ: Exhibit G is a new email -- it's a video that we'll circulate.

(Exhibit G was marked for identification.)

BY MS. KATZ:

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript (X) was ( ) was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed by name.

Dated: August 25, 2021.

Margaret A. Smith

RPR, CRR, CSR No. 9733

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Vuz vs. DCSS III, Inc.

Date of Deposition: 08/13/2021

Job No.: 10085895

I, DWAYNE WYNNE, hereby certify under penalty of perjury under the laws of the State of ________________ that the foregoing is true and correct.

Executed this ______ day of __________________, 2021, at ____________________.

_________________________________
DWAYNE WYNNE

NOTARIZATION (If Required)

State of ________________

County of _______________

Subscribed and sworn to (or affirmed) before me on this _____ day of ____________, 20__, by________________________, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: ______________________________ (Seal)

# Exhibit D



Ashley R. Vuz
v.
DCSS III, Inc., et al.
USDC No.
3:20-cv-00246-GPC-AGS
Defendants Emily Chow and County of San Diego
Notice of Lodgment of Exhibits
Exhibits B, D, E1,E2, F

EXHIBIT D1

# Exhibit E



Ashley R. Vuz
v.
DCSS III, Inc., et al.
USDC No.
3:20-cv-00246-GPC-AGS
Defendants Emily Chow and County of San Diego
Notice of Lodgment of Exhibits
Exhibits B, D, E1,E2, F

# Exhibit F



Ashley R. Vuz
v.
DCSS III, Inc., et al.
USDC No.
3:20-cv-00246-GPC-AGS
Defendants Emily Chow and County of San Diego
Notice of Lodgment of Exhibits
Exhibits B, D, E1,E2, F

EXHIBIT F1

# Exhibit G

# SAN DIEGO REGIONAL CRIME/INCIDENT REPORT

| CRIME REPORT | | PAGE 1 of 6 | INCIDENT NUMBER 18120046017 / CASE NUMBER 18040783 |
|---|---|---|---|

| BEAT | RELATED RPT #S | DATE | DAY OF WEEK | TIME |
|---|---|---|---|---|
| 627 | | 12/29/2018 | Saturday | 23:53 |

CODE SECTION AND DESCRIPTION: PC / 211 / ROBBERY

CODE SECTION AND DESCRIPTION: PC / 243A / BATTERY ON PERSON

LOCATION OF INCIDENT (OR ADDRESS): 1220 UNIVERSITY AV — CITY: SAN DIEGO

## VICTIM / WITNESS

| V | BUS | W TYPE | NAME (LAST, FIRST, MIDDLE SUS / OR ORGANIZATION) |
|---|---|---|---|
| | | BUS | GOSSIP GRILL |

| RESIDENCE ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| | | | |

| RACE | SEX | DATE OF BIRTH | VICTIM INJURED | EXTENT OF TREATMENT | INTERPRETER REQUIRED | LANGUAGE | VICTIM RELATION TO SUSPECT | V/W ASSIST |
|---|---|---|---|---|---|---|---|---|
| | | / / | | | | | | N |

| STATUS | EMPLOYER (RANK IF MILITARY) | BUSINESS ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| | | 1220 UNIVERSITY AV | SAN DIEGO | CA | 92103 |

ADDITIONAL INFORMATION

## VICTIM / WITNESS

| V | RP | W TYPE | NAME (LAST, FIRST, MIDDLE SUS / OR ORGANIZATION) |
|---|---|---|---|
| W | | 06 | Wynne, Dwayne William |

| RESIDENCE ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| [redacted] | SAN DIEGO | CA | 92103 |

| RACE | SEX | DATE OF BIRTH | VICTIM INJURED | EXTENT OF TREATMENT | INTERPRETER REQUIRED | LANGUAGE | VICTIM RELATION TO SUSPECT | V/W ASSIST |
|---|---|---|---|---|---|---|---|---|
| W | M | [redacted] | | | | | | N |

CONTACT: CELL PHONE [redacted]

ID: DL [redacted] CA

| STATUS | EMPLOYER (RANK IF MILITARY) | BUSINESS ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| EMP | Gossip Grill Security Manager | 1220 UNIVERSITY AV | SAN DIEGO | CA | 92103 |

ADDITIONAL INFORMATION

## VICTIM / WITNESS

| | | W TYPE | NAME (LAST, FIRST, MIDDLE SUS / OR ORGANIZATION) |
|---|---|---|---|
| W | | 06 | Casteel, Arnell |

| RESIDENCE ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| | | | |

| RACE | SEX | DATE OF BIRTH | VICTIM INJURED | EXTENT OF TREATMENT | INTERPRETER REQUIRED | LANGUAGE | VICTIM RELATION TO SUSPECT | V/W ASSIST |
|---|---|---|---|---|---|---|---|---|
| B | M | [redacted] | | | | | | N |

CONTACT: CELL PHONE [redacted]

| STATUS | EMPLOYER (RANK IF MILITARY) | BUSINESS ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| EMP | Gossip Grill Security | 1220 UNIVERSITY AV | SAN DIEGO | CA | 92103 |

ADDITIONAL INFORMATION

| REPORTING OFFICER | I.D. # | DIVISION | AGENCY | DATE OF REPORT | TIME |
|---|---|---|---|---|---|
| EVAN HUGHES | 7341 | W3 | SDPD | 12/30/2018 | 01:37 |

(Revised 09/2013 Electronic)

CONTINUED FROM
CRIME REPORT

# SAN DIEGO REGIONAL CRIME/INCIDENT REPORT

PAGE 2 of 6

INCIDENT NUMBER 18120046017
CASE NUMBER 18040783

## VICTIM / WITNESS

| | W TYPE | NAME (LAST, FIRST, MIDDLE SUS / OR ORGANIZATION) |
|---|---|---|
| W | 06 | Mickelcon, Jerome |

RESIDENCE ADDRESS [redacted] | CITY WEST HOLLYWOOD | STATE CA | ZIP

| RACE | SEX | DATE OF BIRTH | VICTIM INJURED | EXTENT OF TREATMENT | INTERPRETER REQUIRED | LANGUAGE | VICTIM RELATION TO SUSPECT | V/W ASSIST |
|---|---|---|---|---|---|---|---|---|
| W | M | [redacted] | | | | | | N |

CONTACT
CELL PHONE [redacted]

ID
DL [redacted] CA

| STATUS | EMPLOYER (RANK IF MILITARY) | BUSINESS ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| | | | | | |

ADDITIONAL INFORMATION

## M.O. INFORMATION

| TOTAL # OF WITNESSES AT CRIME | PLACE OF ATTACK | SURROUNDING AREA |
|---|---|---|
| 3 | 1. Structure | 2. Business |

| F | SPECIFY | HOW USED |
|---|---|---|
| | PUNCH | BATTER |

TYPE OF STRUCTURE
NON-RESIDENTIAL
16. RESTAURANT/BAR

TARGET(S)
1. Cash Register/Drawer
5. Person

POINT OF ENTRY
0. N/A

SECURITY USED
5. Guard
11. Photo/Camera

TYPE LOCK ATTACKED
0. N/A

SUSPECT ACTIONS
40. Susp Took Cash From Reg
22. Inflicted Injury

| VICTIM INJURED | EXTENT OF TREATMENT | SIC |
|---|---|---|
| | | Yes ADULT |

## SUSPECT(S)

| ARRESTED | SUSPECT NAME (LAST, FIRST MIDDLE SUFF) | NICKNAME/AKA |
|---|---|---|
| Y | VUZ, ASHLEY RYAN | |

| RACE | SEX | AGE | DOB | HEIGHT | WEIGHT | BUILD | HAIR COLOR | EYE COLOR |
|---|---|---|---|---|---|---|---|---|
| W | F | 28 | [redacted] | 6'00" - | 155 - | NOR - | BND | BLU |

SUSPECT'S ADDRESS [redacted] | CITY LOS ANGELES | STATE CA | ZIP 90046

ADDITIONAL INFORMATION / FURTHER SUSPECT DESCRIPTION (I.E. GLASSES, TATTOOS, TEETH, BIRTHMARKS, JEWELRY, SCARS, ETC.

SUSPECT'S CLOTHING
BLACK AND WHITE DRESS, BLACK KNEE HIGH BOOTS WITH HEELS

| HAIR LENGTH/TYPE | HAIR STYLE | FACIAL HAIR | COMPLEXION | GENERAL APPEARANCE | DEMEANOR | SPEECH | VOICE |
|---|---|---|---|---|---|---|---|
| LONG 2. FINE | 8. STRAIGHT | 7. NONE/FUZZ | | 9. WELL GROOMED | 1. ANGRY | | |

| REPORTING OFFICER | I.D. # | DIVISION | AGENCY | DATE OF REPORT | TIME |
|---|---|---|---|---|---|
| EVAN HUGHES | 7341 | W3 | SDPD | 12/30/2018 | 01:37 |

(Revised 09/2013 Electronic)

| CONTINUED FROM | | PAGE | INCIDENT NUMBER |
|---|---|---|---|
| CRIME REPORT | | 3 of 6 | 18120046017 |
| | | | CASE NUMBER 18040783 |

# SAN DIEGO REGIONAL CRIME/INCIDENT REPORT

## EVIDENCE

Body Camera
Body Camera Evidence Collected

| EVIDENCE OBTAINED | TAG NUMBERS |
|---|---|
| | None |

| | WITNESS CHECK |
|---|---|
| See Evidence Collection Section for Details | |

## OFFICER ASSAULT (OAK)

| VEHICLE TYPE | NUMBER OFFICERS WITH PERSONAL INJURY | ACTIVITY WHEN ASSAULT OCCURRED |
|---|---|---|
| | NUMBER OFFICERS WITHOUT PERSONAL INJURY | |

## ARSON

| ARSON TYPE | DESCRIPTION | CONTENT LOSS $ | STRUCT LOSS $ | ABANDONED |
|---|---|---|---|---|
| | | | | |

## EVIDENCE COLLECTION

Officer's Investigation
I conducted the following attempts to locate, collect, and preserve evidence from the crime scence at

1220 UNIVERSITY AV SAN DIEGO CA 92103

LATENT PRINTS:
I made attempts to lift latent prints: N
If NO, explain:

OTHER PHYSICAL EVIDENCE:
I made attempts to locate other physical evidence at the scene: N
If NO, explain:

| REPORTING OFFICER | I.D. # | DIVISION | AGENCY | DATE OF REPORT | TIME |
|---|---|---|---|---|---|
| EVAN HUGHES | 7341 | W3 | SDPD | 12/30/2018 | 01:37 |

(Revised 09/2013 Electronic)

| CONTINUED FROM CRIME REPORT | SAN DIEGO REGIONAL CRIME/INCIDENT REPORT | PAGE 4 of 6 | INCIDENT NUMBER 18120046017 / CASE NUMBER 18040783 |
|---|---|---|---|

**SYNOPSIS:**
On 12/29/2018 at 23:53 hours Ashley Vuz robbed the Gossip Grill Bar, 1220 University Ave. Vuz took an unknown amount of US currency from a cash box and punched the security manager in an attempt to flee the location. She was arrested shortly after on the incident on the 1000 block of University Ave without incident and was booked into Central Jail for 212.5(C) PC robbery.

**ORIGIN:**

On 12/29/2018 I was working Western Division Patrol in full police uniform operating a marked patrol unit when I responded to the report of a robbery at the Gossip Grill 1220 University Ave. The reported loss was US currency and the suspect was described as a transgendered female, late 20s, blonde, wearing a black and white dress and knee high black boots.

**INVESTIGATION:**

I arrived on scene and was notified that the female was last seen on the 1100 block of University Avenue in the area of "Flicks" a local bar. I responded to that location and security from Flicks were physically restraining a transgendered female matching the listed description. I placed the female in handcuffs, and placed her in the rear of a patrol car. The female identified herself as Ashley Vuz and I confirmed her identity with her CA Driver's license. Vuz had given me permission to open her purse to obtain her ID card, and inside I located an unknown amount of crumpled US paper currency.

I began to take witness/victim statements.

**Statement of Dwayne Wynne (Victim/RP):**

> Wynne identified himself as the security manager. He told me that he was alerted by two separate patrons that a female was vomiting in the middle stall of the women's bathroom. When female staff entered the bathroom the located Vuz and asked her to leave as the bar has a strict "no vomit" policy. Vuz was walked out of the bar and was yelling that she was being discriminated against because she was transgendered. Once Vuz reached the entry of the bar she yelled that she wanted her money back and reached for the cash box where the bouncer that was collecting cover charges. She grabbed a handful of US currency and when Wynne attempted to stop the theft, Vuz pushed him and then punched him once in the face with a right hook. Vuz then fled westbound on University Ave.

Wynne complained of pain in his right face but declined paramedics. He said the bar desired prosecution and he desires prosecution for the battery. Wynne positively identified Vuz in a curbside lineup as the female that had robbed the business and punched him.

| REPORTING OFFICER | I.D. # | DIVISION | AGENCY | DATE OF REPORT | TIME |
|---|---|---|---|---|---|
| EVAN HUGHES | 7341 | W3 | SDPD | 12/30/2018 | 01:37 |

(Revised 09/2013 Electronic)

| CONTINUED FROM CRIME REPORT | SAN DIEGO REGIONAL CRIME/INCIDENT REPORT | PAGE 5 of 6 | INCIDENT NUMBER 18120046017 / CASE NUMBER 18040783 |
|---|---|---|---|

I then spoke to Jerome Mickelson, a friend of Ashley's and took his statement. Mickelson was less than cooperative with officers through the entire contact.

**Statement of Jerome Mickelson:**

Mickelson told me that he did not have any part of what happened inside of the bar and that he was simply standing outside on the corner when a security guard from Gossip approached and pushed him in what he felt was an unprovoked attack. The guard was identified as Arnell Casteel. Mickelson said that he was pushed by Casteel for no reason and desired prosecution for battery. Mickelson refused to tell me if he was involved in the initial dispute inside the bar, but told me that he knew Ashley and was in the bar with her, and left with her. Mickelson changed his story several times and when I confronted him for pushing the security guard he changed his story to being punched and then recanted completely after further questioning.

Mickelson had a video that was recorded during the altercation. It showed Ashley fleeing Gossip Security and being chased west on University Ave. In the video Mickelson continuously yells at Gossip Grill Security. In the video you also see Mickelson call Casteel a "fat fuck" as he walked away. Casteel turned around an approached Mickelson following the "fat fuck" comment Mickelson's unidentified male partner steps between them and pushes the 5'11 290lb Casteel back. No punches or pushes are visible and Casteel does not physically engage Mickelson. Mickelson was persistent in stating that he was pushed and or punched (changing story) by Casteel, even though the video clearly shows no physical contact. Mickelson also refused to send me the video to impound as evidence.

Due to the claim that he had punched Mickelson I spoke to Arnell Casteel and took his statement.

**Statement of Arnell Casteel:**

Casteel told me that he was eating lunch when he was informed that a transgendered female patron had taken cash from the cover charge cash box and punched Wynne in the face while taking the money. He pursued her westbound on University and stopped her at the intersection of University and Vermont. He said he became involved in a verbal dispute with Ashley, her mother, Mickelson and his unnamed partner. He told me that he did not touch Mickelson, and was fully aware that he was being recorded. He said the only physical contact during the altercation was when Mickelson's unnamed partner pushed him in the chest. Casteel did not desire prosecution for any form of battery.

I made several attempts to fully explain the situation to Mickelson, and what his options were in being named in the report. He accused me of acting like "everything was a joke' and "discriminating against him"

| REPORTING OFFICER | I.D. # | DIVISION | AGENCY | DATE OF REPORT | TIME |
|---|---|---|---|---|---|
| EVAN HUGHES | 7341 | W3 | SDPD | 12/30/2018 | 01:37 |

(Revised 09/2013 Electronic)

| CONTINUED FROM | SAN DIEGO REGIONAL CRIME/INCIDENT REPORT | PAGE | INCIDENT NUMBER / CASE NUMBER |
|---|---|---|---|
| CRIME REPORT | | 6 of 6 | 18120046017 / 18040783 |

as well as being biased in my policing. I provided him with my ID number and an event number for his reference. Sgt. Kelly (6540) was present for the interaction.

I generated a case number for 211 PC and Officer Zajda's (7460) arrested Vuz and booked her into Central Jail. See his report for further.

Gossip Grill cannot identify how much money was taken as they have no inventory system for cover charge income.

**EVIDENCE:**

See Officer Zajda's arrest report

**INJURIES:**

Wynne sustained a complaint of pain and bruising to the left face. He declined paramedics.

**PROPERTY DAMAGE:**

None

**FOLLOW-UP:**

None

**RELATED REPORTS:**

Officer Zajda's (7460) Arrest Report.

Approved By: Sgt. P. Kelly #6540

| REPORTING OFFICER | I.D. # | DIVISION | AGENCY | DATE OF REPORT | TIME |
|---|---|---|---|---|---|
| EVAN HUGHES | 7341 | W3 | SDPD | 12/30/2018 | 01:37 |

(Revised 09/2013 Electronic)

EXHIBIT G6

COSD000025



SAN DIEGO POLICE DEPARTMENT

Page 1 of 2

# CURBSIDE LINE-UP

181200461017

(One Victim/Witness per Form / One Form per Location)

CASE # 18-040783

On 12-30-18 (date), at 0026 (hours), at 1000 UNIVERSITY AV (location)

the Victim/Witness WYNNE, DWAYNE (name)

was read the following statement by officer(s) E. HUGHES #7341

I want you to look at somebody we have detained. Do not conclude from the fact that we have detained someone that he/she is the guilty party. You are not obligated to identify anyone. It is just as important to free an innocent person as to identify the guilty person. Be aware that sometimes people who commit crimes will try to disguise their appearance by changing clothes and wearing hats, sunglasses, or wigs. Do not say anything or make any gestures (nod, point, etc.) until you have totally viewed this person.

The following person(s) were detained and presented at this line-up:

#1: VUZ, ASHLEY by presenting officer R. SLADE #6763

#2: ______ by presenting officer ______

#3: ______ by presenting officer ______

#4: ______ by presenting officer ______

The detained person(s) were positioned approximately 20 FT (distance) from the Victim/Witness. The lighting conditions for the viewing were as follows: STREET LIGHT + VEH LIGHT

The Victim/Witness identified or could not identify the following:

#1: ☒ Identified ☐ Could not identify

#2: ☐ Identified ☐ Could not identify

#3: ☐ Identified ☐ Could not identify

#4: ☐ Identified ☐ Could not identify

PD-903-FO (8-97) 602813

See other side for Victim/Witness Statement

continued ☐

EXHIBIT G7

18040783

Victim/Witness statement for person #1:

YES, THAT IS HER, 100 %. THE FACE, HAIR DRESS + BOOTS ARE ALL THE SAME

Victim/Witness statement for person #2:

Victim/Witness statement for person #3:

Victim/Witness statement for person #4:

Victim/Witness Signature [signature] Date 12/30/18

Printed on recycled paper

continued ☐

Booking Number: 18182295

# SAN DIEGO REGIONAL ARREST/JUVENILE CONTACT REPORT

| REPORT TYPE | INCIDENT NUMBER |
|---|---|
| ARREST | 18120046017 |

| WARRANT | AGENCY | ARREST DATE | TIME | BEAT | PAGE |
|---|---|---|---|---|---|
| NONE | SDPD | 12/30/2018 | 00:27 | 627 | 1 of 5 |

RELATED REPORTS (TYPE & NUMBER)

## ARRESTEE INFORMATION

CHARGE(S)
PC 212.5(C) ROBBERY: SECOND DEGREE

| PERSON ARRESTED (L, F M Suff) | NICKNAME | ADULT RELEASES |
|---|---|---|
| Vuz, Ashley Ryan | | |

| RACE | SEX | AGE | DOB | PLACE OF BIRTH | HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|
| W | F | 28 | [redacted] | Carrolton, Tx | 6'00" | 155 | THI | BND | BLU |

ALIAS/MAIDEN NAME (L, F M Suff)

| ARRESTEE'S ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| [redacted] | LOS ANGELES | CA | 90046 |

| EMPLOYER/SCHOOL | MILITARY | OCCUPATION/RANK | BUS/MILITARY ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|
| UNEMPLOYED | N | | | | | |

CONTACT
CELL PHONE [redacted]

| EMERGENCY CONTACT/NEXT OF KIN(L, F M) | EMERGENCY ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| | | | | |

| IS SUBJECT A SUSPECTED USER OF NARCOTICS/DRUGS? | INTERPRETER REQUIRED | LANGUAGE | SUSPECT'S RELATION TO VICTIM(S) |
|---|---|---|---|
| | | | STRNG |

## ARREST / OFFENSE

| LOCATION OF ARREST | CITY | BEAT |
|---|---|---|
| 1041 UNIVERSITY AV | SAN DIEGO | 627 |

| LOCATION OF OFFENSE | CITY | BEAT |
|---|---|---|
| 1220 UNIVERSITY AV | SAN DIEGO | 627 |

| OFFENSE DATE | OFFENSE TIME | CITIZEN ARREST | ARRESTING OFFICER | I.D. | ADMONISHED BY | I.D. |
|---|---|---|---|---|---|---|
| 12/29/2018 | 23:53 | N | ZAJDA, MATTHEW | 7460 | ZAJDA, MATTHEW | 7460 |

DO YOU UNDERSTAND EACH OF THESE RIGHTS I HAVE EXPLAINED TO YOU? Yes Sir

HAVING IN MIND AND UNDERSTANDING YOUR RIGHTS AS I HAVE TOLD YOU, ARE YOU WILLING TO TALK WITH US? Yeah I can give you a statement

STATEMENT: Y

## ARRESTEE DESCRIPTION

| HAIR LENGTH/TYPE | HAIR STYLE | FACIAL HAIR | COMPLEXION | SPEECH | VOICE |
|---|---|---|---|---|---|
| 3 LONG THICK | 8 STRAIGHT | 7 NONE/FUZZ | 4 LIGHT | 9 TALKATIVE | 8 PLEASANT |

ID
DL [redacted] CA

| FURTHER SUSPECT DESCRIPTION (I.E., GLASSES, TATTOOS, TEETH, BIRTHMARKS, JEWELRY, SCARS, MANNERISMS, ETC.) | UNDOCUMENTED PERSON |
|---|---|
| | |

CLOTHING DESCRIPTION
White/Black Dress, Black Boots

## EVIDENCE

Body Camera
Body Camera Evidence Collected

| PROPERTY TAG NOS. | DISPOSITION OF EVIDENCE |
|---|---|
| OTHER EVIDENCE CASH RECOVERED FROM SUSPECT'S PURSE 10967390 | IMPOUNDED |

| REPORTING OFFICER | I.D. # | DIVISION | AGENCY | DATE OF REPORT | TIME |
|---|---|---|---|---|---|
| MATTHEW ZAJDA | 7460 | W3 | SDPD | 12/30/2018 | 04:43 |

(Revised 09/2013 Electronic)

EXHIBIT G9

Booking Number: 18182295

# SAN DIEGO REGIONAL ARREST/JUVENILE CONTACT REPORT

| CONTINUED FROM | PAGE | INCIDENT NUMBER |
|---|---|---|
| ARREST | 2 of 5 | 18120046017 |

## VICTIM / WITNESS

| | | W TYPE | NAME (LAST, FIRST, MIDDLE SUS / OR ORGANIZATION) |
|---|---|---|---|
| W | | 06 | Martinez-Rocha, Maria |

| RESIDENCE ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| [redacted] | SAN DIEGO | CA | 92114 |

| RACE | SEX | DATE OF BIRTH |
|---|---|---|
| H | F | [redacted] |

CONTACT
CELL PHONE [redacted]

CONTACT
HOME EMAIL [redacted]

ID
DL [redacted] CA

| STATUS | EMPLOYER (RANK IF MILITARY) | BUSINESS ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| EMP | Gossip Grill Security Guard | | | | |

ADDITIONAL INFORMATION

| REPORTING OFFICER | I.D. # | DIVISION | AGENCY | DATE OF REPORT | TIME |
|---|---|---|---|---|---|
| MATTHEW ZAJDA | 7460 | W3 | SDPD | 12/30/2018 | 04:43 |

(Revised 09/2013 Electronic)

Booking Number: 18182295

| CONTINUED FROM | SAN DIEGO REGIONAL ARREST/JUVENILE CONTACT REPORT | PAGE | INCIDENT NUMBER |
|---|---|---|---|
| ARREST | | 3 of 5 | 18120046017 |

**OFFICER'S NARRATIVE:**

On 12-29-2018 at approximately 2353 hours, I responded to a radio call to investigate the report of a robbery in progress at the Gossip Grill located at 1220 University Avenue in San Diego. The reporting party was Drey Jennings, an employee at the business who stated a white transgender female stole an unknown amount of cash from their tip jar and punched another employee before fleeing the business. I was in full police uniform and driving a marked police patrol vehicle.

I arrived on scene and located Officer Hughes #7341 who had a white female, later identified as Ashley Vuz, detained in front of Rich's Night club. Security guards from the Gossip Grill followed Vuz after she fled their business with an unknown amount of cash.

It was determined by Officer Hughes after speaking with Dwayne Wynne, the manager of Gossip Grill, that their business was the victim of a robbery. See Crime Case #18-040783 by Officer Hughes for further details.

I assisted Officer Hughes with his investigation by locating additional witnesses to the incident. I spoke to Maria Martinez-Rocha who told me she was the first person who contacted Vuz inside the restroom of the business. She told me the following.

**Statement of Maria Martinez-Rocha (Witness):**

Rocha essentially stated she was notified of an intoxicated female in the restroom from another security guard. She contacted her inside the bathroom. She told the female she was intoxicated and it was time for her to call it a night. The female yelled her "what are you talking about?" Rocha told her she could "always come back tomorrow, it's another day." Rocha then "guided" her out of the bathroom and to the front of the bar. Rocha stated she did not touch her. Rocha walked her to the front of the bar. The female again told her not to touch her. Rocha told her again she was done for the night.

Before she went out the door, she saw the female grab the money from the tip jar. Rocha told her to put the money back. Rocha told her she was not going to let her go until she put the money back. Rocha also warned her she would call the cops if she did not put the money back. The female said "fuck you guys, this is my money" and "if you're going to kick me out, then I'm going take my money." She called in her boss (Wynne) who came out. Rocha told Wynne she took their money and she was being aggressive with her. Rocha stated that's when the female spit at her boss. Rocha then saw her try to swing at Wynne but she did not think she hit him. She estimated the female took approximately $40 or $50 from the tip jar. She watched her run out the door with the money. Rocha followed her out

| REPORTING OFFICER | I.D. # | DIVISION | AGENCY | DATE OF REPORT | TIME |
|---|---|---|---|---|---|
| MATTHEW ZAJDA | 7460 | W3 | SDPD | 12/30/2018 | 04:43 |

(Revised 09/2013 Electronic)

Booking Number: 18182295

| CONTINUED FROM | SAN DIEGO REGIONAL ARREST/JUVENILE CONTACT REPORT | PAGE | INCIDENT NUMBER |
|---|---|---|---|
| ARREST | | 4 of 5 | 18120046017 |

the door and last saw her running toward Rich's. Rocha stated she could identify the female if seen again.

I explained to Rocha we had located and detained a possible suspect (later identified as Ashley Vuz) nearby. Rocha agreed to participate in a curbside lineup. During the curbside lineup, Rocha positively identified Vuz as the suspect who committed the robbery. Wynne also positively identified Vuz as the suspect who committed the robbery.

Based on the statements provided along with both witnesses identifying Vuz as the suspect, I determined there was probable cause to place her under arrest for 212.5(c) PC – Robbery. Vuz and her property was searched incident to arrest. Vuz, who identified herself as transgender, requested to be searched by a female officer. While at the Police Headquarters, I had a female officer search her incident to arrest. Vuz checked negative for weapons or contraband on her person.

I proceeded to search her purse which contained $64 in cash. The cash consisted of fourteen $1 bills, two $20 bills, and one $10 bill. Based on the above statement provided by Rocha who stated Vuz took approximately $40 or $50 in cash, I collected the money as evidence.

Also while at Police Headquarters, I admonished Vuz by using my PD-145. Vuz responded to the first question by stating "yes sir". Vuz responded to the second question by stating "Yeah I can give you a statement." I obtained Vuz's statement.

**Statement of Ashley Vuz (Suspect):**

Vuz essentially stated she was with her mom and her two best friends. They decided to go to the Gossip Grill after eating dinner. Everyone ordered drinks except for her. Vuz stated she does not drink much. They all sat down and were in the back of the bar. Vuz decided to use to restroom. While she was in the restroom, she was standing up and peeing into the toilet. She heard a female screaming "she's throwing up, she throwing up." Vuz thought perhaps the female screaming did not know she was transgender and that they were in a lesbian bar. When she walked out of the urinal, a female security guard started grabbing her. She started pulling her out of the bar. Vuz told her "please, don't touch me." She stated she was transgender and it was against the law to remove her from the restroom. Vuz also became upset because she was trying to use the restroom. The female security guard told her someone saw her throwing up. Vuz told her she had the wrong person. Vuz tried to walk back toward where her mom and friends were sitting. The security guard started following her. When they went to leave the bar, the female security guard and anther male who had red hair, started grabbing her more. Vuz pushed them off of her. They also started pulling her hair.

| REPORTING OFFICER | I.D. # | DIVISION | AGENCY | DATE OF REPORT | TIME |
|---|---|---|---|---|---|
| MATTHEW ZAJDA | 7460 | W3 | SDPD | 12/30/2018 | 04:43 |

(Revised 09/2013 Electronic)

EXHIBIT G12

COSD000031

| CONTINUED FROM | SAN DIEGO REGIONAL ARREST/JUVENILE CONTACT REPORT | PAGE | INCIDENT NUMBER |
|---|---|---|---|
| ARREST | | 5 of 5 | 18120046017 |

She continued telling them she was not throwing up and that she was sober. She stated she was not drunk at all.

She stated the female security guard had short hair, tattoos, and was heavy set. She was also wearing a shirt that said security on it.

While obtaining Vuz's statement, I asked her about the tip jar and the money. Vuz quickly responded by telling me she wanted to talk to her lawyer. I did not ask any further questions and ended my interview with Vuz.

I collected the money I located from Vuz's purse and explained to her it would be collected as evidence. I issued and had Vuz sign a weapons/currency receipt. I also provided her with a copy of the receipt.

After obtaining her statement and completing processing, I transported Vuz to San Diego Central Jail where she was booked for the above charge without further incident.

**EVIDENCE:**

The cash collected from Vuz's purse was impounded at Police Headquarters under evidence barcode #10967390.

**RELATED REPORTS:**

See Crime Case #18-04783 by Officer Hughes for further details.

Approved by: Sgt. P. Kelly #6540

| REPORTING OFFICER | I.D. # | DIVISION | AGENCY | DATE OF REPORT | TIME |
|---|---|---|---|---|---|
| MATTHEW ZAJDA | 7460 | W3 | SDPD | 12/30/2018 | 04:43 |

(Revised 09/2013 Electronic)

# Exhibit H

18182295

# DECLARATION AND DETERMINATION

| ARREST | | | | Incident Number 18120046017 |
|---|---|---|---|---|
| WARRANT | AGENCY SDPD | ARJIS ASSISTED? NO | Page 1 of 1 | SDSD BOOKING NUMBER |
| ARRESTED DATE 12-30-2018 | TIME 00:27 | BEAT/DISTRICT 627 | RELATED REPORT (TYPE, NUMBER) 18040783 | CITATION NUMBER |
| CHARGES (S) 212.5(C) PC - Robbery | | | | ADULT RELEASES N/A |
| PERSON ARRESTED (L, F, M) Vuz, Ashley Ryan | | | ADDTIONAL CHARGES. | |
| NICKNAME | | | D.O.B. [redacted] | P.O.B. |

| RACE | SEX | AGE | HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|---|---|---|
| WHITE | M | 28 | 6'-00" | 155lbs. | THIN | BLOND | BLUE |

## FACTS ESTABLISHING ELEMENTS OF CRIME AND IDENTIFICATION

On 12-29-2018 at approximately 2353 hours, Officers responded to a radio call to investigate the report of a robbery in progress at the Gossip Grille located at 1220 University Avenue in San Diego. The reporting party was Drey Jennings, an employee at the business who stated a white transgender female stole an unknown amount of cash from their tip jar and punched another employee before fleeing the business. I was in full police uniform and driving a marked police patrol vehicle.

