ROBERT A. ORTIZ, Senior Deputy (SBN 246849)
ALEXA KATZ, Senior Deputy (SBN 317968)
Office of County Counsel, County of San Diego
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-5279; Fax: (619) 531-6005
E-mail: robert.ortiz@sdcounty.ca.gov

Attorneys for Defendants County of San Diego and Emily Chow

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHLEY R. VUZ, <br><br> Plaintiff, <br><br> v. <br><br> DCSS III, Inc., a California corporation doing business as GOSSIP GRILL; DWAYNE WYNNE, an individual; COUNTY OF SAN DIEGO, a political subdivision on the State of California, EMILY CHOW, an individual; CITY OF SAN DIEGO, a municipal corporation; MATTHEW ZADJA, an individual; and DOES NOS. 1 THROUGH 45, individuals, <br><br> Defendants. | No. 20cv0246-GPC-AGS <br><br> **DECLARATION OF DR. JON MONTGOMERY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |

I, Dr. Jon Montgomery, declare as follows:

1. I have knowledge of the matters set forth herein, and could competently testify thereto if called upon.

2. I am the Chief Medical Officer for the San Diego Sheriff's Department and oversee all of the medical and mental health care provided in the San Diego Sheriff's Department's detention facilities.

///

3. I received my medical degree from the Arizona College of Osteopathic Medicine in 2007 and have been a practicing physician for 14 years. I specialize in public health and generalized preventive medicine. Prior to working with the San Diego Sheriff's Department, I worked as a naval physician at the Navy's Environmental and Preventive Medicine Unit.

4. As the Chief Medical Officer, I am familiar with the San Diego Sheriff's Department's policies, procedures, and practices pertaining to the medical intake process and the handling of prescription medications. I am also aware of the allegations against the County of San Diego ("County") and Nurse Emily Chow, as set forth in Plaintiff Ashley R. Vuz's ("Plaintiff") Second Amended Complaint.

5. Every incoming patient transported to a detention facility is initially screened by a registered nurse to identify any potential injuries or emergency medical conditions that would immediately jeopardize the patients' health or the health of other inmates. This process is referred to as intake medical screening or medical receiving screening. During the medical screening, an intake nurse assesses vital signs, notes any visible signs of illness or injury, and asks a series of questions used to evaluate physical and psychological health, including whether the patient is taking prescription medications. The medical intake process has two essential functions: screening and the establishment of future medical care.

6. First, the patient is screened for the patient's own well-being, as well as the welfare of others in the detention facility. If the patient is medically or psychiatrically unstable they may need to be referred to a higher level of care. If this is the case, they cannot enter the facility and the arresting officer is directed to take them to an emergency room or psychiatric facility as soon as possible. This is known as the gate refusal process. Arrestees are also medically screened for the protection of others and the intake nurse evaluates the arrestee for potential communicable conditions or illnesses.

7. If, for whatever reason, the intake nurse identified a condition that required further medical evaluation or where medications or treatment would need to be

1 expeditiously delivered, for example kidney disease requiring dialysis, the patient would
2 be referred to a secondary screening for evaluation. That secondary-screening nurse
3 would conduct an examination of the patient (as opposed to a screening), provide care
4 and/or contact a provider as needed.

5     8. The second function of the medical intake process is to establish future
6 patient care and ensure that patient is entered into the medical care system. Part of this
7 process is attempting to obtain the patient's medical, surgical, and psychiatric history,
8 In order to obtain medical records from community pharmacies and clinics, the Medical
9 Services Division needs to obtain legal permission from the patient, which is why the
10 intake nurse provides releases for the patient's signature. These releases include
11 authorizing the Medical Services Division to administer medical care, and to request
12 medical psychiatric and pharmaceutical records from community providers on their
13 behalf.

14     9. The intake nurse who conducts the medical screening cannot prescribe or
15 dispense medications regardless of whether the medications are prescription or over the
16 counter. Nurses do not have the legal ability to prescribe medications. Additionally,
17 prescriptions are not able to be legally administered without an authorized medical order,
18 issued by either a physician or a clinical provider with state-granted prescription
19 authorization.