Prior to officers arriving on scene, Gossip Grill security was notified on an intoxicated female who was seen vomiting in the bathroom. Maria Martinez-Rocha, a security guard at Gossip Grill, went into the bathroom and confronted the female. Rocha asked the female, later identified as Ashley Vuz, to leave the business due to being seen vomiting which was against their business policy. Vuz became confrontational and combative toward Rocha. Rocha proceeded by attempting to escort Vuz out of the business. While escorting Vuz out of the business, Rocha and her manager Dwayne Wynne, observed Vuz grab approximately $40 to $50 in cash from a tip jar. Both Rocha and Wynne attempted to get the money back from Vuz. Vuz, who refused to give the money back, pushed and then punched Wynne in the face with her right fist. Vuz then ran out of the business and was followed by security guards, Arnell Casteel and Chelsea Langner. They both followed her across the street where they pointed her out to Officer Hughes #7341 who arrived on scene and detained her. A curbside lineup was performed where Rocha and Wynne both positively identified Vuz as the suspect.

After obtaining witness statements and being positively identified as the suspect, Vuz was placed under arrest for being in violation of 212.5(C) PC – Robbery. She was searched incident arrest and $64 in cash was also recovered from her purse. Vuz was ultimately transported to San Diego Central Jail where she was booked for the above charges.

SCANNED

I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief. Executed on 12-30-18 in the County of San Diego, State of California, By M. ZAJDA #7460 (Declarant's Signature)

On the basis of the foregoing Declaration, I hereby determine that there:

IS ☐ IS NOT ☐

Probable cause to believe this arrestee has committed a crime.

(DATE) (TIME) (Magistrate's Signature)

BY (Telephonic Approval)

EXHIBIT H1

 # San Diego County Sheriff's Department

"Keeping the peace since 1850"

## PCD Judge Response Report

| | |
|---|---|
| Booking Number | 18182295_1 |
| Arrestee Name | VUZ, ASHLEY RYAN |
| Status | Approved |
| Comments | |
| Signature | 12/30/2018 11:53:45 AM tweather CN=Theodore Weathers,OU=Accounts,OU=AutoAppServices,DC=sdsheriff,DC=netSigned by Theodore Weathers 98.176.124.76 |
| Scan Id | {3518e971-b6d0-416b-8dce-d1873b00f71b} |

See page below

# Exhibit I

In the District Court of CA, Southern Division Matter of

**VUZ**
**vs.**
**DCSS III, INC.**

Case No.
**3:20-CV-246-GPC-AGS**

---

**PAGES**
**11** through **120**
for the
Web Videoconference Deposition of
**OFFICER MATTHEW ZAJDA**

CONFIDENTIAL

Taken on
**AUGUST 25, 2021**

---

Reported By:
**DEBRA PARR, CSR NO. 12146**

EXHIBIT I1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ASHLEY R. VUZ, )
)
Plaintiff, )
)
vs. ) Case No.: 3:20-CV-246-GPC-AGS
)
DCSS III, Inc (D/B/A GOSSIP )
GRILL), et al., )
)
Defendants. )
________________________________)

The videoconference deposition of OFFICER MATTHEW ZAJDA, taken on behalf of the Plaintiff, before Debra Parr, Certified Shorthand Reporter 12146 for the State of California, with principal office in the County of Orange, commencing at 1:07 p.m., Wednesday, August 25, 2021; taken with all parties appearing virtually via video conference.

APPEARANCES OF COUNSEL:
FOR THE PLAINTIFF:
LAW OFFICES OF RYAN A. GRAHAM
BY: RYAN A. GRAHAM, Esq.
1049 Havenhurst Drive
Suite 510
West Hollywood, California 90046
(323) 792-6377
ryan@ryan.law

FOR CITY OF SAN DIEGO and OFFICER MATTHEW ZAJDA:

HURRELL CANTRALL, LLP
BY: NATALIE LUONGO, Esq.
300 South Grand Avenue
Suite 1300
Los Angeles, California 90017
(213) 426-2000
nluongo@hurrellcantrall.com

FOR CITY OF SAN DIEGO CITY ATTORNEY'S OFFICE:
OFFICE OF CITY ATTORNEY
BY: STACY J. PLOTKIN-WOLFF, Esq.
1200 3rd Avenue
Suite 1200
San Diego, California 92101
(619) 533-5800
sjpwolff@sandiego.gov

FOR COUNTY OF SAN DIEGO and NURSE EMILY CHOW:

SAN DIEGO OFFICE OF COUNTY COUNSEL
BY: ALEXA F. KATZ, Esq.
1600 Pacific Highway
Room 355
San Diego, California 92101
(619) 405-0273
alexa.katz@sdcounty.ca.gov

ALSO PRESENT:
ASHLEY R. VUZ

Q Yes.

A Blond female with like a white dress or white outfit.

Q Okay. Are you aware that Ms. Vuz is transgender?

A Yes.

Q And you're aware that she is a male to female transgender individual, correct?

A Yes.

Q When did you learn that information?

A I believe it was right away on scene; after looking at the video. I think even the radio call, it came out saying it was a transgender female.

Q Okay. Do you have any information about Ms. Vuz's genitalia?

A At this time, or at the time of the incident or --

Q At the time of the incident.

A It wasn't until later when I had asked or inquired about it at jail that, yes, I asked about transition, what stage they were at, she was at.

Q And why did you ask that question?

A Essentially, you know, we have a procedure when it comes in to deciding where we're going to take them for intake to jail.

Q Uh-huh.

A And that sometimes does come up. And as awkward or tough for people to ask, it's something that I had to ask.

Q And so you say that you asked that as a matter of SDPD policy, correct?

A Yeah, like --

MS. LUONGO: Misstates prior testimony.

MR. GRAHAM: Can I have the question read back.

MS. LUONGO: Hold on. It assumes facts not in evidence. And misstates prior testimony

MR. GRAHAM: May I have the reporter read back the question, please.

(The record was read as follows:

"And so you asked that as a matter SDPD policy, correct?")

MS. LUONGO: Same objections.

You can answer.

THE WITNESS: I can? Okay. Yeah, it's a procedure or a training bulletin that I was following.

BY MR. GRAHAM:

Q All right. So you didn't ask because you were personally interested in that topic, correct?

A Yeah. Correct, no, I'm not.

Q Would you have asked that question to Ms. Vuz about her stage in her transition if she were not

transgender?

MS. LUONGO: Calls for speculation. It's an incomplete hypothetical.

You can answer.

THE WITNESS: Yeah, I would not, no.

BY MR. GRAHAM:

Q If that policy were not in place, that training bulletin rather, would you have asked that question?

MS. LUONGO: Misstates prior testimony. Assumes facts not in evidence.

You can answer.

THE WITNESS: I'm sorry. What's the question again?

BY MR. GRAHAM:

Q Sure. Let me ask it this way: You asked Ms. Vuz about her genitalia, correct?

A Yes.

Q Would you have asked that question if there were not the training bulletin in effect?

MS. PLOTKIN-WOLFF: Objection. Incomplete hypothetical. Calls for speculation.

MS. LUONGO: May I have the question read back, please.

(The record was read as follows:

"Would you have asked that question if there were

took her down to our police headquarters.

Q What was the purpose of taking her to the police headquarters instead of an actual jail facility?

A So any time we arrest somebody, we are required to -- especially if it's new charges, we have to take them to police headquarters where we call the Sally port. And we have to write what's called a probable cause declaration. Basically it's kind of a summary of the actual arrest report that will be written later.

However, the declaration is kind of just a quick summary so that that way when we take them to jail, sheriff's deputies and judges can review the case and decide if it meets, you know, the crime element and that they will hold them until the report is reviewed.

And then, you know, followed up by detectives, because they have a window of a certain amount of hours when they have to submit the case for prosecution. So detectives do a follow-up. But anyways, the declaration is just a document that just has a quick summary of what occurred that night. And, you know, we write it in there. There's a couple of tables and chairs. We use our computer to type it up real quick.

And then prior to taking them to jail we have to get that declaration approved by a sergeant --

Q Okay.

arrest?
A Yes.
Q Okay. Do you recall who wrote the probable cause declaration in this case?
A I did.
Q And I believe you mentioned you did not read Officer Hughes' report; am I understanding that correctly?
A That's correct.
Q All right. How would you describe Ms. Vuz's demeanor in the car ride?
A She was nice, pleasant. I mean, I've had a lot of people in the past that are not very pleasant. And I'd say Ms. Vuz was professional and nice. You know, I had no issues with her in the vehicle.
Q Do you communicate with her at one point that she would be detained in a all male prison or all male jail?
A I'm not sure. I mean, I'd have to look at my video to see if I had that question asked.
Q Okay. Do you recall there being a sudden change in her otherwise pleasant disposition during the intake process?
A No, not that I recall.
Okay. So after taking her statement at the headquarters -- let me withdraw that.
The statement that you took from her, did you

take that at the headquarters?

A Yes. I did, yes.

Q Okay. And then what else did you do at the headquarters before transporting Ms. Vuz to jail?

A Yeah, like I said, I got her statement. I read her her rights. She agreed to speak. So I talked to her, got a statement from her. At one point during the statement she didn't want to talk anymore. And I ended my conversation with her.

And then I wrote the declaration. And then usually you have to fill out a sheet with their top sheet, you know, saying -- booking paperwork so that when we go to the jail, it's got all of her information on there. And they can just put in the computer and we can go on our way with the booking process, so. That's usually what happens at headquarters.

Q Okay. Then do you recall the car ride from headquarters to jail?

A Yes.

Q Which jail did you transport her to?

A So I took her to central jail.

Q Is that also known as SDCJ?

A Yes.

Q And is SDCJ an all-male facility?

A Yes.

Q And why did you transport Ms. Vuz to that facility, that all-male facility?

A Because her being a transgender female that was transitioning to a female.

Q Is that an instruction that you're given as a SDPD officer to do that?

A Based on the training bulletin that we were -- talked about or taught, yes.

Q Okay. If Ms. Vuz were a transgender female, as she is, with the difference that she had undergone surgery to change her genitalia to have a vagina, with that one difference, would you have still transported her to SDCJ?

A No.

MS. LUONGO: Vague as to time.

MR. GRAHAM: Ms. Luongo, I'd be happy to confer if that is vague on time. I would love you to clear that up for me so I can get something clear on the record.

MS. LUONGO: It's an incomplete hypothetical. Are you talking about in the present or in the past, at the time of the incident?

BY MR. GRAHAM:

Q Excellent point. Officer Zajda, as of December 2018, would you have still transported Ms. Vuz to SDCJ if she had a vagina?

A Based on the training bulletin, no, I wouldn't.

 A Okay.

Q So I'll start at the top. And you tell me when to scroll down.

MS. PLOTKIN-WOLFF: Counsel, is it possible for you to make it a tad larger. You had it bigger and now you made it smaller.

MR. GRAHAM: Yes.

THE WITNESS: Maybe window width.

BY MR. GRAHAM:

Q How is that?

A There we go. You can Scroll down, 1,000 -- scroll up real quick, if you don't mind.

Q Sure.

A Okay. Yeah, you can keep going down. And the witness -- get her information -- all right, scroll down. Keep going down a little farther. There you go. Thanks.

Q Uh-huh.

A Okay. Scroll down just a little bit to Ms. Rocha's statement. Thanks. Yeah. You can scroll down to the next page.

So I'd like to add just one thing. So, you know, when we're at police headquarters doing processing, there's a couple of other things that went on during that time there.

And, you know, just reading this, I do recall that, yeah, I took the cash that she had on her person. And I think it was in her purse, and collected that as evidence.

So anytime there's evidence like that we have to -- especially when money's involved, we have to give the arrestee a property receipt, especially if we're going to collect evidence.

So in this case that does take time where I'm, you know, counting the money, showing her how much money she had with her. And then I explained to her that hey, this money needs to be impounded as evidence because it was possibly used in the incident, which was approximately 40 or $50 cash.

So in that case I have to fill out a property receipt. And the property receipt is a special form the City requires us to use.

Q Uh-huh.

A And we have to put exactly what we impounded as far as money, or in some case it could be ammo or guns. But in this case it was money. And then we have them sign it. And I gave her a copy.

Q Understood.

A Also in that case I got to impound the money into the evidence room, which requires completing a bar code

statement.

Keep going down. You can go to the next page.

Q Okay.

A You can scroll down a little farther. I think that's it.

Q That is the end of that run of pages.

So Officer Zajda, to the best of your recollection, after reviewing this document, does it seem like a genuine replication of the arrest report that you wrote in connection with the arrest of Ms. Vuz?

A Yes.

Q Okay. I want to direct your attention to what is page 14 of this exhibit. For the record it is Bates stamped COSD 33.

(Exhibit Number 3 was marked for identification by the Court Reporter.)

BY MR. GRAHAM:

Q Do you recognize this type of document, Officer Zajda?

A Yes.

Q And what is this document?

A So again, this is the arrest declaration that I wrote at police headquarters. And as you can see, it's actually fairly long for an arrest declaration. Sometimes these are short and sweet; a quick summary.

When you took Ms. Vuz to SDCJ for her to be detained there, did you give any employee at SDCJ any document that would support probable cause to detain her at that specific jail facility?

A Yeah, I give her this declaration sheet that I wrote up, and the booking top sheet, which has Ms. Vuz's information on it.

Q So that document you mentioned in the first part of your answer, is that what's being displayed on your screen right now?

A Yes.

Q Okay. Do you recall any of the names of the deputies that you spoke with or that you dealt with insofar as processing Ms. Vuz into SDCJ?

MS. LUONGO: Asked and answered.

THE WITNESS: The answer is no.

BY MR. GRAHAM:

Q Okay. Did you convey any information specifically about Ms. Vuz's transgender status to any of the deputies or employees at SDCJ?

A Yes, I did.

Q And what information was that?

A I advised them that she's transgender.

Q Did you advise them that she had male genitalia?

A Yes.

Q And what was, as far as you understand, the purpose of that explanation?

A To tell them that based on the procedure we have that she's supposed to be booked into men's jail.

Q So you're an employee of the San Diego Police Department. We talked a little bit about the policies as far as transporting transgender detainees as far as the City policy goes. So I'm going to ask you a separate question --

MS. LUONGO: Misstates the record and prior testimony, but yeah.

BY MR. GRAHAM:

Q Yeah. So the point I really want to fixate on this question are County policies.

Do you have any knowledge about County policies at the jail regarding transgender detainees being taken to a certain jail?

A I just go based on what the San Diego Police Department has their offices, you know, follow, which is the procedure that was discussed already.

Q Fair enough. Fair enough. I just wanted to see if you by virtue of having arrested people and taken them to jail, if you had any knowledge about the County's policies. If you don't know, that's fine.

A Yeah, I don't know.

I'm fine with whatever the default is, as long as we can send it to Ms. Luongo's office.

MS. LUONGO: It goes by the Federal Rules of Civil Procedure.

MR. GRAHAM: Thank you, everybody.

THE REPORTER: Would either of you like to order a certified copy of the transcript?

MS. LUONGO: My office, yes, it's a read only, so we don't get the original. Yeah, we will order a copy.

MS. KATZ: I'll order an electronic copy as well.

MS. LUONGO: Yeah, ours is electronic too.

(Whereupon, proceedings concluded at 4:31 p.m.)

_________________________________

OFFICER MATTHEW ZADJA

REPORTER'S CERTIFICATE

I, Debra P. Parr, Certified Shorthand Reporter in and for the State of California, License No. 12146, hereby certify that the deponent was by me first duly sworn and the foregoing testimony was reported by me and was thereafter transcribed with computed-aided transcription; that the foregoing is a full, complete, and true record of said proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceedings and caption named or in any way interested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificate null and void.

In witness whereof, I have hereunto set my hand this day: September 3, 2021.

[ ] Reading and Signing was waived.

[ X ] Reading and Signing was requested.

Debra Parr

Debra P. Parr, CSR No. 12146

# Exhibit J



EXHIBIT J1



EXHIBIT J2



023 1-Uncuffing Area
12/30/2018 04:13:12
NOT BOOKED
BOOKED
FELONY
BOOKED
MISDEMEANOR

EXHIBIT J3



EXHIBIT J4



023 1-Uncuffing Area
12/30/2018 09:37:50
NOT BOOKED
FELONY
BOOKED
MISDEMEANOR

EXHIBIT J5



EXHIBIT J6



EXHIBIT J7



EXHIBIT J8



EXHIBIT J9



EXHIBIT J10



EXHIBIT J11



EXHIBIT J12

# Exhibit K

In the District Court of US, Southern District of CA Matter of

**VUZ**
**VS.**
**DCSS III, INC.**

Case No.
**3:20-CV-246-GPC-AGS**

Web Videoconference Deposition of
**EMILY CHOW, R.N.**

Taken on
**AUGUST 24, 2021**

Reported By:
**EVE M. JAMES, CSR NO. 9934**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

ASHLEY R. VUZ, )
)
Plaintiff, )
)
vs. ) No. 3:20-CV-246-GPC-AGS
)
DCSS III, INC. (D/B/A GOSSIP )
GRILL) et al., )
)
Defendants. )
______________________________)

Remote Web Conference Deposition of EMILY CHOW, R.N., taken on behalf of Plaintiff, virtually taken in California, beginning at 9:03 a.m. and ending at 11:29 a.m. on Tuesday, August 24, 2021, before EVE M. JAMES, Certified Shorthand Reporter No. 9934.

EXHIBIT K2

APPEARANCES: (All appearances via Web conference.)

For Plaintiff:

LAW OFFICES OF RYAN A. GRAHAM
Attorneys at Law
BY: RYAN A. GRAHAM, ESQ.
1049 Havenhurst Drive
Suite 510
West Hollywood, California 90046-6002
(323) 792-6377
ryan@ryan.law

For Defendants County of San Diego, and Emily Chow:

SAN DIEGO OFFICE OF COUNTY COUNSEL
BY: ALEXA KATZ, ESQ.
BY: ROBERT ORTIZ, ESQ.
1600 Pacific Highway
Room 355
San Diego, California 92101-2437
(619) 531-5279
alexa.katz@sdcounty.ca.gov
robert.ortiz@sdcounty.ca.gov

For Defendants City of San Diego, and Matthew Zadja:

HURRELL CANTRALL LLP
Attorneys at Law
BY: NATALIE LUONGO, ESQ.
300 S. Grand Avenue
Suite 1300
Los Angeles, California 90071
(213) 426-2000
nluong@hurrellcantrall.com

Also Present:

MEGAN WINTERS, Barrett Reporting
Host of Zoom conference

INDEX

| WITNESS | EXAMINATION |
|---|---|
| EMILY CHOW, R.N. | |
| BY MR. GRAHAM | 6 |

EXHIBITS

| PLAINTIFF'S | | PAGE |
|---|---|---|
| Exhibit A | San Diego County Sheriff's Department Detention Services Bureau - Manual of Policies and Procedures, Number Q.7, 3 pages Bates Nos. CSD000148 to 000150 | 18 |
| Exhibit B | San Diego Sheriffs Department, Medical Intake Questions, 23 pages Bates Nos. CSD000033 to 000055 | 23 |
| Exhibit C | San Diego County Sheriff's Department Mug Shot Profile-Facecard, 9 pages Bates Nos. CSD000024 to 000032 | 34 |

Virtually Taken in California
Tuesday, August 24, 2021
9:03 a.m. - 11:29 a.m.

THE REPORTER: Good morning. Today's date is Tuesday, August 24, 2021, and the time is approximately 9:03 a.m. This deposition is being taken remotely via Zoom conference.

The witness is Emily Chow, in the case of Ashley Vuz vs. DCSS III, Inc., dba Gossip Grill, et al., Case Number 3:20-CV-246-GPC-AGS, venued in United States District Court, Southern District of California.

My name is Eve James, the court reporter for today's proceedings, representing Barrett Reporting located in Tustin, California.

Would all counsel present please state your name and whom you represent, starting with plaintiff's counsel, Mr. Graham.

MR. GRAHAM: My name is Ryan Graham and I'm the attorney for plaintiff Ashley Vuz.

MS. KATZ: Alexa Katz, attorney for the County of San Diego and Nurse Emily Chow. And Robert Ortiz, for the County of San Diego. And Emily Chow is also on the Zoom call.

MS. LUONGO: Natalie Luongo, for the defendant City of

Q And during that one- to three-month orientation period, how many shifts did you work at SDCJ?

A I'm not sure. SDCJ became my home facility, so the rest of my orientation shifts were there.

Q So is it fair to say you worked significantly more shifts at SDCJ during that period than at Vista or Las Colinas?

A Yes.

Q At what point were you assigned permanently to one of those facilities?

A I'm not entirely sure.

Q What I'm trying to get to, when you begin orientation, do you know at that point that you're going to be assigned to SDCJ or is that choice made within the orientation?

A Generally, I believe the decision is made prior to you starting orientation. However, I was told originally I was supposed to be at Las Colinas, but I asked to be placed at SDCJ.

Q Is there a reason why you asked to be placed at SDCJ?

A I enjoyed my orientation shift there more than at Las Colinas.

Q What was it specifically about SDCJ that you enjoyed more?

A The staff appeared more welcoming.

Q Understood. So I want to talk about one of the duties you mentioned.

You mentioned you worked with incoming arrestees or detainees, correct?

A Correct.

Q Can you describe what that assessment process is?

A Incoming arrestees are required to get evaluated or assessed by an R.N. at intake to see if they are stable enough to be in our facility.

Q When you say "stable enough," how do you make that determination?

A We determine if they are stable enough to be in the facility, that's physically or mentally, based on our assessment as well as their vital signs, any medical conditions that they might have and any psychiatric issues that they might have.

Q All right. I want to jump back real quick and talk about your education and kind of like your professional background.

So you went to undergrad, correct?

A Yes.

Q And where did you go to undergrad?

A My undergrad was with -- it was partially with Cerritos College. And my nursing program, which was part

time.

It looks like a screen play when you get the transcript. It'll say "Ms. Chow," colon, and there's the answer, and then it'll say "Ms. Katz," colon, and then the objection, but then the objection will kind of cut off and then you continue talking and then the objection continues.

So if you hear Ms. Katz or Mr. Ortiz make an objection, either one, just take a step back and let them get that on the record.

A Okay. Sorry.

Q No, no. It's fine. I'm sure if I were in your position, I would be doing the exact same thing.

So the inmates come into the facility and get to see a nurse.

Do you know what that process looks like, how the arrestees are sent to you?

MS. KATZ: Objection. Calls for speculation.

THE WITNESS: After the inmates are added into the system by the booking clerk and they have their booking photo taken, then they are brought over to be assessed.

We have a series of questions that we're required to ask each inmate as well as take their vital signs. And after our assessment, if they are stable enough to be in the facility, then they will move on and continue on in

the booking process.

BY MR. GRAHAM:

Q So real quick, jumping back to the different jails you worked at during orientation.

You said you worked at Vista and Las Colinas for two shifts, correct?

A I believe so, yes.

Q Is it your understanding that Vista and Las Colinas are both female facilities?

A No. Vista is both male and female.

Q And what about Las Colinas?

A Las Colinas is San Diego County's only all-female facility from what I understand.

Q All right. The series of questions that you would ask the arrestees that were brought to you for intake, do you recall what those questions were?

A There were quite a few of them. I can't recall all of them specifically.

(Plaintiff's Exhibit B was marked and is attached hereto.)

BY MR. GRAHAM:

Q Let me just show you another exhibit. This we'll call Exhibit B.

If you look at the screen, it says "San Diego Sheriffs Department, Medical Intake Questions."

this if you scroll up.
Q Right here, right?
A Yes.
Q Okay. Do you recognize this document, starting on page 15?
A Yes.
Q What is this?
A This is part of the psychiatric portion.
Q So these questions would have also been asked during the intake?
A Yes. And I believe if you scroll down a little further, there they are.
Q Here we go. So I want to bring to your attention this highlighted box. It says page 16 of the document, page 2 of 4 in a four-page run.
It says "Do you identify yourself as transgender?"
And then what are the answers listed below?
A If an inmate or arrestee identifies as transgender, a drop-down box will appear and we specify if they are transitioning from male to female or female to male, and then another drop-down box will appear that will ask if we have notified class.
Q What is "class"?
A Classification.

EXHIBIT K10

Q Can you explain what that means?

MS. KATZ: Objection. Calls for speculation.

THE WITNESS: I'm not entirely sure what their role specifically is. However, as I understand it, the classification deputy helps with housing inmates once they complete the actual booking process.

BY MR. GRAHAM:

Q So to your best understanding, classification, is that like a subunit of SDCJ?

MS. KATZ: Objection. Calls for speculation.

THE WITNESS: I -- I don't know.

BY MR. GRAHAM:

Q All right. But when this question was answered "Yes," that means that somebody at classification was notified?

A Yes.

Q And who would that person be?

A I have no idea their name. We just call --

Q I was going to ask that same question.

What's the manner of notification; is it an email or a phone call?

A We call the classification deputy from intake.

Q Okay. When the intake process is happening, do you know the steps that the arrestee goes through before coming into contact with you?

MS. KATZ: Objection. Calls for speculation.

THE WITNESS: As I understand it, there are two steps that they go through before they are medically assessed by a nurse. They have their information input into JIMS by a booking clerk and they have their booking photo taken.

BY MR. GRAHAM:

Q Those are the two steps?

A I believe those are the only two things that happen prior to when they come see nursing staff.

MS. KATZ: I'm going to belatedly object to that question as calling for speculation.

BY MR. GRAHAM:

Q Do you know if there's a search that happens before the arrestee comes into contact with you?

MS. KATZ: Objection. Calls for speculation.

THE WITNESS: I don't know for certain.

BY MR. GRAHAM:

Q Do you know if a search happens after they come into contact with you?

MS. KATZ: Objection. Calls for speculation.

THE WITNESS: After they are deemed medically -- after they are deemed stable enough to be in the facility, they continue on in the booking process, which involves a full body scan in the next room, but that's -- I -- I'm not a deputy. I can't tell you what their process is.

THE WITNESS: I don't know.

BY MR. GRAHAM:

Q I want to draw your attention to Exhibit B -- no. This is Exhibit A. This is the Policy Q.7 dated June 18, 2018, Bates Number CSD 148. I want you to look at the paragraph sub B.

It says "Once the inmate is determined to be 'fit for jail,' the pre-book process will be completed by the assigned DPT."

What do you understand the phrase "fit for jail" to mean?

A Again, the term "fit for jail" to nursing staff means that they're stable enough to be there medically or mentally.

Q Earlier when I asked if you'd ever processed any women into SDCJ, your answer was no, correct?

A Correct.

Q Going back up to Exhibit D, page 1 of the document, Bates Number CSD 24, when you look at the photograph displayed to you on the screen now, does that appear to be a male or a female?

MS. KATZ: Objection. Vague and ambiguous.

THE WITNESS: I guess they look pretty feminine.

BY MR. GRAHAM:

Q All right. So how many people that look this

feminine have you processed into SDCJ that you can recall?

MS. KATZ: Objection. Vague, lacks foundation, calls for speculation.

THE WITNESS: I don't know. We would process hundreds of arrestees a night.

BY MR. GRAHAM:

Q So I will represent to you that Ms. Ashley Vuz, the person who is photographed there, was born and identified by the doctor as being male and then has since transitioned and she is a female. So she is a male-to-female transgender individual.

Using that information, let me ask you, how many male-to-female transgender arrestees did you clear for intake at SDCJ?

MS. KATZ: Objection. Vague and ambiguous.

THE WITNESS: Within my time at SDCJ, I would estimate that I have cleared around 20 inmates who identified as transgender, but I can't say for certain the actual number.

BY MR. GRAHAM:

Q And of those 20, how many of them were male-to-female?

A I would say nearly all of them.

Q How many of them would have been female-to-male?

A Probably one or two.

Q Do you know if female-to-male transgender individuals are processed into a different jail?

MS. KATZ: Objection. Calls for speculation, vague and ambiguous.

THE WITNESS: I don't know.

BY MR. GRAHAM:

Q Okay. When you were working at SDCJ, the phrase "fit for jail," was that a phrase that you would use at work with your co-workers and your supervisors?

A Yes.

Q Is that the determination that you understand your process is supposed to come to a conclusion about?

MS. KATZ: Objection. Vague and ambiguous.

BY MR. GRAHAM:

Q That was a terrible question. I'm sorry.

You understand your role in the intake process is to determine whether or not the arrestee is fit for jail?

A Yes, this is part of my role as intake nurse.

Q Is that necessary to be found -- withdraw that.

Is the fit for jail determination necessary in order to accept a detainee into SDCJ?

A Yes.

Q And what would happen in the event that your determination found that the detainee was not fit for jail?

A They would be considered a gate refusal.
Q And what is a gate refusal?
A We use that term to describe arrestees who are not stable enough to be in the facility for any number of reasons.
Q And what are some of those reasons?
A I can't remember them all, but some that come to mind are if they have -- if they are actively trying to harm themselves while we're doing our assessment; if they have some sort of wound that might require stitches; if they admit that they have swallowed some kind of substance or drugs; if they are actively overdosing or if their vital signs are too unstable.
Those are some of the reasons that come to mind right away.
Q Do you make the determination by yourself or is somebody else involved?
A Typically it is up to the discretion of the R.N.
Q If there is a gate refusal, what happens to the detainee?
A If they need to go to the hospital for something or the County of Mental Health, CMH, we let the arresting officer know that they need to be cleared by either one of those entities prior to being booked into the facility. Otherwise I don't know what happens to them.

you would have conducted on, it says, December 30, 2018?

A Yes.

Q Okay. As you've reviewed this, is there anything that jumps out at you to make you think it's not genuine?

A No.

Q Okay. I also want to check real quick, it says the time here, "0338."

Does that indicate to you that this intake would have been done at 3:38 in the morning?

A I don't -- I don't know.

Q That's fine. The reason why I'm asking is it says "Book Date/Time" and then "Created Date/Time."

I was wondering if you knew what those times were?

A I don't.

Q That's fine. So I want to go back to the prescriptions point here. This is on page 13 of the document, Bates page CSD 45. It says "Are you currently taking any medications?" "Description, Several."

You said that you put "several" when the person cannot convey to you what the prescriptions are; is that right?

MS. KATZ: Objection. Misstates prior testimony.

THE WITNESS: No. We put that when they tell us that they're taking several medications.

as transgender.

BY MR. GRAHAM:

Q The page I'm presenting right now is page 16 of the exhibit Bates-stamped CSD 48. It indicates in the red highlighted portion that the detainee informed you that she was male-to-female transgender, correct?

A Yes.

Q Because of that, did you think to ask whether or not she might have been on any hormones?

A Yes, because the question below that is "Are you in the process of gender reassignment therapy?"

Q And it has a "Y" next to it, correct?

A Uh-huh, yes.

Q So as part of the assessment you would have attempted to learn if she was on any medications for that reassignment therapy?

A Yes.

Q And would that be recorded on this document?

A Yes. We just looked at it.

Q So how would you ensure that the detainee was provided with the medications that she needed?

MS. KATZ: Objection. Vague and ambiguous, overbroad, incomplete hypothetical.

THE WITNESS: If an arrestee cannot recall their medications, we would ask them "Do you" -- "Do you

remember your pharmacy?" And if they do, then we can have them sign a Release of Information or an ROI so that we can obtain the exact name and dosage and schedule of their medications.

BY MR. GRAHAM:

Q And do you know if there's a mechanism to ensure that that happens by the time that they need to take the medication so they don't skip a dose?

A I don't know.

Q As part of your intake, do you attempt to learn the quantity or the dosages of medications?

MS. KATZ: Objection. Asked and answered.

THE WITNESS: We try to. It's -- let me rephrase that. When we ask them if they are on any medications, we do ask if, like, they have been consistent with taking them and when the last time they took them was.