20     10. A provider can generate a prescription in two ways: (1) independent
21 verification of a pre-existing (community) prescription, that provides the ordering
22 information of medication name, quantity, dose/strength and treatment duration, or (2)
23 see the patient themselves and make their own determination on medication, quantity,
24 dose, etc.

25     11. Verifying community prescriptions can either be a rapid process or take a
26 few days depending on the response from the pharmacy or clinic. Medical care can still
27 be provided to the patient while the prescriptions are being verified. The providers cannot
28 guess or speculate regarding the medications listed by the patient because that would not

normally not be enough information to generate a prescription. (e.g. Did the patient actually have the name right? What was the dose/strength?). Once those records are received from a pharmacy or clinic, a physician then needs to review the records to ensure that the prescriptions are still active and appropriate for the patient. Based on the physician's review of the patient's medical file, they can either approve the medications or schedule an appointment with the patient. The physician may also communicate with the individual's primary care doctor or a specialist to gather more information regarding the prescribed medications.

12. The other way to order medications is through a medical encounter or clinic appointment. Then, based on the physician's expertise, the provider evaluates the patient and determines a course of treatment, which may involve medications or treatment. This process is frequently done in conjunction with verifying a patient's community pharmacy records and once those records are received the provider can adjust the medications if necessary.

13. After reviewing the medications either by verifying community prescriptions or a medical encounter, the physician will send out the prescription to a pharmacy. While San Diego County Jail facilities stock some medications, most medications need to be filled by an outside pharmacy. Once the prescription is filled, usually within a day, a nurse will administer those medications to the patient pursuant to orders from a physician.

14. The processes for obtaining prescription medications cannot be completed in ten hours. The various checks on prescription medications are necessary to ensuring the health of patients and is legal requirement before a physician can restart a community medication or obtain a new prescription for the patient.

15. Emergency care is routinely defined as 'life, limb or eyesight.' There is no evidence in medical literature to support that hormone therapy is required therapy to save any of the three. Considering that dosing levels and frequency for such medications can vary significantly, ranging from every 12 to 24 hours, to potentially once per week, a

delay of several hours in the taking of prescription medications, particularly steroids/ hormonal medications is highly unlikely to cause long term health effects. There is also no evidence in the medical literature that a few hours variance in medication dosing would have any effect on hormone therapy treatments. Based on my training and practice as a licensed physician, transition related hormone therapy for individuals who identify as transgender would not be identifiable as an emergency medical condition where urgent physician interaction was necessary.

16. It is my understanding that the Plaintiff in this case had expressed concern about potentially being exposed to Hepatitis A during the few hours she was present in the intake detention area of the San Diego Central Jail. Hepatitis A is a viral infection. Viral transmission is usually transmitted by the fecal oral route (either direct person to person contact or consumption of contaminated food or water). From my understanding, the Plaintiff was never in a cell with another individual. Additionally, all the food handlers at the San Diego Central Jail are vaccinated for Hepatitis A. The San Diego Sheriff's Department maintains robust policies and procedures to ensure that all communicable diseases are contained. Therefore, it's unlikely that Plaintiff would have been exposed to Hepatitis A at the San Diego Central Jail, as a result of those policies.

17. It is also my understanding that Plaintiff was diagnosed with the Influenza Type A about a week after her brief time in County custody. Influenza is a respiratory infection typically transmissible by aerosolized particulates (the respiratory secretions from an infected person). The typical incubation period for influenza ranges from one to four days, with the average time being two days. Considering that Plaintiff was housed individually, and had been out in the community for several days before becoming ill, the infection was most likely contracted by incidental exposure in the community.

///
///
///
///

1  I declare under penalty of perjury under the laws of the State of California that the
2  foregoing is true and correct and that this Declaration was executed on September 23,
3  2021 at San Diego, California.

_____
DR. JON MONTGOMERY