BY MR. GRAHAM:

Q Are those questions reflected in this form?

A No.

Q And you don't recall whether or not specifically you asked those questions to Ms. Vuz in this case, correct?

A That is correct. It is just my common practice to ask those follow-up questions.

Q Okay. Do you recall -- let me rephrase that.

jail, correct?

MS. KATZ: Objection. Again, asked and answered.

THE WITNESS: Yes, typically it is up to the nurse's discretion.

BY MR. GRAHAM:

Q Excellent.

And would you agree with the following that arrestees that are supposed to be housed in a San Diego County detention facility must be medically screened by a nurse who conducts a comprehensive assessment of the medical and psychiatric needs of the inmate and records the responses in JIMS?

A Yes.

MS. KATZ: Objection -- go ahead.

MR. GRAHAM: Did you want to enter an objection, Alexa?

MS. KATZ: No.

BY MR. GRAHAM:

Q Would you agree with the statement that arrestees who are not fit for jail as determined by a nurse are not booked into the jail facility?

A That is correct. If they are not fit for jail or stable enough to be there, we gate refuse them.

Q And would you agree with the statement that the classification process happens after the medical

assessment process?

MS. KATZ: Objection. Calls for speculation, also vague and ambiguous.

THE WITNESS: Typically, yes, classification tends to be the end of the actual booking process. However, when we have -- when we have an inmate who identifies as transgender, we make sure to notify classification first so that they can come down and ask them their series of questions.

BY MR. GRAHAM:

Q Do you know if the interviews that you have with the detainees to assess them if they're fit for jail, are those recorded in any way?

A Other than in like the actual computer system, JIMS, no.

Q So there's no, to your knowledge, video or audio recordings of those assessments?

A That is correct. That would be a violation of HIPAA.

Q Okay. I believe you testified earlier that you are aware generally that transgender individuals require medications as part of their transitions in some cases, correct?

A Yes.

Q Were you aware of that in 2018?

MS. KATZ: Objection. Vague and ambiguous, lacks foundation.

THE WITNESS: Yes.

BY MR. GRAHAM:

Q Okay. Have you ever heard of detainees in SDCJ having to skip doses of medication because it didn't arrive in time?

MS. KATZ: Objection. Vague and ambiguous, calls for speculation, incomplete hypothetical.

THE WITNESS: I have heard of that before, yes. However, that isn't -- let me rephrase that. I have heard of that happening before, yes. However, we cannot -- when we send off a Release of Information or ROI, we cannot control how quickly the pharmacy or facility or doctor that they're with sends their information back.

BY MR. GRAHAM:

Q Are there doctors employed on staff at SDCJ?

A Yes.

Q Are they able to prescribe medications?

A Yes.

Q Do you know if they ever do?

A Yes, they do.

Q So when you dispense medication at SDCJ, are you doing it under a doctor's orders?

A Yes, that is correct. As a nurse it's out of my

scope to prescribe medications.

Q As an R.N. you can't even prescribe legally, can you?

MS. KATZ: Objection. Vague and ambiguous.

THE WITNESS: Yes, that's what I just said, yes.

BY MR. GRAHAM:

Q Okay.

A That's correct.

Q All right. If a female -- I think I asked this earlier. I want to get it clear on the record. If a woman -- let me rephrase that.

Have you ever medically assessed a woman for intake at SDCJ?

MS. KATZ: Objection. Vague and ambiguous, incomplete hypothetical.

THE WITNESS: That's kind of vague.

BY MR. GRAHAM:

Q Let me clear it up. How is the question vague?

A Well, if an arrestee or inmate is transgender, but they have not made like a complete transition -- like are you asking if I have -- let me rephrase that. Are you asking if I have assessed -- what was the phrase you used earlier -- a cis female inmate or a transgender inmate who has made a complete transition from male to female?

Q So that distinction would make your answer

different, right?

A Yes, I guess.

Q So I'll ask both questions back to back.

Have you ever medically assessed for intake a cisgender female?

A I don't believe so.

Q Okay. And the same question, have you ever medically assessed for intake a transgender female?

A Yes, I have medically assessed a transgender female.

Q Okay. You mentioned the phrase earlier, "complete transition."

What did you mean by "complete transition"?

A Typically we characterize a complete transition from male to female as they are continuing hormone therapy and have had both a top surgery as well as a bottom surgery.

Q And whether or not a transition is complete or incomplete, is that reflected in the documents anywhere?

MS. KATZ: Objection. Vague and ambiguous.

THE WITNESS: I don't know without looking at my notes. I don't believe so.

BY MR. GRAHAM:

Q Okay. So what would the distinction be between a transgender individual who had a complete transition

versus one who has an incomplete transition as far as intake goes?

MS. KATZ: Objection. Vague and ambiguous, calls for speculation.

THE WITNESS: I'm not really sure what you're asking me.

BY MR. GRAHAM:

Q Sure.

So I heard earlier you make a distinction based on whether or not the transition was complete.

So what I'm curious about is whether or not the transition being complete or incomplete has any significance as far as intake goes.

MS. KATZ: Objection. Vague and ambiguous, calls for speculation.

THE WITNESS: Typically it does not influence our medical assessment because we as nurses still treat the actual individual. However, it might affect classification, but I don't -- that's out of my scope. I don't -- I don't know what their role is.

BY MR. GRAHAM:

Q Sure. Just because you used that word, you know, "complete," I was just curious if that was a word that was in policies that you'd seen or came from a supervisor and where in your awareness that phrase came from.

provided Ms. Vuz with medication, based on the information gathered in your intake?

MS. KATZ: Objection. Calls for speculation.

THE WITNESS: No, I have no idea.

BY MR. GRAHAM:

Q Okay. We talked earlier about whether or not people can get their medications.

Have you ever heard of specifically transgender individuals having to skip doses at SDCJ of essential medication?

MS. KATZ: Objection. Calls for speculation.

THE WITNESS: I -- I don't know for certain. Everyone goes through the exact same process in order to obtain the correct medication and dosages. We have everybody who is taking medication sign a Release of Information and we -- I don't actually know what happens after that.

BY MR. GRAHAM:

Q Sure.

A But everyone moves through the exact same process who comes to the facility.

Q Have you ever heard complaints about the cells in SDCJ, about their cleanliness?

MS. KATZ: Objection. Calls for speculation.

THE WITNESS: I don't know.

BY MR. GRAHAM:

MR. GRAHAM: That is all she wrote, as they say. So, Ms. Chow, I am finished with asking questions. The other attorneys will now have their turns.

I'll turn it over to, I guess, the city.

MS. LUONGO: I have no questions for Ms. Chow.

MR. GRAHAM: And the county?

MS. KATZ: No questions.

MR. GRAHAM: We are done in under three hours.

So the transcript, we're just going to do the default rule. It will be sent to Ms. Katz's office, 30 days and all that?

MS. KATZ: Sounds good.

THE REPORTER: Ms. Katz, your office is ordering a copy?

MS. KATZ: Yes.

THE REPORTER: Would you like electronic or hard copy?

MS. KATZ: Both, please.

MS. LUONGO: I'll take just the electronic, please.

THE REPORTER: All right. Thank you.

Off the record.

/

/

______________________________

Emily Chow, R.N.

REPORTER'S CERTIFICATE

I, EVE M. JAMES, CSR #9934, do hereby certify:

That I am authorized to administer oaths pursuant to the California Code of Civil Procedure, Section 2093(b);

That I am not financially interested in the outcome of said action and am not a relative or employee of any attorney or any of the parties;

That the witness in the foregoing deposition was duly sworn or affirmed by me and the testimony was stenographically recorded by me to the best of my ability and thereafter transcribed under my direction and supervision, and that the foregoing transcript accurately reflects the witness's testimony;

That before completion of the deposition, review of the transcript [x] was [ ] was not requested, and if reviewed, any changes made by the deponent and provided during the period allowed are appended hereto.

In witness whereof, I have subscribed my name this 31st day of August, 2021.

{Eve M. James, CSR Number 9934

# Exhibit L

| | |
|---|---|
| **DATE:** | JUNE 18, 2018 |
| **NUMBER:** | Q.7 |
| **SUBJECT:** | INMATE PROCESSING |
| **RELATED SECTIONS:** | Q.1, Q.5, Q.55, J.5, I.52 |

PURPOSE

To ensure the processing of inmates entering the detention system is consistent, legal, and accurate.

POLICY

To receive and process arrestees efficiently, in accordance with established state and federal laws.

PROCEDURE

I. INTAKE SCREENING

All arrestees will complete the intake process. The arresting officer (AO) will complete a Booking Intake/Personal Property Inventory (J-15) form and provide it to the Detention Processing Technician (DPT). The DPT will verify the arrest is acceptable based on the established departmental booking acceptance criteria and will create a record in the Jail Information Management System (JIMS). The DPT will record the inmate's booking number on the J-15 form and on all other documentation and capture the inmate's mugshot photograph. The DPT will verify if the AO/transporting deputy has marked the 'DO NOT RELEASE MUGSHOT' box. If they have marked the corresponding box, the DPT will ensure the flag in the mugshot system is changed to 'NO' before proceeding with the process. Detainees transferred from work furlough, CPAC and Fire Camp do not require a new mugshot photograph, unless the appearance has changed.

A. Prior to acceptance into the facility, all incoming inmates shall be evaluated to assess medical or mental health problems. All inmates shall be screened per DSB P&P section M.9. Licensed medical staff shall document the responses in the JIMS triage screen.

B. Once the inmate is determined to be "fit for jail," the pre-book process will be completed by the assigned DPT. The accuracy and completeness of the J-15 form will be verified in the AO/transporting officer's presence before the arrest information is entered in the JIMS.

C. The AO/transporting officer will itemize all personal items (i.e., jewelry, etc.) on the J-15 form. The AO/transporting officer and inmate will sign the J-15 form. If the inmate refuses to sign the J-15 form, the AO will write "refused." All U.S. currency will be processed according to DSB P&P section Q.55. The AO/transporting officer will heat-seal the property in a plastic bag. Using a black pen, the officer will print the inmate's name and date of birth on a white label. The officer will place the label on the upper left hand corner of the sealed property bag. The AO/transporting officer will give the J-15 form, all required documentation, and the sealed property bag to the intake/pre-book

CSD000148

EXHIBIT L1

DPT. The DPT will record the inmate's booking number on the sealed property bag and forward it to property.

D. The inmate shall be wrist-banded by a deputy and will provide instructions on the use of the phones. He/she will be placed into a holding area. The inmate will be given the opportunity to use the telephone per section 851.5 of the Penal Code.

E. After being given the prescribed legal time limit in which to make phone calls, the inmate shall continue through the booking process.

F. During the booking process, the information entered at the pre-book position will be verified for accuracy. The inmate will be interviewed and his/her personal information will be entered in the JIMS.

G. Any and all searches shall be in compliance with section 4030 of the Penal Code and DSB P&P section I.52. Those inmates who may be in the process of posting bail, have posted bail, or receive an O/R, are not subject to a strip search

H. After the booking process is complete, the inmate will be taken to the designated holding area to await the classification process. The Jail Population Management Unit (JPMU) will determine the appropriate housing assignments for each inmate.

I. Those inmates who post bail or are a book and release are not to be sent to housing units.

II. NEW INMATE PROPERTY HANDLING

A. Any additional property found on an inmate after he/she has been accepted into custody will be inventoried on an Incoming Property Receipt (J-53) form. The deputy will place all items in an additional property bag and heat-seal it. The deputy and the inmate will sign the J-53 form. The pink copy of the J-53 form will be given to the inmate. The deputy will record the inmate's name and DOB on the sealed property bag and attach the white and canary copies of the J-53 form to the bag. The deputy will give the additional bag to the stock clerk. The additional sealed property bag will be inventoried in the JIMS.

B. The inmate's clothing items will be inventoried in the JIMS and stored in the property room.

III. INCOMING OUT OF COUNTY/PRISON TRANSFERS

A. The transporting officer will itemize all valuables (i.e., jewelry, personal items, etc.) and will complete a J-15 form. If the inmate has an out of county/prison check it will also be itemized in their property. All U.S. currency will be processed according to DSB P&P section Q.55. The transporting officer and the inmate will sign the J-15 form and will heat seal the property bag. The inmate can later request a check cashing request for the out of county/prison check placed in his or her property to be cashed and placed in their inmate funds account.

B. The receiving deputy will conduct a security search of all other property items received (i.e., clothing, module property, etc.). Acceptable module property will be given to the inmate. All other items will be appropriately labeled and forwarded to the property room.

IV. INTER-FACILITY TRANSFERS

The transporting officer and/or receiving deputy will forward the inmate's personal clothing and sealed property bag items to the property room.

The receiving deputy will conduct a security search of the inmate's module property. Acceptable items will be given to the inmate. All other items will be itemized on a J-53 form and will be processed per facility guidelines.

EXHIBIT L3

| | |
|---|---|
| **DATE:** | DECEMBER 4, 2015 |
| **NUMBER:** | Q.1 |
| **SUBJECT:** | INTAKE INFORMATION |
| **RELATED SECTIONS:** | M.9, Q.5, Q.7 |

PURPOSE

To establish uniform handling of required documentation for accepting arrestees into Sheriff's detention facilities.

POLICY

All law enforcement agencies must use a Booking Intake/Personal Property Inventory (J-15 form) to book arrestees into any Sheriff's detention facility. In addition, a Probable Cause Declaration (PCD) form, which establishes probable cause for warrantless arrests, shall be completed prior to booking.

Inmate Processing Division (IPD) staff will be responsible for making the initial determination of the acceptance of an arrestee into a Sheriff's detention facility. Acceptance will be in accordance with the established San Diego County Sheriff's Department Booking Acceptance Criteria. If an appeal of this decision is made, the watch commander will make the final determination. All arrest documentation will be verified prior to accepting the inmate into custody.

PROCEDURE

I. Felony/misdemeanor field arrests: Arresting agencies must present a properly completed J-15 form for every arrestee delivered to a detention facility for booking. If the arrest is for new criminal charges requiring arraignment in court, a completed PCD must be presented prior to acceptance of the arrestee.

II. Felony/misdemeanor warrant arrests: If the arrest is for an outstanding warrant, the warrant or warrant abstract must be presented prior to acceptance of the arrestee.

III. Prior to accepting an arrestee into a Sheriff's detention facility, the arrestee shall be medically screened by the facility registered nurse.

A. The registered nurse conducting the screening shall complete the first stage screening questions so that the arrestee can be properly classified in the Jail Information Management System.

B. After completing the questioning, the registered nurse conducting the screening shall determine if the inmate is "Fit for Jail."

IV. Any medical/mental health information obtained during the screening process shall be treated as confidential unless the information is necessary for the protection of the welfare of inmates, of others, management of the detention facility, or maintenance of facility security and order.

# Exhibit M

| | |
|---|---|
| DATE: | MARCH 14, 2018 |
| NUMBER: | M.9 |
| SUBJECT: | INTAKE / MEDICAL SCREENING |
| RELATED SECTIONS: | MSD P.7, MSD I.3, Americans with Disabilities ACT of 1990, PREA 115.81, MSD.P.18, F.16 |

PURPOSE

To establish a uniform procedure to assess health claims of arrestees during the booking process.

POLICY

All arrestees presented by arresting agencies shall be medically screened prior to acceptance for booking at a Sheriff's detention facility.

PROCEDURE

I.      INTAKE SCREENING

The registered nurse (RN) assigned to first stage triage will do the following:

A.      Observe and assess the arrestee for the following: visible signs of injury or illness, level of consciousness, signs and symptoms of potential contagious disease(s), signs and symptoms of mental health problems, physical impairments, alcohol and/or drug intoxication.

B.      Ask the medical screening questions and document the responses on the Jail Information Management System (JIMS) triage screen.

C.      Arrestees being seen in first stage triage after being tasered at the time of arrest, will be evaluated by the medical staff.  Based on their assessment, the arrestee will be accepted or refused, pending medical clearance.

D.      Arrestees with questionable medical/mental health status will be further examined within the immediate triage area.

E.      Medically and mentally unstable arrestees may be refused based on the RN's assessment, pending medical/mental health clearance.

F.      Upon notification of an intake refusal, Inmate Processing Division (IPD) staff will release the arrestee from custody in JIMS utilizing the disposition of Not Fit For Jail (NFFJ).

G.      If the arresting officer (AO) asks, the nurse may make a recommendation regarding which hospital or mental health facility to take the arrestee to, the Sheriff's contract hospital being the preference.

EXHIBIT M1

H. Arrestees who have an immediate/emergent medical need, as determined by the RN, will be refused and sent to the emergency department (ED) for medical clearance.

I. Arrestees who arrive at first stage triage, confined in a Pro-Straint chair or maximum restraints, shall be clinically assessed by the nurse who will determine if the arrestee will be medically cleared for the detention facility.

J. Arrestees can return from the hospital with medical clearance paperwork and still be secured in a Pro-Straint chair or maximum restraints. Nursing discretion and a clinical assessment will determine if the arrestee will be allowed admittance into the detention facility at that time.

K. If an arrestee has been subjected to maximum restraints, is combative, seriously injured, or in such a state of intoxication or drug influence that he/she cannot stand or walk on their own, the arrestee should remain in the AO's patrol vehicle (preferably in the recovery position) and monitored by the AO until seen by the nurse. Upon notification, the nurse shall respond to the vehicle sally port and conduct a medical assessment of the arrestee for clearance into the detention facility. This will prevent unnecessary risk to the arrestee in the event the nurse rejects the arrestee. Nursing staff will generally reject arrestees who are unable to ambulate into the detention facility on their own due to intoxication, drug influence, or other acute medical condition.

L. Arrestees who have refused treatment against medical advice (AMA) at the ED may be returned to the detention facility accompanied by a refusal form from the ED signed by the arrestee and witnessed by the physician or nurse.

M. Any arrestee who is accepted into the detention facility after refusing treatment AMA at the ED will require expedited booking and placement in the detention facility’s medical observation beds (MOB).

N. Acceptance for booking will be indicated on the Booking Intake/Personal Property Inventory (J-15) form by a red stamp with the nurse’s initials, ARJIS and date.

II. MEDICAL SCREENING

A. All inmates to be housed at a detention facility shall be medically screened. This process will be conducted by a RN after the inmate has completed intake processing. The RN will complete a comprehensive assessment of the medical and psychiatric needs of the inmate and record the responses in JIMS. All other inmates not scheduled to remain in Sheriff’s custody (book and release, court book and release, work release and bail-outs) shall not be required to participate in the medical screening interview except for those who were placed in a safety cell, sobering cell or restraint chair while in custody.

1. Any prescription medications brought in by an inmate will go into his/her property in a separate property bag after the medications are reviewed and inventoried by the nurse.

2. All arrestees who are suicidal or have a history of prior suicide attempts shall be identified in the JIMS system with the administrative alert code "PSA."

3. Recommendations for medically indicated housing (e.g., lower bunk, lower tier) will be entered into JIMS.

4. Arrestees who are being treated for seizures will have the "Seizure Disorder" medical drop-down instruction added in JIMS.

5. Medically indicated equipment and or accommodations (e.g., wheel-chairs, canes, crutches, oxygen, prosthetic appliances, prescription eyewear, and hearing aids) will be evaluated by medical staff for the necessity to retain for use by the inmate during confinement. Medical staff will add the applicable medical instructions in JIMS, to include ADM (ADA Mobility). All inmates who are identified as requiring the aforementioned equipment shall be housed in a facility with appropriate accommodations by JPMU.

6. In the event medically indicated equipment and/or accommodations are not being used in the prescribed manner or for other than the intended purpose, medical staff will be asked to reevaluate the inmate's necessity of the indicated equipment, based on facts presented by security staff.

7. Developmentally disabled inmates will be identified and reported to the San Diego Regional Center's developmental disability intake office the next business day. Housing recommendations for developmentally disabled inmates will be made in JIMS. All arrestees who are identified as clients of the San Diego Regional Center shall have the administrative alert "RCC" applied.

8. All inmates who have been screened and determined to be disabled must be reasonably accommodated through some means. Medical screening staff shall enter medical instructions into the IMS module in JIMS. MSD ADA case manager or designee will routinely review the medical instructions that were entered in JIMS and make additional referrals as needed for further evaluation of accommodation and/or housing. See DSB.M.39 Disabled Inmates for details.

9. Any inmate whose findings, by history or physical examination, indicate the possibility of communicable disease will be seen immediately and their treatment needs, appropriate housing, or referral to a physician will be initiated.

10. An inmate that advises the screening nurse that they have been a victim of sexual assault during a previous incarceration will be referred to the Mental Health Clinician for appropriate intervention and to JPMU staff to determine housing needs.

11. An inmate with a medical condition(s) that cannot be treated within the limitations of the detention facility will be transported to a contract hospital for diagnosis and treatment in order to provide the level of care available in the community.

EXHIBIT M3

III.     SEXUAL ASSAULTS OCCURRING IN THE COMMUNITY

Medical and mental health personnel shall obtain informed consent from the inmate before reporting information about prior sexual victimization that did not occur in an institutional setting and will provide the inmate with a PREA Incident Consent Form (J-316 form).

A.     The inmate may choose not to report the sexual victimization in the community to sworn staff.  If this option is chosen, the following shall occur:

1.     The J-316 form shall be completed and filed according to the distribution.

2.     Sworn staff will complete an incident report in JIMS, utilizing the incident type "PREA," to document completion of the J-316 form and that the inmate has declined to report sexual victimization in the community.

3.     Sworn staff will notify the watch commander and jail population management unit (JPMU) of the incident.

4.     The watch commander or designee will be responsible for reviewing and approving PREA incident reports in JIMS.

B.     The inmate may choose to give consent for medical staff to share information related to sexual victimization in the community with sworn staff.  If the inmate chooses to report the incident, refer to the procedure pursuant to inmate/medical screening in DSB P&P section F.16.

EXHIBIT M4

# Exhibit N

# SAN DIEGO SHERIFFS DEPARTMENT

## MEDICAL INTAKE QUESTIONS

**JIM:** 400443378 **Book #:** 18182295 **Book Dt/Tm:** 12-30-2018 0338

**Name(L,F,M,S):** VUZ, ASHLEY, RYAN

**DOB:** [redacted] **Age:** 28 **Des.:** W **Sex:** M **SSN:** [redacted]

**Created Dt/Tm:** 12-30-2018 0355 **Created By:** CHOW,EMILY

**Standard Medical Screening?**

**Have you been injured, hurt or in an accident in the last 72 hours?**

**Explain:**

**During the time of arrest were you treated in a hospital?**

**Name of hospital:**

**Were you given any medications at the hospital?**

**Name of medication:**

**During the time of arrest were you tasered/restrained with any device other than handcuffs?**

**Explain:**

**If tasered, were barbs removed in the hospital and which hospital?**

**Explain:**

**Do you have any major medical problems?**

**Explain:**

**Do you have any communicable diseases?**

**Explain:**

**Have you traveled outside of the United States within the last 30 days?**

**If so which countries have you visited and when did you return?**

**Explain**

**When was your last CXR?**

**Explain:**

**Do you have any psychiatric problems?**

**Explain:**

**Are you currently in the process of gender reassignment or do you consider yourself to be a transgender person? (If Yes, Inform JPMU)**

**Explain MTF / FTM**

Printed with FinePrint trial version - purchase at www.fineprint.com

EXHIBIT N2

# SAN DIEGO SHERIFFS DEPARTMENT

## MEDICAL INTAKE QUESTIONS

---

**JIM:** 400443378 **Book #:** 18182295 **Book Dt/Tm:** 12-30-2018 0338

**Name(L,F,M,S):** VUZ, ASHLEY, RYAN

**DOB:** [redacted] **Age:** 28 **Des.:** W **Sex:** M **SSN:** [redacted]

**Created Dt/Tm:** 12-30-2018 0355 **Created By:** CHOW,EMILY

---

N **Are you a client of the Regional Center for developmentally disabled?**

**Which Center?**

**Are you feeling suicidal?**

**Explain:**

**Is the inmate/patient alert and oriented?**

**Explain:**

**Breathalyzer result?**

**Record result:**

**Vital Signs at First Stage?**

**BP**

**TPR**

**Describe**

**Fit for Booking?**

**Disposition:**

---

**Combined Medical Screening?**

------------------------------------------------------------------------------------------------------------------

Y **Vital signs?**

**BP:** 155/99

**TPR:** 98.6 99 18

**Hgt/Wt:** 6'0 155#

**INFORMATION FROM SWORN (ARRESTING OFFICER)**

------------------------------------------------------------------------------------------------------------------

Printed with FinePrint trial version - purchase at www.fineprint.com

EXHIBIT N3

# SAN DIEGO SHERIFFS DEPARTMENT

## MEDICAL INTAKE QUESTIONS

**JIM:** 400443378 **Book #:** 18182295 **Book Dt/Tm:** 12-30-2018 0338
**Name(L,F,M,S):** VUZ, ASHLEY, RYAN
**DOB:** [redacted] **Age:** 28 **Des.:** W **Sex:** M **SSN:** [redacted]
**Created Dt/Tm:** 12-30-2018 0355 **Created By:** CHOW,EMILY

RQ **Arresting Officer's Information**

**AO's Agency** SAN DIEGO POLICE DEPARTMENT
**AO's Last Name** ZAJDA
**AO's Agency ID#** 7460

N **Did the arresting officer witness anything to believe the arrestee may be at risk for a medical condition, intellectual disability, or suicide?**

**Description**

N **By your observation, does the arrestee appear to be under the influence of drugs or alcohol?**

**Description**

N **Was the arrestee combative at the time of the arrest?**

**Description**

N **Is there additional information that you can provide to us to better care for this arrestee and insure his/her health and safety?**

**Description**

-----------------------------------------------------------------------------------------------------------------

**OBSERVATION**

-----------------------------------------------------------------------------------------------------------------

RQ **Describe individual's appearance (e.g. sweating, tremors, anxious, disheveled, no acute distress, etc.)?**

**Description** N AD

RQ **Describe individual's state of consciousness (e.g. alert, responsive, lethargic, etc.)**

**Description** ALERT

Y **Is the arrestee oriented? To person, place, and time? (Need to have inmate answer those three questions)**

**Explain:**

Y **Is the arrestee cooperative?**

**Refusing to answer?**

**Description**

Printed with FinePrint trial version - purchase at www.fineprint.com

EXHIBIT N4

# SAN DIEGO SHERIFFS DEPARTMENT

## MEDICAL INTAKE QUESTIONS

**JIM:** 400443378 **Book #:** 18182295 **Book Dt/Tm:** 12-30-2018 0338

**Name(L,F,M,S):** VUZ, ASHLEY, RYAN

**DOB:** [redacted] **Age:** 28 **Des.:** W **Sex:** M **SSN:** [redacted]

**Created Dt/Tm:** 12-30-2018 0355 **Created By:** CHOW,EMILY

Y **Fit to complete medical screening process?**

**Disposition:**

Printed with FinePrint trial version - purchase at www.fineprint.com

EXHIBIT N5

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

**JIM:** 400443378 **Book #:** 18182295 **Book Dt/Tm:** 12-30-2018 0338

**Name(L,F,M,S):** VUZ, ASHLEY, RYAN

**DOB:** ██████ **Age:** 28 **Des.:** W **Sex:** M **SSN:** ██████

**Created Dt/Tm:** 12-30-2018 0355 **Created By:** CHOW,EMILY

---

**Are you pregnant?**

**LMP?**

**EDC?**

---

**Have you had a baby in the last 12 months?**

**Explain:**

---

**Have you had an abortion recently?**

**Date:**

---

**Pregnancy test obtained?**

**Test Result**

---

**Standard Medical Screening?**

**Vital signs?**

**BP:**

**TPR:**

**Describe:**

**Are you being seen by a physician?**

**Physicians name:**

**Psychiatrist:**

**Are you a client of the Regional Center for the developmentally disabled?**

**Which Center:**

**Allergies**

**Medications?**

**Describe:**

**Food?**

**List Food & Reaction**

Printed with FinePrint trial version - purchase at www.fineprint.com

EXHIBIT N6

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

**JIM:** 400443378 **Book #:** 18182295 **Book Dt/Tm:** 12-30-2018 0338

**Name(L,F,M,S):** VUZ, ASHLEY, RYAN

**DOB:** [redacted] **Age:** 28 **Des.:** W **Sex:** M **SSN** [redacted]

**Created Dt/Tm:** 12-30-2018 0355 **Created By:** CHOW,EMILY

**Bee sting?**

**Carry Kit:**

**Swelling:**

**Do you have health insurance?**

**Explain:**

**Do you use street drugs?**

**Type:**

**Amount:**

**Last Used:**

**Do you have problems when you stop using them?**

**Explain:**

**Do you use alcohol?**

**Type:**

**Amount:**

**Last Used:**

**Do you have problems when you stop using it?**

**Explain:**

**Do you have asthma?**

**Explain:**

**Hypertension?**

**Explain:**

**Infection?**

**Explain:**

**Diabetes?**

**Explain:**

Printed with FinePrint trial version - purchase at www.fineprint.com

EXHIBIT N7

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

**JIM:** 400443378 **Book #:** 18182295 **Book Dt/Tm:** 12-30-2018 0338

**Name(L,F,M,S):** VUZ, ASHLEY, RYAN

**DOB:** [redacted] **Age:** 28 **Des.:** W **Sex:** M **SSN:** [redacted]

**Created Dt/Tm:** 12-30-2018 0355 **Created By:** CHOW,EMILY

**Open wound or skin breakage on feet or legs?**

**Describe:**

**Assessment done?**

**Picture taken?**

**Heart problems?**

**Explain:**

**Orthopedic?**

**Explain:**

**Seizure?**

**Explain:**

**On renal dialysis?**

**Name of Clinic, MD:**

**Do you have any other medical problems?**

**Explain:**

**Do you have any dental problems?**

**Explain:**

**Do you have TB?**

**Last x-ray:**

**2 Rx:**

**3+ Rx:**

**Hepatitis?**

**Last date:**

**Type:**

**Rx Name:**

Printed with FinePrint trial version - purchase at www.fineprint.com

EXHIBIT N8

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

**JIM:** 400443378 **Book #:** 18182295 **Book Dt/Tm:** 12-30-2018 0338

**Name(L,F,M,S):** VUZ, ASHLEY, RYAN

**DOB:** [redacted] **Age:** 28 **Des.:** W **Sex:** M **SSN:** [redacted]

**Created Dt/Tm:** 12-30-2018 0355 **Created By:** CHOW,EMILY

**Venereal disease?**

**Type:**

**Last Date:**

**RX Name:**

**HIV tested?**

**HIV positive?**

**MD Name:**

**T-Cell:**

**Rx Name:**

**AIDS?**

**MD Name:**

**T-Cell:**

**Rx Name:**

**Scabies?**

**Explain:**

**Lice?**

**Explain:**

**Crabs?**

**Explain:**

**Rash on body?**

**Explain:**

**Open sores on private parts?**

**Explain:**

**Do you have any other communicable diseases?**

**Explain:**

**Mental Status**

Printed with FinePrint trial version - purchase at www.fineprint.com

EXHIBIT N9

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

**JIM:** 400443378 **Book #:** 18182295 **Book Dt/Tm:** 12-30-2018 0338

**Name(L,F,M,S):** VUZ, ASHLEY, RYAN

**DOB:** [redacted] **Age:** 28 **Des.:** W **Sex:** M **SSN:** [redacted]

**Created Dt/Tm:** 12-30-2018 0355 **Created By:** CHOW,EMILY

**Alert and oriented person?**

**Describe:**

**Alert and oriented place?**

**Describe:**

**Alert and oriented time?**

**Describe:**

**Alert and oriented date?**

**Describe:**

**Level of Consciousness**

**Alert?**

**Describe:**

**Lethargic?**

**Describe:**

**Stuporous?**

**Describe:**

**Other?**

**Describe:**

**Physical Appearance**

**Clean?**

**Malodorous?**

**Describe:**

**Malnourished?**

**Describe:**

**Alcohol breath?**

**Describe:**

Printed with FinePrint trial version - purchase at www.fineprint.com

EXHIBIT N10

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

**JIM:** 400443378 **Book #:** 18182295 **Book Dt/Tm:** 12-30-2018 0338

**Name(L,F,M,S):** VUZ, ASHLEY, RYAN

**DOB:** [redacted] **Age:** 28 **Des.:** W **Sex:** M **SSN:** [redacted]

**Created Dt/Tm:** 12-30-2018 0355 **Created By:** CHOW,EMILY

**Disheveled?**

**Describe:**

**Mobility**

**Ambulatory?**

**Explain:**

**Limitations?**

**Describe:**

**Prosthetics?**

**Describe:**

**Normal speech?**

**Describe:**

**Normal thought process?**

**Describe:**

**Cooperative behavior?**

**Describe:**

**Unusual affect / mood?**

**Describe:**

**Visible signs of illness?**

**Describe:**

**Sight limitation?**

**Describe:**

**Hearing limitation?**

**Describe:**

**Unusual skin color / temp. turgor?**

**Describe:**

Printed with FinePrint trial version - purchase at www.fineprint.com

EXHIBIT N11

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

**JIM:** 400443378 **Book #:** 18182295 **Book Dt/Tm:** 12-30-2018 0338

**Name(L,F,M,S):** VUZ, ASHLEY, RYAN

**DOB:** [redacted] **Age:** 28 **Des.:** W **Sex:** M **SSN:** [redacted]

**Created Dt/Tm:** 12-30-2018 0355 **Created By:** CHOW,EMILY

**Needle marks present?**

**Describe:**

**Loss of bladder / bowel function?**

**Describe:**

**SOB / persistent cough?**

**Describe:**

**Have you ever served in the United States Military?**

**Other**

**Describe:**

**Describe:**

**Describe:**

**Explain sick call process?**

**Explain:**

**Scheduling clinic / provider appointment?**

**Are you currently taking any medications?**

**Record in Med Screen**

**Combined Medical Screening?**

**SUBSTANCE ABUSE INFORMATION FROM INMATE**

----------------------------------------------------------------------------------------------------------------

N **Prior to your arrest, did you swallow or hide any drugs in any body cavity?**

**Description**

N **Do you drink alcohol?**

**Type and Last drink?**

**How often?**

**For how many years?**

Printed with FinePrint trial version - purchase at www.fineprint.com

EXHIBIT N12

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

**JIM:** 400443378 **Book #:** 18182295 **Book Dt/Tm:** 12-30-2018 0338

**Name(L,F,M,S):** VUZ, ASHLEY, RYAN

**DOB:** [redacted] **Age:** 28 **Des.:** W **Sex:** M **SSN** [redacted]

**Created Dt/Tm:** 12-30-2018 0355 **Created By:** CHOW,EMILY

**Do you have medical complications when you stop drinking?**

**Describe symptoms**

**Seizures/Shakes?**

**Hospitalization?**

N **Do you use drugs such as heroin, cocaine, meth etc.?**

**What do you use?**

**How much do you use?**

**Last time used?**

RQ **What happens when you stop taking these drugs?**

**Description**

---

**INMATE MEDICAL SCREENING QUESTIONS**

**OBSERVATION**

---

N **Does the individual have issues with mobility (Cane, Wheelchair, Prosthetics, Crutches, Splints)?**

**Description**

N **Does the individual have other limitations like hearing, visual, communication?**

**Description**

N **Does the individual have any noticeable rashes, infestations, wounds, or discoloration of the skin?**

**Description**

N **Is the individual experiencing difficulty breathing or breathing rapidly (e.g. persistent cough, hyperventilation, etc.)?**

**Description**

Y **Did the arrestee walk into the intake area without any assistance?**

**Description**

---

**MEDICAL INFORMATION FROM INMATE**

---

Printed with FinePrint trial version - purchase at www.fineprint.com

EXHIBIT N13

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

**JIM:** 400443378 **Book #:** 18182295 **Book Dt/Tm:** 12-30-2018 0338

**Name(L,F,M,S):** VUZ, ASHLEY, RYAN

**DOB:** [redacted] **Age:** 28 **Des.:** W **Sex:** M **SSN:** [redacted]

**Created Dt/Tm:** 12-30-2018 0355 **Created By:** CHOW,EMILY

N **Do you currently have any medical conditions such as asthma, diabetes, seizures, cancer, orthopedic issues, terminal illnesses, communicable diseases**

**Description**

N **Have you had recent illness with symptoms of chronic cough, coughing up blood, lethargy, weakness, weight loss, loss of appetite, fever or night sweats?**

**Description**

N **Documented normal CXR in JIMS within the past 6 months?**

**Explain:** NEEDED

N **Are you currently a dialysis patient?**

**Last time treated?**

**Clinic Name?**

N **Do you have any dental problems?**

**Description**

N **Do you have any allergies (e.g. food, medication, etc.)?**

**Type/Reaction?**

Y **Are you currently taking any medications?**

**Description** SEVERAL

**Pharmacy used?** WALGREENS PHARMACY

N **In the past 30 days, have you had any recent hospitalizations or serious injuries?**

**Description**

N **Do you have any history of head trauma?**

**Describe:**

Y **Patient informed of adult immunization availability (Hep A, B, Tetanus, Seasonal Flu, etc.)?**

Y **Patient informed of screening availability for STD's?**

Printed with FinePrint trial version - purchase at www.fineprint.com

EXHIBIT N14

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

**JIM:** 400443378 **Book #:** 18182295 **Book Dt/Tm:** 12-30-2018 0338

**Name(L,F,M,S):** VUZ, ASHLEY, RYAN

**DOB:** [redacted] **Age:** 28 **Des.:** W **Sex:** M **SSN:** [redacted]

**Created Dt/Tm:** 12-30-2018 0355 **Created By:** CHOW,EMILY

N **Do you currently have a health provider?**

**Doctor's Name**

**Location**

N **Do you have Medi-Cal?**

N **Are you interested in information on Medi-Cal enrollment?**

Printed with FinePrint trial version - purchase at www.fineprint.com

EXHIBIT N15

# SAN DIEGO SHERIFFS DEPARTMENT

## PSYCHIATRIC QUESTIONS

**JIM:** 400443378 **Book #:** 18182295 **Book Dt/Tm:** 12-30-2018 0338

**Name(L,F,M,S):** VUZ, ASHLEY, RYAN

**DOB:** [redacted] **Age:** 28 **Des.:** W **Sex:** M **SSN** [redacted]

**Created Dt/Tm:** 12-30-2018 0355 **Created By:** CHOW,EMILY

**Standard Medical Screening?**

**Do you have any current psychiatric / mental health problems?**

**Explain:**

**Do you have any previous mental health history?**

**Explain:**

**Have you been a victim of sexual assault during a previous incarceration or in the community?**

**Want to see a MHC?**

**Do you know your psychiatrist / clinic name?**

**Explain:**

**Any visual hallucinations?**

**Explain:**

**Any auditory hallucinations?**

**Explain:**

**Any suicidal ideation?**

**Explain:**

**Any homicidal ideation?**

**Explain:**

**Any prior suicide attempts?**

**Explain:**

**Are you currently taking any psychiatric medications?**

**Scheduling clinic / provider appointment?**

**Combined Medical Screening?**

**GENDER IDENTITY/PREA**

Printed with FinePrint trial version - purchase at www.fineprint.com

EXHIBIT N16

# SAN DIEGO SHERIFFS DEPARTMENT

## PSYCHIATRIC QUESTIONS

**JIM:** 400443378 **Book #:** 18182295 **Book Dt/Tm:** 12-30-2018 0338

**Name(L,F,M,S):** VUZ, ASHLEY, RYAN

**DOB:** [redacted] **Age:** 28 **Des.:** W **Sex:** M **SSN:** [redacted]

**Created Dt/Tm:** 12-30-2018 0355 **Created By:** CHOW,EMILY

---

Y **Do you identify yourself as transgender?**

**MTF or FTM?** MALE TO FEMALE

**Class Notified?** YES

Y **Are you in the process of gender reassignment therapy?**

N **Have you been a victim of a sexual assault either while incarcerated or in the community?**

**Schedule for MHC?**

---

**PSYCHIATRIC INFORMATION FROM INMATE**

---

N **Are you a client of the Regional Center for developmentally disabled?**

**Which Center?**

N **Have you ever been diagnosed with a mental illness (ex. Schizophrenia, Bipolar, Depression, PTSD, etc.)?**

**Description**

N **Have you ever been hospitalized in a psychiatric hospital?**

**Where?**

**When?**

N **Do you ever hear voices or see things that are not there?**

**Description**

---

**SUICIDE RISK INQUIRY**

---

N **Have you recently experienced a significant loss? (Relationship, Death of a family member/close friend, job etc.)**

**Description**

**Scheduled for MHC?**

Printed with FinePrint trial version - purchase at www.fineprint.com

EXHIBIT N17

# SAN DIEGO SHERIFFS DEPARTMENT

## PSYCHIATRIC QUESTIONS

**JIM:** 400443378 **Book #:** 18182295 **Book Dt/Tm:** 12-30-2018 0338

**Name(L,F,M,S):** VUZ, ASHLEY, RYAN

**DOB:** [redacted] **Age:** 28 **Des.:** W **Sex:** M **SSN:** [redacted]

**Created Dt/Tm:** 12-30-2018 0355 **Created By:** CHOW,EMILY

N **Has a family member or close friend ever attempted or committed suicide?**

**Description**

**Scheduled for MHC?**

N **Do you feel there is nothing to look forward to in the immediate future? (Inmate expressing helplessness and/or hopelessness)**

**Description**

**Gatekeeper Assesmnt?**

**-----------------------------------------------------------------------------------------------------------------**

**COLUMBIA SUICIDE SEVERITY SCALE**

**-----------------------------------------------------------------------------------------------------------------**

N **Have you wished you were dead or wished you could go to sleep and not wake up? (Past Month)**

**Sched. for MHC?**

N **Have you had any actual thoughts of killing yourself? (Past Month)**

**Have you been thinking how you might do this?**

**Description**

**Have you had these thoughts and had some intention of acting on them?**

**Description**

**Have you started to work out or worked out the details of how to kill yourself?**

**Description**

**Refer to ISP**

**Do you intend to carry out this plan?**

**Description**

N **Have you ever done anything, started to do anything, or prepared to do anything to end your life?**

**Within past 3 months**

**Description**

**Refer to MHC**

Y **Consents/ROIs completed and signed (General consent, Sterilization,PREA if applicable)?**

Printed with FinePrint trial version - purchase at www.fineprint.com

EXHIBIT N18

# SAN DIEGO SHERIFFS DEPARTMENT

## PSYCHIATRIC QUESTIONS

**JIM:** 400443378 **Book #:** 18182295 **Book Dt/Tm:** 12-30-2018 0338

**Name(L,F,M,S):** VUZ, ASHLEY, RYAN

**DOB:** [redacted] **Age:** 28 **Des.:** W **Sex:** M **SSN:** [redacted]

**Created Dt/Tm:** 12-30-2018 0355 **Created By:** CHOW,EMILY

Y **Fit for Jail?**

**Disposition:** CLIN SCREENED HOUSE PER CLASS

Printed with FinePrint trial version - purchase at www.fineprint.com

EXHIBIT N19

## SAN DIEGO SHERIFFS DEPARTMENT

### Medical Chart

**JIM:** 400443378 **Book#:** 18182295 **Name (L,M,F,S):** VUZ, ASHLEY, RYAN

**Book Dt/Tm:** 12-30-2018 0338

**DOB:** [redacted] **Age:** 28 **Des.:** W **Sex:** M **SSN:** [redacted]

**Fac:** 995 **Area:** **HU:** **Cell:** **Bed:**

**Health Service #:** **Health Status:** UNKNOWN

**Medical Classification: NO**

Printed with FinePrint trial version - purchase at www.fineprint.com

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

**JIM:** 400443378 **Book#:** 18182295 **Name (L,M,F,S):** VUZ, ASHLEY, RYAN

### Encounter Detail

**Type:** Booking Intake **Reason:** Tb Screening **Date:** 12-30-2018 0338

**Resource:** **Cost:**

### Objective

### Tests

**Test:** X-RAY **Req'd by:** ESNPX2SH **At:** 12-30-2018 0338

**Reason:** Required **Taken by:** **At:**

**Result:** **At:** **Desc:**

### Orders

### Med Alerts

Printed with FinePrint trial version - purchase at www.fineprint.com

EXHIBIT N21

# Exhibit O

The undersigned patient authorizes and requests the San Diego County Sheriff's Medical Services, its physicians, dentists, contracted agents and its medical personnel to administer and perform any and all medical examinations, including photographs, and treatments, dental examinations and treatments, diagnostic procedures to include Telehealth (Medical and/or Psychiatry) Consultation, as deemed advisable or necessary. Further authorize to provide to the Health Information Exchange my medical record(s) in whole or in part for the purpose of continuity of care by other authorized providers or de-identified information for the purpose of studies for the prevention of diseases or illness.

The undersigned patient authorizes and requests San Diego County Sheriff's Medical Services Division, mental health personnel to provide evaluation and treatment of emotional and mental health problems. The treatment services requested are Outpatient and Inpatient as indicated.

I understand that my participation is voluntary. Confidentiality may be observed except for reference to jail escapes, immediate threats to others, elder/child abuse, loss of consciousness that may impede driving, and homicidal or suicidal expressions. Release of medical information is authorized under Federal Privacy Laws for investigations by City, County, State and Federal law enforcement agencies.

State laws require clinics and physicians to report certain injuries and illnesses. These include communicable diseases (to prevent spread), injuries which may have been caused unlawfully, and illnesses/conditions which cause lapse of consciousness. Federal law requires reporting of any information of alleged sexual abuse.

I UNDERSTAND THAT IF I AM TAKING MEDICATION SHERIFF MEDICAL STAFF WILL ATTEMPT TO VERIFY IT WITH MY PHYSICIAN OR PHARMACY. IF I DO NOT RECEIVE IT WITHIN SIX (6) DAYS, OR SOONER IF NEEDED, I AM TO SUBMIT A SICK CALL SLIP STATING I NEED MY MEDICATIONS.

I consent to receive verified prescription medications necessary for continuity of my medical/ psychiatric care until I am seen by the Sheriff's medical/psychiatric provider.

IF I AM REFERRED TO A PHYSICIAN/DENTIST, INCLUDING A SPECIALIST, AND HAVE NOT BEEN SEEN OR MY EVALUATION AND TREATMENT HAVE NOT BEEN COMPLETED, I UNDERSTAND THAT I AM RESPONSIBLE TO FOLLOW UP WITH MY OWN PHYSICIAN/DENTIST UPON MY RELEASE.

Patient Signature for Acceptance — 12/30/2018 Date

☐ Patient accepts treatment, but declines to sign waiver.

Staff Signature — 12/30/2018 Date

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT
MEDICAL SERVICES DIVISION
**Consent For Medical Dental & Mental Health Treatment**
Page 1 of 1

SDCJ (SAN DIEGO CENTRAL JAIL)
Patient's Name: VUZ, ASHLEY RYAN
D.O.B: 7/13/1990

Form **J226** Rev 07/2016

18182295

12/30/2018

Printed with FinePrint trial version - purchase at www.fineprint.com

**I authorize (releasing party):**

Name Walgreens

Address

City/State Santa Monica, CA

Phone Fax

**To disclose to (receiving party):**

Name

Address

City/State

Phone Fax

By paper, oral, and electronic means any and all of my medical records listed below. Mental Health, Alcohol/Drug & HIV information will not be released unless specifically requested.

☒ **MEDICAL** injuries, illnesses, conditions
☒ **MENTAL** illnesses, conditions
☒ **HIV** test results
☒ **ALCOHOL/DRUG** abuse

PURPOSE for release: ☒ Continuity of care ☒ Other: meds

SPECIFIC records to release: ☐ HIV test results ☐ Other:

☐ Evaluation of Behavioral Health Court Calendar eligibility

**NOTICE:** I understand that the medical information used or disclosed pursuant to this authorization may be subject to re-disclosure by the recipient and no longer protected by federal privacy regulations (HIPAA). I further understand that the Sheriff's Department may not condition treatment on whether I sign this authorization. California law prohibits the person receiving my health information from making further disclosure of it unless another authorization for such disclosure is obtained or unless such disclosure is specifically required or permitted by law.

**EXPIRATION:** This authorization will expire automatically in 3 months or on: ________

**REVOCATION:** I may revoke this authorization at any time by notifying the issuing party in writing.

**COPY:** I authorize the use of a facsimile or photocopy of this form. I may receive a copy of this authorization. (Initial here for copy): ________ Copy given: ☐ Yes ☐ No

Social Security Number | AKA | CDC Number

Patient's Signature (or Other Representative) | 400443378 JIMS Number | 7/13/1990 Date of Birth | 12/30/18 Date

If not signed by patient, specify basis for authority to sign:

☐ Attorney-In-Fact For Health Care (Attach a copy to this authorization)
☐ Other (Attach a copy to this authorization): ________

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT
MEDICAL SERVICES DIVISION
**Authorization To Release Patient Medical Record**
Page 1 of 1

SDCJ (SAN DIEGO CENTRAL JAIL)
Patient's Name: VUZ, ASHLEY RYAN
D.O.B: 7/13/1990

Form **J224** Rev 12/2018 18182295 12/30/2018

Printed with FinePrint trial version - purchase at www.fineprint.com

# Exhibit P

Vuz, Ashley

# San Diego County
# SHERIFF'S DEPARTMENT

## VOLUNTARY GENDER IDENTIFY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

All transgender and intersex inmates regardless of housing assignment will be given the opportunity to shower separately from other inmates, upon request. Additionally, they may receive jail issued clothing and order available commissary items in accordance to their gender identity.

Please complete the following information so your preference can be documented and considered:

Booking Number: 18182295 Gender Identity: Female

**Search Preference**

Woman X Men ______ No Preference ______

**Housing Preference**

While in custody I would prefer to be housed with:

Women X Men ______ No Preference ______

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff or others.

[signature] Signature 12/30/18 Date

**Witnessing Sworn Staff**

Feusthon Print Name 0412 ARJIS

[signature] Signature 12/30/18 Date 0415 Hrs Time

J-XXX 10/18 Original. Custody Record

# Exhibit Q



San Diego County
SHERIFF'S DEPARTMENT

VOLUNTARY GENDER IDENTIFY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

Please complete the following information so your preference can be documented and considered:

Booking Number: [redacted] Gender Identity: Female

**Search Preference**

Woman ______ Man ______ No Preference ✓

**Housing Preference**

While in custody I would prefer to be housed with:

Women ______ Men ______ No Preference ✓

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff and others.

[redacted] 12/17/18
Date

**Witnessing Sworn Staff**

[redacted] ARJIS

Signature 12/17/18 0300
Date Time

J-350 10/18 Original: Custody Record



 San Diego County
SHERIFF'S DEPARTMENT

## VOLUNTARY GENDER IDENTIFY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

All transgender and intersex inmates regardless of housing assignment will be given the opportunity to shower separately from other inmates, upon request. Additionally, they may receive jail issued clothing and order available commissary items in accordance to their gender identity.

Please complete the following information so your preference can be documented and considered:

Booking Number: [redacted] Gender Identity: FEMALE

**Search Preference**

Woman ______ Men ______ No Preference X

**Housing Preference**

While in custody I would prefer to be housed with:

Women ______ Men X No Preference ______

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff or others.

[redacted] 12/10/18
Date

**Witnessing Sworn Staff**

[redacted] ARJIS [redacted]

Signature 12/10/18 0245
Date Time

J-XXX 10/18 Original Custody Record



San Diego County
SHERIFF'S DEPARTMENT

VOLUNTARY GENDER IDENTIFY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

Please complete the following information so your preference can be documented and considered: Sexual

Booking Number [redacted] Gender Identity: Reidentifying Transgender Female

**Search Preference**

Woman X Man ____ No Preference ____

**Housing Preference**

While in custody I would prefer to be housed with:

Women X Men ____ No Preference ____

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff and others.

[redacted] 12/13/18
Date

**Witnessing Sworn Staff**

[redacted] [redacted]
ARJIS

12/13/18 2300
Date Time

J-350 10/18 Original Custody Record

EXHIBIT Q3

CSD000237



San Diego County
**SHERIFF'S DEPARTMENT**

## VOLUNTARY GENDER IDENTIFY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

All transgender and intersex inmates regardless of housing assignment will be given the opportunity to shower separately from other inmates, upon request. Additionally, they may receive jail issued clothing and order available commissary items in accordance to their gender identity.

Please complete the following information so your preference can be documented and considered:

Booking Number: [redacted] Gender Identity: [redacted]

**Search Preference**

Woman ______ Men ______ No Preference ✓

**Housing Preference**

While in custody I would prefer to be housed with:

Women ______ Men ______ No Preference ✓

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff or others.

[redacted] ______ Date

**Witnessing Sworn Staff!'**

[redacted] Print Name [redacted] ARJIS

[redacted] Signature 12-14-18 Date 0910 Time

J-XXX 10/18 Original: Custody Record



San Diego County
SHERIFF'S DEPARTMENT

## VOLUNTARY GENDER IDENTITY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

Please complete the following information so your preference can be documented and considered:

Booking Number: [redacted] Gender Identity: TGF

**Search Preference**

Female ✓ Male ____ No Preference ____

**Housing Preference**

While in custody I would prefer to be housed with:

Female ✓ Male ____ No Preference ____

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff and others.

[redacted] Signature 6/25/2021 Date

**Witnessing Sworn Staff**

[redacted] [redacted] ARJIS

6/25/21 Date 0643 Time

2021 JUN 25 AM 7:25

J-350 10/19 Original: Custody Record



# San Diego County SHERIFF'S DEPARTMENT

## VOLUNTARY GENDER IDENTITY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

Please complete the following information so your preference can be documented and considered:

Booking Number: [redacted] Gender Identity: TGF

**Search Preference**

Female ✓ Male ______ No Preference ______

**Housing Preference**

While in custody I would prefer to be housed with:

Female ✓ Male ______ No Preference ______

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff and others.

[redacted] 4/15/21
Date

**Witnessing Sworn Staff**

[redacted] [redacted]
ARJIS

Signature 4/15/21 2045
Date Time

J-350 10/19 Original: Custody Record



San Diego County
**SHERIFF'S DEPARTMENT**

## VOLUNTARY GENDER IDENTITY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

Please complete the following information so your preference can be documented and considered:

Booking Number: ______ Gender Identity: NON-BINARY

**Search Preference**

Female ______ Male ✓ No Preference ______

**Housing Preference**

While in custody I would prefer to be housed with:

Female ______ Male ✓ No Preference ______

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff and others.

______ 3/20/21
Date

**Witnessing Sworn Staff**

______ ______
ARJIS

______ 3/20/21 2030
Signature Date Time

J-350 10/19 Original Custody Record

EXHIBIT Q7

CSD000241



San Diego County
SHERIFF'S DEPARTMENT

VOLUNTARY GENDER IDENTIFY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

Please complete the following information so your preference can be documented and considered:

Booking Number: [redacted] Gender Identity: Females

Search Preference

Woman X Man ______ No Preference [crossed out]

Housing Preference

While in custody I would prefer to be housed with:

Women ______ Men ______ No Preference X

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff and others.

[redacted]
Signature [signature] Date

Witnessing Sworn Staff

[redacted]
Signature

[redacted]
ARJIS

10-19-20 Date 0450 Time

J-350 10/18

Original: Custody Record

EXHIBIT Q8

CSD000242



San Diego County
SHERIFF'S DEPARTMENT

# VOLUNTARY GENDER IDENTITY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

Please complete the following information so your preference can be documented and considered:

Booking Number: [REDACTED] Gender Identity: TRANSGender Fem.

**Search Preference**

Female ______ Male X No Preference ______

**Housing Preference**

While in custody I would prefer to be housed with:

Female ______ Male ______ No Preference X

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff and others.

[REDACTED] Signature 10/9/20 Date

Witnessing Sworn Staff

[REDACTED] ARJIS

[REDACTED] Signature 10/9/20 Date 0300 Time

J-350 10/19 Original: Custody Record



**San Diego County**
**SHERIFF'S DEPARTMENT**

## VOLUNTARY GENDER IDENTIFY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

All transgender and intersex inmates regardless of housing assignment will be given the opportunity to shower separately from other inmates, upon request. Additionally, they may receive jail issued clothing and order available commissary items in accordance to their gender identity.

Please complete the following information so your preference can be documented and considered:

Booking Number: [redacted] Gender Identity: TRANS Female

**Search Preference**

Woman ______ Men ______ No Preference X

**Housing Preference**

While in custody I would prefer to be housed with:

Women ______ Men ______ No Preference X

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff or others.

[redacted] ______ 8/22/2020
Date

**Witnessing Sworn Staff**

[redacted] ______ [redacted] ARJIS

8/22/2020 Date 0220 Time

J-XXX 10/18 Original: Custody Record

EXHIBIT Q10

CSD000244



San Diego County
SHERIFF'S DEPARTMENT

# VOLUNTARY GENDER IDENTIFY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

Please complete the following information so your preference can be documented and considered:

Booking Number: [redacted] Gender Identity: TRANSg- Female

**Search Preference**

Woman ____ Man ____ No Preference ✓

**Housing Preference**

While in custody I would prefer to be housed with:

Women ✓ Men ____ No Preference ____

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff and others.

[redacted] 2/19/2020
Date

Witnessing Sworn Staff

[redacted] [redacted]
ARJIS

2/19/20 1930
Date Time

J-350 10/18

Original: Custody Record

EXHIBIT Q11

CSD000245



**San Diego County**
# SHERIFF'S DEPARTMENT

## VOLUNTARY GENDER IDENTIFY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

All transgender and intersex inmates regardless of housing assignment will be given the opportunity to shower separately from other inmates, upon request. Additionally, they may receive jail issued clothing and order available commissary items in accordance to their gender identity.

Please complete the following information so your preference can be documented and considered:

Booking Number: ███████████        Gender Identity: _TRANSgender fem._

**Search Preference**

Woman ___X___        Men _____        No Preference _____

**Housing Preference**

While in custody I would prefer to be housed with:

Women _____        Men ___X___        No Preference _____

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff or others.

████████████        _1/23/2020_
                     Date

Witnessing Sworn Staff

████████████        ARJIS████████

                     _1/23/2020_     _2200_
                     Date            Time

J-XXX  10/18                                    Original: Custody Record



**San Diego County**
**SHERIFF'S DEPARTMENT**

## VOLUNTARY GENDER IDENTIFY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

All transgender and intersex inmates regardless of housing assignment will be given the opportunity to shower separately from other inmates, upon request. Additionally, they may receive jail issued clothing and order available commissary items in accordance to their gender identity.

Please complete the following information so your preference can be documented and considered:

Booking Number: ________ Gender Identity: TRANS Female

**Search Preference**

Woman ✓ Men ________ No Preference ________

**Housing Preference**

While in custody I would prefer to be housed with:

Women ✓ Men ________ No Preference ________

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff or others.

________ 1/13/20
Date

**Witnessing Sworn Staff**

________ ________
ARJIS

________ 1/13/20 0130
Date Time

J-XXX 10/18 Original: Custody Record

EXHIBIT Q13

CSD000247



San Diego County
SHERIFF'S DEPARTMENT

# VOLUNTARY GENDER IDENTIFY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

All transgender and intersex inmates regardless of housing assignment will be given the opportunity to shower separately from other inmates, upon request. Additionally, they may receive jail issued clothing and order available commissary items in accordance to their gender identity.

Please complete the following information so your preference can be documented and considered:

Booking Number: ______ Gender Identity: TRANGender Female

Search Preference

Woman ✓ Men ______ No Preference ______

Housing Preference

While in custody I would prefer to be housed with:

Women ______ Men ✓ No Preference ______

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff or others.

______ Signature 12/11/19 Date

Witnessing Sworn Staff

______ ARJIS

12/11/19 Date 12/11/19 Time

J-XXX 10/18 Original: Custody Record

EXHIBIT Q14

CSD000248



San Diego County
SHERIFF'S DEPARTMENT

# VOLUNTARY GENDER IDENTITY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

Please complete the following information so your preference can be documented and considered:

Booking Number: [redacted] Gender Identity: TRAnGender Female

**Search Preference**

Female ________ Male ✓ No Preference ________

**Housing Preference**

While in custody I would prefer to be housed with:

Female ________ Male ✓ No Preference ________

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff and others.

[redacted] 11/30/19
Date

**Witnessing Sworn Staff**

[redacted] [redacted]
ARJIS

11/30/19 1500
Date Time

J-350 10/19 Original: Custody Record





[redacted]

# San Diego County
# SHERIFF'S DEPARTMENT

## VOLUNTARY GENDER IDENTIFY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

All transgender and intersex inmates regardless of housing assignment will be given the opportunity to shower separately from other inmates, upon request. Additionally, they may receive jail issued clothing and order available commissary items in accordance to their gender identity.

Please complete the following information so your preference can be documented and considered:

Booking Number: [redacted] Gender Identity: transgender

**Search Preference**

Woman ______ Men ✓ No Preference ______

**Housing Preference**

While in custody I would prefer to be housed with:

Women ______ Men ✓ No Preference ______

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, [redacted]

10-23-19
Date

**Witnessing Sworn Staff**

[redacted]

[redacted]
ARJIS

10-23-19 1500
Date Time

J-XXX 10/18 Original: Custody Record



**San Diego County**
**SHERIFF'S DEPARTMENT**

# VOLUNTARY GENDER IDENTIFY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

All transgender and intersex inmates regardless of housing assignment will be given the opportunity to shower separately from other inmates, upon request. Additionally, they may receive jail issued clothing and order available commissary items in accordance to their gender identity.

Please complete the following information so your preference can be documented and considered:

Booking Number: [redacted] Gender Identity: Female

**Search Preference**

Woman ✓ Men ______ No Preference ______

**Housing Preference**

While in custody I would prefer to be housed with:

Women ✓ Men ______ No Preference ______

I understand this is a preference and the ultimate decision will be based on several factors to include my safety.

[redacted] 9/12/19
Date

Witnessing Sworn Staff

[redacted] [redacted]
ARJIS

9/12/19 0300
Date Time

J-XXX 10/18 Original: Custody Record

 

 San Diego County
SHERIFF'S DEPARTMENT

# VOLUNTARY GENDER IDENTITY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

Please complete the following information so your preference can be documented and considered:

Booking Number: ______ Gender Identity: Female

**Search Preference**

Woman ______ Man ______ No Preference X

**Housing Preference**

While in custody I would prefer to be housed with:

Women X Men ______ No Preference ______

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff and others.

______ Signature ______ Date

Witnessing Sworn Staff

______ ARJIS

______ Signature 8/13/19 Date 1346 Time

J-350 02/19

Original: Custody Record

EXHIBIT Q18

CSD000252



## San Diego County
## SHERIFF'S DEPARTMENT

### VOLUNTARY GENDER IDENTITY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

Please complete the following information so your preference can be documented and considered:

Booking Number: ______ Gender Identity: TRANS - Female

**Search Preference**

Woman ______ Man ______ No Preference X

**Housing Preference**

While in custody I would prefer to be housed with:

Women ______ Men X No Preference ______

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff and others.

______ 3-7-19
Date

**Witnessing Sworn Staff**

______ ______
ARJIS

______ 3-7-19 1830
Date Time

J-350 02/19

Original: Custody Record

EXHIBIT Q19

CSD000253



San Diego County
SHERIFF'S DEPARTMENT

VOLUNTARY GENDER IDENTIFY STATEMENT OF PREFERENCE

- It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

Please complete the following information so your preference can be documented and considered:

Booking Number: [redacted] Gender Identity: NON BINARY

Search Preference

Woman ______ Man X No Preference ______

Housing Preference

While in custody I would prefer to be housed with:

Women ______ Men X No Preference ______

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff and others.

[redacted] Signature 2/8/19 Date

Witnessing Sworn Staff

[redacted] ARJIS

[redacted] Signature 2/8/19 Date @0200 Time

J-350 10/18 Original: Custody Record

EXHIBIT Q20

CSD000254



San Diego County
SHERIFF'S DEPARTMENT

# VOLUNTARY GENDER IDENTIFY STATEMENT OF PREFERENCE

It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

All transgender and intersex inmates regardless of housing assignment will be given the opportunity to shower separately from other inmates, upon request. Additionally, they may receive jail issued clothing and order available commissary items in accordance to their gender identity.

Please complete the following information so your preference can be documented and considered:

Booking Number: ______ Gender Identity: NON BINARY

**Search Preference**

Woman X Men ______ No Preference ______

**Housing Preference**

While in custody I would prefer to be housed with:

Women X Men ______ No Preference ______

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff

______ Signature 01/18/2019 Date

**Witnessing Sworn Staff**

______ ARJIS

01/18/2019 Date 2014 Time

J-XXX 10/18 Original Custody Record



San Diego County
SHERIFF'S DEPARTMENT

# VOLUNTARY GENDER IDENTIFY STATEMENT OF PREFERENCE

- It is the duty of the Sheriff's Detention Services Bureau to receive, evaluate, house and provide secure, safe and humane custody of all persons who are lawfully committed or held for confinement until their appropriate release from Sheriff's custody. Every inmate, including each transgender, intersex or gender non-conforming inmate, will be individually assessed and provided appropriate housing based on classification standards.

Please complete the following information so your preference can be documented and considered:

Booking Number: [REDACTED] Gender Identity: Femme

**Search Preference**

Woman ✓ Man ____ No Preference ____

**Housing Preference**

While in custody I would prefer to be housed with:

Women ✓ Men ____ No Preference ____

I understand this is a preference and the ultimate decision will be based on several factors to include my safety, safety of staff and others.

[REDACTED] Signature 1/23/2019 Date

**Witnessing Sworn Staff**

[REDACTED] [REDACTED] ARJIS

Signature 1/23/19 Date 1945 Time

J-350 10/18 Original: Custody Record

EXHIBIT Q22

CSD000256

# Exhibit R

# SAN DIEGO SHERIFFS DEPARTMENT

## Incident Report

**Incident #:** 184052962

**Incident Dt/Tm:** 12-30-2018 0444

**Incident Type Code:** PC PROTECTIVE CUSTODY ISR

**Participants**

| Name (L,F,M,S) | JIM/Book # | Facility | Area | HU | Cell | Bed | Inv |
|---|---|---|---|---|---|---|---|
| VUZ, ASHLEY R. | 400443378 / 18182295 | 0 | | | | | O |

**Incident Occurred:**

**Fac:** 1 **Area:** JPIV **HU:** CLA

**Location:** SDCJ classification

**Officer:** MFRUSHSH, FRUSHON **Submitted Dt/Tm:** 12-30-2018 0446

**Update By:** RHAARXSH, HAAR **Update Dt/Tm:** 12-31-2018 0746

**Supervisor:** RHAARXSH, HAAR **Approval Dt/Tm:** 12-31-2018 0746

**Use of force?** N **CS Violence?** N **Inmate Violence?** N **Contraband?** N

**Facility Damage?** N **Disciplinary?** N **Hearing Required?** N

**Action Taken:**

Female Strip search//House in a female facility// identifies as female

**Approval Action:**

## SAN DIEGO SHERIFFS DEPARTMENT

### Incident Report

**Incident Information:**

**Entry Dt/Tm:** 12-30-2018 0445 **Entered By:** MFRUSHSH,FRUSHON

**Update Dt/Tm:** 12-30-2018 1812 **Updated By:** MFRUSHSH,FRUSHON

**Approved Dt/Tm:** 12-31-2018 0746 **Approved By:** RHAARXSH,HAAR

Origin:

On 12/30/18, I was assigned as a Classification Deputy at the San Diego Central Jail when I conducted an initial classification interview with Inmate Vuz, Ashley Bn. 18182295.

Deputy's Observations and Actions:

I was informed by the intake deputies Vuz identifies as a transgender female. I went to the 1st Floor and conducted the classification interview. Vuz informed me she identified herself as a female and has legally changed her name to Ashley. Vuz stated she would prefer to be house in a female facility and strip searched/ pat-downs by a female deputy. I went over the "Voluntary Gender Identify Statement of Preference - J350 form" with Vuz. Vuz agreed with the boxes checked and signed the form. Vuz requested Protective Custody due to her alternative lifestyle.

Vuz exhibited feminine mannerisms while answering my questions. Vuz spoke in a feminine tone and has long blonde hair, manicured fingernails, and defined eyebrows. Vuz stated he only dresses in female clothing and wears make up on a daily basis. Vuz stated she has been taking female hormones since 2014/2015 and requires a bra.

Based on Vuz' statements, safety concerns, and feminine characteristics, she will be housed in P/C at her request. Vuz will be housed in P/C at Vista Detention Facility (VDF) when transferred. Vuz refused a copy of his J-72 Segregated Housing order.

# Exhibit S



# San Diego County
# SHERIFF'S DEPARTMENT

## SEGREGATED HOUSING ORDER

☒ SDCJ ☐ GBDF ☐ FAC8 ☐ EMRF ☐ LCDRF ☐ SBDF ☐ VDF

| INMATE NAME: | Vuz, Ashley | | BOOKING #: | 18182295 |
|---|---|---|---|---|
| HOUSING UNIT: | 2 BKG | CLASS CODE: 4/ PC | INCIDENT #: | |
| DEPUTY NAME: | Frushon | | ARJIS: | 412 |

**SEGREGATED HOUSING IS ORDERED AS SPECIFIED BECAUSE THE ABOVE INMATE:**

☐ **ADMINISTRATIVE SEGREGATION**

- ☐ Pending a hearing or investigation for a rule violation or criminal act.
- ☐ Continual failure to adjust and conform to minimum standards.
- ☐ Propensity for violence towards other inmates and/or staff.
- ☐ Has paroled from or is anticipated to be housed in a restrictive housing environment.
- ☐ High profile case or extreme act of violence which jeopardizes public safety.
- ☐ Demonstrated influence over other inmates,
- ☐ Suspected juvenile.
- ☐ Sentenced to death.
- ☐ Other reason as described per the JPMU Training Manual or JPMU Unit Directives.

☒ **PROTECTIVE CUSTODY**

- ☐ Developmentally disabled, and requires segregation for the inmate's own safety(e.g., RCC).
- ☒ By virtue of his/her small size, advanced age, gender nonconformance or other risk factors and characteristics, may be in danger of abuse from inmates in general population.
- ☐ Nature of charges places the inmate's safety in jeopardy.
- ☐ Material witness in a high profile case or employment as law enforcement (past or current).
- ☐ Held on a civil commit order (Sexually Violent Predator).
- ☐ Has paroled from or is anticipated to be housed in a Protective Custody Environment.
- ☐ Segregated at request of inmate.

| APPROVED BY: Frushon | ARJIS: 412 | DATE: 12/30/18 | TIME: 0430 |
|---|---|---|---|
| INMATE'S COPY DELIVERED BY: | ARJIS: | DATE: | TIME: |

J-72 REV 2/18

# Exhibit T

Automated: Hello. This is a collect call from Ashley Ryan, an inmate at San Diego Central Jail. To pay for just this call using your credit or debit card, please press 1. To decline this call, press 4. If you would like to permanently block your number from receiving calls – this call will cost 21 cents per minute, plus any applicable federal, state, and local taxes. Plus, a one-time transaction fee of $3.00. You will only be charged the per minute rate for the amount of time you are on the phone. If you do not want to connect this call but would like to fund an account to pay for future calls, please hang up and dial 800-844-6591. **[Inaudible] [00:00:54].**

Speaker 1: Hello?

Automated: Please hold, while the person you are calling is entering information to pay for this call. This call is being recorded. If you are an attorney, physician, or religious advisor, and would like to speak to your client without being recorded, you must first contact the Sheriff's Department at 858-565-3519 during normal business hours.

If you proceed with this call, you do so with the understanding that this telephone call is non-confidential and will be recorded by the Sheriff's Department and shared with any law enforcement or government entity seeking to listen to and use it. If you agree to have this call recorded and wish to proceed with this call, please continue. Otherwise, you should terminate this call now. To continue, press 1. To disconnect, press 2. Thank you for using Securus, you may start the conversation now.

Speaker 1: Ashley?

Ashley: Hello? Hi.

Speaker 1: Finally. Where are you?

Ashley: I am at the men's jail downtown. I'm in a private cell. There's bail bond numbers here to call, they weren't really telling me what to do to get bonded out. So, I wasn't sure if I call you first or if we have to do the bail bond thing.

Speaker 1: I'm not sure. Do you know what your bond is?

Ashley: No, they didn't say anything. There's just a list of numbers of bond phone numbers to call. I just wasn't sure if I should call you first or…

EXHIBIT T1

| | |
|---|---|
| Speaker 1: | No, probably me. |
| Ashley: | Probably you first? Okay. Because I wasn't sure if you post my bail, or if the bail bonds people approve the bail, they'll have someone to post it. But I think it's going to be $250. Well, they said that's for a bond, but I don't know. I think that the most would be between $250 and $2500. Use my money, I'll forward you the money. |
| Speaker 1: | Two hundred and fifty. So, I pay with cash? |
| Ashley: | I'm not sure. They just kind of put me in here with the phone and bail bonds numbers to call, but no instruction. But I'm at the Men's Division downtown and they have a private cell for me, so… |
| Speaker 1: | Okay. So, downtown. Okay. So, I can just come get you then? If I post the bail? |
| Ashley: | Yeah. I mean, I think that's how it would work, right? We don't need to have a bail bondsman involved, right? |
| Speaker 1: | I don't think so. |
| Ashley: | Because Brenden called Dad to get bailed out of jail or something. I don't know what was going on with that, I don't remember. |
| Speaker 1: | Yeah. I have no idea how this works. So, I will figure out where the men's jail is downtown. |
| Ashley: | So, I mean, I'll ask the guard next time they come back that it's okay to call you, but I mean, you can't really call me back here, so – |
| Speaker 1: | Well, no, they told me…they said that you had to call me. Because they said I couldn't come get you, I couldn't do anything, that you had to call me first. |
| Ashley: | Oh, okay. Cool. Well, I'm going to give you my ID number on my bracelet, which is my identification number. |
| Speaker 1: | Okay. |
| Ashley: | Do you have somewhere to write that down? |
| Speaker 1: | Yeah. |

Ashley: Okay. It is 1-8-1-8-2-2-9-5.

Speaker 1: 2-2-9-5. Okay. 1-8-1-8-2-2-9-5?

Ashley: Correct.

Speaker 1: Okay. Okay, well I will get down there and come get you out of…

Ashley: Okay, cool. And next time the guard comes by, I'll ask again. She's a nice guard, but she doesn't talk to me. And so…and she saying to call bail bonds and all. I'll have to make a call to them, but otherwise I'll just have to wait. I think they have to bring me out of here for fingerprinting, so I'll talk to them more. And the officer that I've been with this whole time, since the car…for the past however long it's been, has been really nice.

Speaker 1: Oh, the one that we were talking to at the…

Ashley: Yeah. You might have talked to him, what you said. But he is treating me very well.

Speaker 1: Okay. Well, I will get down there to see what it takes to get you out.

Ashley: Yeah. I don't think it would be more than $2500.

Speaker 1: Well, it shouldn't even be that much. I mean…

Ashley: Yeah. I mean, I think it's going to be $250 because it's not major or anything.

Speaker 1: Okay. I will get down there in a little bit.

Ashley: All right, so sorry about all of this. I love you.

Speaker 1: Okay, I love you too. Bye.

Ashley: Bye.

**[End of Audio]**

**Duration: 10 minutes**

Automated System: Hello, this is a collect call from Ashley Ryan, an inmate at San Diego Central Jail. To pay for just this call using your credit or debit card, please press 1. To decline this call, press 4. This call will cost $0.21 per minute, plus any applicable federal, state, and local taxes, plus a one-time transaction fee of $3.00. You will only be charged the per minute rate for the amount of time you are on the phone. If you do not want to connect this call, but would like to fund an account to pay for future calls, please hang up and dial 800-844-6591. **[No dictation] [00:00:44 – 00:03:04]** Please hold while the person you are calling is entering information to pay for this call.

This call is being recorded. If you are an attorney, physician, or religious advisor, and would like to speak to your client without being recorded, you must first contact the sheriff's department at 858-565-3519 during normal business hours. If you proceed with this call, you do so with the understanding that this telephone call is non-confidential and will be recorded by the sheriff's department and shared with any law enforcement or government entity seeking to listen to and use it.

If you agree to have this call recorded and wish to proceed with this call, please continue. Otherwise, you should terminate this call now. To continue, press 1. To disconnect, press 2. Thank you for using Securus. You may start the conversation now.

Ashley: Hey.

Female Speaker: Hello? Hey.

Ashley: So, you talked to a bail bondsman guy?

Female Speaker: Yeah. I went downtown and they didn't tell me that they wouldn't let you out.

Ashley: What do you mean?

Female Speaker: Well, I went downtown to try to get you out.

Ashley: Yeah, and what'd they say?

Female Speaker: They said you have to be processed. They have to do a background check and all this stuff.

Ashley: How long does that take?

Female Speaker: Twelve hours.

Ashley: Oh, my gosh.

Female Speaker: I know and I've paid the bail bondsman and so –

Ashley: I can't believe they set it so high. They said if you came to bail me out myself, you would have had to pay $50,000.00.

Female Speaker: Yeah. Oh, Dad is livid. He's like we're getting a lawyer. We're gonna fucking sue that place.

Ashley: I don't know if they'll drop my case or not, but the guy in the car made it seem like they drop cases all the time because they're too busy with other things.

Female Speaker: Yeah.

Ashley: I mean, this whole thing is over a $5.00 cover.

Female Speaker: Right, right.

Ashley: I don't think that's justified in pulling me out of the bathroom in the first place though.

Female Speaker: Well, but there was so many things they did. They attacked you down the street after we'd left.

Ashley: Well, she wouldn't leave us alone in the club. We told her I wasn't drinking and I wasn't throwing up.

**[Crosstalk]**

Female Speaker: I came back home. I went down there to try to get you out. Also, I'm not happy that you're with the men either.

Ashley: Yeah. I didn't get into the jail until I called you. Right when I called you was like right when I go in.

Female Speaker: Okay.

Ashley: We were just processing and there was a lot of people.

Female Speaker: So, are you in your own cell?

Ashley:          Yeah, it's very dirty. I'm not wearing shoes.

Female Speaker:  I mean, what are you in? Are you in that dress now?

Ashley:          Uh-huh, and my fur.

Female Speaker:  Oh, did they finally give that back to you?

Ashley:          Yeah. I'm wearing the fur and the dress. It would be freezing if I didn't have the fur.

Female Speaker:  I know! I was so worried because it was so cold last night. I was like 'can I have that back,' and they wouldn't give it. Then, I was like well how long is she gonna sit in that car, but you were freezing.

Ashley:          Yeah. Well, I don't even know why they booked me for the amount of money because the only cash that was in my purse was $50.00. It's like okay, what?

Female Speaker:  No, it's absolutely not baseless.

Ashley:          I could be calmer in the future, but I'm in the bathroom, going to the bathroom. Leave me alone.

Female Speaker:  Right. When someone tells you no, I wasn't throwing up, why did she just keep going on? That's what got everybody irritated was she just wouldn't believe you and you had no reason to lie.

Ashley:          Yeah, I don't know. I just had an issue. When people accuse me of things, I don't like it. I'm sorry.

Female Speaker:  No, I know. I know.

Ashley:          I could have done things better. If she wouldn't have followed me into the bathroom yelling at me because I was peeing the wrong direction, facing the toilet, that's what this is about. You know she thought I was throwing up because I was peeing facing the toilet instead of away.

Female Speaker:  Oh.

Ashley:          They were looking under. That's what they were doing. That's what this is about because my heels were facing the wrong way when I was peeing.

Female Speaker: Oh, okay. That's it. But still, if someone is throwing up, you freakin' hear it.

Ashley: It didn't look like I was throwing up either.

Female Speaker: Right. I kept telling the cops, I said please breathalyze her. I said take her blood.

Ashley: I said that too. I said breathalyze.

Female Speaker: I said take her blood right now and I said swab her throat to see if she's thrown up. She was not throwing up. I said this is all a big mistake and the place blew it all out of proportion and just upset everybody. So anyway, I guess all you can do now is just hang tight and try to get some sleep. I know you're probably freezing in there.

Ashley: Yeah, I'm cold, hungry, I haven't slept, and this cell is an absolute mess because whoever was in here before went crazy with the toilet paper and I don't even know what else is everywhere.

Female Speaker: Do you have a blanket or anything?

Ashley: No, there's not even anywhere to lay down. It's just like a sitting chair, and a toilet and shower, and the ground is absolutely filthy. I don't even know what to do. I was hoping they would move me to a place with a bed, but I don't think that's gonna happen because they're like oh, you're in holding. You're **[inaudible] [00:09:47]**. So, I think they're just gonna keep me here.

Female Speaker: Well, at least the guy, the bailsman, he's on it, and the minute you get through the clearing, he should know it because I think he's all hooked up to the…

Ashley: Yeah, I don't think they have recordings of everything else that happened. They don't have recordings of what happened in the bathroom, so it's just shitty.

Female Speaker: Yeah. Well, we're gonna get a lawyer and –

Ashley: Do you want to talk to Ricardo Perez?

Female Speaker: Yeah, maybe we can. What kind of lawyer is Ricardo?

Ashley: We'll have to see, but his dad owns a law firm, so either they can

do it or they're gonna have good friends.

Female Speaker: Okay.

Ashley: But if they were able to represent, I mean if these charges aren't dropped, **[inaudible] [00:10:51]**. The bail bondsman said this is something like me walking into a store with a gun.

Female Speaker: No!

Ashley: That's what they said I'm being charged with.

Female Speaker: The police told me that they weren't arresting you. It was the security guards at that place were doing a citizen's arrest.

Ashley: Yeah.

Female Speaker: This whole thing is crazy. It's crazy. It's crazy. We will get a lawyer and it will be handled because it's absolutely ridiculous. There wasn't anything. Anyway, why don't you just, I was gonna say lay down and take a nap, but… As soon as you're cleared or whatever, they've checked your background or whatever, and you can get bailed out, I guess they just release you right out and you can walk right down to the bail bondsman.

Ashley: So, is that the plan B that I just walk down there? Well, they're gonna give me my phone, so I'll call you and then walk over there. They want me to come to them first off?

Female Speaker: Well, they said you can. You can just walk down there or I can just pick you up.

Ashley: They want people's phone numbers and stuff. I don't know why.

Female Speaker: What do you mean?

Ashley: I don't know. They were like asking me all these random questions like how much do I make or what car do I drive, my roommate's phone number, **[inaudible] [00:12:35]** phone number, my dad's phone number.

Female Speaker: Well, they called me.

Ashley: Yeah, they didn't believe my story. They were like you're lying. You wouldn't be charged with this if it's over you having to pay

cover or not. I'm like nope, that's what it's over.

Female Speaker: Well, I told the guy and he goes this is ridiculous, because he wanted to know the story, and I go yeah.

Ashley: It's the same thing.

Female Speaker: So, anyway. Well, just hang in there and hopefully, we'll get you home soon and you can just sleep the rest of the night and day and rest up from this ordeal. I'm ordering in for New Year's and not gonna leave this house. Every time you call, I have to enter in all these credit card numbers and my eyes are so bad, I can barely see them. I'm like oh, god. I wish they'd give you a blanket or something. Are you there? Ashley? Are you there?

Automated System: The caller has hung up.

**[End of Audio]**

**Duration: 15 minutes**



**CERTIFICATION OF AUTHENTICITY**

Date: August 31, 2021

**Client:** Victoria Greska

**Audio File Transcribed by GMR Transcription Services, Inc.:**
File Name: 299116_Jail Call 1.mp3

To Whom It May Concern:

I, Beth Worthy, President at GMR Transcription, do hereby certify under the penalty of perjury, under the laws of the state of California, that:

The transcript provided by GMR Transcription Services, Inc. is a full, true, and correct transcription of the audio file mentioned above, having been transcribed and reviewed by GMR Transcription to the best of the company's ability. I further certify that neither I, nor the transcriber, have any personal association with the case; nor am I, nor the transcriber in any way interested in the outcome thereof.

Executed this 31st day of August, 2021.

Sincerely,

**Beth Worthy**
**President**
Email: Beth@gmrtranscription.com
Phone: (714) 202-9653

EXHIBIT T10



**CERTIFICATION OF AUTHENTICITY**

Date: August 31, 2021

**Client:** Victoria Greska

**Audio File Transcribed by GMR Transcription Services, Inc.:**
File Name: 299116_Jail Call 2.mp3

To Whom It May Concern:

I, Beth Worthy, President at GMR Transcription, do hereby certify under the penalty of perjury, under the laws of the state of California, that:

The transcript provided by GMR Transcription Services, Inc. is a full, true, and correct transcription of the audio file mentioned above, having been transcribed and reviewed by GMR Transcription to the best of the company's ability. I further certify that neither I, nor the transcriber, have any personal association with the case; nor am I, nor the transcriber in any way interested in the outcome thereof.

Executed this 31st day of August, 2021.

Sincerely,

**Beth Worthy**
**President**
Email: Beth@gmrtranscription.com
Phone: (714) 202-9653

EXHIBIT T11

# Exhibit U

| | |
|---|---|
| **DATE:** | NOVEMBER 13, 2018 |
| **NUMBER:** | R.13 |
| **SUBJECT:** | TRANSGENDER AND INTERSEX INMATES |
| **RELATED SECTIONS:** | R.1, R.3, R.11, I.47, I.52, L.1, L.11, J.3, and PREA |

PURPOSE

To ensure decisions regarding the searching, housing, programming, and in-custody services such as clothing, commissary, and toiletries are applied in a manner consistent with an inmate's declared gender identity.

POLICY

Staff shall treat all inmates with respect and maintain professional positive interactions and effective communication with inmates. Staff shall not use racial, ethnic, homophobic or other derogatory language towards any individual.

It is the policy of the San Diego County Sheriff's Department to receive, evaluate, house, and provide secure, safe and humane custody of all persons, including transgender and intersex, which are lawfully committed or held for confinement by the Sheriff until their lawful and appropriate release or transfer to another authority.

PROCEDURE

I. DEFINITIONS

**Transgender** – a person whose gender identity (internal sense of feeling male or female) differs from their sex at birth.

**Intersex** – a condition in which a person is born with external genitalia, internal reproductive organs, chromosome patterns, and/or an endocrine system that does not fit typical definitions of male or female.

**LGBTQ+** – acronym used to include all those who have diverse sexual orientations and/or gender identities. The acronym includes those who identify as lesbian, gay, bisexual, transgender, queer and/or questioning and the "+" includes all others within the spectrum.

**Gender identity** – distinct from sexual orientation and refers to a person's internal, deeply felt sense of being male, female, or non-binary.

II. IDENTIFICATION OF TRANSGENDER AND INTERSEX INMATES

A. Upon identifying an individual as transgender or intersex, based on the inmate's response to the gender identity intake screening question, medical staff will immediately notify the Jail Population Management Unit (JPMU).

B. If at any time a staff member suspects an inmate may be transgender or intersex, they will notify JPMU for a resolution.

III. SEARCHES OF TRANSGENDER AND INTERSEX INMATES

A. All searches of transgender and intersex inmates will be conducted by two staff members of the gender requested by the transgender inmate. Staff shall not search or physically examine a transgender or intersex inmate for the sole purpose of determining genital status. If the inmate's genital status is unknown, it may be determined during conversations with the inmate, by reviewing medical records, or, if necessary, by learning that information as part of a broader medical examination conducted in private by a medical practitioner.

B. Inmates who identify as transgender or intersex shall not be subject to a strip search or body scan, prior to being interviewed by JPMU, unless exigent circumstances exist.

C. JPMU staff will conduct an interview with the inmate to determine the appropriate gender of the staff to conduct the search. During the interview, JPMU staff will provide the inmate with a Voluntary Gender Identity Statement of Preference Form (J-350) to document the inmate's gender identity, gender search, and housing preference.

D. The J-350 Form will be placed in the inmate's custody record and a Jail Information Management System (JIMS) housing modifier will be entered to identify the inmate's strip search preference.

1. If the inmate prefers male deputies to conduct the strip search, the code MSS will be utilized.

2. If the inmate prefers female deputies to conduct the strip search, the code FSS will be utilized.

3. Transgender or intersex inmates who do not specify a gender search preference on the J-350 form will be searched by staff that is of the same gender as the inmate's biological sex.

IV. HOUSING AND PROGRAMMING ASSIGNMENTS

A. JPMU staff will be consulted to determine individualized housing assignments for all transgender and intersex inmates in custody. JPMU staff will use the information obtained from the J-350 form, along with other factors to include the inmate's safety, safety of other inmates, and staff to determine the most suitable housing assignment. A transgender or intersex inmate's own views, with respect to his or her own safety, shall be given serious consideration.

B. Transgender and intersex inmates that do not specify a housing preference on the J-350 form, will receive housing assignments consistent with their biological sex.

C. Inmates shall not be denied access to programs or services, that they would otherwise be eligible for, based on their sexual orientation and/or gender identity.

D.    In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the department shall consider, on a case-by-case basis, whether the placement would ensure the inmate's health and safety, and whether the placement would present management or security problems.

E.    Transgender and intersex inmates can be housed in dorm style or cell housing. The following options apply when assigning a transgender or intersex inmate to cell housing:

1.    Single cell housing
The JIMS Operation Status Board (Area Status) will be changed to "JPMU-JPMU Override Do Not Change" for additional beds in the cell. This will notify staff the bed(s) are out of service and require approval from JPMU.

2.    Transgender or intersex cell mate(s).

3.    Non transgender or intersex cell mate(s) will require that the approval from JPMU is documented in an Inmate Status Report (ISR).

F.    Inmates at high risk for sexual victimization shall not be placed in involuntary segregated housing unless an assessment of all available alternatives has been made, and a determination has been made that there is no available alternative means of separation from likely abusers.  If a facility cannot conduct such an assessment immediately, the facility may hold the inmate in involuntary segregated housing for less than 24 hours while completing the assessment.  JPMU supervisors will be notified and provide direction in determining the most suitable housing option.

JPMU staff will be consulted if an involuntary segregated housing assignment is necessary.  The JPMU deputy shall clearly document the basis for the concern for the inmate's safety and the reason why no alternative means of separation can be arranged. All inmates housed in Administrative Segregation will be subject to weekly reviews as described in J.3.

G.    In conjunction with existing parameters, transgender and intersex inmate custody levels shall be reassessed, when necessary, due to a referral, request, incident of sexual abuse, or receipt of additional information that increases the inmate's risk of sexual victimization or abusiveness.  Housing and programming assignments for each transgender or intersex inmate shall be reassessed at least twice each year to review any threats to safety experienced by the inmate.

V.    DOCUMENTATION

For each new arrest, all initial classification housing assignment decisions will be documented in an ISR, regardless of the housing decision (e.g. male or female facility, general population or protective custody).  The ISR will detail the inmate's gender presentation, and their own views with respect to his or her own safety.

VI.    HYGIENE, COMMISSARY AND INMATE CLOTHING

A.    Transgender and intersex inmates shall be given the opportunity to shower separately from other inmates.

B.   Transgender and intersex inmates will be given jail issued clothing that matches with their gender identity (e.g. female undergarments for a transgender female inmate or male undergarments for a transgender male), upon request.

C.   Transgender and intersex inmates will be allowed to order available commissary items in accordance to their gender identity.

| | |
|---|---|
| **DATE:** | AUGUST 29, 2017 |
| **NUMBER:** | R.1 |
| **SUBJECT:** | INMATE CLASSIFICATION |
| **RELATED SECTIONS:** | R.3, R.11, I.47 and J.3 |

PURPOSE

The purpose of the Inmate Classification System is to screen, assess and house inmates in a manner that will protect the safety of the community, staff and other inmates. It also assists detention managers and staff in making sound decisions regarding inmate population management. Proper inmate classification promotes impartial and consistent classification evaluations, and helps provide legal protection to staff by establishing reasonable, objective and defensible safety practices.

POLICY

An inmate's initial classification is determined by their original booking charges, criminal history information, medical and psychiatric issues or additional special conditions, and information obtained from the inmate interview. The inmate will be assigned to the most appropriate housing location based on their classification designation.

PROCEDURE

I. CLASSIFICATION EVALUATION

Any person booked into a detention facility shall undergo a classification evaluation to determine an appropriate housing assignment. Exceptions:

A. Inmates being processed through the "Book and Release," or similar programs.

B. Inmates being processed for release per 853.6 P.C.

C. Any inmate not formally booked (e.g., hospital inmates booked in absentia or juveniles tried as adults).

II. JAIL POPULATION MANAGEMENT UNIT (JPMU) DEPUTY RESPONSIBILITIES

A. Inmates should be classified as soon after booking as possible, but in any event, prior to being assigned to a housing area.

B. In preparation for the classification interview, care must be taken to obtain the most complete history on the inmate as possible. A follow-up with various agencies may be necessary to verify information. This criminal history will often be of greater importance in determining the inmate's security level than the interview.

C. In cases where the JPMU deputy feels that the objective custody level, as determined by the use of the "decision tree," does not truly reflect the custody risk of the inmate, the

deputy may override the code (either higher or lower) to more accurately assess the inmate.

If the override results in a change in the inmate's custody level , the JPMU deputy will make an entry in the inmate's "Chronological Notes" articulating the rationale behind their decision. A JPMU sergeant is responsible for reviewing the overrides for concurrence and approval.

D. All inmates are screened to assess their risk of being sexually abused by other inmates or being sexually abusive toward other inmates. Depending on the risk factors, and with serious consideration of the inmate's own perception of vulnerability, one or more of the following can be considered: special housing, transfer restrictions, and/or an override of the inmate's custody level. The screening for risk of victimization or abusiveness will be on a case by case basis, tailored for that individual inmate. The inmate's participation in the screening is considered optional and in the event of a refusal to answer questions, the static known risk factors will be considered.

Lesbian, gay, bisexual, transgender, or intersex inmates will not be placed in dedicated housing units solely on the basis of such identification. Placement and programming assignments for each transgender or intersex inmate shall be reassessed at least twice each year to review any threats to safety experienced by the inmate.

E. Determination of the inmate's classification code will be entered into the Jail Information Management System (JIMS) using the Evaluation Update Screen. Appropriate housing assignment based on the inmate's custody level, and Hazards & Instructions will be made using the movement list on the JIMS Classification Navigator screen.

III. HOUSING ASSIGNMENTS

A. Inmates with custody levels 1-3 can be housed together. Levels 4 and 5 can be housed together. Level 6 inmates will be housed in Administrative Segregation.

B. Exceptions to aforementioned housing assignments will be inmates housed in Administrative Segregation, Protective Custody, Psychiatric Security Unit (PSU), and designated medical or psychiatric housing.

IV. RECLASSIFICATION

Any employee who receives information that could change an inmate's classification code and/or housing assignment has the responsibility of advising a JPMU deputy. The JPMU deputy will evaluate the information to determine whether it requires the inmate to be reclassified. If it does, the reporting deputy may be asked to complete an Inmate Status Report detailing the relevant information. The following are examples of events that may require reclassification:

A. Information indicating the inmate is a potential escape risk, is assaultive or has threatened to assault staff.

B. Sentenced to any number of years to life in prison (with or without the possibility of Parole), or death.

C. Medical or psychiatric treatment (medical and psychiatric staff to notify JPMU).

D.     Automatic JIMS notifications:

    1.     The addition of new charges, dropping of charges, or the modification of current charges.

    2.     Sentencing to local time.

    3.     Prison commitments.

V.     PROGRAM PARTICIPATION EVALUATION

Penal Code 4114 requires all inmates sentenced to over 30 days be classified for custody and treatment purposes.  Correctional Counselors will meet with those sentenced inmates to determine what programs the inmate is eligible for based on the inmate's classification, interview, and institutional behavior.  Each inmate serving a jail sentence of over 30 days shall be interviewed during the first third of his/her sentence.  The program evaluation will take into consideration all programs within our detention system as well as community-based resources such as Electronic Surveillance Program (ESP), County Parole, Home Detention, Work Furlough, etc.

# Exhibit V



# County of San Diego

NICK MACCHIONE, FACHE
AGENCY DIRECTOR

HEALTH AND HUMAN SERVICES AGENCY
PUBLIC HEALTH SERVICES
3851 ROSECRANS STREET, MAIL STOP P-578
SAN DIEGO, CA 92110-3134
(619) 531-5800 • FAX (619) 542-4186

WILMA J. WOOTEN, M.D., M.P.H.
PUBLIC HEALTH OFFICER

July 24, 2017

Lt. David Gilmore
Sheriff's Standards & Compliance Office
Division of Inspection Service
P.O. Box 939062
San Diego, CA 92193-9062

Dear Lt. Gilmore,

Enclosed is the FY 16/17 Title 15 Inspection Reports for:

- San Diego Central Jail Detention Facility

We have reviewed the inspections completed by the Institute for Medical Quality (Medical/Mental Health and Nutrition (if applicable)) and the Department of Environmental Health. We appreciate the cooperation received from your facility staff involved in the completion of these reports.

Sincerely,

WILMA J. WOOTEN, M.D., M.P.H.
Public Health Officer
Director, Public Health Services

BRUCE COON, MSN, RN, PHN
Public Health Nurse Manager
HHSA Nursing Administration

cc: Nicholas Maryn, Sgt, San Diego Sheriff's Department
Adam Arkwright, Sgt, San Diego Sheriff's Department

EXHIBIT V1

**III. MEDICAL/MENTAL HEALTH EVALUATION**
**Adult Type I, II, III and IV Facilities**
**SAN DIEGO CENTRAL JAIL**

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| **Article 11. Health Services** | | | | |
| **1200 Responsibility For Health Care Services**<br><br>The facility administrator has developed a plan to ensure provision of emergency and basic health care services to all inmates. | X | | | San Diego Central Jail has written polices and staff provided by SDSD Medical Services Division for emergency and basic health care services. |
| Clinical judgments are the sole province of the responsible physician, dentist, and psychiatrist or psychologist, respectively. | X | | | |
| Security regulations are applicable to facility staff and health care personnel. | X | | | |
| At least one physician is available. | X | | | |
| In Type IV facilities where routine health services are provided by access to the community, there is a written plan for the treatment, transfer, or referral of emergencies. *(When Type IV facilities provide health services within the facility, they must meet applicable regulations, as do other facilities.)* | | | X | This is a Type II facility. |
| **1202 Health Service Audits** *(Applicable to facilities with on-site health care staff)*<br><br>There is a written plan for annual statistical summaries of health care and pharmaceutical services that are provided. | X | | | There is an extensive Quality Improvement program in place. |
| There is a mechanism to assure that the quality and adequacy of health care services are assessed annually. | X | | | |
| There is a process for correcting identified deficiencies in the health care and pharmaceutical services delivered. | X | | | |
| Based on information from these audits, the health authority provides the facility administrator with an annual written report on health care and pharmaceutical services delivered. | X | | | |
| **1203 Health Care Staff Qualifications** *(Applicable to facilities with on-site health care staff)*<br><br>There are policies and procedures to assure that state licensing, certification, or registration requirements and restrictions that apply in the community, also apply to health care personnel in the facility. | X | | | Staff licenses on file and are current. |
| Health care staff credentials are on file at the facility or another central location where they are available for review. | X | | | |
| **1204 Health Care Procedures** *(Applicable to facilities with on-site health care staff)*<br><br>Medical care performed by personnel other than a physician, is performed pursuant to written protocol or order of the responsible physician. | X | | | Health Services Policies and Procedures are electronically available to all staff and updated annually and as needed. |

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| **1206.5 Management of Communicable Diseases**<br><br>There is a written plan that addresses the identification, treatment, control and follow-up management of communicable diseases. The plan reflects the current local incidence of communicable diseases which threaten the health of inmates and staff and includes: | X | | | Digital CXRs are completed for all arrestees prior to housing unless clinically contraindicated. |
| Intake health screening procedures; | X | | | |
| Identification of relevant symptoms; | X | | | |
| Referral for medical evaluation; | X | | | |
| Treatment responsibilities during incarceration; and, | X | | | |
| Coordination with public and private community-based resources for follow-up treatment. | X | | | |
| Consistent with the plan, there are policies and procedures that conform with applicable state and federal law, which include but are not limited to: | X | | | |
| The types of communicable diseases to be reported; | X | | | |
| The persons who must receive the medical reports; | X | | | |
| Sharing of medical information with inmates and custody staff; | X | | | |
| Medical procedures required to identify the presence of disease(s) and lessen the risk of exposure to others; | X | | | |
| Medical confidentiality requirements; | X | | | |
| Housing considerations based upon behavior, medical needs, and safety of the affected inmates; | X | | | Specialized housing areas;<br>2nd floor- 4 safety cells, 4 sobering cells.<br>3rd floor-17 MOB beds, 6 isolation, 30 PSU beds, 2 safety cells. 4th floor-pre-arraignment. 5th floor-post-arraignment. 6th-floor out-patient psychiatric. 7th-floor PC, Ad-Seg. 8th floor-medical, Ad-Seg. |
| Provision for inmates consent that address the limits of confidentiality; and, | X | | | |
| Reporting and appropriate action upon the possible exposure of custody staff to a communicable disease. | X | | | |
| **1207 Medical Receiving Screening**<br><br>A receiving screening is performed on all inmates at the time of intake. *(See regulation for exception.)* | X | | | There is an initial medical triage with a second station for comprehensive medical, dental and mental health assessment. |
| This screening is completed in accordance with procedures established by the responsible physician in cooperation with the facility administrator. | X | | | |
| The screening includes, but is not limited to, medical, mental health, developmental disabilities, and communicable diseases, including, TB and other airborne diseases. | X | | | |
| The screening is performed by licensed health care staff or by trained facility staff. | X | | | |
| There is a written plan for compliance with PC§ 2656, which allows prisoners to keep prescribed orthopedic or prosthetic appliances unless an immediate risk to security has been determined. | X | | | |

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| There is a written plan to provide medical care for any inmate who appears in the need of or requests medical, mental health or developmental disability treatment. | X | | | |
| **1207.5 Special Mental Disorder Assessment** *(Not applicable Type I & IV. Type I facilities are expected to transfer these women to an appropriate facility where the assessment can occur.)*<br><br>There are written procedures for the mental health screening of women who have given birth within the past year and are charged with murder or attempted murder of their infant. Screening occurs at intake and, if postpartum psychosis is indicated, a referral for further evaluation is made. | | | X | Females are not housed at this facility. |
| **1208 Access to Treatment**<br><br>A written plan has been developed and implemented for identifying, assessing, treating and/or referring any inmate who appears to be in need of medical, mental health or developmental disability treatment at any time during incarceration. | X | | | Inmates are well oriented by multiple methods regarding how to access healthcare 24/7.<br>RN Clinics/Sick Call: 7 days per week<br>MD Clinics/Sick Call: 7 days per week<br>Specialty Clinics and Specialty Providers scheduled as clinically indicated on-site, off-site, or Telehealth as scheduled. |
| Health care personnel perform the evaluation. | X | | | |
| **1209 Transfer to a Treatment Facility** *(Not applicable Type I and IV.)*<br><br>a) There are policies and procedures to provide mental health services that include but are not limited to: | X | | | Inmates with acute mental health problems are housed at this facility in PSU/LPS. |
| 1) Screening for mental health problems; | X | | | |
| 2) Crisis intervention and management of acute psychiatric episodes; | X | | | |
| 3) Stabilization and treatment of mental disorders; and, | X | | | |
| 4) Medication support services. | X | | | |
| b) Provision is made to evaluate or transfer mentally disordered inmates to a Lanterman Petris Short treatment facility for further evaluation as provided in PC § 4011.6 or 4011.8, unless the jail contains a designated treatment facility, or has implemented PC § 1369.1. | X | | | Central Jail has a 30 bed PSU designated as LPS with 4 observation rooms. |
| c) The facility provides onsite treatment of incompetent inmate/patients pursuant to Penal Code Section 1369.1. *(If yes, please complete the following)* | X | | | |
| Written policies and procedures for the involuntary administration of medications are developed by the health authority, in cooperation with the facility administrator and include, but are not limited to: | X | | | |
| Designation of licensed personnel authorized to order and administer involuntary medication. | X | | | |
| Designation of appropriate setting for involuntary administration of medication. | X | | | |
| Designation of restraint procedures and/or devices that may be used to maintain safety of the inmate and facility staff. | X | | | |

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| Except in emergencies, as defined in Business and Professional Code § 2397 and Title 15 § 1217, all examination, treatments and procedures affected by informed consent standards in the community are likewise observed for inmate care. | X | | | |
| For minors and conservatees, the informed consent of parent, guardian, or legal custodian applies when the law requires it.  Absent informed consent in non-emergency situations, a court order is required before involuntary treatment is done. | | | X | Minors are not housed at this facility. |
| Any inmate who has not been adjudicated to be incompetent may refuse non-emergency health care. | X | | | |
| **1215 Dental Care**<br><br>Policies and procedures ensure that emergency and medically required dental care is provided to inmates, upon request. | X | | | A dentist is onsite twice a month including restorative services as medically necessary. |
| **1216 Pharmaceutical Management**<br><br>Pharmaceutical policies, procedures, space and accessories include, but are not limited to: | X | | | |
| Securely lockable cabinets, closets and refrigeration units: | X | | | |
| A means for the positive identification of the recipient of the prescribed medication; | X | | | Inmates wear identification wristbands that include a picture and bar code for positive identification of a recipient of medication. |
| Administration/delivery of medicines to minors as prescribed; | | | X | Minors are not housed at this facility. |
| Confirmation that the recipient has ingested the medication or accounting for medication under self-administration procedures outlined in Title 15, § 1216; | X | | | |
| Documenting that prescribed medications have or have not been administered, by whom, and if not, for what reason; | X | | | |
| Prohibiting delivery of drugs by inmates; | X | | | |
| Limitation to the length of time medication may be administered without further medical evaluation; | X | | | |
| Limitation to the length of time allowable for a physician's signature on verbal orders, and, | X | | | |
| An annual written report is prepared by a pharmacist on the status of pharmacy services, and provided to the health authority and facility administrator. | X | | | |
| There are written protocols that are consistent with pharmacy laws and regulations, and limit the following functions to being performed by the identified personnel: | X | | | |
| Procurement is done only by a physician, dentist, pharmacist, or other person authorized by law. | X | | | |
| Medication storage assures that stock supplies of legend medications are accessed only by licensed health care personnel.  Supplies of legend medications that have been properly dispensed and supplies of over-the-counter medications may be accessed by both licensed and non-licensed staff. | X | | | |

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| Repackaging is done only by a physician, dentist, pharmacist, or other persons authorized by law. | X | | | |
| Labels are prepared by either licensed or non-licensed personnel, provided the label is checked and affixed to the container by the physician, dentist, or pharmacist before administration or delivery to the inmate. Labels are prepared in accordance with Business and Professions Code § 4076. | X | | | Prescribed inhalants, creams, ear/eye drops, and over-the-counter medications may be given to a patient for self-administration and medications are labeled appropriately. |
| Dispensing is only done by a physician, dentist, pharmacist, or persons authorized by law. | X | | | |
| Administration of medication is only done by authorized and licensed health care personnel acting on the order of a prescriber. | X | | | Licensed Vocational Nurses deliver medication acting on the order of a prescriber. |
| Licensed and non-licensed personnel may deliver medication acting on the order of a prescriber. | X | | | |
| Disposal of legend medication is done accordance with pharmacy laws and regulations and requires any combination of two of the following classifications: physician, dentist, pharmacist, or reregistered nurse. Controlled substances are disposed of in accordance with Drug Enforcement Administration disposal procedures. | X | | | |
| There are written procedures for managing and providing over-the-counter medications, which include but are not limited to how they are made available, documentation when delivered by staff and precautions against hoarding large quantities. | X | | | |
| Policy and procedures may allow inmate self-administration of prescribed medication under limited circumstances *(see regulation text)*. If self-administration of prescription drugs is not allowed, this subsection is "not applicable." When allowed, policies and procedures must include but are not limited to: | X | | | |
| Medications permitted for self-administration are limited to those with no recognized abuse potential. Medication for treating tuberculosis, psychotropic medication, controlled substances, injectables and any medications for which documentation of ingestion is essential, are excluded from self-administration. | X | | | |
| Inmates with histories of frequent rule violations of any type, or those who are found to be in violation of rules regarding self-administration, cannot participate. | X | | | |
| Prescribing health care staff must document that each inmate participating in self-administration is capable of understanding and following the rules of the program and instructions for medication use. | X | | | |
| Provisions are made for the secure storage of the prescribed medication when it is not on the inmate's person. | X | | | |

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| Provisions are made for consistent enforcement of self-medication rules by both custody and health care staff, with systems of communication among them when either one finds that an inmate is in violation of rules regarding the program. | X | | | |
| Health care staff performs documented assessments of inmate compliance with self-administration medication regimens. Compliance evaluations are done with sufficient frequency to guard against hoarding medication and deterioration of the inmate's health. | X | | | |
| **1217 Psychotropic Medications** *(Not applicable Type IV.)* There are policies and procedures governing the use of psychotropic medications. | X | | | |
| Involuntary administration of psychotropic medication is limited to emergencies. *(See Business and Professional Code § 2397 and the text of Title 15 § 1217 for definition of an emergency.)* | X | | | The 30-bed LPS unit has applicable and compliant policies and procedures for involuntary medications. |
| If psychotropic medication is administered in an emergency, such medication is only that which is required to treat the emergency condition. | X | | | |
| Medication is prescribed by a physician in written form in the inmate's record following a clinical evaluation in person or by telephone. Verbal orders are entered in the inmate's record and signed by a physician within 72 hours. | X | | | |
| There is a protocol for supervising and monitoring inmates who are involuntarily receiving psychotropic medication. | X | | | |
| Psychotropic medication is not administered to an inmate absent an emergency unless: (1) the inmate has given his or her informed consent in accordance with WIC § 5326.2; or, (2) has been found to lack the capacity to give consent pursuant to the county's hearing procedures under the Lanterman-Petris-Short (LPS) Act for handling capacity determinations and subsequent reviews. *(Note: Inspectors need to be aware of differing consent requirements for juveniles held in adult facilities.)* | X | | | |
| Policies limit the length of time both voluntary and involuntary psychotropic medications may be administered. | X | | | |
| There is a plan for monitoring and re-evaluating all inmates receiving psychotropic medications, including a review of all emergency situations. | X | | | |
| The administration of psychotropic medication is not allowed for disciplinary reasons. | X | | | |
| **1219 Suicide Prevention Program** There is a written suicide prevention plan designed to identify, monitor and provide treatment for those inmates who present a suicide risk. | X | | | Suicide Awareness/Suicide Prevention training is completed at least annually for all employees. |
| **1220 First Aid Kits** One or more first aid kits are available in the facility. | X | | | |

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| The responsible physician has approved the contents, number, location and procedure for periodic inspection of the kit(s). | X | | | First aid kits are regularly monitored. |
| **ARTICLE 4, RECORDS AND PUBLIC INFORMATION** | | | | |
| **1046 Death in Custody**<br><br>Written policy and procedures assure that there is a review of each in-custody death. The review team includes the facility administrator and/or manager; the health administrator; the responsible physician; and other health care and supervision staff who are relevant to the incident. | X | | | Written policy and procedure in place.<br><br>Nine in-custody deaths in past inspection year, three of them were suicide. Critical Incident Review Board reviewed all cases. |
| When a minor dies in a facility, the administrator of the facility provides the Corrections Standards Authority with a copy of the death in custody report that is submitted to the Attorney General under Government Code Section 12525, within 10 days of the death. | | | X | Minors are not housed at this facility. |
| **ARTICLE 5, CLASSIFICATION AND SEGREGATION** | | | | |
| **1051 Communicable Diseases**<br><br>Upon identification, all inmates with suspected communicable diseases are segregated until a medical evaluation can be completed. | X | | | Respiratory Isolation Cells are available as clinically indicated. |
| In absence of medically trained personnel at the time of intake into the facility, an inquiry is made to determine if the inmate has or has had any communicable diseases, or has observable symptoms of communicable diseases, including but not limited to tuberculosis or other airborne diseases, or other special medical problems identified by the health authority. | X | | | |
| The inmate's response is noted on the booking form and/or screening device. | X | | | |
| **1052 Mentally Disordered Inmates**<br><br>There are policies and procedures to identify and evaluate all mentally disordered inmates, with segregation provided, if necessary to protect the safety of the inmate of others. | X | | | |
| A physician's opinion is secured within 24 hours of identification or at the next daily sick call, whichever is earliest. | X | | | Psychiatrist sick call: 7 days per week. |
| **1055 Use of Safety Cell**<br><br>A safety cell, specified in Title 24, Part II, Section 1231.2.5, is used only to hold inmates who display behavior that results in the destruction of property or reveals an intent to cause physical harm to self or others. | X | | | Review of Safety Cell logs and patient medical records demonstrated compliance with policies, procedures and applicable standards. |
| There are policies and procedures, written by the facility administrator in cooperation with the responsible physician, governing safety cell use. | X | | | |
| Safety cells are not used for punishment or as a substitute for treatment. | X | | | |

San Diego Central Jail Facility
1173 Front Street
San Diego, CA. 92101

Date of Inspection: 02/28/17

San Diego Central Jail was opened in 1998 with the current census of 996 male only inmates. Special housing includes six floors and a 30-bed inpatient psychiatric unit designated as Lanterman Petris Short (LPS) bed for comprehensive mental health services including involuntary psychiatric medications when court ordered. A Jail Based Competency Program for patients identified as Incompetent to Stand Trial is being implemented.

There are 17 Medical Observation Beds (MOB) for post-operative care, complicated wound care, intravenous treatment and higher acuity medical care. Provider, psychiatrist and RN Clinics are provided seven days per week.

An innovative Enhanced Observation Housing (EOH) for suicide watch and suicide watch step down has been implemented. The EOH includes comprehensive structural changes such as Plexiglas from handrails to ceilings to prevent inmates from jumping off the stairs. Additional precautions include increased frequency of suicide watch checks, removing potential risk items from cells, suicide prevention gowns, blankets and mattresses.

San Diego Central Jail meets all applicable Title 15 Standards for Medical/Mental Health care.

Terry Fillman, MBA, RN, CCHP, IMQ C&D Program (909) 463-5358

2/28/17

EXHIBIT V9

# I. ENVIRONMENTAL HEALTH EVALUATION

## Adult Type I, II, III and IV Facilities

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| **Article 12. Food** | | | | |
| **Approach for Providing Food Service**<br><br>*California Retail Food Code "CalCode" (HSC Division 104, Part 7, Chapter 1-13, Section 11370 et seq.) has been incorporated into Title 15 for local detention facilities through the rulemaking process*<br><br>Food served in the facility is prepared in the facility. If "No," respond to items 1 and 2 below prior to continuing with the checklist. | | | | Food is prepared and packaged at central kitchen on the 9th floor. Food is prepared, packaged and reheated at the kitchen. |
| 1. Food is prepared at another city or county detention facility. | | X | | CENTRAL PRODUCTION KITCHEN. |
| 2. Food is contracted through a private vendor who had been inspected and complies with provisions of CalCode. | X | | | |
| **1230 Food Handlers**<br><br>*(Note: Title 15, § 1230 is in Article 11, MMH, but inspected under Environmental Health due to CalCode reference.)*<br><br>Policy and procedures have been developed and implemented for medical screening of inmate food handlers prior to working in the facility. | X | | | The Environmental Health Inspector retains primary responsibility to determine compliance with Section 1230. Compliance should be assessed in consultation with the Nutrition Inspector so that the findings on the Environmental Health Evaluation reflect the observations, expertise and consensus of both parties. |
| There are procedures for education, ongoing monitoring, and cleanliness of food handlers in accordance with CalCode. | X | | | |
| **1243 Food Service Plan**<br><br>There is a food services plan that complies with applicable California Retail Food Code (CalCode). Facilities with an average daily population of 100 or more have a trained and experienced food service manager to prepare and implement a food services plan.<br><br>The plan includes: planning menus; purchasing food; storage and inventory control; food preparation; food serving; transporting food; orientation and ongoing training; personnel supervision; budgets and food cost accounting; documentation and record keeping; emergency feeding plan; waste management; and, maintenance and repair. | Do not identify compliance with this section here. See comments. | | | The Nutrition Inspector retains primary responsibility to determine compliance with Section 1243. Compliance should be assessed in consultation with the Environmental Health Inspector so that the findings on the Nutritional Health Evaluation reflect the observations, expertise and consensus of both parties. The text of the regulation is provided here for reference only. |
| In facilities with less than 100 average daily population that do not employ or have access to a food services manager, the facility administrator has prepared a food services plan that addresses the applicable elements listed above. | | | | |

EXHIBIT V10

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| **Article 15. Facility Sanitation and Safety** | | | | |
| **1280 Facility Sanitation, Safety and Maintenance**<br><br>There are policies and procedures for the maintenance of an acceptable level of cleanliness, repair and safety throughout the facility. | X | | | |
| The plan provides for a regular schedule of housekeeping tasks and inspections to identify and correct unsanitary or unsafe conditions or work practices. | X | | | |
| Medical care housing as described in Title 24, Part 2, § 470A.2.14 is cleaned and sanitized according to policies and procedures established by the health authority. | X | | | |
| **Other Applicable Codes** | | | | |
| **Title 24, Uniform Building Code -- Plumbing**<br><br>Toilet bowls, wash basins, drinking fountains, and showers are clean and in good repair. | X | | | |
| **Title 24, Uniform Building Code – Cleanliness and Repair**<br><br>Floors, walls, windows, grillwork and ceilings are clean and in good repair. | X | | | |
| **Title 24, Part 1, 13-102(c)6 – Heating and Cooling**<br><br>There is provision for a comfortable living environment in accordance with the heating, ventilating, and air conditioning requirements of Parts 2 and 4 and energy conservation requirements of Part 6, Title 24, CCR. | X | | | |
| **Title 24, Uniform Plumbing Code – Floor Drains**<br><br>Floor drains are flushed at least weekly. | X | | | |
| Traps contain water to prevent escape of sewer gas. | X | | | |
| Grids and grates are present. | X | | | |
| **Title 24, Part 2, 470A.3.6 – Lighting**<br><br>Lighting in housing units, dayrooms and activity areas is sufficient to permit easy reading by a person with normal vision. | X | | | |
| 20 foot candles light are provided at desk level and in the grooming area. *(Applicable to facilities constructed after 1980.)* | X | | | |
| Lighting is centrally controlled or occupant controlled in housing cells or rooms. | X | | | |
| Night lighting provides good vision for supervision. *(Applicable to facilities constructed after 1980.)* | X | | | |
| | | | | |
| **CA Safe Drinking Water Act**<br><br>Potable water is supplied from an approved source in satisfactory compliance with this Act. | X | | | |

EXHIBIT V11

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| **Local Ordinances**<br><br>Solid, toxic and infectious wastes are disposed of in accordance with state and local laws and regulations. | X | | | |
| **HSC § 1803**<br><br>The facility is free of vermin (or vermin signs), and general housekeeping is satisfactory. | X | | | |
| **General Industry Safety Order, Title 8-3362**<br><br>The facility is free of structural and other safety hazards. | X | | | |

Summary of environmental health evaluation:

PERMIT # FDET – 305249

SAN DIEGO CENTRAL JAIL MEETS THE ENVIRONMENTAL SECTION OF TITLE 15 REQUIREMENTS.

The following observations were made:

- 8th floor : Modules A-E – NO VIOLATIONS OBSERVED
- 7th floor: Modules A-E – CO7 TOILET NOT FLUSHING, HOWEVER REPAIRS WERE MADE BEFORE THE END OF THE INSPECTION.
- 6th floor : Modules A-E – NO VIOLATIONS OBSERVED
- 5th floor : Modules A-E – NO VIOLATIONS OBSERVED
- 4th floor : Modules A-E – NO VIOLATIONS OBSERVED
- 3th floor : MEDICAL – NO VIOLATIONS OBSERVED
- 2th floor : NO VIOLATIONS OBSERVED
- 1th floor :NO VIOLATIONS OBSERVED

Sulmaz Soly Yakhi | Registered Environmental Health Specialist II
Department Of Environmental Health | Food & Housing Division | Specialized Inspections & Enforcement
5500 Overland Avenue, San Diego California 92123 | 858 926 6656



NICK MACCHIONE, FACHE
AGENCY DIRECTOR

HEALTH AND HUMAN SERVICES AGENCY
PUBLIC HEALTH SERVICES
3851 ROSECRANS STREET, MAIL STOP P-578
SAN DIEGO, CA 92110-3134
(619) 531-5800 • FAX (619) 542-4186

WILMA J. WOOTEN, M.D., M.P.H.
PUBLIC HEALTH OFFICER

July 31, 2018

Lt. David Gilmore
Sheriff's Standards & Compliance Office
Division of Inspection Service
P.O. Box 939062
San Diego, CA 92193-9062

Dear Lt. Gilmore,

Enclosed is the FY 17/18 Title 15 Inspection Reports for:

- San Diego Central Jail

We have reviewed the inspections completed by the Institute for Medical Quality (Medical/Mental Health and Nutrition (if applicable)) and the Department of Environmental Health. We appreciate the cooperation received from your facility staff involved in the completion of these reports.

Sincerely,

WILMA J. WOOTEN, M.D., M.P.H.
Public Health Officer
Director, Public Health Services

BRUCE COON, MSN, RN, PHN
Public Health Nurse Manager
HHSA Nursing Administration

cc: Sgt. Dave Perkins, San Diego Sheriff's Department
Sgt. Joe Navarro, San Diego Sheriff's Department

EXHIBIT V13

# III. MEDICAL/MENTAL HEALTH EVALUATION
## Adult Type I, II, III and IV Facilities
## SAN DIEGO CENTRAL JAIL

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| **Article 11. Health Services** | | | | |
| **1200 Responsibility For Health Care Services**<br><br>The facility administrator has developed a plan to ensure provision of emergency and basic health care services to all inmates. | X | | | San Diego Central Jail has written polices and staff provided by SDSD Medical Services Division for emergency and basic health care services. |
| Clinical judgments are the sole province of the responsible physician, dentist, and psychiatrist or psychologist, respectively. | X | | | |
| Security regulations are applicable to facility staff and health care personnel. | X | | | |
| At least one physician is available. | X | | | |
| In Type IV facilities where routine health services are provided by access to the community, there is a written plan for the treatment, transfer, or referral of emergencies. *(When Type IV facilities provide health services within the facility, they must meet applicable regulations, as do other facilities.)* | | | X | This is a Type II facility. |
| **1202 Health Service Audits** *(Applicable to facilities with on-site health care staff)*<br><br>There is a written plan for annual statistical summaries of health care and pharmaceutical services that are provided. | X | | | There is an extensive Quality Improvement program in place. |
| There is a mechanism to assure that the quality and adequacy of health care services are assessed annually. | X | | | |
| There is a process for correcting identified deficiencies in the health care and pharmaceutical services delivered. | X | | | |
| Based on information from these audits, the health authority provides the facility administrator with an annual written report on health care and pharmaceutical services delivered. | X | | | |
| **1203 Health Care Staff Qualifications** *(Applicable to facilities with on-site health care staff)*<br><br>There are policies and procedures to assure that state licensing, certification, or registration requirements and restrictions that apply in the community, also apply to health care personnel in the facility. | X | | | Staff licenses on file and are current. |
| Health care staff credentials are on file at the facility or another central location where they are available for review. | X | | | |
| **1204 Health Care Procedures** *(Applicable to facilities with on-site health care staff)*<br><br>Medical care performed by personnel other than a physician, is performed pursuant to written protocol or order of the responsible physician. | X | | | Health Services Policies and Procedures are electronically available to all staff and updated annually and as needed. |

EXHIBIT V14

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| **1206.5 Management of Communicable Diseases**<br><br>There is a written plan that addresses the identification, treatment, control and follow-up management of communicable diseases. The plan reflects the current local incidence of communicable diseases which threaten the health of inmates and staff and includes: | X | | | Digital CXRs are completed for all arrestees prior to housing unless clinically contraindicated. |
| Intake health screening procedures; | X | | | |
| Identification of relevant symptoms; | X | | | |
| Referral for medical evaluation; | X | | | |
| Treatment responsibilities during incarceration; and, | X | | | |
| Coordination with public and private community-based resources for follow-up treatment. | X | | | |
| Consistent with the plan, there are policies and procedures that conform with applicable state and federal law, which include but are not limited to: | X | | | |
| The types of communicable diseases to be reported; | X | | | |
| The persons who must receive the medical reports; | X | | | |
| Sharing of medical information with inmates and custody staff; | X | | | |
| Medical procedures required to identify the presence of disease(s) and lessen the risk of exposure to others; | X | | | |
| Medical confidentiality requirements; | X | | | |
| Housing considerations based upon behavior, medical needs, and safety of the affected inmates; | X | | | Specialized housing areas;<br>2nd floor- 4 safety cells, 4 sobering cells.<br>3rd floor-17 MOB beds, 6 isolation, 30 PSU beds, 2 safety cells. 4th floor-pre-arraignment. 5th floor-post-arraignment. 6th-floor out-patient psychiatric. 7th-floor PC, Ad-Seg. 8th floor-medical, Ad-Seg. |
| Provision for inmates consent that address the limits of confidentiality; and, | X | | | |
| Reporting and appropriate action upon the possible exposure of custody staff to a communicable disease. | X | | | |
| 1207 **Medical Receiving Screening**<br><br>A receiving screening is performed on all inmates at the time of intake. *(See regulation for exception.)* | X | | | There is an initial medical triage with a second station for comprehensive medical, dental and mental health assessment. |
| This screening is completed in accordance with procedures established by the responsible physician in cooperation with the facility administrator. | X | | | |
| The screening includes, but is not limited to, medical, mental health, developmental disabilities, and communicable diseases, including, TB and other airborne diseases. | X | | | |
| The screening is performed by licensed health care staff or by trained facility staff. | X | | | |
| There is a written plan for compliance with PC§ 2656, which allows prisoners to keep prescribed orthopedic or prosthetic appliances unless an immediate risk to security has been determined. | X | | | |

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| There is a written plan to provide medical care for any inmate who appears in the need of or requests medical, mental health or developmental disability treatment. | X | | | |
| **1207.5 Special Mental Disorder Assessment** *(Not applicable Type I & IV. Type I facilities are expected to transfer these women to an appropriate facility where the assessment can occur.)*<br><br>There are written procedures for the mental health screening of women who have given birth within the past year and are charged with murder or attempted murder of their infant. Screening occurs at intake and, if postpartum psychosis is indicated, a referral for further evaluation is made. | | | X | Females are not housed at this facility. |
| **1208 Access to Treatment**<br><br>A written plan has been developed and implemented for identifying, assessing, treating and/or referring any inmate who appears to be in need of medical, mental health or developmental disability treatment at any time during incarceration. | X | | | Inmates are well oriented by multiple methods regarding how to access healthcare 24/7.<br>RN Clinics/Sick Call: 7 days per week<br>MD Clinics/Sick Call: 7 days per week<br>Specialty Clinics and Specialty Providers scheduled as clinically indicated on-site, off-site, or Telehealth as scheduled. |
| Health care personnel perform the evaluation. | X | | | |
| **1209 Transfer to a Treatment Facility** *(Not applicable Type I and IV.)*<br><br>a) There are policies and procedures to provide mental health services that include but are not limited to: | X | | | Inmates with acute mental health problems are housed at this facility in PSU/LPS. |
| 1) Screening for mental health problems; | X | | | |
| 2) Crisis intervention and management of acute psychiatric episodes; | X | | | |
| 3) Stabilization and treatment of mental disorders; and, | X | | | |
| 4) Medication support services. | X | | | |
| b) Provision is made to evaluate or transfer mentally disordered inmates to a Lanterman Petris Short treatment facility for further evaluation as provided in PC § 4011.6 or 4011.8, unless the jail contains a designated treatment facility, or has implemented PC § 1369.1. | X | | | Central Jail has a 30 bed PSU designated as LPS with 4 observation rooms. |
| c) The facility provides onsite treatment of incompetent inmate/patients pursuant to Penal Code Section 1369.1.<br>*(If yes, please complete the following)* | X | | | |
| Written policies and procedures for the involuntary administration of medications are developed by the health authority, in cooperation with the facility administrator and include, but are not limited to: | X | | | |
| Designation of licensed personnel authorized to order and administer involuntary medication. | X | | | |
| Designation of appropriate setting for involuntary administration of medication. | X | | | |
| Designation of restraint procedures and/or devices that may be used to maintain safety of the inmate and facility staff. | X | | | |

EXHIBIT V16

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| Except in emergencies, as defined in Business and Professional Code § 2397 and Title 15 § 1217, all examination, treatments and procedures affected by informed consent standards in the community are likewise observed for inmate care. | X | | | |
| For minors and conservatees, the informed consent of parent, guardian, or legal custodian applies when the law requires it.  Absent informed consent in non-emergency situations, a court order is required before involuntary treatment is done. | | | X | Minors are not housed at this facility. |
| Any inmate who has not been adjudicated to be incompetent may refuse non-emergency health care. | X | | | |
| **1215 Dental Care**<br><br>Policies and procedures ensure that emergency and medically required dental care is provided to inmates, upon request. | X | | | A dentist is onsite twice a month including restorative services as medically necessary. |
| **1216 Pharmaceutical Management**<br><br>Pharmaceutical policies, procedures, space and accessories include, but are not limited to: | X | | | |
| Securely lockable cabinets, closets and refrigeration units: | X | | | |
| A means for the positive identification of the recipient of the prescribed medication; | X | | | Inmates wear identification wristbands that include a picture and bar code for positive identification of a recipient of medication. |
| Administration/delivery of medicines to minors as prescribed; | | | X | Minors are not housed at this facility. |
| Confirmation that the recipient has ingested the medication or accounting for medication under self-administration procedures outlined in Title 15, § 1216; | X | | | |
| Documenting that prescribed medications have or have not been administered, by whom, and if not, for what reason; | X | | | |
| Prohibiting delivery of drugs by inmates; | X | | | |
| Limitation to the length of time medication may be administered without further medical evaluation; | X | | | |
| Limitation to the length of time allowable for a physician's signature on verbal orders, and, | X | | | |
| An annual written report is prepared by a pharmacist on the status of pharmacy services, and provided to the health authority and facility administrator. | X | | | |
| There are written protocols that are consistent with pharmacy laws and regulations, and limit the following functions to being performed by the identified personnel: | X | | | |
| Procurement is done only by a physician, dentist, pharmacist, or other person authorized by law. | X | | | |
| Medication storage assures that stock supplies of legend medications are accessed only by licensed health care personnel.  Supplies of legend medications that have been properly dispensed and supplies of over-the-counter medications may be accessed by both licensed and non-licensed staff. | X | | | |

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| Repackaging is done only by a physician, dentist, pharmacist, or other persons authorized by law. | X | | | |
| Labels are prepared by either licensed or non-licensed personnel, provided the label is checked and affixed to the container by the physician, dentist, or pharmacist before administration or delivery to the inmate.  Labels are prepared in accordance with Business and Professions Code § 4076. | X | | | Prescribed inhalants, creams, ear/eye drops, and over-the-counter medications may be given to a patient for self-administration and medications are labeled appropriately. |
| Dispensing is only done by a physician, dentist, pharmacist, or persons authorized by law. | X | | | |
| Administration of medication is only done by authorized and licensed health care personnel acting on the order of a prescriber. | X | | | Licensed Vocational Nurses deliver medication acting on the order of a prescriber. |
| Licensed and non-licensed personnel may deliver medication acting on the order of a prescriber. | X | | | |
| Disposal of legend medication is done accordance with pharmacy laws and regulations and requires any combination of two of the following classifications:  physician, dentist, pharmacist, or reregistered nurse.  Controlled substances are disposed of in accordance with Drug Enforcement Administration disposal procedures. | X | | | |
| There are written procedures for managing and providing over-the-counter medications, which include but are not limited to how they are made available, documentation when delivered by staff and precautions against hoarding large quantities. | X | | | |
| Policy and procedures may allow inmate self-administration of prescribed medication under limited circumstances *(see regulation text)*.  If self-administration of prescription drugs is not allowed, this subsection is "not applicable."  When allowed, policies and procedures must include but are not limited to: | X | | | |
| Medications permitted for self-administration are limited to those with no recognized abuse potential.  Medication for treating tuberculosis, psychotropic medication, controlled substances, injectables and any medications for which documentation of ingestion is essential, are excluded from self-administration. | X | | | |
| Inmates with histories of frequent rule violations of any type, or those who are found to be in violation of rules regarding self-administration, cannot participate. | X | | | |
| Prescribing health care staff must document that each inmate participating in self-administration is capable of understanding and following the rules of the program and instructions for medication use. | X | | | |
| Provisions are made for the secure storage of the prescribed medication when it is not on the inmate's person. | X | | | |

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| Provisions are made for consistent enforcement of self-medication rules by both custody and health care staff, with systems of communication among them when either one finds that an inmate is in violation of rules regarding the program. | X | | | |
| Health care staff performs documented assessments of inmate compliance with self-administration medication regimens. Compliance evaluations are done with sufficient frequency to guard against hoarding medication and deterioration of the inmate's health. | X | | | |
| **1217 Psychotropic Medications** *(Not applicable Type IV.)* There are policies and procedures governing the use of psychotropic medications. | X | | | |
| Involuntary administration of psychotropic medication is limited to emergencies. *(See Business and Professional Code § 2397 and the text of Title 15 § 1217 for definition of an emergency.)* | X | | | The 30-bed LPS unit has applicable and compliant policies and procedures for involuntary medications. |
| If psychotropic medication is administered in an emergency, such medication is only that which is required to treat the emergency condition. | X | | | |
| Medication is prescribed by a physician in written form in the inmate's record following a clinical evaluation in person or by telephone.  Verbal orders are entered in the inmate's record and signed by a physician within 72 hours. | X | | | |
| There is a protocol for supervising and monitoring inmates who are involuntarily receiving psychotropic medication. | X | | | |
| Psychotropic medication is not administered to an inmate absent an emergency unless: (1) the inmate has given his or her informed consent in accordance with WIC § 5326.2; or, (2) has been found to lack the capacity to give consent pursuant to the county's hearing procedures under the Lanterman-Petris-Short (LPS) Act for handling capacity determinations and subsequent reviews. *(Note:  Inspectors need to be aware of differing consent requirements for juveniles held in adult facilities.)* | X | | | |
| Policies limit the length of time both voluntary and involuntary psychotropic medications may be administered. | X | | | |
| There is a plan for monitoring and re-evaluating all inmates receiving psychotropic medications, including a review of all emergency situations. | X | | | |
| The administration of psychotropic medication is not allowed for disciplinary reasons. | X | | | |
| **1219 Suicide Prevention Program** There is a written suicide prevention plan designed to identify, monitor and provide treatment for those inmates who present a suicide risk. | X | | | Suicide Awareness/Suicide Prevention training is completed at least annually for all employees. |
| **1220 First Aid Kits** One or more first aid kits are available in the facility. | X | | | |

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| The responsible physician has approved the contents, number, location and procedure for periodic inspection of the kit(s). | X | | | First aid kits are regularly monitored. |
| **ARTICLE 4, RECORDS AND PUBLIC INFORMATION** | | | | |
| **1046 Death in Custody**<br><br>Written policy and procedures assure that there is a review of each in-custody death. The review team includes the facility administrator and/or manager; the health administrator; the responsible physician; and other health care and supervision staff who are relevant to the incident. | X | | | Written policy and procedure in place.<br><br>5 in-custody deaths occurred in the in past inspection year, none of them were due to suicide. Critical Incident Review Board reviewed all cases. |
| When a minor dies in a facility, the administrator of the facility provides the Corrections Standards Authority with a copy of the death in custody report that is submitted to the Attorney General under Government Code Section 12525, within 10 days of the death. | | | X | Minors are not housed at this facility. |
| **ARTICLE 5, CLASSIFICATION AND SEGREGATION** | | | | |
| **1051 Communicable Diseases**<br><br>Upon identification, all inmates with suspected communicable diseases are segregated until a medical evaluation can be completed. | X | | | Respiratory Isolation Cells are available as clinically indicated. |
| In absence of medically trained personnel at the time of intake into the facility, an inquiry is made to determine if the inmate has or has had any communicable diseases, or has observable symptoms of communicable diseases, including but not limited to tuberculosis or other airborne diseases, or other special medical problems identified by the health authority. | X | | | |
| The inmate's response is noted on the booking form and/or screening device. | X | | | |
| **1052 Mentally Disordered Inmates**<br><br>There are policies and procedures to identify and evaluate all mentally disordered inmates, with segregation provided, if necessary to protect the safety of the inmate of others. | X | | | |
| A physician's opinion is secured within 24 hours of identification or at the next daily sick call, whichever is earliest. | X | | | Psychiatrist sick call: 7 days per week. |
| **1055 Use of Safety Cell**<br><br>A safety cell, specified in Title 24, Part II, Section 1231.2.5, is used only to hold inmates who display behavior that results in the destruction of property or reveals an intent to cause physical harm to self or others. | X | | | Review of Safety Cell logs and patient medical records demonstrated compliance with policies, procedures and applicable standards. |
| There are policies and procedures, written by the facility administrator in cooperation with the responsible physician, governing safety cell use. | X | | | |
| Safety cells are not used for punishment or as a substitute for treatment. | X | | | |

**San Diego Central Jail Facility**
**1173 Front Street**
**San Diego, CA. 92101**

**Date of Inspection: 01/23/18**

**San Diego Central Jail was opened in 1998 with the current census of approximately 950 male only inmates. Special housing includes six floors and a 30-bed inpatient psychiatric unit designated as Lanterman Petris Short (LPS) bed for comprehensive mental health services including involuntary psychiatric medications when court ordered. A Jail Based Competency Program for patients identified as Incompetent to Stand Trial has been implemented.**

**Recently implemented electronic ordering and delivery for medications including scanning barcodes for patient and medication packages to ensure accuracy.**

**Recent changes to Mental Health Providers contract has improved the delivery and timeliness of mental health care.**

**There are 17 Medical Observation Beds (MOB) for post-operative care, complicated wound care, intravenous treatment and higher acuity medical care. Provider, psychiatrist and RN Clinics are provided seven days per week.**

**An innovative Enhanced Observation Housing (EOH) for suicide watch and suicide watch step down has been implemented. Additional precautions include increased frequency of suicide watch checks, removing potential risk items from cells, suicide prevention gowns, blankets, mattresses and a team approach to patient observations.**

**San Diego Central Jail meets or exceeds all applicable Title 15 Standards for Medical/Mental Health care.**

**Terry Fillman, MBA, RN, CCHP, IMQ C&D Program (909) 463-5358**

1/23/18

# I. ENVIRONMENTAL HEALTH EVALUATION

## Adult Type I, II, III and IV Facilities

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| **Article 12. Food** | | | | |
| **Approach for Providing Food Service**<br><br>*California Retail Food Code "CalCode" (HSC Division 104, Part 7, Chapter 1-13, Section 11370 et seq.) has been incorporated into Title 15 for local detention facilities through the rulemaking process*<br><br>Food served in the facility is prepared in the facility. If "No," respond to items 1 and 2 below prior to continuing with the checklist. | X | | | Food is prepared and packaged at central kitchen on the 9th floor. Food is prepared, packaged and reheated at the kitchen. |
| 1. Food is prepared at another city or county detention facility. | | X | | CENTRAL PRODUCTION KITCHEN. |
| 2. Food is contracted through a private vendor who had been inspected and complies with provisions of CalCode. | X | | | |
| **1230 Food Handlers**<br><br>*(Note: Title 15, § 1230 is in Article 11, MMH, but inspected under Environmental Health due to CalCode reference.)*<br><br>Policy and procedures have been developed and implemented for medical screening of inmate food handlers prior to working in the facility. | X | | | The Environmental Health Inspector retains primary responsibility to determine compliance with Section 1230. Compliance should be assessed in consultation with the Nutrition Inspector so that the findings on the Environmental Health Evaluation reflect the observations, expertise and consensus of both parties. |
| There are procedures for education, ongoing monitoring, and cleanliness of food handlers in accordance with CalCode. | X | | | |
| **1243 Food Service Plan**<br><br>There is a food services plan that complies with applicable California Retail Food Code (CalCode). Facilities with an average daily population of 100 or more have a trained and experienced food service manager to prepare and implement a food services plan.<br><br>The plan includes: planning menus; purchasing food; storage and inventory control; food preparation; food serving; transporting food; orientation and ongoing training; personnel supervision; budgets and food cost accounting; documentation and record keeping; emergency feeding plan; waste management; and, maintenance and repair. | Do not identify compliance with this section here. See comments. | | | The Nutrition Inspector retains primary responsibility to determine compliance with Section 1243. Compliance should be assessed in consultation with the Environmental Health Inspector so that the findings on the Nutritional Health Evaluation reflect the observations, expertise and consensus of both parties. The text of the regulation is provided here for reference only. |
| In facilities with less than 100 average daily population that do not employ or have access to a food services manager, the facility administrator has prepared a food services plan that addresses the applicable elements listed above. | | | | |

EXHIBIT V22

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| **Article 15. Facility Sanitation and Safety** | | | | |
| **1280 Facility Sanitation, Safety and Maintenance**<br><br>There are policies and procedures for the maintenance of an acceptable level of cleanliness, repair and safety throughout the facility. | X | | | |
| The plan provides for a regular schedule of housekeeping tasks and inspections to identify and correct unsanitary or unsafe conditions or work practices. | X | | | |
| Medical care housing as described in Title 24, Part 2, § 470A.2.14 is cleaned and sanitized according to policies and procedures established by the health authority. | X | | | |
| **Other Applicable Codes** | | | | |
| **Title 24, Uniform Building Code – Plumbing**<br><br>Toilet bowls, wash basins, drinking fountains, and showers are clean and in good repair. | X | | | |
| **Title 24, Uniform Building Code – Cleanliness and Repair**<br><br>Floors, walls, windows, grillwork and ceilings are clean and in good repair. | X | | | |
| **Title 24, Part 1, 13-102(c)6 – Heating and Cooling**<br><br>There is provision for a comfortable living environment in accordance with the heating, ventilating, and air conditioning requirements of Parts 2 and 4 and energy conservation requirements of Part 6, Title 24, CCR. | X | | | |
| **Title 24, Uniform Plumbing Code – Floor Drains**<br><br>Floor drains are flushed at least weekly. | X | | | |
| Traps contain water to prevent escape of sewer gas. | X | | | |
| Grids and grates are present. | X | | | |
| **Title 24, Part 2, 470A.3.6 – Lighting**<br><br>Lighting in housing units, dayrooms and activity areas is sufficient to permit easy reading by a person with normal vision. | X | | | |
| 20 foot candles light are provided at desk level and in the grooming area. *(Applicable to facilities constructed after 1980.)* | X | | | |
| Lighting is centrally controlled or occupant controlled in housing cells or rooms. | X | | | |
| Night lighting provides good vision for supervision. *(Applicable to facilities constructed after 1980.)* | X | | | |
| | | | | |
| **CA Safe Drinking Water Act**<br><br>Potable water is supplied from an approved source in satisfactory compliance with this Act. | X | | | |

EXHIBIT V23

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| **Local Ordinances**<br><br>Solid, toxic and infectious wastes are disposed of in accordance with state and local laws and regulations. | X | | | |
| **HSC § 1803**<br><br>The facility is free of vermin (or vermin signs), and general housekeeping is satisfactory. | X | | | |
| **General Industry Safety Order, Title 8-3362**<br><br>The facility is free of structural and other safety hazards. | X | | | |

Summary of environmental health evaluation:

PERMIY # FDET – 305249

SAN DIEGO CENTRAL JAIL MEETS THE ENVIRONMENTAL SECTION OF TITLE 15 REQUIREMENTS.

The following observations were made:

- 8th floor : Modules A-E – NO VIOLATIONS OBSERVED
- 7th floor: Modules A-E – NO VIOLATIONS OBSERVED
- 6th floor : Modules A-E – NO VIOLATIONS OBSERVED
- 5th floor : Modules A-E – NO VIOLATIONS OBSERVED
- 4th floor : Modules A-E – NO VIOLATIONS OBSERVED
- 3th floor : MEDICAL – NO VIOLATIONS OBSERVED
- 2th floor : NO VIOLATIONS OBSERVED
- 1th floor :NO VIOLATIONS OBSERVED

Sulmaz Soly Yakhi | Registered Environmental Health Specialist II
Department Of Environmental Health | Food & Housing Division |
5500 Overland Avenue, San Diego California 92123 | 858 926 6656

EXHIBIT V24



# County of San Diego

NICK MACCHIONE, FACHE
AGENCY DIRECTOR

HEALTH AND HUMAN SERVICES AGENCY
PUBLIC HEALTH SERVICES
3851 ROSECRANS STREET, MAIL STOP P-578
SAN DIEGO, CA 92110-3134
(619) 531-5800 • FAX (619) 542-4186

WILMA J. WOOTEN, M.D., M.P.H.
PUBLIC HEALTH OFFICER

July 01, 2019

Lt. Scott Amos
Sheriff's Standards & Compliance Office
Division of Inspection Service
P.O. Box 939062
San Diego, CA 92193-9062

Dear Lt. Amos,

Enclosed is the FY 18/19 Title 15 Inspection Reports for:

- San Diego Central Jail

We have reviewed the inspections completed by the Institute for Medical Quality (Medical/Mental Health (MMH), Nutrition) and the Department of Environmental Health (DEH). This facility passed the Nutrition inspection, thus meeting Title 15 requirements in these that area. However, during the MMH and DEH inspection, items needing repairs/corrections were listed in the narrative at the end of each report. We have requested a Corrective Action Plan (CAP) that details how San Diego Central Jail (SDCJ) addressed, or will be addressing, those repairs/corrections. We will review the CAP after it is completed to ensure that SDCJ has addressed the suggestions made by the IMQ and DEH inspectors. We appreciate the cooperation received from your facility staff involved in the completion of these reports.

Sincerely,

WILMA J. WOOTEN, M.D., M.P.H.
Public Health Officer
Director, Public Health Services

BRUCE COON, MSN, RN, PHN
Quality Assurance Specialist (Nurse)
Public Health Services

cc: Sgt. Joe Navarro, San Diego Sheriff's Department

EXHIBIT V25

# III. MEDICAL/MENTAL HEALTH EVALUATION

## Adult Type I, II, III and IV Facilities

## San Diego Central Jail

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| | **Article 11. Health Services** | | | |
| **1200 Responsibility for Health Care Services** In Type I, II, III and IV facilities, the facility administrator shall have the responsibility to ensure provision of emergency and basic health care services to all inmates. | X | | | Medical services are provided by San Diego county nurses. A contract with Coastal Medical provides for physicians and nurse practitioners. There is a medical director on site. Currently there is no CMO. |
| Medical, dental, and mental health matters involving clinical judgments are the sole province of the responsible physician, dentist, and psychiatrist or psychologist respectively. | X | | | |
| Security regulations applicable to facility personnel also apply to health personnel. | X | | | |
| Each facility shall have at least one physician available to treat physical disorders. | X | | | |
| In Type IV facilities, compliance may be attained by providing access into the community: however, in such cases, there shall be a written plan for the treatment, transfer, or referral in the event of an emergency. | X | | | This is a Type II facility. |
| In court holding and temporary holding facilities, the facility administrator shall have the responsibility to develop written policies and procedures which ensure provision of emergency health care services to all inmates. | X | | | |
| **1202 Health Service Audits** The health authority shall develop and implement a written plan for annual statistical summaries of health care and pharmaceutical services that are provided. | X | | | There is an extensive Quality Improvement program in place, with meetings taking place quarterly. |
| The responsible physician shall also establish a mechanism to assure that the quality and adequacy of these services are assessed annually. | X | | | |
| The plan shall include a means for the correction of identified deficiencies of the health care and pharmaceutical services delivered. | X | | | |
| Based on information from these audits, the health authority shall provide the facility administrator with an annual written report on health care and pharmaceutical services delivered. | X | | | |
| **1203 Health Care Staff Qualifications** State and/or local licensure and/or certification requirements and restrictions, including those defining the recognized scope of practice specific to the profession, apply to health care personnel working in the facility the same as to those working in the community. | X | | | Staff licenses are on file and are current. |
| Copies of licensing and/or certification credentials shall be on file in the facility or at a central location where they are available for review. | X | | | |
| **1204 Health Care Procedures** Health care performed by personnel other than a physician shall be performed pursuant to written protocol or order of the responsible health care staff. | X | | | |

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| (r) provisions for timely and appropriate medical and mental health screenings, access to medical and mental health services, and no-cost access to contraception and STD treatment, for inmates who have reported sexual abuse or sexual harassment, regardless of the location where the incident(s) occurred. | X | | | |
| **1206.5 Management of Communicable Diseases** (a) The responsible physician, in conjunction with the facility administrator and the county health officer, shall develop a written plan to address the identification, treatment, control and follow-up management of tuberculosis and other communicable diseases. | X | | | Digital CXRs are completed for all arrestees prior to housing unless clinically contraindicated. |
| The plan shall cover the intake screening procedures, identification of relevant symptoms, referral for a medical evaluation, treatment responsibilities during incarceration and coordination with public health officials for follow-up treatment in the community. | X | | | |
| The plan shall reflect the current local incidence of communicable diseases which threaten the health of inmates and staff. | X | | | |
| (b) Consistent with the above plan, the health authority shall, in cooperation with the facility administrator and the county health officer, set forth in writing, policies and procedures in conformance with applicable state and federal law, which include, but are not limited to: | X | | | |
| (1) The types of communicable diseases to be reported; | X | | | |
| (2) The persons who shall receive the medical reports; | X | | | |
| (3) Sharing of medical information with inmates and custody staff; | X | | | |
| (4) Medical procedures required to identify the presence of disease(s) and lessen the risk of exposure to others; | X | | | |
| (5) Medical confidentiality requirements; | X | | | |
| (6) Housing considerations based upon behavior, medical needs, and safety of the affected inmates; | X | | | Specialized housing areas;<br>2nd floor- 4 safety cells, 4 sobering cells.<br>3rd floor-17 MOB beds + 3 Hemodialysis beds, 6 negative flow cells, 30 PSU beds, 2 safety cells.<br>6th 20 EOH beds, JBCT-32 beds with six on the waiting list<br>7th-floor PC<br>8th floor A/B house inmate workers, D houses inmates with medical DME's such as wheelchair, walker, cane, casts, etc. |
| (7) Provision for inmate consent that address the limits of confidentiality; and, | X | | | |
| (8) Reporting and appropriate action upon the possible exposure of custody staff to a communicable disease. | X | | | |
| **1207 Medical Receiving Screening** With the exception of inmates transferred directly within a custody system with documented receiving screening, a screening shall be completed on all inmates at the time of intake | X | | | A minimum of two RN's are posted in the booking area and complete comprehensive intake screenings on all bookings. This includes medical questions asked of the arresting officer reference anything that may have happened during the arrest and includes obtaining the officer's badge number. |

EXHIBIT V27

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| This screening shall be completed in accordance with written procedures and shall include but not be limited to medical and mental health problems, developmental disabilities, tuberculosis and other communicable diseases. | X | | | |
| The screening shall be performed by licensed health personnel or trained facility staff, with documentation of staff training regarding site specific forms with appropriate disposition based on responses to questions and observations made at the time of screening. | X | | | |
| The training depends on the role staff are expected to play in the receiving screening process. | X | | | |
| The facility administrator and responsible physician shall develop a written plan for complying with Penal Code Section 2656 (orthopedic or prosthetic appliance used by inmates). | X | | | |
| There shall be a written plan to provide care for any inmate who appears at this screening to be in need of or who requests medical, mental health, or developmental disability treatment. | X | | | |
| Written procedures and screening protocol shall be established by the responsible physician in cooperation with the facility administrator. | X | | | |
| **1207.5 Special Mental Disorder Assessment** An additional mental health screening will be performed, according to written procedures, on women who have given birth within the past year and are charged with murder or attempted murder of their infants. Such screening will be performed at intake and if the assessment indicates postpartum psychosis a referral for further evaluation will be made. | X | | | Females are not housed at this facility. |
| **1208 Access to Treatment** The health authority, in cooperation with the facility administrator, shall develop a written plan for identifying and/or referring any inmate who appears to be in need of medical, mental health or developmental disability treatment at any time during his/her incarceration subsequent to the receiving screening. | X | | | Inmates are well oriented by multiple methods regarding how to access healthcare 24/7.<br>RN Clinics/Sick Call: 7 days per week<br>NP Clinic / Sick Call: 7 days per week<br>MD Clinics/Sick Call: 7 days per week<br>Specialty Clinics and Specialty Providers scheduled as clinically indicated on-site via telemedicine, or off-site when needed. |
| The written plan shall also include the assessment and treatment of such inmates as described in Title 15, Section 1207, Medical Receiving Screening. | X | | | |
| Assessment and treatment shall be performed by either licensed health personnel or by persons operating under the authority and/or direction of licensed health personnel. | X | | | |
| **1208.5. Health Care Maintenance** For inmates undergoing prolonged incarceration, an age appropriate and risk factor based health maintenance visit shall take place within the inmate's second anniversary of incarceration. | X | | | |
| The specific components of the health maintenance examinations shall be determined by the responsible physician based on the age, gender, and health of the inmate. | X | | | |
| Thereafter, the health maintenance examinations shall be repeated at reasonable intervals as determined by the responsible physician. | X | | | |

EXHIBIT V28

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| **1213 Detoxification Treatment** The responsible physician shall develop written medical policies on detoxification which shall include a statement as to whether detoxification will be provided within the facility or require transfer to a licensed medical facility. The facility detoxification protocol shall include procedures and symptoms necessitating immediate transfer to a hospital or other medical facility. | X | | | Detoxification protocols are in place and make provision for the inmate to begin receiving necessary assessments, medications, treatments and immediate transfer to a hospital when clinically indicated. Beginning in June of this year there will be a designated CIWA/COWS housing unit. Currently there are an average of 60 inmates each day on detox protocols. |
| Facilities without medically licensed personnel in attendance shall not retain inmates undergoing withdrawal reactions judged or defined in policy, by the responsible physician, as not being readily controllable with available medical treatment. Such facilities shall arrange for immediate transfer to an appropriate medical facility. | X | | | |
| **1214 Informed Consent** The health authority shall set forth in writing a plan for informed consent of inmates in a language understood by the inmate. | X | | | Informed consents and refusals are maintained in the medical record. |
| Except for emergency treatment, as defined in Business and Professions Code Section 2397 and Title 15, Section 1217, all examinations, treatments and procedures affected by informed consent standards in the community are likewise observed for inmate care. | X | | | |
| In the case of minors, or conservatees, the informed consent of parent, guardian or legal custodian applies where required by law. Any inmate who has not been adjudicated to be incompetent may refuse non-emergency medical and mental health care. | X | | | |
| Absent informed consent in non-emergency situations, a court order is required before involuntary medical treatment can be administered to an inmate. | X | | | |
| **1215 Dental Care** The facility administrator shall develop written policies and procedures to ensure emergency and medically required dental care is provided to each inmate, upon request, under the direction and supervision of a dentist, licensed in the state. | X | | | A dentist is onsite every first and third Wednesday. |
| **1216 Pharmaceutical Management** (a) The health authority in consultation with a pharmacist and the facility administrator, shall develop written plans, establish procedures, and provide space and accessories for the secure storage, the controlled administration, and disposal of all legally obtained drugs. Such plans, procedures, space and accessories shall include, but not be limited to, the following: | X | | | |
| (1) Securely lockable cabinets, closets and refrigeration units: | X | | | |
| (2) A means for the positive identification of the recipient of the prescribed medication; | X | | | Inmates wear identification wristbands that include a picture and bar code for positive identification of a recipient of medication. |
| (3) Procedures for administration/delivery of medicines to inmates as prescribed; | X | | | |

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| (4) Confirming that the recipient has ingested the medication or accounting for medication under self-administration procedures outlined in Title 15, Section 1216(d); | X | | | |
| (5) That prescribed medications have or have not been administered, by whom, and if not, for what reason; | X | | | |
| (6) Prohibiting the delivery of drugs by inmates; | X | | | |
| (7) Limitation to the length of time medication may be administered without further medical evaluation; and, | X | | | |
| (8) Limitation to the length of time required for a physician's signature on verbal orders. | X | | | |
| (9) A written report shall be prepared by a pharmacist, no less than annually, on the status of pharmacy services in the institution. The pharmacist shall provide the report to the health authority and the facility administrator. | X | | | |
| (b) Consistent with pharmacy laws and regulations, the health authority shall establish written protocols that limit the following functions to being performed by the identified personnel: | X | | | |
| (1) Procurement shall be done by a physician, dentist, pharmacist, or other persons authorized by law. | X | | | |
| (2) Storage of medications shall assure that stock supplies of legend medications shall be accessed only by licensed health personnel. Supplies of legend medications that have been dispensed and supplies of over-the-counter medications may be accessed by either licensed or non-licensed personnel. | X | | | |
| (3) Repackaging shall only be done by a physician, dentist, pharmacist, or other persons authorized by law. | X | | | |
| (4) Preparation of labels can only be done by a physician, dentist, pharmacist or other persons, either licensed or non-licensed, provided the label is checked and affixed to the medication container by the physician, dentist, or pharmacist before administration or delivery to the inmate. Labels shall be prepared in accordance with section 4076, Business and Professions Code. | X | | | The only KOP medications provided inmates are inhalers or NTG, and they are prescribed as such by a physician and monitored closely. If an inmate is prescribed Tylenol or Advil, they may request their dose at pill call and keep only two of either on their person to take as needed. |
| (5) Dispensing shall only be done by a physician, dentist, pharmacist, or persons authorized by law. | X | | | |
| (6) Administration of medication shall only be done by licensed health personnel who are authorized to administer medication acting on the order of a prescriber. | X | | | LVN's administer medication acting on the order of a prescriber. |

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| (7) Delivery of medication may be done by either licensed or non-licensed personnel, e.g., custody staff, acting on the order of a prescriber. | X | | | |
| (8) Disposal of legend medication shall be done in accordance with pharmacy laws and regulations and requires any combination of two of the following classifications: physician, dentist, pharmacist, or registered nurse. Controlled substances shall be disposed of in accordance with the Drug Enforcement Administration disposal procedures. | X | | | |
| (c) Policy and procedures on "over-the-counter" medications shall include, but not be limited to, how they are made available, documentation when delivered by staff and precautions against hoarding large quantities. | X | | | |
| (d) Policy and procedures may allow inmate self-administration of prescribed medications under limited circumstances. Policies and procedures shall include but are not limited to the following considerations: | X | | | |
| (1) Medications permitted for self-administration are limited to those with no recognized abuse potential. Medications for treatment of tuberculosis, psychotropic medication, controlled substances, injectables and any medications for which documentation of ingestion is essential are excluded from self-administration. | X | | | |
| (2) Inmates with histories of frequent rule violations of any type, or who are found to be in violation of rules regarding self-administration, are excluded from self-administration. | X | | | |
| (3) Prescribing health care staff document that each inmate participating in self-administration is capable of understanding and following the rules of the program and instructions for medication use. | X | | | |
| (4) Provisions are made for the secure storage of the prescribed medication when it is not on the inmate's person. | X | | | |
| (5) Provisions are made for the consistent enforcement of self-medication rules by both custody and health care staff, with systems of communication among them when either one finds that an inmate is in violation of rules regarding self-administration. | X | | | |
| (6) Provisions are made for health care staff to perform documented assessments of inmate compliance with self-administration medication regimens. Compliance evaluations are done with sufficient frequency to guard against hoarding medication and deterioration of the inmate's health. | X | | | |

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| (g) Provisions for reporting suicides and suicides attempts. | X | | | |
| (h) Multi-disciplinary administrative review of suicides and attempted suicides as defined by the facility administrator. | X | | | |
| **ARTICLE 5, CLASSIFICATION AND SEGREGATION** | | | | |
| **1051 Communicable Diseases** The facility administrator, in cooperation with the responsible physician, shall develop written policies and procedures specifying those symptoms that require segregation of an inmate until a medical evaluation is completed. | X | | | |
| At the time of intake into the facility, an inquiry shall be made of the person being booked as to whether or not he/she has or has had any communicable diseases, such as tuberculosis or has observable symptoms of tuberculosis or any other communicable diseases, or other special medical problem identified by the health authority. | X | | | |
| The response shall be noted on the booking form and/or screening device. | X | | | |
| **1052 Mentally Disordered Inmates** The facility administrator, in cooperation with the responsible physician, shall develop written policies and procedures to identify and evaluate all mentally disordered inmates, and may include telehealth. If an evaluation from medical or mental health staff is not readily available, an inmate shall be considered mentally disordered for the purpose of this section if he or she appears to be a danger to himself/herself or others or if he/she appears gravely disabled. | X | | | |
| An evaluation from medical or mental health staff shall be secured within 24 hours of identification or at the next daily sick call, whichever is earliest. Segregation may be used if necessary to protect the safety of the inmate or others. | X | | | Psychiatrist sick call: 7 days per week. |
| **1055 Use of Safety Cell** The safety cell described in Title 24, Part 2, Section 1231.2.5, shall be used to hold only those inmates who display behavior which results in the destruction of property or reveals an intent to cause physical harm to self or others | X | | | Review of Safety Cell logs and patient medical records demonstrated compliance with policies, procedures and applicable standards. |
| The facility administrator, in cooperation with the responsible physician, shall develop written policies and procedures governing safety cell use and may delegate authority to place an inmate in a safety cell to a physician. | X | | | |
| In no case shall the safety cell be used for punishment or as a substitute for treatment. | X | | | |
| An inmate shall be placed in a safety cell only with the approval of the facility manager or designee, or responsible health care staff; continued retention shall be reviewed a minimum of every four hours. | X | | | |
| A medical assessment shall be completed within a maximum of 12 hours of placement in the safety cell or at the next daily sick call, whichever is earliest. The inmate shall be medically cleared for continued retention every 24 hours thereafter. | X | | | |

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| (2) A pregnant inmate in labor, during delivery, or in recovery after delivery, shall not be restrained by the wrists, ankles, or both, unless deemed necessary for the safety and security of the inmate, the staff, or the public. | | | X | |
| (3) Restraints shall be removed when a professional who is currently responsible for the medical care of a pregnant inmate during a medical emergency, labor, delivery, or recovery after delivery determines that the removal of restraints is medically necessary. | | | X | |
| (4) Upon confirmation of an inmate's pregnancy, she shall be advised, orally or in writing, of the standards and policies governing pregnant inmates. | | | X | |

Summary of Medical/Mental Health Evaluation:

San Diego Central Jail was opened in 1998 with s BSCC rated capacity of 946. The ADP is 987. The population on the day of the inspection was 1027. This jail serves as the primary point of intake for male prisoners in San Diego County. There are over 45,000 bookings per year. Booking nurses interview between 60-80 bookings per shift.
There is a 30-bed inpatient psychiatric unit designated as a Lanterman Petris Short (LPS) bed for comprehensive mental health services including involuntary psychiatric medications when court ordered. A Jail Based Competency Training (JBCT) program for patients identified as Incompetent to Stand Trial has been implemented.

There are 17 Medical Observation Beds (MOB) for post-operative care, complicated wound care, intravenous treatment and higher acuity medical care. Provider, psychiatrist and RN Clinics are provided seven days per week.

An innovative Enhanced Observation Housing (EOH) with 17 beds for suicide watch and suicide watch step down is in place. Additional precautions include increased frequency of suicide watch checks, removing potential risk items from cells, suicide prevention gowns, blankets, mattresses and a team approach to patient observations.

The medical department is spacious and encompasses multiple units. All sick call is provided here. There are two nursing supervisors, four charge nurses, 50 RN's and 14 LVN's as well as multiple ancillary personnel. Thirteen RN's and four LVN's work 10-hour shifts. All are CPR and AED certified. Prehospital trauma and Advanced Medical Life Support certification training is available and encouraged. CCHP is not required but also encouraged. There are vacancies for a CMO, two RN's and one LVN. Nurses are skills tested annually, with the training unit providing unannounced man-down and disaster drills annually, or more often. RN's currently use standardized procedures; however, in the near future these are changing to Nursing Assessment Protocols. Regular pet therapy is provided to MH inmates as well as any others who may benefit from animal interaction.

Beginning this month, a public health nurse will be a ful- time addition to the booking staff to offer Hepatitis A, and other, vaccinations to the inmate population. It is a year-long pilot program that is expected to continue.

Multiple officers were interviewed throughout the jail tour. All were invested in their jobs, well-trained, and dedicated in providing care to the inmates.

Thanks to the two sergeants and two supervising RN's who made themselves available to me in this very impressive jail. All are very knowledgeable and clearly dedicated to this program. There is an impressive relationship between medical and custody staff to ensure outstanding care to inmates housed here.

Valerie Tennessen, RN, CLNC\
IMQ Surveyor
April 3, 2019

–Valerie Tennessen, RN, CLNC

# I. ENVIRONMENTAL HEALTH EVALUATION

## Adult Type I, II, III and IV Facilities

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| **Article 12. Food** | | | | |
| **Approach for Providing Food Service**<br><br>*California Retail Food Code "CalCode" (HSC Division 104, Part 7, Chapter 1-13, Section 11370 et seq.) has been incorporated into Title 15 for local detention facilities through the rulemaking process.*<br><br>Food served in the facility is prepared in the facility. If "No," respond to items 1 and 2 below prior to continuing with the checklist. | X | | | Food is prepared and packaged at central kitchen on the 9th floor. |
| 1. Food is prepared at another city or county detention facility. | | X | | Central Production Kitchen |
| 2. Food is contracted through a private vendor who had been inspected and complies with provisions of CalCode. | X | | | |
| **1230 Food Handlers**<br><br>*(Note: Title 15, § 1230 is in Article 11, MMH, but inspected under Environmental Health due to CalCode reference.)*<br><br>Policy and procedures have been developed and implemented for medical screening of inmate food handlers prior to working in the facility. | X | | | The Environmental Health Inspector retains primary responsibility to determine compliance with Section 1230. Compliance should be assessed in consultation with the Nutrition Inspector so that the findings on the Environmental Health Evaluation reflect the observations, expertise and consensus of both parties. |
| There are procedures for education, ongoing monitoring, and cleanliness of food handlers in accordance with CalCode. | X | | | |
| **1243 Food Service Plan**<br><br>There is a food services plan that complies with applicable California Retail Food Code (CalCode). Facilities with an average daily population of 100 or more have a trained and experienced food service manager to prepare and implement a food services plan.<br><br>The plan includes: planning menus; purchasing food; storage and inventory control; food preparation; food serving; transporting food; orientation and ongoing training; personnel supervision; budgets and food cost accounting; documentation and record keeping; emergency feeding plan; waste management; maintenance and repair; and, three-day mainline sample tray. | Do not identify compliance with this section here. See comments. | | | The Nutrition Inspector retains primary responsibility to determine compliance with Section 1243. Compliance should be assessed in consultation with the Environmental Health Inspector so that the findings on the Nutritional Health Evaluation reflect the observations, expertise and consensus of both parties. The text of the regulation is provided here for reference only. |
| In facilities with less than 100 average daily population that do not employ or have access to a food services manager, the facility administrator has prepared a food services plan that addresses the applicable elements listed above. | | | | |

EXHIBIT V34

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| Any mattress purchased for issue to an inmate in a facility which is locked to prevent unimpeded access to the outdoors, is certified by the manufacturer as meeting all requirements of the State Fire Marshal and Bureau of Home Furnishings for penal mattresses at the time of purchase. | X | | | |
| **Article 15. Facility Sanitation and Safety** | | | | |
| **1280 Facility Sanitation, Safety and Maintenance**<br><br>There are policies and procedures for the maintenance of an acceptable level of cleanliness, repair and safety throughout the facility. | X | | | |
| The plan provides for a regular schedule of housekeeping tasks and inspections to identify and correct unsanitary or unsafe conditions or work practices. | X | | | |
| Medical care housing as described in Title 24, Part 2, § 470A.2.14 is cleaned and sanitized according to policies and procedures established by the health authority. | X | | | |
| **Other Applicable Codes** | | | | |
| **Title 24, Uniform Building Code – Plumbing**<br><br>Toilet bowls, wash basins, drinking fountains, and showers are clean and in good repair. | X | | | |
| **Title 24, Uniform Building Code – Cleanliness and Repair**<br><br>Floors, walls, windows, grillwork and ceilings are clean and in good repair. | X | | | |
| **Title 24, Part 1, 13-102(c)6 – Heating and Cooling**<br><br>There is provision for a comfortable living environment in accordance with the heating, ventilating, and air conditioning requirements of Parts 2 and 4 and energy conservation requirements of Part 6, Title 24, CCR. | X | | | |
| **Title 24, Uniform Plumbing Code – Floor Drains**<br><br>Floor drains are flushed at least weekly. | X | | | |
| Traps contain water to prevent escape of sewer gas. | X | | | |
| Grids and grates are present. | X | | | |
| **Title 24, Part 2, 470A.3.6 – Lighting**<br><br>Lighting in housing units, dayrooms and activity areas is sufficient to permit easy reading by a person with normal vision. | X | | | |
| 20 foot candles light are provided at desk level and in the grooming area. *(Applicable to facilities constructed after 1980.)* | X | | | |
| Lighting is centrally controlled or occupant controlled in housing cells or rooms. | X | | | |
| Night lighting provides good vision for supervision. *(Applicable to facilities constructed after 1980.)* | X | | | |

EXHIBIT V35

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| **CA Safe Drinking Water Act**<br><br>Potable water is supplied from an approved source in satisfactory compliance with this Act. | X | | | Municipal source |
| **Local Ordinances**<br><br>Solid, toxic and infectious wastes are disposed of in accordance with state and local laws and regulations. | X | | | |
| **HSC § 1803**<br><br>The facility is free of vermin (or vermin signs), and general housekeeping is satisfactory. | X | | | |
| **General Industry Safety Order, Title 8-3362**<br><br>The facility is free of structural and other safety hazards. | X | | | |

Summary of environmental health evaluation:

Permit# DEH2002-FDET-301647

The following observations were made:

8th floor: Modules A-E – No Violations Observed
7th floor: Modules A-E – No Violations Observed
6th floor: Modules A-E – No Violations Observed
5th floor: Modules A-E – No Violations Observed
4th floor: Modules A-E – No Violations Observed
3rd floor: Medical – No Violations Observed
2nd floor: No Violations Observed
1st floor: No Violations Observed

Craig Cameon, Registered Environmental Health Specialist III
San Diego Department of Environmental Health
Food and Housing Division
5500 Overland Ave, San Diego Ca 92123

# Exhibit W

BSCC CALIFORNIA

STATE OF CALIFORNIA

BOARD OF STATE AND COMMUNITY CORRECTIONS

2590 VENTURE OAKS WAY, SUITE 200 SACRAMENTO CA 95833 916 445 5073 BSCC.CA.GOV

LINDA M. PENNER
*Chair*

KATHLEEN T. HOWARD
*Executive Director*

EDMUND G. BROWN JR.
*Governor*

September 24, 2018

William D. Gore, Sheriff
San Diego County Sheriff's Department
9621 Ridgehaven Court
San Diego, CA 92123

2016-2018 BIENNIAL INSPECTION – PENAL CODE SECTION 6031 WELFARE INSITITUTION CODE 209

Dear Sheriff Gore:

During May 2 thru May 31,2018, the Board of State and Community Corrections (BSCC) conducted the 2016-2018 biennial inspection of the San Diego County Sheriff's Detention Facilities:

*Type II*

| Facility: | BSCC#: |
|---|---|
| San Diego Central Jail | 4381 |
| Las Colinas Women's Detention Facility | 4402 |
| Facility #8 | 4410 |
| South Bay Detention Facility | 4420 |
| George Bailey Detention Facility | 4430 |
| East Mesa Re-Entry Facility | 4435 |
| Vista Detention Facility | 4440 |

*Type IV*

| Facility: | BSCC#: |
|---|---|
| Work Furlough/Correctional Alternatives | 4600 |

*Temporary Holding Facilities*

| Station: | BSCC#: |
|---|---|
| Poway Station (PS) | 4465 |
| Fallbrook | 4468 |
| Valley Center | 4470 |
| Rancho | 4482 |
| Pine Valley | 4483 |

EXHIBIT W1

*Title 24, CCR – Physical Plant*

*System Wide*

The public areas were clean and the grounds were well maintained. We found similar conditions in dayrooms, and the program/recreational areas. The health care services, food services, and laundry service areas also appeared orderly and very clean. Stations and court facilities were just as clean and maintained.

*Type II*

**San Diego Central Jail**
Completed in 1998, San Diego Central Jail is evaluated as a Type II facility using the 1994 and 2008 Minimum Standards for Local Detention Facilities that were in effect at the time of original construction and when various areas were remodeled or additions made to the facility. The facility has a BSCC Rated Capacity of 945, and with 980 actual beds, there were 916 male inmates in custody at the time of the inspection. The facility was clean and appeared well maintained. No issues of non-compliance with Title 15 regulations were identified. Nine beds added to each of four dorms in Level 8 Housing results the following issue of non-compliance with Title 24 standards:

- **1231.2.7 Double Occupancy cell**: 4th and 5th floor's pods have three bunks in a double bunk cell. Housing unit 4B, 4C and 5 floors had (3) three inmates sleeping inside of cell).

**George Bailey Detention Facility**
Completed in 1989, George Bailey Detention Facility is evaluated as a Type II facility using the 1988, 1994 and 2001 Minimum Standards for Local Detention Facilities that were in effect at the time of original construction and when various areas were remodeled or added to the facility. The facility has a BSCC RC of 1380, and with 1852 actual beds, there were 1527 male inmates in custody at the time of the inspection. The facility was clean and appeared well maintained. As a result of crowding, the following issues of non-compliance Title 24 standards were identified:

- **1231.2.7 Double Occupancy Cell**: 3rd, 4th, 5th and 6th floors have three bunks in a double bunk cell. Several cells were being shared by (3) three inmates.
- **1231.2.8: Dormitories**: Nine bunks were added to each dormitory.
- **1231.2.9 Dayroom**: Not enough table and chairs.
- **1231.3.1: Toilets-Urinals**: Not enough toilets in dormitories.
- **Section 470A.3.2: Washbasins**: Not enough washbasins in dormitories.

**East Mesa Reentry Facility**
Completed in 1991, the East Mesa Detention Facility was renamed East Mesa Reentry Facility in 2013 to better identify its purpose. The facility is evaluated as a Type II facility using the 1994, 2001 and 2008 Minimum Standards for Local Detention Facilities that were in effect at the time of original construction and when various areas were remodeled or additions made to the facility. With the completion the 400-bed expansion project which will include additional classroom space, the facility has a BSCC RC of 760. With 962 actual beds, there were 744 male inmates in custody at the time of the inspection. The facility was clean and appeared well maintained. No issues of non-compliance with Title 24 regulations were identified.

EXHIBIT W2

**Corrective Action Plan:**

Should efforts be made to remedy these issues, please let us know by November 5, 2018.

This concludes our inspection report for the 2016 – 2018 inspection cycles. I would like to thank everyone involved in the inspection process for the hospitality and courtesy they extended during the inspection. If I could be of further assistance to you or your agency, please do not hesitate to call me at (916) 324-9861 or email me at [illegible]

Sincerely,

Michael J. Bush
Field Representative
Facilities, Standards and Operations Division

Enclosures

cc County Administrator, San Diego County*
Chair, Board of Supervisors, San Diego County*
Presiding Judge, Superior Court, San Diego County*
Grand Jury Foreman, Superior Court, San Diego County*
Assistant Sheriff John Ingrassia, Detentions
Assistant Sheriff Larry Nesbit, Court Detentions
Commander Will Brown, Detention*
Commander Mike Hernandez, Detention*
Commander Frank Clamer, Detentions*
Commander John Maryon, Court Services*

* Copies of the complete report are available on BSCC website

| TITLE 15 SECTION | SDCJ | LCWD | SBDF | GBDF | EMRF | VDF | FAC8 | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|
| The review team includes the facility administrator and/or manager; the health administrator; the responsible physician; and other health care and supervision staff who are relevant to the incident. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | |
| When a minor dies in a facility, the administrator of the facility provides the Board of State and Community Corrections with a copy of the death in custody report that is submitted to the Attorney General[4], within 10 days of the death. *Note: Reference Government Code § 12525* | NA | NA | NA | NA | NA | NA | NA | |
| **1050 CLASSIFICATION PLAN** The facility has a written classification plan designed to properly assign inmates to housing units and activities. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | DSM: R.1 A bureau-wide computerized system (JIMS) includes a classification component which stores required information. |
| Includes receiving screening performed at intake by trained personnel. | Yes | Yes | NA | NA | NA | Yes | NA | |
| Includes maintenance of a record of each inmate's classification level, housing restrictions and housing assignments. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | |
| The facility has an actively functioning classification system and/or classification committee as specified. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | |
| The classification plan includes a channel of appeal by the inmate to the facility manager. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | DSM: N.1 |
| Inmates sentenced to more than 60 days may request a review no more than 30 days from the last review. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | |
| **1051 COMMUNICABLE DISEASES** Upon identification the facility segregates all inmates with suspected communicable diseases until a medical evaluation can be completed. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | DSM: M.37 |

[4] Government Code § 12525

| TITLE 15 SECTION | SDCJ | LCWD | SBDF | GBDF | EMRF | VDF | FAC8 | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|
| In absence of medically trained personnel at the time of intake into the facility, an inquiry is made to determine if the inmate has or has had any communicable diseases, or has observable symptoms of communicable diseases, including but not limited to tuberculosis or other airborne diseases, hepatitis, or other special medical problems identified by the health authority. | Yes | Yes | NA | NA | NA | Yes | NA | DSM: M.9<br><br>Screening is completed at intake by medical staff with documentation in JIMS triage screen. |
| Inmate's response is noted on booking form and/or screening device. | Yes | Yes | NA | NA | NA | Yes | NA | Reviewed medical documentation at each intake facility. |
| **1052 MENTALLY DISORDERED INMATES**<br><br>There are written policies and procedures for the identification and evaluation of all mentally disordered inmates. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | DSM: M.9 & J.7 |
| An evaluation by health care staff occurs within 24 hours of identification or at the next daily sick call, whichever is earliest. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | DSM: M.9 I & J.7 |
| Segregation may be used if necessary to protect the safety of the inmate or others. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | |
| There are provisions for transfer of such inmates to a medical facility for diagnosis, treatment, and evaluation of such suspected mental disorder, pursuant to Section 1209, Title 15, CCR. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | DSM: J.7 II |
| **1053 ADMINISTRATIVE SEGREGATION**<br><br>There are written policies and procedures which provide for administrative segregation of inmates who are determined to be prone to: escape; assault staff or other inmates; disrupt operations of the jail; or, are likely to need protection from other inmates. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | DSM: J.3 II |
| The administrative segregation consists of separate and secure housing with no deprivation of privileges other than those necessary to obtain the objective of protecting inmates and staff. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | DSM: J.3 II A |

EXHIBIT W5

BSCC CALIFORNIA

STATE OF CALIFORNIA

BOARD OF STATE AND COMMUNITY CORRECTIONS

2590 VENTURE OAKS WAY, SUITE 200 ♦ SACRAMENTO CA 95833 ♦ 916.445.5073 ♦ BSCC.CA.GOV

LINDA M. PENNER
*Chair*

KATHLEEN T. HOWARD
*Executive Director*

GAVIN NEWSOM
*Governor*

December 7, 2020

Sheriff William Gore
San Diego County Sheriff's Office
9621 Ridgehaven Ct.
San Diego, Ca 92123

**2018-2020 BIENNIAL INSPECTION – SAN DIEGO COUNTY JAILS - PENAL CODE SECTION 6031**

Dear Sheriff Gore,

On June 25, 2020 (Pursuant to Penal Code section 6031.1, Welfare and Institutions Code sections 209 and 855) Board of State and Community Corrections (BSCC) staff conducted the 2018-2020 biennial inspection of the San Diego County Adult Jail System, via a remote desk audit.

This inspection was performed to determine compliance with the Minimum Standards for Local Detention Facilities as outlined in Titles 15 and 24, California Code of Regulations. In addition, BSCC staff conducted compliance monitoring pursuant to Welfare and Institutions Code Section 209(f) for the Federal Juvenile Justice and Delinquency Prevention Act (JJDPA) for the separation requirements of juveniles from incarcerated adults.

Due to the Coronavirus Pandemic and the issuance of statewide and local shelter-in-place orders, BSCC staff were prohibited from traveling and were unable to complete the on-site portion of the inspection. BSCC staff conducted a virtual inspection via desk audit of all facilities originally scheduled for inspection during this timeframe. Desk audits are comprised of a comprehensive review of all applicable policies and procedures and associated documentation to support that practices meet the agency policies. BSCC staff intend to conduct comprehensive onsite inspections of all local detention facilities as soon as travel restrictions are no longer in effect.

During the desk audit, I was provided with electronic files containing a sample of documentation for each of the jail facilities as follows: facility safety checks, exercise and recreation logs, safety cell placements, discipline records, grievances, local inspection reports, fire suppression pre-planning and inspections, suicide prevention, incident reports, restraint device documentation, the inmate orientation handbook and access to all agency policies, procedures, and post orders.

The BSCC inspection report consists of this transmittal letter and the attached Title 15 Procedure checklist.

**Juvenile Justice and Delinquency Prevention Act Compliance Monitoring**

In accordance with the JJDPA, BSCC monitors jail facilities for compliance with one of four core requirements of the Act: Separation of Juveniles from Incarcerated Adults. Minors are not housed or supervised in these facilities; therefore, no violations of the JJDPA were identified.

This concludes our inspection report for the 2018-2020 inspection cycle. We would like to express our gratitude to all involved, specifically to Sergeant Joseph Navarro. He devoted the extra time and effort needed to prepare and complete a successful virtual inspection. His professionalism, courtesy and flexibility with this unprecedented method of inspection and documentation review was appreciated. If you should have any questions, please contact me at (916) 322-8081 or by email at kim.moule@BSCC.CA.GOV.

Sincerely,

KIMBERLY MOULE, CJM
Field Representative
Facilities Standards and Operations Division

Enclosures

cc: Chair, Board of Supervisors, San Diego County *
Presiding Judge, Superior Court, San Diego County *
County Administrator, San Diego County *
Grand Jury Foreperson, Superior Court, San Diego County *
Frank Clamser, Assistant Sheriff, San Diego County Sheriff's Office
Erika Frierson, Commander, San Diego County Sheriff's Office
Daniel Dennis, Sergeant, San Diego County Sheriff's Office

* Complete copies of this inspection are available upon request or online at the BSCC website.

**TYPE II AND III FACILITIES**

**Board of State and Community Corrections**

**PROCEDURES**[1]

**BSCC Codes: 4381 4402 4410 4420 4430 4435 4440**

| **FACILITY NAMES:** San Diego Central Jail (SDCJ)<br>Las Colinas Women's Detention (LCWD)<br>Facility #8 (FAC8)<br>South Bay Detention Facility (SBDF)<br>George Bailey Detention Facility (GBDF)<br>East Mesa Re-Entry Facility (EMRF)<br>Vista Detention Facility (VDF) | **FACILITY TYPE: II** |
|---|---|
| **PERSON(S) INTERVIEWED:** Lieutenant Joseph Navarro<br>Desk Audit Only due to COVID 19 | |
| **FIELD REPRESENTATIVE:** Kimberly Moule | **DATE:** June 25, 2020 |

| TITLE 15 SECTION | YES | NO | N/A | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|
| **1020 CORRECTIONS OFFICER CORE COURSE**[2]<br><br>(a) In addition to the provisions of California Penal Code Section 831.5, all custodial personnel of a Type I, II, III, or IV facility shall successfully complete the "Corrections Officer Core Course" as described in Section 179 of Title 15, CCR, within one year from the date of assignment. | ☒ | ☐ | ☐ | SDBM D-9 Detention Operation Training<br>All custody personnel are CORE trained. |
| (b) Custodial Personnel who have successfully completed the course of instruction required by Penal Code Section 832.3 shall also successfully complete the "Corrections Officer Basic Academy Supplemental Core Course" as described in Section 180 of Title 15, CCR, within one year from the date of assignment. | ☒ | ☐ | ☐ | |
| **1021 JAIL SUPERVISORY TRAINING**<br><br>Prior to assuming supervisory duties, jail supervisors shall complete the core training requirements pursuant to Section 1020, Corrections Officer Core Course. | ☒ | ☐ | ☐ | SDBM D-11 Detention Supervisor Training<br>All newly assigned detention sergeants, lieutenants, and professional staff supervisors shall attend the required training program within one (1) year of promotion.<br>All sergeants complete POST Supervisors' Training. |
| In addition, supervisory personnel of any Type I, II, III or IV jail shall also be required to complete either the STC Supervisory Course (as described in Section 181, Title 15, CCR) or the POST supervisory course within one year from date of assignment. | ☒ | ☐ | ☐ | |

[1] This document is intended for use as a tool during the inspection process; this worksheet may not contain each Title 15 regulation that is required. Additionally, many regulations on this worksheet are SUMMARIES of the regulation; the text on this worksheet may not contain the entire text of the actual regulation. Please refer to the complete California Code of Regulations, Title 15, Minimum Standards for Local Facilities, Division 1, Chapter 1, Subchapter 4 for the complete list and text of regulations.

[2] For STC participating agencies, consistency with training sections 1020, 1023 & 1025 is annually assessed by the STC Division. Unless otherwise indicated, the regulatory intent is for training to occur within one year from the date of assignment.

EXHIBIT W8

| TITLE 15 SECTION | YES | NO | N/A | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|
| Deaths shall be reviewed to determine the appropriateness of clinical care; whether changes to policies, procedures, or practices are warranted; and to identify issues that require further study. | ☒ | ☐ | ☐ | The Critical Incident Review Board (CIRB) will also conduct a review of all in custody deaths, other than natural causes. The CIRB will carefully review in custody deaths from multiple perspectives, including training, tactics, policies, and procedures with the ultimate goal of identifying problem areas and recommending remedial actions (Department P&P 4.23). If applicable, CIRB will make recommendations to the Suicide Prevention and Focused Response Team. |
| (b) Death of a Minor<br>In any case in which a minor dies while detained in a jail, lockup, or court holding facility: | ☐ | ☐ | ☒ | Minors are not held in these facilities. |
| (1) The administrator of the facility shall provide to the Board a copy of the report submitted to the Attorney General under Government Code Section 12525. A copy of the report shall be submitted within 10 calendar days after the death. | ☐ | ☐ | ☒ | |
| (2) Upon receipt of a report of death of a minor from the administrator, the Board may within 30 calendar days inspect and evaluate the jail, lockup, or court holding facility pursuant to the provisions of this subchapter. Any inquiry made by the Board shall be limited to the standards and requirements set forth in these regulations. | ☐ | ☐ | ☒ | |
| **1050 CLASSIFICATION PLAN**<br><br>(a) Each administrator of a temporary holding, Type I, II, or III facility shall develop and implement a written classification plan designed to properly assign inmates to housing units and activities according to the categories of sex, age, criminal sophistication, seriousness of crime charged, physical or mental health needs, assaultive/non-assaultive behavior, risk of being sexually abused, or sexually harassed and other criteria which will provide for the safety of the inmates and staff. Such housing unit assignment shall be accomplished to the extent possible within the limits of the available number of distinct housing units or cells in a facility.<br>The written classification plan shall be based on objective criteria and include receiving screening performed at the time of intake by trained personnel, and a record of each inmate's classification level, housing restrictions, and housing assignments. | ☒ | ☐ | ☐ | DSM: R.1 Inmate Classification<br>A bureau-wide computerized system (JIMS) includes a classification component which maintains required information.<br>The purpose of the Inmate Classification System is to screen, assess and house inmates in a manner that will protect the safety of the community, staff and other inmates.<br>Any person booked into a detention facility shall undergo a classification evaluation to determine an appropriate housing assignment.<br>All inmates are screened to assess their risk of being sexually abused by other inmates or being sexually abusive toward other inmates. Depending on the risk factors, and with serious consideration of the inmate's own perception of vulnerability, one or more of the following can be considered: special housing, transfer restrictions and/or an override of the inmate's custody level. The screening for risk of victimization or abusiveness will be completed on a case by case basis, tailored for that individual inmate. The inmate's participation in the screening is considered optional and in the event of a refusal to answer questions, the static known risk factors will be considered.<br>All Classification interviews are conducted in a confidential environment with dedicated trained classification staff. |

EXHIBIT W9

| TITLE 15 SECTION | YES | NO | N/A | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|
| Each administrator of a Type II or III facility shall establish and implement a classification system which will include the use of classification officers or a classification committee in order to properly assign inmates to housing, work, rehabilitation programs, and leisure activities. Such a plan shall include the use of as much information as is available about the inmate and from the inmate and shall provide for a channel of appeal by the inmate to the facility administrator or designee. An inmate who has been sentenced to more than 60 days may request a review of his classification plan no more often than 30 days from his last review.<br>*Subsection b does not apply and has been deleted.* | ☒ | ☐ | ☐ | Any person booked into a detention facility shall undergo a classification evaluation to determine an appropriate housing assignment.<br>California Penal Code section 4114 requires all inmates sentenced to over thirty (30) days be classified for custody and treatment purposes. Correctional counselors will meet with those sentenced inmates to determine what programs the inmate is eligible for based on the inmate's classification, interview and institutional behavior. Each inmate serving a jail sentence of over thirty (30) days shall be interviewed during the first third of their sentence. |
| (c) In deciding whether to assign an inmate to a housing area for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems. An inmate's own views with respect to his or her own safety shall be given serious consideration. | ☒ | ☐ | ☐ | All inmates are screened to assess their risk of being sexually abused by other inmates or being sexually abusive toward other inmates. Depending on the risk factors, and with serious consideration of the inmate's own perception of vulnerability, one or more of the following can be considered: special housing, transfer restrictions and/or an override of the inmate's custody level. The screening for risk of victimization or abusiveness will be completed on a case by case basis, tailored for that individual inmate. |
| **1051 COMMUNICABLE DISEASES**<br><br>The facility administrator, in cooperation with the responsible physician, shall develop written policies and procedures specifying those symptoms that require segregation of an inmate until a medical evaluation is completed. | ☒ | ☐ | ☐ | DSBM M-37 Communicable Disease Control<br>To protect the health and safety of employees in the presence of, or suspected presence of, infectious and/or communicable diseases and to provide information and training to employees who may come in contact with biological substances requiring respiratory and standard precautions during the performance of their duties.<br>The detention facility medical staff identifies inmates with health problems and indicates when an inmate needs special housing. The Watch Commander and Classification staffs are notified regarding medical housing needs. |
| At the time of intake into the facility, an inquiry shall be made of the person being booked as to whether or not he/she has or has had any communicable diseases, such as tuberculosis or has observable symptoms of tuberculosis or any other communicable diseases, or other special medical problem identified by the health authority. The response shall be noted on the booking form and/or screening device. | ☒ | ☐ | ☐ | DSBM M-9 Receiving Screening<br>The registered nurse (RN) assigned to receiving screening will complete a comprehensive assessment of the medical, dental and mental health needs of the arrestee and record the responses in the inmates' health record.<br><br>The policy reviewed is comprehensive and includes all relevant requirements of this regulation. |

EXHIBIT W10